1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   RAHINAH IBRAHIM, an individual,          No. C 06-00545 WHA

11              Plaintiff,

12        v.                                  **ORDER GRANTING MOTIONS**
                                              **TO DISMISS BROUGHT BY**
13   DEPARTMENT OF HOMELAND SECURITY,         **FEDERAL DEFENDANTS,**
     MICHAEL CHERTOFF, in his official        **UNITED AIRLINES**
     capacity as                             **DEFENDANTS, AND**
14   the Secretary of the Department of Homeland  **DEFENDANT JOHN**
     Security, TOM RIDGE, in his official capacity as the  **BONDANELLA**
15   former Secretary of the Department of Homeland
     Security, TRANSPORTATION SECURITY
16   ADMINISTRATION, KIP HAWLEY, in his official
     capacity as Administrator of the Transportation
17   Security Administration, DAVID M. STONE, in his
     official capacity as Acting Administrator of the
18   Transportation Security Administration, TERRORIST
     SCREENING CENTER, DONNA A. BUCELLA, in
19   er official capacity as Director of the Terrorist
     Screening Center, NORM MINETA, in his official
20   capacity as Secretary of Transportation, FEDERAL
     AVIATION ADMINISTRATION, MARION C.
21   BLAKEY, in her official capacity as Administrator of
     the Federal Aviation Administration, FEDERAL
22   BUREAU OF INVESTIGATION, ROBERT
     MUELLER, in his official capacity as Director of the
23   Federal Bureau of Investigation, SAN FRANCISCO
     AIRPORT, CITY OF SAN FRANCISCO, COUNTY
24   OF SAN FRANCISCO, COUNTY OF SAN
     MATEO, SAN FRANCISCO POLICE
25   DEPARTMENT, UAL CORPORATION, UNITED
     AIRLINES; DAVID NEVINS, an individual,
26   RICHARD PATE, an individual, JOHN
     BONDANELLA, an individual, JOHN
27   CUNNINGHAM, an individual, ELIZABETH
     MARON, an individual, and DOES 1 THROUGH
28   100, inclusive,

                Defendants.
     _____/

*United States District Court*

*For the Northern District of California*

**United States District Court**
For the Northern District of California

# INTRODUCTION

In part, plaintiff Rabinah Ibrahim's action challenges the constitutionality of the so-called "No-Fly List," a set of watch lists maintained by the United States government to identify certain aircraft passengers as potential threats to commit violent acts while flying.  This Court lacks subject-matter jurisdiction to consider the constitutionality, maintenance, and implementation of the No-Fly List.  These questions must be resolved by the courts of appeals.

Plaintiff Ibrahim's action, however, is also a challenge to her arrest and interrogation by the San Francisco Police Department after United Airlines apparently determined that plaintiff's name was on the No-Fly List.  This Court *does* have subject-matter jurisdiction over this latter portion of plaintiff's action pertaining to her arrest.  Even with respect to this latter part of the action, however, plaintiff has failed to establish personal jurisdiction over defendant John Bondanella and has failed to state a claim against United Airlines or its employees.  Similarly, as against the numerous federal defendants named in this action, plaintiff has not made sufficient allegations to support a theory that these federal officials and agencies acted in concert with local law enforcement so as to violate plaintiff's Fourth Amendment rights under 42 U.S.C. 1983.  In sum, these defendants' motions are granted.

Plaintiff may, however, still pursue this action as against certain local-government defendants who have not joined the instant motions to dismiss, as well as against the United States Intelligence Services, Inc., a private-government contractor that was only recently added as a defendant after the instant motions were filed.

# STATEMENT

The statutory framework is decisive.

Both before and after the terrorist attacks of September 11, 2001, federal law has prohibited a host of violent or threatening conduct committed aboard aircrafts.  For example, it is a crime to commit "aircraft piracy," which is defined as "seizing or exercising control of an aircraft . . . by force, violence, threat of force or violence, or any form of intimidation, and with wrongful intent."  49 U.S.C. 46502(a)(1)(A).  It is also a crime to "take[] any action that poses an imminent threat to the safety of the aircraft or other individuals on the aircraft."  49 U.S.C.

2

46318(a).  Similarly, federal law prohibits "assaulting or intimidating a flight crew," or otherwise "interfer[ing] with the performance of the duties of the member or attendant."  49 U.S.C. 46504.  It is also impermissible to attempt to board an aircraft while in possession of a "concealed dangerous weapon."  49 U.S.C. 46505(b)(1).

Federal law has also maintained measures, both before and after the September 11 attacks, designed to prevent the above conduct from occurring.  Accordingly, federal law "provide[s] for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft," and for the use of devices capable of detecting dangerous weapons and explosives.  49 U.S.C. 44901.

On November 19, 2001, in the wake of the September 11 attacks, Congress enacted the Aviation and Transportation Security Act.  P.L. 107-71 (2001).  In the ATS Act, Congress authorized additional prophylactic measures relating to aircraft security.  One significant component of the Act was to confer the responsibility for airline security upon the Under Secretary of Transportation for Security, who is the head of the Transportation Security Administration.  Pursuant to the Act, the TSA became an agency within the Department of Transportation.  49 U.S.C. 114(a).  In March 2003, after the creation of the Department of Homeland Security, the TSA shifted and became an agency under the DHS.  6 U.S.C. 203(2).

The ATS Act stated that "[t]he Under Secretary shall prescribe regulations to protect passengers and property on an aircraft operating in air transportation or intrastate air transportation against an act of criminal violence or aircraft piracy."  49 U.S.C. 44903(b).  Likewise:

> The Under Secretary shall prescribe regulations under subsection (b) of this section that require each operator of an airport regularly serving an air carrier holding a certificate issued by the Secretary of Transportation to establish an air transportation security program that provides a law enforcement presence and capability at each of those airports that is adequate to ensure the safety of passengers.  The regulations shall authorize the operator to use the services of qualified State, local, and private law enforcement personnel.

49 U.S.C. 44903(c)(1).

**United States District Court**
For the Northern District of California

Pursuant to the ATS Act, the TSA's Under Secretary was also required to implement certain data-sharing programs between law-enforcement agencies. The Under Secretary was to "enter into memoranda of understanding with Federal agencies or other entities to share or otherwise cross-check as necessary data on individuals identified on Federal agency databases who may pose a risk to transportation or national security." 49 U.S.C. 114(h)(1). Similarly, the Under Secretary was required to:

> [E]stablish procedures for notifying the Administrator of the Federal Aviation Administration, appropriate State and local law enforcement officials, and airport or airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety.

49 U.S.C. 114(h)(2). "[I]f such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. 114(h)(3)(B).

TSA has implemented the provisions of the ATS Act through a series of security directives. One such directive is the so-called "No-Fly List," which is one subject of plaintiff Ibrahim's action.

The No-Fly List is actually comprised of two separate watch lists. One list is known as the "Selectee List." The Selectee List identifies individuals who must undergo additional security screening, above and beyond the screening imposed on all passengers. The other list is the actual "No-Fly List." The actual No-Fly List identifies individuals who are prohibited from boarding aircrafts and flying altogether. According to TSA's Deputy Assistant Administrator Joseph C. Salvator, "[b]oth lists are updated continually, and TSA requires that air carriers monitor them closely" (Salvator Decl. ¶ 7).[1]

A separate agency from the TSA known as the Terrorist Screening Center actually compiles the list of names ultimately placed on the No-Fly List.

---

[1] The ATS Act also provided secrecy for the TSA's security directives implemented pursuant to the Act. "[T]he Under Secretary shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act." 49 U.S.C. 114(s)(1). Defendants have thus submitted the directive embodying the No-Fly List under seal for *in camera* review and only roughly described the contents of the directive in their public filings (Salvator Decl. ¶ 8). This order does not reveal any of the non-public details of defendants' *in camera* filings.

United States District Court

For the Northern District of California

*          *          *

Plaintiff Rahinah Ibrahim is a citizen of Malaysia. Ibrahim is a Muslim woman. She is 41 years old. As of 2005, Ibrahim was a doctoral student at Stanford University, working on a thesis about affordable housing. She was scheduled to complete her degree in March 2005. Ibrahim has no criminal record or links to terrorist activity (First Amd. Compl. ¶¶ 4, 41).

Ibrahim had a student visa that was valid from 2001 to 2007. She and her fourteen-year-old daughter were scheduled to travel to Kuala Lumpur on January 2, 2005. The travel itinerary called for them to fly on United Airlines from San Francisco to Kuala Lumpur, with an intermediate stop in Hawaii.

On January 2 at 7:00 a.m., Ibrahim and her daughter arrived at San Francisco International Airport. Their flight was scheduled to depart at 9:00 a.m. They went to the United ticket counter, seeking to check-in. Ibrahim also requested wheelchair service, as she was suffering from abdominal pain and back pain due to complications from a recent hysterectomy surgery.

According to plaintiff, the United ticketing agent, defendant David Nevins, found Ibrahim's name on the No-Fly List (First Amd. Compl. ¶ 44). Nevins then allegedly called the San Francisco Police Department to report this information. SFPD Officers Richard Pate and J. Cunningham, also defendants in this action, arrived to investigate the report.

Officer Pate called defendant John Bondanella in Washington, D.C. At the time of the incident, Bondanella worked for defendant United States Investigations Services, Inc., which provided contract services to the United States government. USIS contracted out Bondanella's services to the TSA (Bondanella Decl. 4). Bondanella apparently confirmed that Ibrahim was on the No-Fly List and that the Officer Pate should detain Ibrahim (*ibid*.).

At 8:45 a.m., Officer Cunningham allegedly told Ibrahim she was being arrested (First Amd. Compl. ¶ 46). There is dispute between the parties whether plaintiff was "arrested" or "detained." Regardless of terminology, Ibrahim was handcuffed behind her back and escorted by officers to SFPD's police station near the airport. She was placed in a holding cell for over

5

United States District Court

For the Northern District of California

1   two hours.  While in custody, Ibrahim was questioned and searched by several officers.

2   Defendant Officer Elizabeth Maron allegedly asked Ibrahim to remove her *hijab* (*id*. at ¶ 47).[2]

3   At 11:15 a.m., the Federal Bureau of Investigation purportedly requested Ibrahim's

4   release (First Amd. Compl. ¶ 49).  Plaintiff alleged that upon her release she was told that she

5   would be removed from the No-Fly List (*id*. at ¶ 50).  Nevertheless, according to plaintiff, she

6   was subjected to heightened screening at each stop during her trip, which ultimately took place

7   the following day, January 3, 2005 — a fact she took to mean that she was still on the No-Fly

8   List (presumably the Selectee List) (*ibid*.).  After reaching Malaysia, plaintiff's student visa was

9   revoked by the United States Embassy in Malaysia (Salvator Decl. Exh. 2).

10   On January 27, 2006, Ibrahim filed a complaint against a long list of defendants.  The

11   defendants fall into four categories:  The federal defendants, the United defendants, the San

12   Francisco defendants, and John Bondanella.[3]

13   Ibrahim's complaint included claims under 42 U.S.C. 1983 against all defendants for

14   violations of her constitutional rights including:  Violation of the Due Process Clauses of the

15   Fifth and Fourteenth Amendments; violation of the Equal Protection Clause of the Fourteenth

16   Amendment; violation of the Fourth Amendment's prohibition on unreasonable searches and

17   seizures; violation of plaintiff's right to freedom of religion under the First Amendment; and

18

19   [2] "The complex phenomenon of *hijab* is generally translated into the English as *veil* with its correlate
20   seclusion."  ENCYCLOPEDIA OF ISLAM AND THE MUSLIM WORLD, 721 (Thomson Gale 2004) (emphasis in
     original).  "For many Muslim women, due to a complex of personal belief, social reenforcement, and public
21   self-image, the use of the *hijab* is an integral part of their being in the world and an outward expression of their
     inward faith that dictates modesty and chastity."  *Ibid*. (emphasis in original).

22   [3] The "federal defendants" include:  TSA; DHS; Michael Chertoff in his official capacity as Secretary
     of DHS; Tom Ridge in his official capacity as the former Secretary of DHS; Edmund S. Hawley in his official
23   capacity as Assistant Secretary of TSA; David M. Stone in his official capacity as former Administrator of TSA;
     the Terrorist Screening Center; Donna A. Bucella in her official capacity as Director of TSC; Norm Mineta in
24   his official capacity as Secretary of Transportation; the Federal Aviation Administration; Marion C. Blakely in
     her official capacity as Administrator of FAA; FBI;Robert Mueller in his official capacity as Director of FBI;
25   the Transportation Security Operations Center; and the Transportation Security Intelligence Service.

26   The "United defendants" include:  United Airlines; UAL Corporation; and United customer-service
     agent David Nevins.
27

28   The "San Francisco defendants" include:  The San Francisco International Airport; the City and
     County of San Francisco; the San Francisco Police Department; and SFPD Officers Pate, Cunningham and
     Maron.

violation of her right to freedom of association under the First Amendment.  Plaintiff also listed five claims under state law, again against all defendants, including:  violations of her civil rights pursuant to California Civil Code §§ 52.1 and 52.3; false imprisonment; intentional infliction of emotional distress; and negligent infliction of emotional distress.  Plaintiff also listed declaratory and injunctive relief as a separate cause of action.

Plaintiff sought compensatory, exemplary and punitive damages.  She also sought a declaration that "defendants' maintenance, management, and dissemination of the No-Fly List are unconstitutional;" for an injunction "requiring defendants to remedy immediately the Constitutional violations;" and for an injunction "to remove IBRAHIM's name from the No-Fly List."

On January 30, 2006, plaintiff also filed a petition based on related  allegations directly with the Ninth Circuit.  *Ibrahim v. Tran*, Case No. 06-70574.  On June 13, the Ninth Circuit transferred the petition to the Court of Appeals for the District of Columbia.

Federal defendants, United defendants, and Bondanella moved to dismiss the initial complaint and plaintiff sought leave to amend.  San Francisco defendants did not join the dismissal motions, and instead answered the complaint.  Extensive oral argument on those motions was heard on July 20, 2006.  An order issued that same day, granting plaintiff leave to amend and allowing defendants to renew their motions to dismiss, so as to address any potential changes in the jurisdictional landscape following the amendment.

The amended complaint was filed on August 4, 2006 (although defendants had access to the amended complaint prior to the July 20 hearing).  The amended complaint left in tact all of the allegations and legal claims from the initial complaint, but added three entities to the list of federal defendants:  The Transportation Security Operations Center ("TSOC"); the Transportation Security Intelligence Service ("TSIS"); and the United States Intelligence Services, Inc. ("USIS").  Summons was only issued to these three defendants on August 7, 2006.  Because the jurisdictional questions pertaining to USIS as a private entity incorporated in Virginia and unaffiliated with the other defendants may be unique, no findings are made with

1  respect to USIS in this order.  The holdings pertaining to federal defendants herein apply

2  equally to TSOC and TSIS, however.  (Federal Dfdts' Supp. Br. 2).

3       This order is based on a consideration of the briefing for the initial motions to dismiss,

4  the oral argument, and the supplemental briefing of the parties in response to plaintiff's

5  amended complaint.

6                                    **ANALYSIS**

7       Federal defendants, United defendants and Bondanella jointly argue that this Court lacks

8  subject-matter jurisdiction.  Bondanella also contends there is no personal jurisdiction over him

9  for purposes of this action.  All three sets of defendants also raise arguments as to the

10  sufficiency of the claims under FRCP 12(b)(6).

11  **1.      SUBJECT-MATTER JURISDICTION**

12       Pursuant to FRCP 12(h)(3), a court shall dismiss the action if it lacks subject-matter

13  jurisdiction over the case.  To avoid dismissal, plaintiff must "show that the facts alleged, if

14  proved, would confer standing upon him."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d

15  1136, 1140 (9th Cir. 2003).  A court "must accept as true all material allegations of the

16  complaint, and must construe the complaint in favor of the complaining party."  *Warth v.*

17  *Seldin*, 422 U.S. 490, 501 (1975).  While materials outside the complaint are generally not

18  considered, a court may take judicial notice of "matters of public record."  *Lee v. City of Los*

19  *Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted).

20  **A.      Claims Pertaining to Constitutionality and Implementation of the**
         **No-Fly List.**

21

22       Congress has enacted a special review statute for final orders of the Secretary of

    Transportation promulgated under the Federal Aviation Act:

23

24            a person disclosing a substantial interest in an order issued by the
              Secretary of Transportation (or the Under Secretary of
              Transportation for Security with respect to security duties and
25            powers designated to be carried out by the Under Secretary or the
              Administrator of the Federal Aviation Administration with respect
26            to aviation duties and powers designated to be carried out by the
              Administrator) in whole or in part under this part, part B, or
27            subsection (l) or (s) of section 114 *may apply for review of the*
              *order by filing a petition for review in the United States Court of*
28            *Appeals for the District of Columbia Circuit or in the court of*

                                        8

> *appeals of the United States for the circuit in which the person*
> *resides or has its principal place of business.*

49 U.S.C. 46110(a) (emphasis added).

"Accordingly, whether the district court had jurisdiction over Gilmore's claims turns on whether the Security Directive that established the identification policy is an 'order' within the meaning of this statute." *Gilmore v. Gonzales*, 435 F.3d 1125, 1132 (9th Cir. 2006). "Courts have given a broad construction to the term 'order' in Section 1486(a) [46110's predecessor]." *Ibid*. (citation omitted). The *Gilmore* court explained that:

> "Order" carries a note of finality, and applies to any agency
> decision which imposes an obligation, denies a right, or fixes
> some legal relationship. In other words, if the order provides a
> "definitive" statement of the agency's position, has a "direct and
> immediate" effect on the day-to-day business of the party
> asserting wrongdoing, and envisions "immediate compliance with
> its terms," the order has sufficient finality to warrant the appeal
> offered by section [46110].

*Ibid*. (quoting *Crist v. Leippe*, 138 F.3d 801, 804 (9th Cir.1998)).

Here, the TSA's directive of the No-Fly List is an "order" under the ambit of Section 46110. Our sister district recently tackled this exact question in *Green v. Transportation Security Administration*, 351 F. Supp. 2d 1119, 1124 (W.D. Wash. 2005). *Green*, like the instant action, involved a constitutional challenge to the implementation and maintenance of the No-Fly List. The *Green* opinion concluded that the No-Fly List was an order under Section 46110 because:

> These Security Directives provide a definitive statement of the
> TSA position and have a direct and immediate effect on persons
> listed on the No-Fly List, barring travel on commercial aircraft.
> Each aircraft operator is required by law to comply immediately
> with Security Directives.

*Id*. at 1124–25. Accordingly, all of the requirements under *Gilmore* for an "order" are satisfied. The No-Fly List is an order of the TSA.

Indeed, it appears that the Ninth Circuit has already ruled in *this case* that the special jurisdictional provisions of Section 46110 apply to plaintiff's constitutional challenges to the No-Fly List. As noted above, plaintiff filed a direct petition to the Ninth Circuit based on similar allegations in the complaint she filed in this Court. According to the Ninth Circuit's

**United States District Court**
For the Northern District of California

1  docket, the Ninth Circuit transferred the action to Court of Appeals for the District of Columbia

2  on June 13 for the following reason (Federal Defdts' Reply Br. Exh. 1):

> This is a petition for review of a Security Directive of the
> Transportation Security Administration.  A petition for review
> must be filed in "the USCA for the Dist. of Columbia Circuit or in
> the ct of appeals of the US for the circuit in which [petr] resides
> or has its principal place of business."  Petr works & resides in
> Malaysia.  Accordingly, we transfer this petition for review to
> USCA for the Dist. of Columbia Circuit.

7  Thus on the same challenge to the No-Fly List before us, the Ninth Circuit has deemed that

8  plaintiff must comply with the special review procedures of Section 46110.

9  Nevertheless, plaintiff contends there are reasons why dismissal for lack of subject-

10  matter jurisdiction under Section 46110 is not required here as to her challenge to the

11  constitutionality of the No-Fly List.

12  *First*, plaintiff argues that Section 46110 no longer applies to orders of TSA because

13  TSA is under the umbrella of the Department of Homeland Security, rather than the Department

14  of Transportation.  Section 46110, it is argued, only requires review in the courts of appeals for

15  orders by the Secretary of Transportation or the Under Secretary of Transportation for Security,

16  not the heads of DHS.

17  This argument lacks merit.  At the time the ATS Act was passed, the head of TSA *was*

18  also the Under Secretary of Transportation for Security.  Thus Section 46110's reference to the

19  Under Secretary manifests Congress' intent to place orders of the TSA in the hands of the

20  courts of appeals.  The fact that the language of Section 46110 was not amended after the

21  creation of DHS does not alter the reality that TSA's security directives involve aviation

22  security — the exact directives over which Section 46110 vested exclusive jurisdiction in the

23  courts of appeals.

24  *Second*, plaintiff similarly argues that Section 46110 does not apply because the

25  Terrorist Screening Center rather than TSA maintains the names on the No-Fly List.  This

26  argument ignores the reality of administrative-agency operations.  Congress authorized TSA,

27  not TSC, to implement directives to promote and assure the safety of passengers on aircrafts.

28  TSA, in fulfilling this Congressional mandate, may rely on outside agencies to assist with

implementation of its security directives.  At the end of the day, however, the directives were

issued by TSA and TSA bears the ultimate responsibility for their implementation.

*Third*, plaintiff contends that this Court retains jurisdiction over orders "collateral" to

TSA's No-Fly List directive.  The "Passenger Identification Verification" process, it is argued,

is such a collateral order that falls outside of Section 46110.

The Passenger Identification Verification process allows individuals to submit

identification in advance of travel and thereby assure that they are not mistaken for being on the

No-Fly List.  TSA's website explains the function of the Passenger Identification Verification

process as follows (RJN Exh. Q) (emphasis added):

> Please understand that the TSA clearance process *will not remove
> a name from the Watch Lists*.  Instead this process distinguishes
> passengers from persons who are in fact on the Watch Lists by
> placing their names and identifying information in a cleared
> portion of the Lists.  Airline personnel can then more quickly
> determine when implementing TSA-required identity verification
> procedures that these passengers are not the person of interest
> whose name is actually on the Watch Lists.

Plaintiff argues that the Passenger Identification Verification process is akin to the

Ombudsman Clearance Procedure which was deemed to be a collateral order outside of the

reach of Section 46110 in *Green*, *supra*.  The Ombudsman procedure at issue in *Green* similarly

provided a means for individuals placed on the No-Fly List to seek administrative appeal of the

placement.  The *Green* court accordingly let the plaintiffs proceed on their claim under the Due

Process Clause of the Fifth Amendment, alleging that the defendants "failed to provide

constitutionally adequate mechanisms for Plaintiffs to avoid being subjected to the stigma,

interrogations, delays, enhanced searches, detentions, and/or other travel impediments

associated with having a name identical or similar to a name on the No-Fly List."

351 F. Supp. 2d at 1128–29.

It is true that *Green* found the Ombudsman Clearance procedure challengeable in district

court.  But the difference here is that plaintiff is not actually challenging the Passenger

Identification Verification process.  Plaintiff did not raise allegations in her amended complaint

about the procedures for "clearing" herself as *not* on the No-Fly List.  Instead, plaintiff

challenged the fact that she *was* on the No-Fly List.  Accordingly, federal defendants conceded

11

during oral argument that plaintiff was on the No-Fly List.  The plaintiffs in *Green*, in contrast, were challenging the inadequacy of the process for avoiding the stigma resulting from confusion with names actually on the list.  Here, even if this clearance procedure is a collateral order, it is not genuinely implicated by plaintiff's amended complaint so as to confer subject-matter jurisdiction on this Court.

*Fourth*, plaintiff contends that since her claims are broad constitutional challenges to the No-Fly List, Section 46110 does not apply.  This argument fails under *Gilmore*:  "[T]he district court is divested of jurisdiction only if the claims are 'inescapably intertwined with a review of the procedures and merits surrounding the . . . order.'"  *Gilmore*, 435 F.3d at 1133 n. 9 (quoting *Mace v. Skinner*, 34 F.3d 854, 858 (9th Cir.1994)).

As explained in *Gilmore*, facial constitutional challenges to TSA directives are inescapably intertwined with a review of the merits of the directives and of the procedures implementing the directives.  All of plaintiff's claims, whether clothed in constitutional language or not, attack the merits of the implementation of the No-Fly List.

### B.       Claims Pertaining to Plaintiff's Alleged Arrest.

Defendants have conceded that the jurisdictional bar of Section 46110 is inapplicable to the extent plaintiff has stated claims unrelated to the propriety and implementation of the No-Fly List.  The Court's jurisdiction regarding plaintiff's claims specific to her arrest and subsequent is essentially uncontroverted.  This includes plaintiff's Fourth Amendment claim and her claim under common-law tort principles.

This part of plaintiff's action surrounds her claims that defendants "arrested her, and searched her without any probably [sic] cause or an arrest or search warrant" (First Amd. Compl. ¶ 75).  Significantly, the federal defendants conceded at oral argument, the security directives do not provide for the arrest of an individual identified as being on the No-Fly List. Resolution of plaintiff's Fourth Amendment claims and her tort claims, thus, will not hinge on a determination of the merits of the No-Fly List procedures.  On the contrary, the fact issues will involve whether the arrest/detention and interrogation were proper, independent of plaintiff's placement on the No-Fly List.

**United States District Court**
For the Northern District of California

12

United States District Court

For the Northern District of California

Plaintiff's claims regarding the constitutionality of her arrest/detention under the Fourth Amendment and under common-law tort principles are not intertwined with the broader challenges to the No-Fly List and are, therefore, not subject to Section 46110.

*             *             *

There is still no subject-matter jurisdiction, however, over *federal defendants* with respect to plaintiff's *tort-law claims*.  "The FTCA [Federal Tort Claims Act] waives the government's sovereign immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment."  *Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006).  Plaintiff, however, has failed to comply with the procedural requirements expressed in 28 U.S.C. 2675(a).  That section provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

Plaintiff failed to file an administrative tort complaints against federal defendants until June 7, 2006, *after* she initiated this action in federal court (RJN Exhs. J–N).  Her common-law tort claims against federal defendants, therefore, must be dismissed for want of jurisdiction.

### 2.   PERSONAL JURISDICTION OVER DEFENDANT BONDANELLA.

Defendant Bondanella also moves to dismiss plaintiff's claims against him for lack of personal jurisdiction.  When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff carries the burden of demonstrating that personal jurisdiction exists.  *Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir. 1984).

Defendant Bondanella's alleged contacts with the forum include:  (1) having previously lived in California from 1987–1992; (2) traveling to California a few times after leaving in 1992; and (3) fielding telephone calls from all parts of the country including California as an employee with a private contracting firm for the United States government, including purportedly answering the call about plaintiff Ibrahim from SFO in January 2005.  This order

United States District Court

For the Northern District of California

1    finds that these contacts are insufficient to support the exercise of either general or specific

2    personal jurisdiction over Bondanella.

3                    **A.    General Jurisdiction.**

4         In order for a court to exercise general jurisdiction over a nonresident defendant, the

5    plaintiff must demonstrate that the defendant's contacts with the forum state are "substantial"

6    or "continuous and systematic."  *Helicopteros Nacionales de Columbia, S. A. v. Hall*, 466 U.S.

7    408, 416 (1984).  "[I]n a controversy unrelated to a defendant's contacts with the forum, a court

8    may exercise general jurisdiction only where 'continuous corporate operations within a state are

9    thought so substantial and of such a nature as to justify suit against the defendant on causes of

10   action arising from dealings entirely distinct from those activities.'"  *Tauzon v. R.J. Reynolds*

11   *Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quoting *Int'l Shoe v. Washington*, 326 U.S.

12   310, 318 (1945)).  "The standard for establishing general jurisdiction is 'fairly high,' and

13   requires that the defendant's contacts be of the sort that approximate physical presence."

14   *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

15        Here, Bondanella's contacts in no way "approximate physical presence."  While

16   Bondanella once lived in California, he left California thirteen years before the incidents

17   involving plaintiff.  Plaintiff has not demonstrated that Bondanella's occasional business trips to

18   California after moving away were systematic — sporadic business visits are insufficient.  *See*

19   *Helicopteros*, 466 U.S. at 417 ("Visits on such business, even if occurring at regular intervals,

20   would not warrant the inference that the corporation was present within the jurisdiction")

21   (internal citation omitted).  Likewise, Bondanella's work as a private-contract employee for the

22   TSA in Washington, D.C. failed to provide the type of continuous contacts required.

23   Bondanella apparently received sporadic phone calls from California, just as he likely received

24   phone calls from virtually every jurisdiction.  This is not enough for general jurisdiction.  *See*

25   *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984) ("Making telephone calls

26   and sending telexes and letters to Tucson are not activities which support a finding of general

27   jurisdiction").

28

                                          14

**United States District Court**
For the Northern District of California

**B.     Specific Jurisdiction.**

Specific jurisdiction over a defendant exists where:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citation omitted).  Again, plaintiff carries the burden of demonstrating that personal jurisdiction exists.  *Cubbage*, 744 F.2d at 667.

(1)     *Purposeful Direction*.

"[T]o have purposefully availed oneself of conducting activities in the forum, the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."  *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988).  When an intentional tort claim is asserted, the "effects test" is utilized for the purposeful-availment analysis.  The "effects test" requires that "the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Dole Food*, 303 F.3d at 1111.

Plaintiff alleges that Bondanella's intentional acts in California included receiving the phone call from SFO on January 2, 2005, and by purportedly instructing SFPD officers at SFO to "detain" plaintiff.  These allegations satisfy the intentional act requirement.  While simply receiving a phone call may arguably be involuntary, the subsequent purported direction to detain plaintiff, at least, was intentional.

Nevertheless, Bondanella cannot be deemed to have taken an act "expressly aimed at the forum state."  As the Ninth Circuit recently explained, it is not the case "that a foreign act with foreseeable effects in the forum state will always give rise to specific jurisdiction.  We have said

15

that there must be 'something more' . . . that 'something more' is what the Supreme Court described as 'express aiming' at the forum state." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006). As in *Pebble Beach*, Bondanella "hatched no such plan directed" at the forum. Furthermore, where a defendant's forum-related activities "were conducted for the sole purpose of fulfilling its obligation," the defendant has not purposely availed itself of the protections of the forum-state's law. *Davis v. Am. Family Mut. Ins. Co.*, 861 F.2d 1159, 1162 (9th Cir. 1988). Finally, "ordinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.'" The purported purposeful action was a phone call *received* by Bondanella. *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (internal citation omitted).[4]

### (2)    *Arising Out of Bondanella's Activities.*

If this order found that Bondanella's receipt of the phone call and accompanying directions to Officer Pate constituted purposeful availment, specific jurisdiction requires that these acts must be the ones giving rise to the current suit. "We measure this requirement in terms of 'but for' causation." *Bancroft & Masters*, 223 F.3d at 1088. Since this order finds Bondanella did not so purposefully avail himself this consideration is moot.

### (3)    *Reasonableness.*

Personal jurisdiction would not even be reasonable as to Bondanella, even if all of the above factors were satisfied. "Once it has been decided that a defendant purposefully established minimum contacts with a forum, 'he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' in order to defeat personal jurisdiction." *Dole*, 303 F.3d at 1114 (internal citation omitted).. The Ninth Circuit has identified seven factors relevant to the reasonableness inquiry. They include: (1)

---

[4] The third part of the "effects test" is satisfied as to Bondanella. "[T]he 'brunt' of the harm need not be suffered in the forum state" — there simply must have been "a jurisdictionally sufficient amount of harm . . . suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006). Plaintiff's alleged harm of being unlawfully detained was suffered in California, as Bondanella presumably knew it would be, regardless of plaintiff's Malaysian citizenship.

United States District Court

For the Northern District of California

the extent of the defendant's purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*First*, the extent of Bondanella's injection into California's affairs is extremely limited. He received a phone call from California authorities — he did not initiate the call.  He merely confirmed the information based on his obligations as a contract employee of the TSA.  After he relayed the relevant information to Officer Pate, Bondanella was completely out of the picture.

*Second*, Bondanella will be greatly burdened by having to defend himself in California. As a resident of Virginia, he is being asked to defend litigation on the opposite side of the country.  He is an individual lacking the resources of the other governmental and corporate entities in this litigation.  This is a strong factor against asserting jurisdiction.

*Third*, it is a neutral factor as to whether there is conflict with the sovereignty of defendant's state.

*Fourth*, California's interest in avoiding unlawful arrests is not controlling.  While California's interest is real, it is diminished given the citizenship of the parties.  Plaintiff is a Malaysian citizen.  Bondanella is a Virginia citizen.  Plaintiff's selected forum lacks sufficient interest necessary, standing alone, to render personal jurisdiction reasonable.  *See, e.g.*, *Asahi Metal Indus. Co., Ltd. v. Cheng Shin Rubber Indus. Co., Ltd.*, 480 U.S. 102, 114–15 (1987).

*Fifth*, the factor of efficient resolution does not tip the balance in favor of a California forum.  Some witnesses such as the SFPD Officers are located in California.  Others, however, including the federal agencies and officials, Ibrahim, and Bondanella are located outside of California.

*Sixth*, a California forum also does not appear to be crucial to resolution of Ibrahim's claims against Bondanella.  The convenience factor is generally of limited importance, particularly so where plaintiff is not present in the jurisdiction and can just as easily get resolution in another forum (Washington, D.C. or Virginia).  *See, e.g.*, *Ziegler v. Indian River*

**United States District Court**
For the Northern District of California

1    *County*, 64 F.3d 470, 476 (9th Cir. 1995).  Indeed, Ibrahim is already litigating her appellate

2    petition in the Washington, D.C. Circuit Court of Appeals.  Thus, California adds little

3    substantive or practical value as a forum for plaintiff's claims against Bondanella.

4         *Seventh*, as noted, plaintiff could pursue her claims against Bondanella in either Virginia

5    or Washington, D.C., where he resided and worked and continues to reside and work.

6         At bottom, even if Bondanella's contacts with California were sufficient, it would be

7    unreasonable to allow him to be haled into court in this jurisdiction for the minimal contacts

8    arising out of the phone call from Officer Pate.  To rule otherwise, would subject an employee

9    like Bondanella to be haled into any court in the country any time he responded to calls from

10   local law enforcement and instructed law enforcement as to his perceived proper course of

11   conduct.  Plaintiff's claims against Bondanella must be dismissed.

12        **3.     FAILURE TO STATE A CLAIM.**

13        United defendants and federal defendants both move to dismiss the surviving portions of

14   plaintiff's claims on grounds that plaintiff has failed to state a claim under FRCP 12(b)(6).

15        A motion to dismiss under FRCP 12(b)(6) tests for legal sufficiency of the claims

16   alleged in the complaint.  A complaint should not be dismissed "unless it appears beyond doubt

17   that the plaintiff can prove no set of facts in support of his claim which would entitle him to

18   relief."  *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  On the other hand, "conclusory

19   allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for

20   failure to state a claim."  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

21        **A.     United Defendants.**

22        Plaintiff's allegations against United defendants consist exclusively of the following.

23   United ticket agent David Nevins requested plaintiff's ticket during check-in.  After apparently

24   finding that plaintiff was on the No-Fly List, Nevins allegedly placed a call to the SFPD

25   informing them of the situation and requesting that officers come to the check-in counter.

26        These allegations, even if borne out, cannot establish a constitutional violation or a

27   tortious act.  Essentially United did nothing more than it was legally *required* to do.

28

(2)     *State Claims.*

California law affords an *unqualified* privilege to citizen reports to law-enforcement personnel.  *See* Cal. Civ. Code § 47(b).  "[T]he overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b)."  *Hagberg v. Cal. Fed. Bank FSB*, 32 Cal. 4th 350, 364 (2004).  Accordingly, "communications are privileged under section 47(b) when they are intended to instigate official governmental investigation into wrongdoing, including police investigation." *Id*. at 370.  *Hagberg* only left open the possibility that a police report that constituted malicious prosecution or that was filed with racial animus would survive the privilege.  *Id.* at 375–76.  Otherwise, all such claims must fail as a matter of law.

Plaintiff's allegations here against United defendants fall far short the exceptions. Plaintiff has not alleged that United defendants acted with malice or racial animus.  There are no allegations that Nevins deliberately sought to punish plaintiff or that Nevin's selected plaintiff's name because of ethnic prejudice.  There are not even any allegations that Nevins incorrectly reported plaintiff being on the No-Fly List.  Plaintiff's allegations have simply described Nevins as following protocol.  The allegations suggest that Nevins read plaintiff's name off a list, which neither he nor United created or maintained, and then contacted SFPD. No state claims can survive against United defendants.

(2)     *Federal Claims.*

Similarly, plaintiff has failed to state a Section 1983 claim against United defendants. The Ninth Circuit explained that a private defendant compelled to take an action at the behest of the government is unlikely to be liable under Section 1983:

> [I]n a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is "fairly attributable" to the private defendant.  Indeed, without some other nexus between the private entity and the government, *we would expect that the private defendant is not responsible for the government's compulsion*.

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999).  "When the state compels a private party to discriminate against members of a racial minority, it is the state

1  action, not the private conduct, which is unconstitutional . . . .  [A] private party in such a case

2  is 'left with no choice of his own' and consequently should not be deemed liable."  *Ibid*.

3  (internal citation omitted).  *See also Rivera v. Green*, 775 F.2d 1381, 1384 (9th Cir. 1985)

4  (holding that plaintiff failed to state a Section 1983 claim against private citizens who contacted

5  police about plaintiff's noisy party).

6        Plaintiff's allegations here against United defendants fall far short of the constitutional

7  threshold.  As noted above, plaintiff has not alleged that United defendants acted with hostility

8  or racially-discriminatory motive directed toward plaintiff.  Again, the allegations simply

9  indicate that Nevins read plaintiff's name off a list compiled by the federal government and

10  stopped plaintiff from traveling — all as Nevins and United Airlines were required to do.

11        All of plaintiff's claims against United defendants are, therefore, dismissed with

12  prejudice.  *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) ("The district

13  court's discretion to deny leave to amend is particularly broad where plaintiff has previously

14  amended the complaint") (internal citation omitted).

15               **B.**       **Federal Defendants.**

16        As stated above, this Court has jurisdiction to determine whether plaintiff's alleged

17  arrest violated plaintiff's Fourth Amendment rights pursuant to Section 1983.  Federal

18  defendants, however, argue that they cannot be sued under Section 1983, even if this Court has

19  subject-matter jurisdiction over plaintiff's Fourth Amendment claim.  This order agrees.

20        Section 1983 provides a remedy for violations committed under color of state law.

21  "[F]ederal officials who violate federal rights protected by § 1983 generally do not act under

22  'color of state law.'"  *Kali v. Bowen*, 854 F.2d 329, 331 (9th Cir. 1988).  A limited exception to

23  this rule is that federal officials may be liable when they conspire with state officials.

24  "Although federal officials acting under federal authority are generally not considered to be

25  state actors, they may be liable under § 1983 if they are found to have conspired with or acted in

26  concert with state officials to some substantial degree."  *Cabrera v. Martin*, 973 F.2d 735, 742

27  (9th Cir. 1992).

28

**United States District Court**
For the Northern District of California

1    Plaintiff here has not made any reasonable allegations that her purportedly

2    unconstitutional arrest and interrogation was the result of a conspiracy between federal

3    defendants and local law enforcement.  Other than Bondella individually, there is no plausible

4    theory by which any federal defendant acted in concert with any police officer.  As noted, this

5    Court lacks personal jurisdiction over Bondanella.  Accordingly,  no Section 1983 claim can

6    survive as to any federal defendant.

7                                            **CONCLUSION**

8        For the foregoing reasons, all of plaintiff's claims against defendant Bondanella, United

9    defendants, and federal defendants are dismissed with prejudice.  Partial judgment will be

10   entered as to these defendants pursuant to FRCP 54(b) so as to allow plaintiff to seek immediate

11   appeal of this order.  These are separable claims from plaintiff's claims against the remaining

12   defendants and are fully adjudicated by this order.  There is no just reason for delay given the

13   novelty and seriousness of the legal issues involved in plaintiff's claims.  *See, e.g.*, *Purdy*

14   *Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313, 1316 (9th Cir. 1979).

15       Of course, all of plaintiff's claims against San Francisco defendants may proceed, as

16   those defendants have not sought dismissal.  Likewise plaintiff's claims against defendant

17   United States Intelligence Services, Inc. may proceed, as USIS was only recently added to this

18   litigation and has not yet responded.

19

20       **IT IS SO ORDERED.**

21

22   Dated:  August 16, 2006.                              _____

23                                                          WILLIAM ALSUP
                                                            UNITED STATES DISTRICT JUDGE

24

25

26

27

28