IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAHINAH IBRAHIM,

    Plaintiff,

v.

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

    Defendants.

No. C 06-00545 WHA

**ORDER ON MOTIONS TO DISMISS**

## INTRODUCTION

This action challenges the placement of plaintiff's name on the "no-fly list," a list maintained by the United States government and circulated to carriers serving the United States. Defendants move to dismiss certain claims in plaintiff's second amended complaint.

Contrary to the federal defendants, this order finds that plaintiff has standing. Plaintiff's claims seeking future relief as to the federal defendants may not go forward, however, because, as a non-resident alien who voluntarily left the United States, the Constitution no longer applies to her. As to her damage claims for *past* violations, a different problem arises, namely the stricter pleading standard in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Her claims for equal protection, freedom of religion, and freedom of association asserted against the San Francisco defendants and defendant John Bondanella must be dismissed but without prejudice to seeking to amend after discovery. While her claims of false imprisonment and interference with the exercise

of civil rights are dismissed as to defendants Bondanella and USIS, those claims will go forward against the San Francisco defendants. The San Francisco defendants and defendants Bondanella and USIS did not challenge plaintiff's Fourth Amendment claims and emotional distress claims against them, so she may also proceed with those claims and may take discovery as to the entire incident.

**STATEMENT**

Before the terrorist attacks of September 11, 2001, federal law maintained measures to prevent violent or threatening conduct, including "the screening of all passengers and property . . . that will be carried aboard a passenger aircraft." 49 U.S.C. 44901. After the September 11 attacks, Congress enacted the Aviation and Transportation Security Act, which authorized additional prophylactic measures relating to aircraft security. The Act placed the responsibility for airline security on the Under Secretary of Transportation for Security, who is the head of the Transportation Security Administration. Pursuant to the Act, the TSA became an agency within the Department of Transportation. 49 U.S.C. 114(a). In March 2003, after the creation of the Department of Homeland Security and passage of the Homeland Security Act, the TSA shifted and became an agency under the DHS. 6 U.S.C. 203(2).

According to the Act, "[t]he Under Secretary shall prescribe regulations to protect passengers and property on an aircraft operating in air transportation or intrastate air transportation against an act of criminal violence or aircraft piracy." 49 U.S.C. 44903(b). It further stated:

> The Under Secretary shall prescribe regulations under subsection (b) of this section that require each operator of an airport regularly serving an air carrier holding a certificate issued by the Secretary of Transportation to establish an air transportation security program that provides a law enforcement presence and capability at each of those airports that is adequate to ensure the safety of passengers. The regulations shall authorize the operator to use the services of qualified State, local, and private law enforcement personnel.

49 U.S.C. 44903(c)(1).

The Act also required the TSA's Under Secretary to implement certain data-sharing programs between law-enforcement agencies. The Under Secretary was to "enter into

2

memoranda of understanding with Federal agencies or other entities to share or otherwise cross-check as necessary data on individuals identified on Federal agency databases who may pose a risk to transportation or national security." 49 U.S.C. 114(h)(1). Similarly, the Under Secretary was required to:

> [E]stablish procedures for notifying the Administrator of the Federal Aviation Administration, appropriate State and local law enforcement officials, and airport or airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety.

49 U.S.C. 114(h)(2). "[I]f such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. 114(h)(3)(B).

TSA has implemented the provisions of the Act through a series of security directives. One such directive is the "no-fly list," which is the subject of this action. The Terrorist Screening Center compiles the list of names ultimately placed on the no-fly list. The Act also provided for secrecy of the security directives: "the Under Secretary shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act." 49 U.S.C. 114(s)(1).

\*      \*      \*

Plaintiff Rahinah Ibrahim alleges that the "no-fly list" consists of two watch lists that names individuals perceived to be threats to aviation security: (1) the "no-fly" list contains names of people that airlines are prohibited from transporting; (2) the "selectee" list contains names of people who are subject to additional screening prior to boarding a plane (Second Amd. Compl. ¶ 30). Both the "no-fly" list and "selectee" list are collectively referred to as the "no-fly list" herein.

Ibrahim is a Muslim woman. She is a citizen of Malaysia, not the United States. In 2005, she was a doctoral student at Stanford University preparing a thesis on affordable housing. She was scheduled to complete her doctoral degree in March 2005. According to the pleading, she has no criminal record or links to terrorist activity.

3

On January 2, 2005, Ibrahim had a flight scheduled to Kuala Lumpur, with a stopover in Hawaii, to present her research at a conference sponsored by Stanford. At approximately 7:00 a.m. on January 2, Ibrahim and her fourteen-year-old daughter arrived at San Francisco International Airport for their 9:00 a.m. flight. They proceeded to the United Airlines ticket counter to get their boarding passes and check their bags. Ibrahim requested wheelchair transportation to the gate because she suffered from back and abdominal pain as a result of a recent hysterectomy and subsequent complications (*id.* at ¶ 38).

David Nevins, a United Airlines employee, asked to see Ibrahim's ticket. According to Ibrahim, Nevins called the San Francisco Police Department and told them that Ibrahim's name was on the no-fly list. Defendant Officers Richard Pate and J. Cunningham, who work for SFPD, arrived at the airport. Officer Pate then called defendant John Bondanella in the District of Columbia. At that time, Bondanella was employed as a watch officer for the Transportation Security Operations Center by defendant United States Investigations Services, Inc., a private corporation that provided contract services to the TSOC. During the telephone conversation, Bondanella allegedly "told defendant, Pate, to not allow Ibrahim on the flight, to contact the FBI, and to detain Ibrahim for questioning" (*id.* at ¶ 39).

At 8:45 a.m., Officer Cunningham allegedly told Ibrahim she was being detained. Ibrahim was handcuffed with her hands behind her back and taken to the SFPD police station. No one told her why she was being detained. At the police station, she was searched by defendant Officer Elizabeth Maron, who allegedly tried to remove Ibrahim's hijab, searched under her hijab, and did so in view of other male officers. She was placed in a holding cell for approximately two hours. At 11:15 a.m., the FBI requested that she be released.

Defendants allegedly told Ibrahim that her name had been removed from the no-fly list (*id.* at ¶ 45). The next day, however, she "discovered that she was still on the no-fly list when she attempted to fly again" (*ibid.*). Exactly what occurred is not revealed by the pleading. She was eventually allowed to fly to Kuala Lumpur from San Francisco, but at the San Francisco airport and every stopover, she was publicly subjected to enhanced searches before boarding any flights.

4

1 Ibrahim was scheduled to return to Stanford in March 2005 to complete her degree.
2 Ibrahim went to the Kuala Lumpur International Airport on March 10, 2005, to try to fly back
3 to the United States (Ibrahim Decl. ¶ 14). At the time, she believed she had a valid student visa.
4 The ticketing agent, however, would not allow her to fly. The ticketing agent told her she had to
5 wait until he received clearance from the United States embassy. Another ticketing agent later
6 informed her there was a note by her name instructing airport personnel to call the police and
7 have her detained (*ibid.*).

8 To try to clear her name, Ibrahim submitted a request for passenger identity verification
9 to the Transportation Security Administration on March 24, 2005. In March 2006, a letter from
10 TSA ambiguously responded that where "it has been determined that a correction to records is
11 warranted, these records have been modified" (Second Amd. Compl. ¶ 46). Also in 2005, a letter
12 from the United States embassy in Malaysia informed Ibrahim that her student visa had been
13 revoked. She has not re-applied for a visa. And in 2005, she filed a claim with the City and
14 County of San Francisco regarding damages she allegedly suffered, but the claim was rejected.

15 Ibrahim commenced this action in 2006. Defendant Bondanella, the United Airlines
16 defendants, and the federal defendants moved to dismiss the complaint. The San Francisco
17 defendants did not join the motions. An order held subject-matter jurisdiction was lacking,
18 because the no-fly list was an order of the TSA under the ambit of 49 U.S.C. 46110(a), which
19 granted exclusive jurisdiction to the federal courts of appeals to review orders of the TSA.
20 The order also dismissed plaintiff's claims against defendant Bondanella, the United Airlines
21 defendants, and the federal defendants. The Ninth Circuit affirmed in part, reversed in part,
22 and remanded. The Ninth Circuit concluded that the district court has original jurisdiction
23 over Ibrahim's claim for injunctive relief regarding *placement* of her name on the no-fly list.
24 The Ninth Circuit affirmed the determination that the district court, however, did not have
25 jurisdiction over Ibrahim's claim for injunctive relief regarding the government's policies and
26 procedures *implementing* the no-fly list. The Ninth Circuit also held that: the federal defendants'
27 actions were not state actions under 42 U.S.C. 1983; the airline defendants were not state actors
28 under Section 1983; the tort claims against the airline defendants were precluded; the tort claims

5

against the federal officials in their official capacities were precluded; and that specific jurisdiction was available for the claims against Bondanella, who was sued in his individual capacity.

On the issue of standing, the Ninth Circuit stated:

> The government argued below, as it does here, that the No-Fly List causes Ibrahim no concrete injury because she now lives in Malaysia and doesn't have a U.S. visa. But Ibrahim points out that she may apply for a visa in the future and that, even if she does not, the fact that her name is on the list still prevents her from "board[ing] a United States airline" anywhere in the world. Whether Ibrahim has standing to bring a claim for removal of her name from the No-Fly List is highly fact-dependent, so the district court is in the best position to resolve it in the first instance. On remand, therefore, Ibrahim must show that she "is realistically threatened" with concrete injury in the future. *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)). The district court should resolve this question before addressing the merits of Ibrahim's APA claim regarding placement of her name on the No-Fly List.

*Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1256 n.9 (9th Cir. 2008).

On remand, Ibrahim filed a second amended complaint, which included thirteen claims. The current defendants fall into three categories: (1) the federal defendants, (2) the San Francisco defendants, and (3) defendants John Bondanella (who worked for private firm USIS under contract to the United States) and USIS. Plaintiff seeks declaratory and injunctive relief against the federal defendants. She also seeks compensatory, exemplary and punitive damages from the San Francisco defendants and defendants Bondanella and USIS. The new federal administration now defends the case as vigorously as the old one. The federal defendants, the San Francisco defendants, and defendants Bondanella and USIS now move to dismiss certain claims in plaintiff's second amended complaint.[1]

---

[1] The "federal defendants" include: Department of Homeland Security; Janet Napolitano, in her official capacity as Secretary of DHS; Michael Chertoff in his official capacity as former Secretary of DHS; Tom Ridge in his official capacity as the former Secretary of DHS; Eric H. Holder, Jr., in his official capacity as Attorney General; Terrorist Screening Center; Leonard C. Boyle in his official capacity as Director of TSC; Donna A. Bucella in her official capacity as former Director of TSC; Federal Bureau of Investigation; Robert Mueller in his official capacity as Director of FBI; Arthur M. Cummings in his official capacity as Executive Assistant Director of FBI's National Security Branch; National Counterterrorism Center; Michael E. Leier, in his official capacity as Director of NCC; Department of State; and Hilary Clinton in her official capacity as Secretary of State.

6

**ANALYSIS**

**1. STANDING.**

As against all federal defendants, the complaint seeks only prospective relief, a critical circumstance. All federal defendants move to dismiss Ibrahim's thirteenth claim on the ground that she lacks standing to seek injunctive or declaratory relief as to the future.

To evaluate standing, a court must ask whether a plaintiff has suffered injury to satisfy the "case or controversy" requirement of Article III. To satisfy the case and controversy requirement, a plaintiff "must show that: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt. Sys., Inc.*, 528 U.S. 167, 180–81 (2000).[2]

**A. Injury in Fact.**

Without question, Ibrahim would have standing to seek *damages* for her detention in the past. The real issue is whether she has standing to seek declaratory relief or an injunction as to the future application of the no-fly list. Again, Ibrahim seeks damages only from the San Francisco defendants, defendants Bondanella and USIS. She requests only declaratory and injunctive relief as to the federal defendants.

Where "a plaintiff seeks prospective injunctive relief, he must demonstrate that he is realistically threatened by a repetition of the violation." *Armstrong v. Davis*, 275 F.3d 849, 860–861 (9th Cir. 2001). An allegation of past harm in and of itself is not enough to confer standing upon a plaintiff *to seek prospective relief*. Future or imminent harm, however, is enough to establish standing if such harm is concrete and cognizable.

---

The "San Francisco defendants" include: San Francisco Airport; City and County of San Francisco; San Francisco Police Department; and SFPD Officers Pate, Cunningham and Maron.

The other defendant is the United States Investigations Services, Inc. USIS employed John Bondanella.

[2] Unless otherwise noted, internal citations and quotations have been omitted.

7

Ibrahim asserts that her future injury stems from placement of her name on the no-fly list, which further led to (1) her being stopped, detained, and prevented from flying on January 2, 2005; (2) her continued inability to enter the United States; and (3) revocation of her visa.

A main question is whether such a stop is likely to happen again. This order finds that plaintiff has a reasonable apprehension that she will be burdened again by being on the no-fly list. *First*, Ibrahim plans to visit the United States again. In response to the Court's recent request for updated information regarding Ibrahim's claim of standing, Ibrahim submitted a declaration that provided a description of her concrete plan for a future trip to the United States. For instance, in her new declaration, she stated: "I am planning a trip in October, 2009, to the 2009 Annual Non-profit Housing Fall Conference in San Francisco with a team from the Selangor government" (Ibrahim Decl. ¶ 12). This statement evidences more than a generalized future plan and instead points to a specific event in the United States she plans to attend.

*Second*, Ibrahim's name is allegedly still on the no-fly list. The list includes the names of individuals who are prohibited from boarding an airplane or are subject to additional screening. Ibrahim's claimed harm stems from the placement of her name on that list and the failure of defendants to take her name off the list despite her request for them to do so. According to the pleading, "defendants do not remove individuals from the no-fly list and other related watch lists, even when it would be appropriate to do so because, among other reasons, the individual has been misidentified or incorrectly placed on the list" or the individual has been determined to not be a security threat (Second Amd. Compl. ¶¶ 29, 48). Plaintiff has a reasonable basis to believe that when she tries to board a United States carrier she will again be refused or subjected to selective screening.

The federal defendants respond that one stop, four years ago, is insufficient to show a real and immediate threat of future harm. For this proposition, they primarily rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999). Those decisions are inapposite. In *Lyons*, the plaintiff sought an injunction against the City of Los Angeles barring the use of "chokeholds." 461 U.S. at 97–98. The plaintiff alleged that the police officers stopped him for a traffic or vehicle code violation and the

officers, without provocation, seized him and applied a chokehold. The plaintiff further alleged that the city's officers regularly and routinely applied chokeholds in situations when they were not threatened with deadly force, that numerous persons had been injured as a result, and that the plaintiff and others were threatened with irreparable bodily injury. The Supreme Court held that the plaintiff did not have standing to seek an injunction because the complaint did not establish that there was a real and immediate threat that the plaintiff would again be stopped and again without provocation be subject to a chokehold. In contrast to the plaintiff in *Lyons*, Ibrahim was allegedly stopped because her name was and remains on an ongoing government watch list rather than because of just one isolated incident.

In *Hodgers-Durgin*, the plaintiff sought injunctive relief prohibiting the Border Patrol's alleged practice of routinely stopping motorists without reasonable suspicion. 199 F.3d at 1037. Although the two plaintiffs regularly drove back-and-forth across the border, each was stopped only once by Border Patrol agents in ten years. The Ninth Circuit held that plaintiffs lacked standing to pursue injunctive relief because it was not sufficiently likely that the plaintiffs would be stopped again by the Border Patrol. The Ninth Circuit further stated that in the absence of a likelihood of injury there was no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally overseen by the executive branch. Again, our case is different. Our plaintiff plainly wants to return to the United States and the no-fly list stands as an obstacle.

### B. Causation and Redressability.

Both the causation and redressability requirements are satisfied here. According to the federal defendants, Ibrahim's harm is not likely to be redressed by a favorable decision because even with the removal of her name from the no-fly list, she would not be permitted to travel to the United States without a visa. Ibrahim's visa was revoked in April 2005. Apparently, she has not applied for a new visa. While Ibrahim argues that having her name on the no-fly list led to the revocation of her visa, defendants argue that the decision to revoke her visa was made independent from any reference to the no-fly list. The basis for the visa revocation need not be resolved at this time. While obtaining a visa may stand as a potential obstacle to her entry into

9

the United States, it does not completely foreclose redressability. Ibrahim is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time.

### 2. CONSTITUTIONAL CLAIMS AGAINST THE FEDERAL DEFENDANTS.

Although plaintiff has standing to reach the merits, her argument on the merits is compromised by the fact that she is an alien who voluntarily left the United States and thus voluntarily left her constitutional rights at the water's edge. She asserts that placing her name on the no-fly list violates her right to freely exercise her religion, her right to freely associate with other Muslims and Malaysians, her right to be free from unreasonable searches and seizures, her right to equal protection, and her right to procedural due process. The Constitution, however, does not apply extraterritorially to protect non-resident aliens outside our country.

Aliens *within* the United States are entitled to the protection of certain constitutional rights. "[I]n extending constitutional protections beyond the citizenry, the [Supreme] Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the judiciary power to act." *Johnson v. Eisentrager,* 339 U.S. 763, 771 (1950) (holding that the right to a writ of habeas corpus did not extend to enemy aliens captured and imprisoned abroad). Aliens, like Ibrahim, who are not within the territorial jurisdiction of the United States are not entitled to such protection. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that the Fourth Amendment did not apply to the search and seizure by United States agents of property owned by a Mexican citizen and located in his Mexican residence).

The basis for Ibrahim's claim is the placement of her name on the no-fly list, which led to the stop, search, detention, and exclusion from her flight on January 2, 2005. The next day, Ibrahim *voluntarily* left the United States. After leaving this country, she filed a complaint seeking *future relief* from the federal defendants. According to Ibrahim, she does not have to be in the United States at the time she filed her complaint to obtain declaratory and injunctive relief as to future flights. Ibrahim contends that is she entitled to adjudicate future relief because she was lawfully present in the United States at the time of the past injuries alleged in her complaint. Her presence in the United States at the time of the alleged injuries on January 2, 2005, is not sufficient, *because she does not seek damages against the federal defendants for those past*

10

*injuries*. Instead, she seeks only prospective relief (removal of her name from the list) based on future harm as against the federal defendants. When she voluntarily left the United States, she regained her status as an alien outside the country. As to any future injuries, she has no constitutional right to assert.

Ibrahim cites *Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996), and *Mathews v. Diaz*, 426 U.S. 67 (1976). The facts in those decisions, however, differed from those presented here. In *Wang*, the plaintiff, an alien who was paroled into the United States to testify in an international drug conspiracy trial, brought an action against the federal government seeking an injunction to prohibit his removal from the United States. 81 F.3d at 812. While here, Ibrahim is essentially seeking relief to enable her to come to the United States. The Ninth Circuit concluded Wang could invoke the right to due process guaranteed by the Fifth Amendment. *Id.* at 818. The rationale was that Wang became an alien *in this country* through the government's purposeful action when the government brought Wang to the United States and forced him to testify in an American courtroom. The American prosecutorial effort violated Wang's due process rights on American soil. *Id.* at 817. An important distinction is that the plaintiff in *Wang* was *in the United States* at the time he sought injunctive relief. Here, plaintiff is voluntarily in Malaysia rather than the United States. Thus, she is not entitled to the same protections.

In *Matthews*, the plaintiffs were *resident* aliens challenging the constitutionality of a provision in the Social Security Act that denied eligibility for enrollment in the Medicare part B supplemental medical insurance program unless they had been admitted for permanent residence and had lived in the United States for at least five years. The plaintiffs sought declaratory and injunctive relief. 426 U.S. at 71. While ultimately finding no due process violation, the Supreme Court stated "[t]here are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law." *Id.* at 77. This statement is not applicable to Ibrahim. Unlike the "millions of aliens" *within* the

United States that are entitled to due process, Ibrahim is *not within* the United States and has not been here for four years.

In the instant case, there is no physical presence. Physical presence in this country, not only before the actions but also during the actions, entitled the plaintiffs in *Wang* and *Matthews* to assert constitutional rights and request prospective relief. As Ibrahim seeks to be removed from the list prospectively so that she may fly back into the United States in the future and does not seek damages for past injury, the fact that she was in the United States when the earlier no-fly incident occurred is unavailing. Accordingly, Ibrahim's thirteenth claim asserting constitutional rights and seeking prospective relief against the federal defendants is dismissed. This, however, does not prevent Ibrahim from seeking damages for the alleged past harm from the San Francisco defendants and defendant Bondanella.[3]

### 3. DISCRIMINATION CLAIMS AGAINST THE SAN FRANCISCO DEFENDANTS AND DEFENDANT BONDANELLA.

The San Francisco defendants move to dismiss plaintiff's first, fifth, and seventh claims for failure to state sufficient facts entitling her to relief. Similarly, defendant Bondanella moves to dismiss plaintiff's second, sixth, and eighth claims for failure to state sufficient facts. Rule 8(a) requires that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief. Addressing the requirements of Rule 8, the Supreme Court stated:

> [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The central theme of plaintiff's complaint against the San Francisco defendants and defendant Bondanella is the accusation that they discriminated against Ibrahim on the basis of

---

[3] The foregoing is consistent with the recent decision of the Supreme Court holding that detainees at Guantanomo Bay may assert constitutional rights. The Supreme Court has stated that the detainees at Guantanomo Bay were "held in a territory that, while technically not part of the United States, is under the complete and total control of our Government." *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008). Malaysia, however, is not a United States territory or within the control of our government.

12

her national origin and religious beliefs by detaining her on January 2, 2005. The San Francisco defendants and Bondanella invoke *Iqbal*, to argue that Ibrahim's factual allegations are insufficient to demonstrate a discriminatory purpose and to plead claims for violation of her rights to freedom of religion, freedom of association, and equal protection. They argue that, like in *Iqbal*, Ibrahim's detention was non-discriminatory and the fact that she is an identifiable Muslim is only incidental.[4]

Here, the complaint alleges that Ibrahim's name was placed on the no-fly list (Second Amd. Compl. ¶ 53). This allegation alone does not support a discrimination claim against the San Francisco defendants or Bondanella. An airline employee or officer who does nothing more than exclude someone from an airplane because their name is on the no-fly list cannot be guilty of discrimination. The reason is they did not compile the list. Rather, as required by the Act, the list was created and maintained by the federal government. We must expect that airlines and officers who do nothing more than rely on the list are doing nothing more than trying to protect the public.

To be sure, Ibrahim alleges that she was detained because she was a Muslim and a Malaysian citizen. For example, as to the equal protection claim against Bondanella, plaintiff pleads as follows (Second Amd. Compl. ¶ 60):

> Bondanella directed the SFPD to arrest Ibrahim although he knew they lacked a warrant, probable cause, or any reasonable belief that she had committed a crime. Ibrahim is informed and believes, and thereon alleges that Bondanella gave this direction despite these obvious deficiencies, because he believed she was a Muslim and a citizen of Malaysia. On information and belief, Bondanella acted in a discriminatory manner, with the intent to discriminate on the basis of Ibrahim's religious beliefs and her national origin as a citizen of Malaysia.

Likewise, the complaint alleges the following as to the San Francisco defendants (*id*. at ¶ 53):

---

[4] Ibrahim asserts eight claims against the San Francisco defendants, including four constitutional claims and four state law claims. The San Francisco defendants only move to dismiss three of the constitutional claims. They do not challenge plaintiff's Fourth Amendment claim or her four state law claims. Similarly, the complaint also includes four constitutional claims and four state law claims against defendant Bondanella. Bondanella moves to dismiss three of plaintiff's claims asserting constitutional rights, but he does not challenge her Fourth Amendment claim. Bondanella and USIS also seek to have two of plaintiff's state law claims dismissed.

13

> [D]efendants arrested Ibrahim for several hours, although they lacked a warrant, probable cause, or any reasonable belief that she had committed a crime. Ibrahim is informed and believes, and thereon alleges, that defendants made the arrest despite these obvious deficiencies, because they perceived she was Muslim and a citizen of Malaysia. On information and belief, San Francisco defendants acted in a discriminatory manner, with the intent to discriminate on the basis of Ibrahim's religious beliefs and her national origin as a citizen of Malaysia.

These allegations are conclusory and not enough to allow Ibrahim to proceed with her discrimination claims against either the San Francisco defendants or Bondanella under *Iqbal*. The reason is that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." 129 S. Ct. at 1949. Instead, a complaint must comply with the following standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ibid.*[5]

Ibrahim has not nudged her claims of discrimination against the San Francisco defendants or Bondanella based on the detention "across the line from conceivable to plausible." *Id.* at 1951. In *Iqbal*, the Supreme Court stated "[w]here the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Purposeful discrimination requires a "decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' the action's adverse effects upon an identifiable group." *Ibid.* To state a claim, plaintiff must plead sufficient factual matter to show that defendants took actions "not for a

---

[5] The remaining allegations of the equal protection claims are even more conclusory and are not entitled to an assumption of truth. For instance, Ibrahim pleads that defendants "committed the actions alleged herein maliciously, fraudulently, oppressively and with the wrongful intention of injuring plaintiff" (Second Amd. Compl. ¶¶ 57, 63). The allegations for her equal protection, freedom of religion and association claims are similar, so the same analysis applies.

14

neutral investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948–49.

Ibrahim has not pleaded that defendants took action because of and not merely in spite of her being Muslim and a Malaysian citizen. That plaintiff was Muslim and detained is not enough to draw an inference of discrimination under the *Iqbal* standard. No additional facts, such as derogatory statements, are alleged. Accordingly, as pled, the discrimination claims against San Francisco officers or Bondanella are insufficient.

A good argument can be made that the *Iqbal* standard is too demanding. Victims of discrimination and profiling will often not have specific facts to plead without the benefit of discovery. District judges, however, must follow the law as laid down by the Supreme Court. Yet, the harshness is mitigated here. Counsel for the San Francisco defendants and Bondanella admit that plaintiff's Fourth Amendment claim can go forward. This means that discovery will go forward. During discovery, Ibrahim can inquire into facts that bear on the incident, including why her name was on the list. If enough facts emerge, then she can move to amend and to reassert her discrimination claims at that time.

\* \* \*

The San Francisco defendants argue that plaintiff's freedom of religion and association claims fail with respect to Officer Maron, who searched Ibrahim at the police station, because conducting pat searches of detainees is a facially neutral policy. Ibrahim alleges that Officer Maron attempted to remove her hijab during the search in the presence of male non-family members. She, however, does not allege that Officer Maron permanently removed the hijab from her head. Nor does Ibrahim allege that she requested that she be searched privately or out of the presence of males.

To prevail on the claim that Officer Maron violated her right to religious expression, Ibrahim must establish that defendants burdened a belief that was sincerely held and rooted in religion. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). The allegation that Officer Maron temporarily removed Ibrahim's hijab to search underneath is not sufficient to plead that Officer Maron burdened her right to religious expression. In *Khatib v. County of Orange*, 2008

15

WL 822562, at *9 (C.D. Cal. 2008), the plaintiff alleged that the removal of her head scarf and the officers' refusal to allow her to wear it in the courtroom and court holding cell violated her First Amendment rights. The court denied the motion on the grounds that prolonged uncovering of the plaintiff's head in the presence of male non-family members was sufficient to plead a free exercise clause violation. In contrast, Officer Maron only temporarily removed Ibrahim's hijab during the pat search. Ibrahim also does not allege any additional facts to support her claims against Office Maron for violation of her rights to equal protection. Accordingly, plaintiff's first, fifth, and seventh claims do not survive against Officer Maron, as pled.

Therefore, this order holds that plaintiff's first, fifth, and seventh claims against the San Francisco defendants, including CCSF, SFO, SFPD, SFPD Officers Pate, Cunningham, and Maron, are dismissed. Plaintiff's second, sixth, and eighth claims against Bondanella are dismissed.

### 4. CALIFORNIA CIVIL CODE SECTION 52.1 CLAIM AGAINST DEFENDANTS BONDANELLA AND USIS.

Ibrahim's ninth claim is for interference with the exercise of her civil rights under Section 52.1 of the California Civil Code. Section 52.1 creates a cause of action where a person, whether or not acting under color of law, interferes by threats, intimidation, or coercion with the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States or of California. Section 52.1(j) states the following:

> Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat.

Ibrahim claims that defendant Bondanella, and by extension USIS, violated Section 52.1 by threatening her.

In order for Ibrahim's Section 52.1 theory to succeed, it would be necessary for her to have reasonably feared that she would be subjected to *violence* following a verbal threat. Her second amended complaint merely states that Officer Pate called Bondanella and Bondanella instructed Officer Pate over the telephone to not allow her to fly, to contact the FBI, and to detain

16

her for questioning. The opposition offers the following gloss on these facts to show how facially non-violent comments could be construed as violent threats: "[a]ny phone call [defendants] would have made would have been perceived by Plaintiff as containing directives on how to interact with her. The fact that she may not have heard what Bondanella was saying did not diminish her awareness of the impact his instructions would have on her" (Opp. 8).

As alleged, however, the facts do not support a Section 52.1 claim for two reasons. *First*, while verbal threats of violence need not be made directly to plaintiff for her to state a claim, it was necessary for them to have been communicated to Ibrahim to be actionable under Section 52.1. She cannot make out a threat claim merely by stating that she speculated that an unheard and unseen party was making threats which might be carried out by officers in her vicinity. *Second*, Ibrahim does not actually assert that Bondanella's alleged instructions threatened *violence* against her. According to the complaint, Bondanella's only utterances pertained to his instructions to have plaintiff detained. Ibrahim neither alleges that these utterances threatened violence nor does she allege that Bondanella made other violent threats to or concerning her. Without these critical assertions of fact, plaintiff's Section 52.1 claim does not survive Bondanella and USIS's motion to dismiss.

### 5. FALSE IMPRISONMENT CLAIM AGAINST DEFENDANTS BONDANELLA AND USIS.

Defendants Bondanella and USIS argue that plaintiff's tenth claim for false imprisonment is barred by the one-year statute of limitations. Ibrahim does not contest defendants' assertion that her claim for false imprisonment accrued when she was detained at the San Francisco airport on January 2, 2005. An action for false imprisonment must be brought within one year of accrual of the action. Cal. Civ. Code § 340(c). The original complaint was filed on January 27, 2006, twenty-five days outside of the statutory period. As she acknowledges that her false imprisonment claim would otherwise be time-barred, Ibrahim relies on equity to toll the statute of limitations.

Courts use a three-prong test to evaluate whether equitable tolling is available for a plaintiff's claim: "(1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; and (3) good faith and

reasonable conduct by the plaintiff in filing the second claim." *Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691, 694–695 (9th Cir. 2003). In addition, the wrong underlying the second claim must be the same as the wrong underlying the first. *Id.* at 695.

Ibrahim has not adequately pleaded equitable tolling. Ibrahim filed her "first" administrative claim arising from her detainment at the San Francisco airport against the County of San Mateo and the City and County of San Francisco on July 1, 2005. The administrative claim did not name Bondanella or USIS as defendants, or even mention them (Notice Exh. A, B). Timely notice of the claim was therefore not provided to Bondanella or USIS (even if somehow mentioning them could have somehow been made known to them via an unknown municipal courtesy). Acknowledging this at the hearing, plaintiff's counsel withdrew any opposition on this issue. Accordingly, plaintiff's false imprisonment claim as asserted against Bondanella and USIS is dismissed.

**CONCLUSION**

For the foregoing reasons, defendants' motions are **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's only claim against the federal defendants — the thirteenth claim — is **DISMISSED**. Plaintiff's first, fifth, and seventh claims against the San Francisco defendants CCSF, SFO, SFPD, and SFPD Officers Pate, Cunningham, and Maron are **DISMISSED**. Plaintiff's second, sixth, and eighth claims asserted against defendant Bondanella are **DISMISSED**, and her ninth and tenth claims asserted against both defendants Bondanella and USIS are **DISMISSED**. Plaintiff's third, fourth, eleventh, and twelfth claims remain. All other motions are **DENIED**.

On remand, a new case management order established November 30, 2009, as the fact discovery cut-off. By **DECEMBER 17, 2009**, plaintiff may bring a motion seeking leave to file an amended complaint based upon any new facts learned in discovery and/or new facts learned via an investigation. This assumes that defendants will cooperate in discovery. If defendants do not do so, the Court will consider extending the fact discovery deadline. If an amendment is allowed, it may be necessary to amend the remainder of the case management schedule. Defendants are

18

requested not to bring any summary judgment motions or motions for judgment on the pleadings until fact discovery is completed.

**IT IS SO ORDERED.**

Dated: July 27, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE