**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAHINAH IBRAHIM,

                    Plaintiff,                          No. C 06-00545 WHA

        v.

DEPARTMENT OF HOMELAND                    **ORDER FOR PRODUCTION OF**
SECURITY, *et al.*,                        **ITEMS DESPITE THE ASSERTION**
                                          **OF VARIOUS PRIVILEGES**
                    Defendants.
_____/

**INTRODUCTION**

        This action challenging the airport detention of plaintiff by police for being on the "no-fly
list" has reached a potential jurisdictional impasse.  The Ninth Circuit earlier held that this
Court has subject-matter jurisdiction over the action as against certain defendants other than
the Transportation Security Administration.  On remand, however, it turns out that important
evidence at the heart of the case is still under lock and key by TSA.  The federal government
asserts that this Court again lacks subject-matter jurisdiction, this time lacking jurisdiction to
compel TSA to release the evidence.  Fortunately, a portion of the jurisdictional impasse can be
broken — a recent statutory amendment allows district courts to compel the production of *at least
some* of the sensitive information.  For the reasons that follow, some evidence will be ordered
produced and usable herein.  Other information, for which insufficient need has been shown, must
remain undisclosed.  As to certain *other* discovery items, it seems correct that this Court lacks

**United States District Court**
For the Northern District of California

1    subject-matter jurisdiction.  Only an appropriate court of appeals has jurisdiction to review a

2    refusal to declassify material as sensitive security information.

3                                               **STATEMENT**

4              The statutory scheme embodied in the Aviation and Transportation Security Act, enacted

5    after the terrorist attacks of September 11, 2001, was explained in the order dated July 27, 2009

6    (*see* Dkt. No. 197).  In brief, the "no-fly list" is a part of this scheme — it is a list of individuals

7    that have been deemed by the federal government "to pose, or [as] suspected of posing, a risk of

8    air piracy or terrorism or a threat to airline or passenger safety."  49 U.S.C. 114(h)(2).  This list

9    is accessible to "the Administrator of the Federal Aviation Administration, appropriate State

10   and local law enforcement officials, and airport or airline security officers."  *Ibid.*

11   Section 114(h)(3)(B) instructs, "if such an individual is identified, notify appropriate law

12   enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate

13   action with respect to that individual."  The "no-fly list" refers to both the "no-fly" list, which

14   allegedly contains names of people that airlines are prohibited from transporting, and the

15   "selectee" list, which allegedly contains names of people who are subject to additional screening

16   prior to boarding a plane.

17             Plaintiff Rahinah Ibrahim is a Muslim woman and a citizen of Malaysia.  In 2005, she

18   was a doctoral student at Stanford University preparing a thesis on affordable housing.  She was

19   scheduled to complete her doctoral degree in March 2005.  According to the pleading, she has

20   neither a criminal record nor link to terrorists.

21             On January 2, 2005, plaintiff and her fourteen-year-old daughter reported to the United

22   Airlines ticket counter at the San Francisco International Airport, intending to board a 9:00 a.m.

23   flight to Kuala Lumpur with a stop-over in Hawaii.  According to plaintiff, the United Airlines

24   employee at the ticket counter, David Nevins, called the San Francisco Police Department and

25   told them that Ibrahim was on the no-fly list.  San Francisco Police Officers Richard Pate and

26   J. Cunningham, both still defendants in this case, arrived at the airport.  Officer Pate telephoned

27   defendant John Bondanella, a watch officer for the Transportation Security Operations Center

28   employed by defendant United States Investigations Services, Inc., a private corporation that

1   provided contract services to the TSOC.  During this phone conversation, Bondanella allegedly

2   "told defendant Pate to not allow Ibrahim on the flight, to contact the FBI, and to detain Ibrahim

3   for questioning" (Second Amd. Compl. ¶ 39).  Plaintiff was then detained by Officer

4   Cunningham, without explanation, taken to the San Francisco Police Station, searched, and placed

5   in a holding cell.  Two hours later, the FBI requested that plaintiff be released.  Plaintiff was then

6   told that her name had been removed from the no-fly list.  The following day, January 3, 2005,

7   plaintiff was allowed to fly to Kuala Lumpur from San Francisco.

8           Plaintiff attempted to return to the United States on March 10, 2005, to complete her

9   degree at Stanford.  But the ticketing agent at Kuala Lumpur International Airport would not

10   allow her to fly.  She was told that a note by her name instructed airport personnel to call the

11   police and have her detained.  A 2005 letter from the United States embassy in Malaysia informed

12   plaintiff that her student visa had been revoked.

13           Ibrahim initiated this action against various individual, state, and federal defendants in

14   2006.  An order dated August 16, 2006, dismissed the action against some defendants based on a

15   lack of subject-matter jurisdiction (Dkt. No. 101).  But the Ninth Circuit reversed that decision in

16   part and found that the district court had jurisdiction to review the events leading up to the alleged

17   placement of plaintiff's name on the no-fly list.  *Ibrahim v. Department of Homeland Security*,

18   538 F.3d 1250 (9th Cir. 2008).  Specifically, the Ninth Circuit stated:

19              The district court determined, based on undisputed facts, that an
                agency called the Terrorist Screening Center, "actually compiles the
20              list of names ultimately placed on the No-Fly List."  And the
                Terrorist Screening Center isn't part of the Transportation Security
21              Administration or any other agency named in section 46110; it is
                part of the Federal Bureau of Investigation, as the government
22              concedes.  Gov't's Br. at 24, *see* Homeland Security Presidential
                Directive 6 (Sept. 16, 2003) (ordering the Attorney General to
23              "establish an organization to consolidate the Government's
                approach to terrorism screening").  Because putting Ibrahim's name
24              on the No-Fly List was an "order" of an agency *not* named in
                section 46110, the district court retains jurisdiction to review that
25              agency's order under the APA.

26   *Id.* at 1255 (emphasis in original).  The Ninth Circuit also stated that the district court had

27   personal jurisdiction over defendant John Bondanella, who was sued in his individual capacity.

28    *Id.* at 1258.

3

United States District Court

For the Northern District of California

1    On remand, plaintiff filed a second amended complaint on April 2, 2009.  An order dated

2    July 27, 2009, dismissed on the merits the only claim plaintiff made against the federal

3    defendants on the basis that a non-resident alien who voluntarily left the United States cannot

4    assert claims under the Constitution, thereby dismissing all federal defendants from the action

5    (Dkt. No. 197).  As a result, the remaining defendants are now:  (1) San Francisco defendants,

6    including the San Francisco Airport, City and County of San Francisco, San Francisco Police

7    Department, and SFPD Officers Richard Pate, J. Cunningham, and Elizabeth Maron; and

8    (2) defendants John Bondanella (who, as stated, worked for United States Investigations Services,

9    Inc., under contract to the United States) and USIS itself.  The "federal defendants" are usually

10    referred to hereinafter as "former federal defendants," as they are no longer parties to the

11    present action.  Former federal defendants include the Department of State, Department of

12    Homeland Security, Federal Bureau of Investigation, and Transportation Security Administration.

13    A complete list of all former federal defendants can be found in the July 27 order (*see* Dkt.

14    No. 197 at n.1).

15    In her opposition to former federal defendants' instant motion to quash, plaintiff now

16    avers several new facts (*see* Dkt. No. 261 at 2–3).  Plaintiff has remained in Malaysia since 2005

17    when her visa was revoked.  On September 9, 2009, counsel for defendants requested that

18    Ibrahim travel to the United States for her deposition in this case.  Thereafter, plaintiff prepared

19    her visa application.  She attended her visa interview while still in Malaysia on September 29,

20    2009, without her counsel because her counsel was in the United States.  Plaintiff states that,

21    during this interview, the federal government asked plaintiff several questions about her legal

22    strategy, including why she hired a lawyer in the United States and what she wanted in order to

23    settle her case.  Plaintiff was then told she would receive a decision on her visa application within

24    one to two weeks.  Over eleven weeks later, however, plaintiff still has not received a decision

25    regarding her application.  (These new allegations post-date the second amended complaint and

26    are proffered on the motion.)

27    The parties and former federal defendants have since filed a series of motions and

28    oppositions seeking to compel, disclose, or suppress certain disclosures, thereby creating a welter

4

of discovery disputes, all more or less tied to information controlled by TSA. These motions are the subject of the present order. A hearing on these motions took place on December 7, 2009. Each motion is now addressed in turn.

**1.     PLAINTIFF'S MOTION TO COMPEL AND FORMER FEDERAL DEFENDANTS' MOTION TO QUASH.**

On April 3, 2009, plaintiff issued requests for production of documents and special interrogatories to the then federal defendants (*see* Dkt. No. 232 Exh. A–B). On May 28, 2009, the then federal defendants responded with numerous privilege objections and refused to produce various documents without redactions (*see id.* at Exh. C–D). According to plaintiff, federal defendants produced no documents showing whether her name was placed on the no-fly list and have refused to answer whether she was on the no-fly list. After a meet-and-confer session, they agreed to allow two of Ibrahim's counsel to undergo an extensive background check and to enter into an appropriate protective order to review the allegedly privileged documents pursuant to 49 U.S.C. 114(r).

Before this could be completed, however, the order dated July 27, 2009, dismissed all federal defendants from the action (Dkt. No. 197). Ordinary party discovery against them evaporated upon this dismissal.

Plaintiff then served subpoenas on former federal defendants' counsel addressed to the following:

1.      FBI employee Paul C. Woods, served on November 2, 2009 (Dkt. No. 245 Exh. 3);

2.      TSA employee Lee Korman, served on November 2, 2009 (*id.* at Exh. 4);

3.      Department of State, served on November 3, 2009 (*id.* at Exh. 1);

4.      Department of Homeland Security, served on November 3, 2009 (*id.* at Exh. 2);

5.      FBI, served on November 10, 2009 (*see* Dkt. No. 253);

6.      Terrorist Screening Center, served on November 10, 2009 (*ibid.*); and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1           7.       Department of Homeland Security, served on November 10, 2009

2   (*ibid.*).

3   The two subpoenas served on November 2 sought deposition testimony.  The two subpoenas

4   served on November 3 sought documents and information regarding plaintiff's visa interview

5   on September 29, 2009, in Kuala Lumpur, plaintiff's visa application, and any decisions on that

6   visa application.  The subpoenas served on November 10 sought the same documents that Ibrahim

7   sought in her requests for production of documents prior to the dismissal of the parties, and

8   plaintiff seeks this same information in her motion to compel — the specifics of these requests

9   are listed below.

10         By October 9, 2009, two of plaintiff's counsel had undergone fingerprinting by a DHS

11   official and submitted the required background check forms, in accordance with the agreement

12   in the prior meet-and-confer session.  But by November 5, 2009, they still had not received the

13   results of the background check, nor had former federal defendants provided the requested

14   protective order.  Plaintiff filed a motion to compel former federal defendants to produce the

15   documents and information that they allegedly failed to respond to in May 2009 (Dkt. No. 231).

16   Specifically, plaintiff sought responses to various special interrogatories and documents

17   responsive to certain requests for production which were propounded in April 2009 (*see*

18   Plaintiff's Br. 1).  The information requested by the special interrogatories is not relevant, as that

19   portion of the motion was dismissed by the November 19 order (Dkt. No. 263).  The document

20   requests sought the following materials (Plaintiff's Br. 2–3):

21           1.       FBI phone logs related to plaintiff identified in former federal

22   defendants' initial disclosures in this case;

23           2.       TSA employee logs generated and kept at the San Francisco Airport

24   related to plaintiff;

25           3.       TSA employee logs and files from the Transportation Security

26   Operations Center related to plaintiff;

27           4.       The no-fly list and other documents identifying plaintiff as someone

28   who should be selected for special screening;

6

United States District Court
For the Northern District of California

5. Documents considered when placing plaintiff's name on the no-fly list;

6. Documents considered when placing plaintiff's name in the terrorist screening database;

7. Documents discussing the incident that is the subject of this lawsuit;

8. Documents instructing law enforcement to arrest or detain plaintiff;

9. Documents discussing instructions about the incident exchanged between federal defendants and other defendants;

10. Documents discussing instructions about plaintiff exchanged between former federal defendants and other defendants; and

11. Video recordings of conversations between federal defendants and plaintiff.

Former federal defendants have emphasized their unwillingness to comply with the subpoenas. On November 4, 2009, former federal defendants' counsel requested by letter that plaintiff withdraw the subpoenas and that any requests for testimony or documents be resubmitted in compliance with 5 U.S.C. 301, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and the *Touhy* regulations associated with each agency (*see* Dkt. No. 245 Exh. 5).[1] Former federal defendants also move to quash the subpoenas served upon them and their employees by plaintiff (Dkt. No. 256).

On December 11, 2009, all parties to this action submitted a joint statement stating that, following a recent meet-and-confer session, "the Parties and Federal Non-Parties have agreed to postpone the depositions of federal personnel to a date after the Court rules on the pending privilege issues" (Dkt. No. 283 at 1–2). But the remaining requests still stand.

---

[1] As explained below, the order dated November 19, 2009, denied these procedural objections, which were also asserted in response to plaintiff's motion to compel and in support of former federal defendants' motion to quash, on the ground that plaintiff had "substantially complied" with the applicable *Touhy* regulations (Dkt. No. 263).

United States District Court

For the Northern District of California

**2.    SAN FRANCISCO DEFENDANTS' MOTION REQUESTING
AUTHORIZATION TO DISCLOSE INFORMATION
RECEIVED FROM FORMER FEDERAL DEFENDANTS.**

On November 9, 2009, San Francisco defendants filed a motion requesting authorization to disclose the information they received from and communications they had with the former federal defendants on January 2, 2005 (Dkt. No. 238).  Specifically, San Francisco defendants seek to disclose three general categories of information:

1.    An unredacted transcript of the teletype that SFPD officers received from law enforcement databases about plaintiff on the day in question;

2.    Information and/or directions that defendant John Bondanella and federal personnel gave to SFPD officers on January 2, 2005; and

3.    Information about plaintiff's status with respect to the no-fly list on the date of the incident, January 2, 2005.

San Francisco defendants want to disclose the information to show that they acted reasonably in detaining plaintiff (SF Defendant's Br. 1–2).

Former federal defendants have asserted a general law enforcement privilege over the first category of information — namely, the unredacted teletype (Dkt. No. 251).  In support of this privilege, former federal defendants filed an administrative motion to file the Declaration of Arthur M. Cummings *in camera* and under seal.  A series of orders dated November 17 and 18, 2009, granted the motion to file under seal, but retained jurisdiction to disclose the document in the event that, upon *in camera* review, the privilege was found inapplicable (Dkt. Nos. 250, 258).  Former federal defendants have also asserted a "sensitive security information" privilege over the final two categories of information requested.  This, as explained below, is a statutory privilege.

**3.    ORDER NARROWING THE DISPUTE.**

An order dated November 19, 2009, attempted "to simplify a thicket of competing discovery motions so that the harder question could be resolved" (Dkt. No. 263).  The November 19 order denied in part plaintiff's motion to compel on the ground that plaintiff cannot compel interrogatory responses *from non-parties*.  This order also denied the *Touhy* procedural jurisdictional arguments made by formal federal defendants against the motion to

8

United States District Court

For the Northern District of California

compel. Finally, the order stated that the only issue remaining to be resolved in this dispute was that of *privilege* — and restated a deadline already set by a prior order: "Any privilege concerns as to all pending motions must be asserted, along will all supporting bases thereof, by Friday, November 20, 2009 at Noon" (*id.* at 11; emphasis omitted).

In a timely manner, former federal defendants asserted the following privileges relevant to their motion to quash and plaintiff's motion to compel:

> 1.      The "sensitive security information" privilege was asserted generally as to all requests made by plaintiff;

> 2.      The law enforcement privilege was asserted as to plaintiff's status on any terrorist database and the policies and procedures used for determining how an individual's name is placed in such a database; and

> 3.      The statutory privilege in Section 222(f) of the Immigration and Nationality Act, 8 U.S.C. 1202(f), a statute giving the Secretary of State certain control regarding the disclosure of visa-related materials, was asserted as to all visa-related documents.

Former federal defendants likewise timely asserted the following privileges as to the information that San Francisco defendants seek to disclose:

> 1.      As to the unredacted transcript of the teletype that SFPD officers received from law enforcement databases about plaintiff, the law enforcement privilege was asserted;

> 2.      As to the last two categories of information requested to be disclosed — namely, information and/or directions that defendant John Bondanella and federal personnel gave to SFPD officers on January 2, 2005, and information about plaintiff's status with respect to the no-fly list on the date of the incident, January 2, 2005 — the sensitive security information privilege was asserted; and

> 3.      Former federal defendants also requested to reserve the right to assert the state secrets privilege if this order concludes the SSI and law

1    enforcement privileges do not apply (*see* Dkt. No. 264).  (This will be dismissed as

2    untimely).

3        As stated, a hearing took place regarding all motions on December 7, 2009.  The parties

4    and former federal defendants have since filed a series of statements regarding their respective

5    opinions as to how they believe this case can be managed from now through trial (*see* Dkt. Nos.

6    281–83).  In short, *all* remaining parties to this case recognize that at least some of the requested

7    information is crucial to both sides' positions in this case, while former federal defendants persist

8    in their refusal to produce the same.

9                                              **ANALYSIS**

10       **1.    RELEVANCE.**

11       Former federal defendants repeatedly assert that the information that plaintiff seeks to

12   obtain and San Francisco defendants seek to disclose is not relevant to this dispute.  But these

13   arguments ignore the November 19 order, which concluded that the information sought *is* relevant

14   (*see* Dkt. No. 263 at 9).  The key information regards certain communications to San Francisco

15   officials and airline employees that led up to plaintiff's detention.  This is the *heart* of plaintiff's

16   case.  Indeed, the parties insist that such information is necessary for plaintiff to attempt

17   to prosecute her case *and* for San Francisco defendants to attempt to exonerate themselves.

18   Even defendants John Bondanella and USIS, who are parties to the overall case but not parties

19   to the present discovery dispute, have filed a statement that they, too, will be hurt by the failure

20   of this information to be disclosed (*see* Dkt. No. 276).  In sum, *at least some of the requested*

21   *information is clearly relevant, namely, to repeat, the information supplied to the San Francisco*

22   *defendants by the Bondanella/USIS defendants.*  This information either will (or will not) justify

23   the actions taken that day.

24       **2.    SENSITIVE SECURITY INFORMATION.**

25       Former federal defendants have designated as sensitive security information *all*

26   information responsive to plaintiff's documents requests as well as two of the three categories of

27   information that San Francisco defendants seek to disclose.

28

**United States District Court**
For the Northern District of California

10

"Sensitive security information" is defined as "information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would . . . [b]e detrimental to the security of transportation." 49 C.F.R. 1520.5(a).  Pursuant to 49 U.S.C. 114(r)–(s) and 49 C.F.R. 1520.5(b), TSA has *broad discretion* to designate certain broad categories of information as sensitive security information.  *See also* 49 C.F.R. 1520.5(b)(16).  Part 1520 of Title 49 of the Code of Federal Regulations governs the disclosure of such information.  Sensitive security information is "not available for public inspection or copying." § 1520.15(a).  Rather, the decision whether to disclose sensitive security information lies solely in the discretion of TSA, the Coast Guard, and/or the Secretary of DOT.  *See* § 1520.9.

### A.   TSA CONTROLS SENSITIVE SECURITY INFORMATION IN THE POSSESSION OR CONTROL OF SAN FRANCISCO DEFENDANTS.

Pursuant to the above-described statutory scheme, TSA also retains control of the SSI that is in San Francisco defendants' possession and control.  This is because San Francisco defendants acquired access to sensitive security information in accordance with their duties at the San Francisco airport, so they are considered "covered persons" under Section 1520.7(j).  San Francisco defendants had a "need to know" the information "to carry out transportation security activities approved, accepted, funded, recommended, or directed by DHS or DOT." § 1520.11(a)(1).  Examples of other "covered persons" listed in Section 1520.7 include "DHS and DOT," "each person employed by, contracted to, or acting for a covered person," and "airport operator[s]," among others.  "Covered persons" may not disclose sensitive security information in their possession or control to "non-covered persons" without written authorization from TSA, the Coast Guard, or the Secretary of DOT.  *See* § 1520.9(a)(1)–(3).

Neither plaintiff nor plaintiff's counsel is a "covered person."  Under this statutory scheme, San Francisco defendants already have access to but may not disclose the sensitive security information without TSA's permission, which TSA will not give.

Under Section 1520.11(c), TSA "may make an individual's access to the SSI contingent upon satisfactory completion of a security background check or other procedures and requirements for safeguarding SSI that are satisfactory to TSA."  *See also* Department of

1    Homeland Security Appropriations Act of 2007, Pub. L. No. 109-295 § 525(d), 120 Stat. 1355,

2    1382 (Oct. 4, 2006).  But this limited procedure hardly resolves the matter.  As explained above,

3    two members of plaintiff's counsel underwent fingerprinting by a DHS official and submitted the

4    required background-check forms on October 9, 2009, but they are still waiting to hear back

5    regarding the results.  Given the bureaucracy and procedure involved, it could be months before

6    the results are released.  Meanwhile, former federal defendants hinge their denial of plaintiff's

7    document requests on the fact that the results of the background check have not yet been released.

8    Denial would require a separate proceeding for judicial review.

9          Even were former federal defendants to grant the two plaintiff's counsel permission to

10   view the SSI, this would not solve the immediate problem.  For example, would *plaintiff* also

11   have to receive clearance from TSA to view the information?  The same information would still

12   need to be shown to the judge, the judge's law clerks, court personnel, the jurors, and any

13   members of the public who attended the trial.  Possibly once counsel saw the information in

14   secret, they would convince plaintiff to drop the entire case (without revealing the classified

15   information).  But failing that limited scenario, providing access to *counsel only* will be unlikely

16   to solve our litigation impasse.

17                    **B.**      **JURISDICTION TO REVIEW AGENCY ACTION.**

18         Prior to late 2006, district courts *lacked* subject-matter jurisdiction to review orders of

19   TSA to refuse to produce SSI, even when such production was absolutely necessary for civil

20   litigation purposes.  *See Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608 (N.D. Cal.

21   2004) (Breyer, J.).  An amendment issued by Congress in late 2006 recognized the problem faced

22   by civil litigants in accessing such sensitive security information and granted district courts

23   limited jurisdiction to require disclosure of such information for certain civil litigation purposes.

24                         **(1)      Section 46110.**

25         Before turning to the limited relief allowed by a district judge to give, it is important to

26   explain the robust and pervasive authority given to TSA to classify information as "sensitive

27   security information" and to underscore that those classification decisions are reviewable only by

28   the court of appeals.

12

United States District Court
For the Northern District of California

1    The governing statute, 49 U.S.C. 46110, states that district courts lack subject-matter

2    jurisdiction to review "orders" of TSA, including TSA's designation of and general refusal to

3    produce SSI:

> (a)  . . . A person disclosing a substantial interest in an order issued
> by the Secretary of Transportation . . . in whole or in part under . . .
> subsection (l) or (s) of 114 [49 USCS § 114] may apply for review
> of the order by filing a petition for review in the United States
> Court of Appeal for the District of Columbia Circuit or in the court
> of appeals of the United States for the circuit in which the person
> resides or has its principal place of business.
>
> *              *              *
>
> (c)  . . . When the petition is sent to the Secretary, Under Secretary,
> or Administrator, the court has exclusive jurisdiction to affirm,
> amend, modify, or set aside any part of the order . . . .

11    The Ninth Circuit has repeatedly held that Section 46110 vests *exclusive* jurisdiction to

12    review "orders" of the Secretary of Transportation in the federal circuit courts of appeal.  *See*,

13    *e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1131–33 (9th Cir. 2006); *Mace v. Skinner*, 34 F.3d 854,

14    857 (9th Cir. 1994); *Clark v. Busey*, 959 F.2d 808, 811 (9th Cir. 1992).  TSA's designation of

15    material as "sensitive security information" is pursuant to 49 U.S.C. 114(s) and, therefore,

16    qualifies as an "order" under Section 46110.  *See* 49 C.F.R. 1520.5(a).  Indeed, the Ninth Circuit

17    in *MacLean v. Department of Homeland Security*, 543 F.3d 1145, 1149 (9th Cir. 2008), held that

18    a letter from TSA that simply stated that material could not be disclosed because it contained

19    sensitive security information was an "order" under Section 46110.

20    Here, former federal defendants (of which TSA is a member) have, in writing, refused to

21    disclose or to allow disclosure of the requested sensitive security information (*see*, *e.g.*, Dkt.

22    Nos. 220, 233, 243).  This refusal is the subject of both San Francisco defendants' and plaintiff's

23    motions.  Section 46110 requires that orders designating sensitive security information are

24    reviewable only by the courts of appeal, not the district courts.

25    Part 1520 of Title 49 of the Code of Federal Regulations gives TSA the authority to order

26    agencies cooperating on security matters *not* to disclose any materials designated as sensitive

27    security information.  For example, as the Ninth Circuit recognized in *Ibrahim*, 538 F.3d at 1255,

28    the Terrorist Screening Center is an agency of the FBI that compiles the names of individuals to

13

United States District Court

For the Northern District of California

1    be placed on the no-fly list, which is then implemented by TSA.  In other words, TSC works with

2    TSA in this manner to maintain transportation security.  As such, TSC is a "covered person"

3    under Sections 1520.7 and 1520.11 and, therefore, may not disclose sensitive security information

4    in its possession and control without the express written permission of TSA.  *The same is true of*

5    *all other agencies that have worked with TSA in this capacity.*  According to Section 46110, the

6    district court lacks jurisdiction to review TSA's designation of and refusal to produce information

7    classified as SSI.

8         True, the earlier Ninth Circuit remand in the instant case held that the district court

9    retained jurisdiction to hear part (but only part) of a larger controversy, but that decision did not

10   override other Ninth Circuit decisions confirming that only the appropriate court of appeals may

11   review TSA's decision to keep the information secret.  *See*, *e.g.*, *Gilmore*, 435 F.3d at 1131–33;

12   *MacLean*, 543 F.3d at 1149; *Mace*, 34 F.3d at 857; *Clark* , 959 F.2d at 811.  Nor did the remand

13   anticipate the impasse now upon us.

14                    **(2)    Section 525(d).**

15        To ameliorate impasses such as ours, Congress enacted an amendment in late 2006.

16   Section 525 of the Department of Homeland Security Appropriations Act of 2007, Pub. L.

17   No. 109-295, 120 Stat. 1355 (Oct. 4, 2006), provided in relevant part (emphasis added):

18            (a)  Within 30 days after enactment of this Act, the Secretary of
              homeland Security shall revise Department of Homeland Security
19            (DHS Management Directive (MD) 11056 to provide for the
              following:
20
              (1)  That when a lawful request is made to publicly release
21            a document containing information designated as sensitive
              security information (SSI), the document shall be reviewed
22            in a timely manner to determine whether any information
              contained in the document meets the criteria for continued
23            SSI protection under applicable law and regulation and
              shall further provide that all portions that no longer require
24            SSI designation be released, subject to applicable law,
              including sections 552 and 552a of title 5, United States
25            Code;

26            (2)  That sensitive security information *that is three years
              old and not incorporated in a current transportation*
27            *security directive, security plan, contingency plan, or
              information circular . . . shall be subject to release upon*
28            *request* unless:

14

(A)  the Secretary or his designee makes a written determination that identifies a rational reason why the information must remain SSI; or

(B)  such information is otherwise exempt from disclosure under applicable law:

Provided, That any determination made by the Secretary under clause (a)(2)(A) shall be provided to the party making a request to release such information and to the Committees on Appropriations of the Senate and the House of Representatives as part of the annual reporting requirement pursuant to section 537 of the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90; 119 Stat. 2088); and

(3)  Common and extensive examples of the individual categories of SSI information cited under 49 1520(b)(1) through (16) in order to minimize and standardize judgment by covered persons in the application of SSI marking.

*          *          *

(d)  That in civil proceedings in the United States District Courts, where a party seeking access to SSI demonstrates that the party has *substantial need of relevant SSI* in the preparation of the party's case and that the party is *unable without undue hardship to obtain the substantial equivalent* of the information by other means, *the party or party's counsel shall be designated as a covered person under 49 C.F.R. Part 1520.7 in order to have access to the SSI* at issue in the case, provided that the overseeing judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS *demonstrates* that such access to the information for the proceeding presents a risk of harm to the nation:

Provided, That notwithstanding any other provision of law, an order granting access to SSI under this section shall be immediately appealable to the United States Courts of Appeals, which shall have plenary review over both the evidentiary finding and the sufficiency of the order specifying the terms and conditions of access to the SSI in question:

Provided further, That notwithstanding any other provision of law, the Secretary may assess a civil penalty of up to $50,000 for each violation of 49 C.F.R. Part 1520 by persons provided access to SSI under this provision.

United States District Court
For the Northern District of California

The legislative history of Section 525 demonstrates that Congress had in mind a scenario like our own when it enacted this provision. The House Conference Report of September 28, 2006, H.R. Conf. Rep. No. 109-699, 2006 WL 3901779, *944–45, explained the meaning and purpose of Section 525 as follows (emphasis added):

> Section 525. The conferees continue and modify a provision proposed by the House and Senate requiring DHS to revise, within 30 days after enactment, its management directive on Sensitive Security Information (SSI) to among other things, *provide for the release of certain SSI information that is three years old unless the Secretary makes a written determination that identifies a rational reason why the information must remain SSI.* The conferees expect this rational reason written determination to *identify and describe the specific risk to the national transportation system. The provision also contains a mechanism for SSI to be used in civil judicial proceedings if the judge determines that is needed.* The conferees expect that *a party will be able to demonstrate undue hardship to the judge if equivalent information is not available in one month's time.* The conferees expect the criminal history records check and terrorist threat assessment on the persons seeking access to SSI in civil proceedings to be identical to that conducted for aviation workers. The conferees further expect *any DHS demonstration of risk or harm to the nation in a judicial proceeding include a description of the specific risk to the national transportation system.* This is consistent with demonstrations made for classified information.

In brief, Section 525(d) authorizes the district court to order production of information classified as sensitive security information upon a civil litigant's showing of "substantial need," provided that TSA and DHS do not "demonstrate" a "rational reason" to the Court as to why disclosure of the information would jeopardize national security.

Here, there is an important distinction between two types of information requested: (1) the information that was made available to the San Francisco defendants on the day of the incident in question based on what Bondanella and USIS told them; and (2) the original information that the FBI and former federal defendants used in determining whether to place plaintiff on the no-fly list in the first place. The latter information is *no longer relevant* as former federal defendants are no longer parties to this action. The actions taken by former federal defendants regarding plaintiff have *no bearing* on the liability of the remaining defendants in this case. The only relevant matter that remains is whether the remaining defendants' actions on the day in question were reasonably based, in part at least, on the first category of information.

It is worth noting again that San Francisco defendants and defendants John Bondanella and USIS *already have* the first category of information, as they were present when these communications originally occurred.  They ask to be able to *use* this information in the present litigation.  Plaintiff, on the other hand, *does not already have access to* the first category of information, and she asks that the government *produce* this information for use in the present litigation.

With these distinctions in mind, and pursuant to Section 525(d), the undersigned has determined that the following information should be produced to plaintiff and usable by San Francisco defendants and defendants John Bondanella and USIS based on a showing by *all* parties of a "substantial need":  *Any and all information supplied by John Bondanella or USIS that San Francisco defendants acted on in deciding to arrest plaintiff.*[2]  Pursuant to this category of information and the distinctions recognized above, former federal defendants are also ordered to produce to plaintiff, and allow all parties in this case to use, the following documents:

1.     FBI phone logs related to plaintiff identified in former federal defendants' initial disclosures in this case that fall under the category of information described above;

2.     TSA employee logs generated and kept at the San Francisco Airport related to plaintiff that relate to the incident in question;

3.     TSA employee logs and files from the Transportation Security Operations Center related to plaintiff that relate to the incident in question;

4.     Documents discussing the incident that is the subject of this lawsuit;

5.     Documents instructing law enforcement to arrest or detain plaintiff;

6.     Documents discussing instructions about the incident exchanged between federal defendants and other defendants (no work product privilege has been asserted as to this request);

---

[2] This order notes that former federal defendants did not assert the law enforcement privilege as to this information.  But even if the law enforcement privilege were asserted as to this information, the privilege's balancing test would mitigate in favor of such disclosure.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    7.    Documents discussing instructions about plaintiff exchanged

2    between former federal defendants and other defendants; and

3    8.    Video recordings of relevant events at the airport on the day in

4    question.

5    As to the specific category of information identified above, this order makes the following

6    findings:

7    1.    Plaintiff, San Francisco defendants, and defendants John

8    Bondanella and USIS have a substantial need for this relevant SSI to be used in the

9    preparation and litigation of their respective cases;

10    2.    The parties are unable without undue hardship to obtain and/or use

11    the substantial equivalent of this information in this litigation by other means; and

12    3.    Revealing this category of information in this proceeding would not

13    present a risk of harm to the nation.

14                    *              *              *

15    Contrary to former federal defendants, *both* plaintiff *and* San Francisco defendants

16    may receive the benefit of Section 525(d) (as can defendants John Bondanella and USIS).

17    Former federal defendants suggested in the discovery hearing that San Francisco defendants

18    signed a strict non-disclosure agreement before they even received access to the SSI.  They argue

19    that plaintiff has rights under Section 525(d), but that San Francisco defendants, by reason of

20    the contract, do not.  This order *rejects* that argument.  The House Report on Section 525(d)

21    demonstrated that Congress specifically wanted this information to be available for litigation

22    purposes when there is a demonstrated substantial need and there is no "rational reason" for it

23    to remain undisclosed.  2006 WL 3901779, at *944–45.  As stated, these requirements have been

24    satisfied, and the information should be produced to plaintiff and used by defendants for purposes

25    of this action.

26    As stated, Section 525(d) states that a district court may order the production and

27    disclosure of such substantially needed SSI, pursuant to a protective order (emphasis added):

28        [U]nless upon completion of a criminal history check and terrorist
          assessment like that done for aviation workers on the persons

18

United States District Court

For the Northern District of California

> seeking access to SSI, or based on the sensitivity of the information,
> the Transportation Security Administration or DHS *demonstrates*
> that such access to the information for the proceeding presents a
> risk of harm to the nation.

The word "demonstrates" in Section 525(d) means that TSA or DHS must *prove to the Court* that release of the information for use in the instant proceeding would present a risk of harm to the nation. The House Report explained that such a "demonstration" must "include a description of the specific risk to the national transportation system." 2006 WL 3901779, at *945. TSA and DHS have thus far failed to do so. The information ordered to be produced and disclosed is *stale* — it is almost five years old. Former federal defendants have made an insufficient showing that its release will endanger national security or the national transportation system. Moreover, Section 525(a)(2) specifically encourages the disclosure of information "that is three years old and not incorporated in a current transportation security directive, security plan, contingency plan, or information circular." Likewise, the House Report, 2006 WL 3901779, at *944–45, reiterated the goal of releasing *out-dated* security information, such as that at issue in the present case, for use in civil litigation. Finally, the House Report noted that "a party will be able to demonstrate undue hardship to the judge if equivalent information is not available in one month's time." *Id.* at 945. In the present action, the one month mark has already been reached and no equivalent information exists, nor could it be obtained elsewhere.

*          *          *

Turning to relief, Section 525(d) states that former federal defendants have the right to do a background check or terrorist threat assessment on any individuals seeking access to the information. As a result, former federal defendants may still restrict the use of this information in the event that the results of these checks or threat assessments *demonstrate* that providing certain access may risk harm to the nation. Two of plaintiff's counsel, San Francisco defendants, and defendants John Bondanella and USIS have already successfully completed these background checks (we presume this because they all already have access to the SSI). Former federal defendants have already had the opportunity *but failed* to demonstrate that releasing the information to those individuals would risk harm to the nation. Anyone else in this action who would like access to this information must apply to former federal defendants for access to the

19

same by no later than **THURSDAY, DECEMBER 31, 2009**.  (Plaintiff's counsel have already applied and those two need not re-apply.)  Anyone who does not apply by this time will not get access to the information ordered to be produced herein.  Former federal defendants must then complete the requested background checks by no later than **WEDNESDAY, MARCH 31, 2010**.  All of this relief is without prejudice to a possible motion to close any portions of the jury trial addressing this information.  The burden will be on the government to demonstrate a risk of harm to the nation and it must file such a motion, if at all, by **MARCH 31, 2010**.

Anyone in this litigation given access to the sensitive security information must use it solely for purposes of this litigation and must acknowledge this duty in writing by signature in a filing herein by **DECEMBER 31, 2009**.  That is, all persons receiving the sensitive information must sign an agreement to be bound by the terms of this protective order.  By no later than **NOON ON THURSDAY, DECEMBER 31, 2009**, all counsel shall submit a more detailed protective order, stipulated to as to form (without prejudice to any appeal rights on the substance of this order).

Until **APRIL 1, 2010, AT NOON**, no production or use of sensitive security information will be allowed.  This will give the government an opportunity to appeal this order (or decline to do so) and/or to bring motions based on the background checks yet to be completed.

Finally, as to the original data and information that the federal government used in determining that plaintiff should be put on the no-fly list, neither plaintiff nor San Francisco defendants has demonstrated a "substantial need" for this information to complete this litigation.  As stated, because former federal defendants are no longer parties to this case, there is no claim for relief for plaintiff to be removed from the no-fly list.  Therefore, that information must remain undisclosed.   This means that former federal defendants need not produce, and defendants in this action may not disclose, the following documents requested by plaintiff:

> 1.    The no-fly list and other documents identifying plaintiff as someone who should be selected for special screening;

> 2.    Documents considered when placing plaintiff's name on the no-fly list; and

United States District Court

For the Northern District of California

1

2

     3.     Documents considered when placing plaintiff's name in the terrorist

screening database.

3

### 3.     LAW ENFORCEMENT PRIVILEGE.

4

Former federal defendants have submitted to the undersigned's jurisdiction:  (1) the

5

unredacted transcript of the teletype that SFPD officers received from law enforcement databases

6

about plaintiff; and (2) the declaration of Arthur M. Cummings filed under seal in support of the

7

assertion of the privilege.  Former federal defendants have asserted *only* the law enforcement

8

privilege as to these materials, and not the sensitive security information privilege (*see* Dkt.

9

No. 264).

10

Although the Ninth Circuit has only mentioned the law enforcement privilege in passing,

11

the Ninth Circuit would presently follow other circuits in adopting the privilege.  The Second

12

Circuit has explained that the law enforcement privilege is designed "to prevent disclosure of

13

law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect

14

witness and law enforcement personnel, to safeguard the privacy of individuals involved in an

15

investigation, and otherwise to prevent interference with an investigation."  *In re Department of*

16

*Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988).

17

But the law enforcement privilege is not absolute.  Rather, it is only a *qualified* privilege

18

that requires "a need to balance the public interest in nondisclosure against the need of the

19

particular litigant for access to the privileged information."  *Friedman v. Bache Halsey Stuart*

20

*Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984).  Furthermore:

21

22

23

24

> When the records are both relevant and essential to the
> presentation of the case on the merits, the need for disclosure
> outweighs the need for secrecy, and the privilege is overcome.  It
> is appropriate to conduct the balancing test for determining
> whether the law enforcement privilege applies with an eye towards
> disclosure.

*Hemstreet v. Duncan*, CV-07-732-ST, 2007 U.S. Dist. LEXIS 89702, *6 (D. Or. Dec. 4, 2007)

25

(citations and quotation marks omitted).

26

### A.     ARTHUR M. CUMMINGS' DECLARATION.

27

28

Former federal defendants assert that declaration of Arthur M. Cummings (Dkt. No. 267)

filed under seal is privileged only by virtue of the law enforcement privilege, and that this

21

United States District Court

For the Northern District of California

1   document further explains why the unredacted transcript of teletype that the San Francisco

2   defendants seek to disclose is subject to the law enforcement privilege.  This submission was

3   made ex parte (but with notice of the ex parte filing) and has not been shared with the other

4   parties, although it will be filed under seal for the eyes of the circuit court.

5          The undersigned has read the declaration of Mr. Cummings.  Applying the balancing test,

6   the Court finds that paragraph 18 of the Arthur Cummings declaration should be produced

7   because the law enforcement need to keep this information secret is outweighed by the need of

8   the parties to have it.  Indeed, in the absence of providing this information, the record will be

9   truncated.  Furthermore, plaintiff already knows that she was detained, so disclosing this

10  information will not reveal anything earth-shattering to her.  Finally, the information contained

11  in paragraph 18 is now almost five years old and is therefore stale and not necessarily applicable

12  anymore.  In sum, former federal defendants are **ORDERED** to produce paragraph 18 of the

13  declaration of Arthur M. Cummings, but nothing else therein.

14                 **B.     UNREDACTED TELETYPE TRANSCRIPT.**

15         Former federal defendants also assert only the law enforcement privilege as to

16  San Francisco defendants' request to disclose the unredacted transcript of the teletype that SFPD

17  officers received from law enforcement databases about plaintiff.  For the reasons above, the

18  law enforcement privilege balancing test militates in favor of authorizing disclosure of this

19  information — plaintiff and San Francisco defendants have a strong need, and safeguards,

20  such as a protective order and filing under seal, can at the very least reduce many of the law

21  enforcement concerns.[3]  In sum, former federal defendants are **ORDERED** to produce the

22  unredacted transcript of the teletype, and San Francisco defendants may disclose it in this suit.

23

24  ───────────

25         [3] Former federal defendants have also submitted the declaration of Tracy A. North in support of the law
    enforcement privilege as to some items that are the subject of *plaintiff's* motion to compel.  The North

26  declaration is asserted *only* as to some items that plaintiff seeks to acquire (*see* Dkt. No. 266 at 2).  This order
    does not address the law enforcement privilege in the context of plaintiff's motion because, as stated, the SSI

27  privilege prevents disclosure of those materials anyway, and the law enforcement privilege has not been
    asserted over the materials ordered to be produced herein.  The undersigned notes that the North declaration

28  adds nothing to former federal defendants' case for the law enforcement privilege as against San Francisco
    defendants that was not already explained by the Cummings declaration.  Also, given this determination, this
    order need not address plaintiff's motion to strike the North declaration.

United States District Court
For the Northern District of California

This part of the order is **STAYED UNTIL MARCH 31, 2010**, to allow former federal defendants an opportunity to decide whether to appeal or seek a writ of mandamus as to this part of the order pertaining to the law enforcement privilege only.

### 4.    STATE SECRETS PRIVILEGE.

As stated, the order dated November 19 stated that "[a]ny privilege concerns as to all pending motions must be asserted, along with all supporting bases thereof, by **FRIDAY, NOVEMBER 20, 2009 AT NOON**" (Dkt. No. 263 at 11).  In their document asserting privileges as to San Francisco defendants' motion, former federal defendants stated:  "[I]n the event it should become necessary, non-parties request time to consider whether to assert the state secrets privilege" (Dkt. No. 264 at 3).  Former federal defendants did not indicate *why* they could not immediately start the "extensive process of analysis and oversight" involved in asserting the privilege (*ibid.*).  Instead, they decided to wait and see what happened with the other privileges first.  This order holds that former federal defendants' failure to assert the state secrets privilege by November 20 thereby *waived* any such privilege.

### 5.    STATUTORY PRIVILEGE UNDER THE IMMIGRATION AND NATIONALITY ACT.

Finally, former federal defendants assert that information pertaining to plaintiff's September 2009 discussions with consular officials and her visa application is subject to a statutory privilege contained in Section 222(f) of the Immigration and Nationality Act, 8 U.S.C. 1202(f).  Section 222(f) provides the Secretary of State with certain control regarding the disclosure of visa-related materials.

But, as explained above, plaintiff's visa-related document requests all pertain to events that post-date the operative second amended complaint.  As such, these events are not a proper subject for discovery in the instant case and any challenge to the agency's withholding of this information would need to be addressed by a separate suit, such as that envisioned in *Weiner v. Federal Bureau of Investigation*, 943 F.2d 972 (9th Cir. 1991).

### 6.    APPELLATE REVIEW.

Counsel are reminded that they should take care to address any "appeals" from this order to the appropriate court of appeals and "the appropriate court" may well turn on the specific

23

1    relief granted (or denied).  For example, plaintiff may be obligated to direct her Section 46110

2    appeal to the District of Columbia Circuit, whereas other issues may have to go to the Ninth

3    Circuit.  As to some issues, appeals may not even lie at this stage (such as the law enforcement

4    privilege ruling).  The district court is not the arbiter of appellate jurisdiction and these words are

5    merely a "heads up" to counsel.

### CONCLUSION

7         Relief is **GRANTED AND DENIED**, as stated above.

9         **IT IS SO ORDERED.**

11   Dated:  December 17, 2009.

_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

24