FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RAHINAH IBRAHIM, an individual,
*Plaintiff-Appellant,*

v.

DEPARTMENT OF HOMELAND
SECURITY; MICHAEL CHERTOFF, in
his official capacity as the former
Secretary of the Department of
Homeland Security; TOM RIDGE, in
his official capacity as the former
Secretary of the Department of
Homeland Security; TERRORIST
SCREENING CENTER; DONNA
BUCELLA, in her official capacity
as former Director of the Terrorist
Screening Center; FEDERAL BUREAU
OF INVESTIGATION; ROBERT S.
MUELLER, III, in his official
capacity as Director of the Federal
Bureau of Investigation; JANET
NAPOLITANO, in her official
capacity as Secretary of the
Department of Homeland security;
ERIC H. HOLDER Jr., Attorney
General, in his official capacity as
Attorney General; ARTHUR M.
CUMMINGS, II, in his official
capacity as Executive Assistant
Director of the FBI's National
Security Branch; NATIONAL

No. 10-15873

D.C. No.
3:06-cv-00545-
WHA

OPINION

1292 IBRAHIM v. DHS

COUNTERTERRORISM CENTER;
MICHAEL E. LEITER, in his official
capacity as Director of the
National Counterterrorism Center;
DEPARTMENT OF STATE; HILARY
CLINTON, in her official capacity as
Secretary of State; JOHN
BONDANELLA, an individual; US
INVESTIGATIONS SERVICES, INC., a
Virginia corporation; CITY AND
COUNTY OF SAN FRANCISCO; SAN
FRANCISCO AIRPORT; SAN FRANCISCO
POLICE DEPARTMENT; RICHARD
PATE, an individual; JOHN
CUNNINGHAM, an individual;
ELIZABETH MARON, an individual,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
May 9, 2011—San Francisco, California

Filed February 8, 2012

Before: Dorothy W. Nelson and William A. Fletcher,
Circuit Judges, and Kevin Thomas Duffy, District Judge.*

Opinion by Judge William A. Fletcher;
Dissent by Judge Duffy

*The Honorable Kevin Thomas Duffy, District Judge for the U.S. District Court for Southern New York, New York, sitting by designation.

Ibrahim v. DHS

## COUNSEL

James McManis, Marwa Elzankaly, Christine Peek, Elizabeth Pipkin, McMANIS FAULKNER, San Jose, California, for the appellant.

Paul G. Freeborne, Douglas Neal Letter, Joshua P. Waldman, US DEPARTMENT OF JUSTICE, Washington, D.C.; Sharon Douglass Mayo, ARNOLD & PORTER, San Francisco, California; and Ronald P. Flynn, Peter Julian Keith, SAN FRANCISCO CITY ATTORNEY'S OFFICE, San Francisco, California, for the appellees.

Veena Dubal, ASIAN LAW CAUCUS, San Francisco, California, and Maria V. Morris, Sanford Jay Rosen, ROSEN BIEN & GALVAN, LLP, San Francisco, California, for the amici curiae.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Rahinah Ibrahim is a citizen of Malaysia and mother of four children. She was legally in the United States from 2001 to 2005 as a Ph.D. student at Stanford University. She alleges that the U.S. government has mistakenly placed her on the "No-Fly List" and other terrorist watchlists. On January 2, 2005, she attempted to travel to a Stanford-sponsored conference in Malaysia where she was to present her doctoral research. She was prevented from flying and was detained in a holding cell for two hours at the San Francisco airport. She was allowed to fly to Malaysia the next day, but she was prevented from returning to the United States after the conference. Ibrahim has not been permitted to return to the United States.

Ibrahim brought suit in federal district court seeking, among other things, injunctive relief under the First and Fifth Amendments, with the ultimate aim of having her name removed from the government's watchlists. The district court denied injunctive relief. We reverse and remand for further proceedings.

## I.   Factual Background

### A.   Ibrahim's Departure

Ibrahim is Associate Professor and Deputy Dean of Research, Postgraduate Studies and International Affairs at the Faculty of Design and Architecture of the University Putra Malaysia in Serdang, Malaysia. She has a Ph.D. in Construction Engineering and Management from Stanford University in California, where she studied from 2001 to 2005 under a student visa.

This case has never gone beyond the complaint stage. For the narrative that follows, we rely on allegations in Ibrahim's complaint and on statements in her declaration in the district court, assuming those allegations and statements to be true for purposes of our review. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

On January 2, 2005, Ibrahim attempted to fly to Kuala Lumpur, Malaysia, to present the results of her doctoral research at a Stanford-sponsored conference. She arrived at the San Francisco airport at about 7 a.m. for a 9 a.m. flight, accompanied by her 14-year old daughter and a friend. She requested wheelchair assistance to the gate because she was recovering from medical complications from a hysterectomy. When Ibrahim tried to check in at the ticket counter, a United Airlines employee, David Nevins, discovered her name on the federal government's No-Fly List. Instead of issuing her a boarding pass, Nevins called the San Francisco police.

Ibrahim v. DHS

When San Francisco police officers arrived, they called the Transportation Security Operations Center,[1] a division of the federal Transportation Security Agency ("TSA"). A federal contractor employed by US Investigation Services, Inc., John Bondanella, answered the call. Bondanella told the police to prevent Ibrahim from flying, to contact the FBI, and to detain Ibrahim for questioning.

At 8:45 a.m., fifteen minutes before her flight was scheduled to leave, San Francisco police officers handcuffed Ibrahim. They took her to a police station in the airport, searched her, and locked her in a holding cell. No one explained to Ibrahim why she had been arrested and detained. After about two hours, the FBI requested that the officers release her. Ibrahim was told by an unspecified person that her name no longer appeared on the No-Fly List.

The next day, Ibrahim went to the San Francisco airport to catch a different flight. An unspecified person told her that she was again (or still) on the No-Fly List. She was nonetheless allowed to fly to the Stanford-sponsored conference in Malaysia. She was subjected to enhanced screening at the San Francisco airport and at all stops en route to Kuala Lumpur.

Ibrahim was scheduled to return to Stanford to complete work on her Ph.D. on March 10. But when she arrived at the Kuala Lumpur airport, she was told by a ticketing agent that she would have to wait for clearance from the United States Embassy before she could board. Another ticketing agent told her that a note by her name instructed airport personnel to call the police and have her arrested. Ibrahim was not arrested but was prevented from boarding her scheduled return flight. She has never been permitted to return to the United States.

---

[1]Subsequently renamed "The Freedom Center." Transportation Security Administration, Transportation Security Operations Center Re-Named Freedom Center, at http://www.tsa.gov/press/speeches/freedom_dedication.shtm (last visited Aug. 30, 2011).

On March 24, 2005, Ibrahim submitted a request through TSA's "Passenger Identity Verification" program to clear her name. TSA failed to respond for approximately one year, and only did so after Ibrahim filed this suit. In a form letter, TSA responded to Ibrahim's request by explaining that "[if] it has been determined that a correction to records is warranted, these records have been modified." The letter did not state whether Ibrahim was, or was not, on the No-Fly List or other terrorist watchlists.

On April 14, 2005, an American consul in Malaysia sent Ibrahim a letter informing her that the Department of State had revoked her student visa on January 31, 2005, a month after her departure from the United States. The letter cited Ibrahim's "possible ineligibility" under § 212(a)(3)(B) of the Immigration & Nationality Act (INA) as the reason for the revocation. That section of the INA provides, among other things, that "[a]ny alien" (1) who "has engaged in terrorist activity"; (2) who "a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity"; or (3) who "has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity," is inadmissible to the United States. 8 U.S.C. § 1182(a)(3)(B). The letter further stated that revocation of Ibrahim's visa did "not necessarily indicate that [she was] ineligible to receive a U.S. visa in the future." "That determination," the letter continued, "can only be made at such time as you apply for a new visa." Ibrahim applied for a new visa after she filed this lawsuit. We take judicial notice that the Department of State denied her application on December 14, 2009, during the pendency of this appeal. In a form letter with a series of boxes, a consular officer marked a box indicating that INA § 212(a)(3)(B) formed the basis of the denial of her visa. The letter did not explain how the consular officer arrived at his determination that she was suspected of terrorist activities.

Ibrahim's inability to return to the United States has limited her academic and professional activities. She currently participates in a long-term project with Stanford to improve Malaysia's construction industry. If she were not prevented from doing so, she would return to Stanford once a year to work on the project. The Malaysian university where Ibrahim currently teaches participated in a summer program at Stanford's Center for Integrated Facility Engineering. Although Ibrahim was her school's representative to Stanford, she was unable to participate in the program. Ibrahim collaborates with Stanford Professors Raymond Levitt and Renate Fruchter, and has co-authored several papers with Professor Fruchter. Ibrahim has stated in an affidavit that she is "occasionally able to meet face-to-face with U.S. citizens outside the United States" but has "otherwise had to use video conferencing and email instead, both of which are poor substitutes for face-to-face contact." Selangor, a provincial government in Malaysia, also asked Ibrahim to act as its representative at a conference in San Francisco but she was unable to attend.

Ibrahim has close friends at Stanford whom she remains unable to visit. Her thesis advisor at Stanford, Professor Boyd Paulson, died in December 2005. Professor Paulson's widow asked Ibrahim to speak at his memorial service, but she was unable to attend. Ibrahim states that she would like to "finally . . . say goodbye to him at his grave."

## B.   The Government's Terrorist Watchlists

Since the terrorist attacks of September 11, 2001, the federal government has assembled a vast, multi-agency, counterterrorism bureaucracy that tracks hundreds of thousands of individuals. *See, e.g.*, 6 U.S.C. §§ 122, 124h, 482, 485; Exec. Order No. 13388, 70 Fed. Reg. 62023 (Oct. 25, 2005). At the heart of this bureaucracy is the Terrorist Screening Center ("TSC"). Established by the Attorney General in 2003 pursuant to a presidential directive, the mission of TSC is "to consolidate the Government's approach to terrorism screening

and provide for the appropriate and lawful use of Terrorist Information in screening processes." *See* Homeland Security Presidential Directive/HSPD-6. Though administered by the FBI, TSC retains personnel from the Departments of State, Homeland Security, and Defense, and other federal agencies.[2]

TSC manages the Terrorist Screening Database ("TSDB"), the federal government's centralized watchlist of known and suspected terrorists. The National Counterterrorism Center nominates known and suspected international terrorists to the TSDB, while the FBI nominates known and suspected domestic terrorists. TSC distributes subsets of the TSDB to other federal agencies to help implement the government's counterterrorism initiatives. TSA uses two subsets of the TSDB — the No-Fly List and the Selectee List — to screen airline passengers. Individuals on the No-Fly List are prohibited from boarding American carriers or any flight having virtually any contact with U.S territory or airspace. Individuals on the Selectee List are subject to enhanced security screening before boarding an airplane.[3] The State Department uses a subset of the TSDB to screen visa applicants through the Consular Lookout and Support System.[4]

The evidence and procedures used to nominate individuals to the TSDB are kept secret from the general public, as are the names of those in the TSDB. However, thousands of front line law enforcement officers from federal, state, local, territorial, and tribal agencies have access to the TSDB, as do some pri-

---

[2]*Five Years After the Intelligence Reform and Terrorism Prevention Act: Stopping Terrorist Travel*: *Hearing Before the S. Comm. on Homeland Sec. and Governmental Affairs,* 111th Cong. 1-2 (Dec. 9, 2009) (Statement of Timothy J. Healy, Director, Terrorist Screening Center) [hereinafter "Healy Statement"].

[3]U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-110, TERRORIST WATCHLIST SCREENING: OPPORTUNITIES EXIST TO ENHANCE MANAGEMENT OVERSIGHT, REDUCE VULNERABILITIES IN AGENCY SCREENING PROCESSES, AND EXPAND USE OF THE LIST 30 (2007) [hereinafter "2007 GAO Report"].

[4]*Id.* at 30.

vate sector entities and individuals.[5] As of January 2011, TSC had also agreed to share information with 22 foreign governments.[6]

Since its inception, the TSDB has grown by more than 700%, from about 158,000 records in June 2004 to over 1.1 million records in May 2009. In 2007, these records contained information on approximately 400,000 individuals.[7] As of 2007, the TSDB was increasing at a rate of 20,000 records per month.[8] TSC makes 400 to 1200 changes to the TSDB every day.[9] It is the "world's most comprehensive and widely shared database of terrorist identities."[10]

In theory, only individuals who pose a threat to civil aviation are put on the No-Fly and Selectee Lists, but the Justice Department has criticized TSC for its "weak quality assurance process."[11] In July 2006 — after the events that gave rise to this lawsuit — there were 71,872 records in the No-Fly List. After an internal review, TSC downgraded 22,412 records

---

[5]U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-10-401T, HOMELAND SECURITY: BETTER USE OF TERRORIST WATCHLIST INFORMATION AND IMPROVEMENTS IN DEPLOYMENT OF PASSENGER SCREENING CHECKPOINT TECHNOLOGIES COULD FURTHER STRENGTHEN SECURITY 2 (2010) [hereinafter "2010 GAO Statement"].

[6]U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-11-335, VISA WAIVER PROGRAM: DHS HAS IMPLEMENTED THE ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION, BUT FURTHER STEPS NEEDED TO ADDRESS POTENTIAL PROGRAM RISKS 21 n.24 (2011) [hereinafter "2011 GAO Report"].

[7]2007 GAO REPORT at 8; U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL, AUDIT DIVISION, AUDIT REPORT 09-25, THE FEDERAL BUREAU OF INVESTIGATION'S TERRORIST WATCHLIST NOMINATION PRACTICES i-ii & n.4 (2009) [hereinafter "2009 DOJ Report"].

[8]U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL, AUDIT DIVISION, AUDIT REPORT 07-41, FOLLOW-UP AUDIT OF THE TERRORIST SCREENING CENTER iii (2007) (hereinafter "2007 DOJ Report").

[9]Healy Statement at 2.

[10]*Id.* at 1.

[11]2007 DOJ REPORT at iii.

from the No-Fly List to the Selectee List and deleted entirely an additional 5,086 records. By January 2007, the TSC had cut the No-Fly List by more than half, to 34,230 records.[12] Tens of thousands of travelers have been misidentified because of misspellings and transcription errors in the nomination process, and because of computer algorithms that imperfectly match travelers against the names on the list.[13] TSA maintains a list of approximately 30,000 individuals who are commonly confused with those on the No-Fly and Selectee Lists.[14] One major air carrier reported that it encountered 9,000 erroneous terrorist watchlist matches every day during April 2008.[15]

Nomination and identification errors are so common that TSC organized a redress unit in 2007 to deal with complaints. The redress procedures have been opaque. A 2006 GAO report stated that an individual who submitted a query to TSC's redress unit received an initial response letter that "neither confirms nor denies the existence of any terrorist watch list records relating to the individual."[16] A 2009 internal DHS report stated, "With few exceptions, redress-seekers receive response letters that do not reveal the basis for their travel difficulties, the action the government took to address those difficulties, or other steps that they may take to help themselves in the future."[17]

---

[12]Id. at 32-33 & n.49.

[13]U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-06-1031, TERRORIST WATCH LIST SCREENING, EFFORTS TO HELP REDUCE ADVERSE EFFECTS ON THE PUBLIC 2, 4-6, 19-20 (2006) [hereinafter "2006 GAO Report"].

[14]Id. at 34.

[15]DEP'T OF HOMELAND SEC., OFFICE OF INSPECTOR GENERAL, OIG-09-103, EFFECTIVENESS OF THE DEPARTMENT OF HOMELAND SECURITY TRAVELER REDRESS INQUIRY PROGRAM (REDACTED) 37 (2009) [hereinafter "2009 DHS Report"].

[16]See 2006 GAO Report at 31.

[17]2009 DHS Report at 89.

Ibrahim v. DHS

When Ibrahim filed suit, TSA managed a Passenger Identity Verification program for travelers who believed that they were mistakenly put on the No-Fly or Selectee List. In place of that program, the Department of Homeland Security ("DHS") now manages the Traveler Redress Inquiry Program ("TRIP"). A 2007 Department of Justice audit commended TSC for accurately resolving redress queries, but noted that 45% of the reviewed records contained an error.[18] The 2009 DHS report was less charitable, concluding that the "TRIP website advises travelers that the program can assist them with resolving a range of travel difficulties. Our review of redress results revealed that those claims are overstated. While TRIP offers effective solutions to some traveler issues, it does not address other difficulties effectively, including the most common — watch list misidentifications in aviation security settings."[19]

## II.   Procedural Background

On January 27, 2006, Ibrahim filed suit against DHS, TSA, TSC, the FBI, the Federal Aviation Administration ("FAA"), and individuals associated with these entities (collectively, "the federal defendants"); the City and County of San Francisco, the San Francisco Police Department, the San Francisco Airport, the County of San Mateo, and individuals associated with these entities (collectively, "the city defendants"); and United Airlines, UAL corporation, and individuals associated with these entities (collectively, "the private defendants"). Ibrahim asserted § 1983 claims and state-law tort claims arising out of her detention at the San Francisco airport, as well as several constitutional claims based on the inclusion of her name on government terrorist watchlists. The district court dismissed her claims against the federal defendants under 49 U.S.C. § 46110(a), which vests exclusive original jurisdiction

---

[18]2007 DOJ Report at xix.

[19]2009 DHS Report at 33-34.

in the courts of appeals over suits challenging security orders issued by TSA.

A panel of this court reversed in part the district court's dismissal of the federal defendants. We held that § 46110(a) does not bar district court jurisdiction over Ibrahim's challenges to her placement on the government terrorist watchlists, including the No-Fly List, because the lists are managed by TSC rather than TSA. *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1254-56 (9th Cir. 2008). We held, however, that § 46110(a) requires all challenges to TSA's policies and procedures implementing the No-Fly and other lists to be filed directly in the court of appeals. *Id.* at 1256-57.[20]

After remand, Ibrahim filed a Second Amended Complaint ("SAC"). In Claim 13 of her SAC, Ibrahim asserted several causes of action against the remaining federal defendants. Ibrahim alleges in Claim 13 that the inclusion of her name on the government's terrorist watchlists violates her First Amendment right to freedom of association and her Fifth Amendment rights to due process and equal protection. She also alleges that the federal defendants violated the Administrative Procedure Act ("APA"), which we construe as an allegation that the APA waives the sovereign immunity of the United States, thereby allowing her claims under the First and Fifth Amendments and authorizing remedies for those claims. *See Ibrahim*, 538 F.3d at 1254. Ibrahim asks for an injunction that would require the government to take her name off its terrorist watch lists, including the No-Fly List, or, in the alternative, to provide procedures under which she could challenge her inclusion on those lists.

---

[20]Ibrahim had also filed a petition directly with the Ninth Circuit pursuant to § 46110(a). Because Ibrahim no longer resides in California, the panel transferred that petition to the D.C. Circuit. *Ibrahim*, 538 F.3d at 1253 n.2. Proceedings there are being held in abeyance pending resolution of this appeal. *Id.*

The federal defendants moved to dismiss Claim 13 for lack
of standing and for failure to state a claim upon which relief
can be granted. The government contended that Ibrahim has
no standing under Article III of the Constitution. The govern-
ment contended, further, that Ibrahim has no right to assert
claims under the First and Fifth Amendments because she is
an alien who has voluntarily left the United States.

The district court held that Ibrahim has standing. The dis-
trict court speculated that Ibrahim's inclusion in the No-Fly
List might be a "monumental mistake," but nonetheless dis-
missed Claim 13, holding that Ibrahim was "an alien who vol-
untarily left the United States and thus left her constitutional
rights at the water's edge."

Ibrahim has settled her claims against the non-federal
defendants. She appeals the dismissal of her Claim 13 against
the federal defendants. She also appeals discovery rulings.

### III.  Standard of Review

We review *de novo* a district court's dismissal of a com-
plaint under Federal Rule of Civil Procedure 12(b)(6) for fail-
ure to state a claim. *Alonzo v. ACF Prop. Mgmt., Inc.*, 643
F.2d 578, 579 (9th Cir. 1981). A complaint must state a claim
for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 129
S. Ct. 1937, 1949 (2009). The facts in the complaint are liber-
ally construed in the plaintiff's favor and are generally
accepted as true. *Id.* The complaint, however, must allege
"more than a sheer possibility that a defendant has acted
unlawfully." *Id.* We review discovery orders for abuse of dis-
cretion. *Laub v. US Dep't of Interior*, 342 F.3d 1080, 1084
(9th Cir. 2003).

### IV.  Discussion

#### A.  Standing

"To satisfy Article III's standing requirements, a plaintiff
must show (1) she has suffered an 'injury in fact' that is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Berhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868-69 (9th Cir. 2002) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). A plaintiff has the burden of showing that she has standing. *See Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

**[1]** Ibrahim seeks only prospective relief against the federal defendants. To establish standing under Article III, she "must demonstrate that [s]he is realistically threatened by a repetition of the violation," *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (internal quotation marks, alterations, and emphasis omitted), abrogated on other grounds by *Johnson v. California*, 43 U.S. 499, 504-05 (2005), or show a credible threat of future injury, *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).

**[2]** The government makes three standing arguments under Article III. First, it argues that Ibrahim has failed to allege that she is still on a government watchlist. The government refuses to confirm or deny whether Ibrahim is on a watchlist, but it contends that her SAC compels the conclusion that she is not now on the No-Fly List, given that she was allowed to fly to Malaysia the day after she was detained. The government ascribes the boarding denial in Malaysia to Ibrahim's lack of a visa. Second, the government argues that a favorable judicial decision will not redress Ibrahim's injury. The government notes that the revocation of Ibrahim's student visa and her inability to obtain a new one independently bars Ibrahim from entering the United States, and that consular decisions denying visas are immune from judicial review. Third, the government argues that Ibrahim's injury is hypothetical because she has no immediate plans to travel.

**[3]** The government's first argument is easily answered. The reasonable inference to draw from Ibrahim's complaint is that she is on one or more government watchlists. When she flew from San Francisco to Malaysia, she was subject to enhanced searches at the San Francisco Airport and all subsequent stopovers. In general, only individuals who are on the government's Selectee List are subject to such searches. In Malaysia, a ticketing agent told Ibrahim that a note by her name instructed airport personnel to have her arrested. Would-be travelers to the United States are not typically subject to arrest before boarding merely for lacking a proper visa. When the State Department revoked Ibrahim's student visa, it cited INA § 212(a)(3)(B), which bars entry of any persons known or suspected to be connected to terrorism. When Ibrahim applied for a new visa, the State Department denied her application for the same reason. The State Department reviews the Consular Lookout and Support System — a subset of the TSDB — to make visa determinations.

The government's second argument, that a favorable decision will not redress her injury, is also unpersuasive. The government mischaracterizes Ibrahim's injury by focusing solely on her inability to return to the United States. The No-Fly List prevents her from boarding any U.S. carrier, whether or not a flight departs from or lands in the United States. It also prevents her from flying over U.S. airspace. These are injuries unrelated to her lack of a visa. Further, TSC shares the TSDB with 22 foreign governments. We can reasonably infer that Ibrahim will suffer delays (or worse) when traveling abroad, even on foreign carriers, resulting from the presence of her name on the No-Fly List.

**[4]** Even if Ibrahim's injury were limited to her inability to enter the United States, she would still have standing. Ibrahim does not challenge the revocation of her visa, as decisions of consular officers to deny a visa are immune from judicial review. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1060 (9th Cir. 2008). But it is a reasonable inference that removal of her

name from government watchlists would make a grant of a visa more likely. If Ibrahim's name were removed from the TSDB, and thereby removed from the Consular Lookout and Support System, the State Department would be more likely to grant her a visa, given that it has relied on her alleged connection to terrorism as the basis for revoking her visa and denying her application for a new one. Though Ibrahim's future ability to obtain a visa is uncertain and we would be powerless to review a denial, "plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision . . . [P]laintiffs must show only that a favorable decision is *likely* to redress [their injuries], not that a favorable decision *will inevitably* redress [their injuries]." *Wilbur v. Locke*, 423 F.3d 1101, 1108 (9th Cir. 2005) (internal quotations omitted, emphasis and alterations in original) (quoting *Graham v. FEMA*, 149 F.3d 997, 1003 (9th Cir. 1998), abrogated on other grounds by *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 (2010). As the district court correctly observed, "While obtaining a visa may stand as a potential obstacle to her entry into the United States, it does not completely foreclose redressability. Ibrahim is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time."

[5] The government's third argument, that Ibrahim's injuries are hypothetical because she has no immediate plans to travel, is also unpersuasive. It is by no means clear that Ibrahim has no plans to travel to non-US destinations. As noted above, the presence of her name on the government's No-Fly List imposes real limitations on such travel. Further, it is obvious from her SAC that Ibrahim will return to the United States if permitted to do so. Ibrahim regularly collaborates with professors in the United States, is a member of several professional organizations in the United States, and has an extensive network of close friends in the United States. Ibrahim has been invited to return to the United States on several occasions since filing this lawsuit and has been obliged to decline every invitation because of the legal obstacles to her

return. These are not hypothetical " 'some day' intentions." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

**[6]** We therefore agree with the district court that Ibrahim has standing under Article III to challenge the presence of her name on government watchlists.

## B.   Constitutional Claims

Claim 13 of the SAC alleges that the placement of Ibrahim's name on the government's terrorist watchlists violates her right to freedom of association under the First Amendment and her rights to equal protection and due process under the Fifth Amendment.[21]

At this point in the litigation, no court has attempted to determine the merits of Ibrahim's claims under the First and Fifth Amendments. The parties have not briefed whether her placement on a terrorist watchlist violates her rights to freedom of association, equal protection, and due process. The only question before us is whether Ibrahim even has the right to assert such claims.

---

[21]Claim 13 also alleges a violation of the Fourteenth Amendment, but Ibrahim's brief on appeal makes clear that this allegation refers to the equal protection component of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497 (1954). The heading to Claim 13 also alleges a violation of the Fourth Amendment, but the body of Claim 13 makes no reference to the Fourth Amendment, and Ibrahim's brief on appeal makes clear that she is alleging claims under only the First and Fifth Amendments.

Claim 13 also alleges violation of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. We understand this to be an allegation that the APA waives the sovereign immunity of the United States for violations of the First and Fifth Amendments and authorizes remedies for such violations. The government contends that Ibrahim has waived any right to appeal the district court's denial of her claim under the APA. We disagree, given that Ibrahim's APA claim ultimately depends on the viability of her First and Fifth Amendment claims. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977) (holding APA does not provide an independent basis for subject matter jurisdiction in district courts).

**[7]** We begin with the uncontested proposition that if Ibrahim had remained in the United States, she would have been able to assert claims under the First and Fifth Amendments to challenge her placement on the government's terrorist watchlists. It is well established that aliens legally within the United States may challenge the constitutionality of federal and state actions. *See, e.g.*, *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 580 (1976); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-03 (1976); *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953); *Torao Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419-20 (1948). Even aliens who are in the United States illegally may bring constitutional challenges, *see, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 211-12 (1982); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), including the ability to challenge the revocation of a visa, *see ANA Int'l Inc. v. Way*, 393 F.3d 886, 893-84 (9th Cir. 2004) (allowing judicial review of INS decision to revoke temporary worker visa for purely legal questions, including constitutional challenges). The question in this case is whether Ibrahim lost the right she otherwise had because she left the United States.

The Supreme Court has held in a series of cases that the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not. For example, a resident alien who voluntarily leaves the United States on a brief trip with an intent to return is constitutionally entitled to a due process hearing if the government seeks to exclude her upon return to the United States. *See*, *e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (resident alien entitled to constitutional due process hearing in exclusion proceedings upon re-entry after a "few days" abroad); *Rosenberg v. Fleuti*, 374 U.S. 449, 450 (1963) (entry after innocent, casual, and brief excursion abroad did not qualify as "entry" for immigration purposes); *Kwong Hai Chew*, 344 U.S. at 593-95 (resident alien entitled to constitu-

IBRAHIM v. DHS

tional due process hearing after exclusion following a five-month voyage abroad). *See also Boumediene v. Bush*, 553 U.S. 723 (2008) (aliens held as enemy combatants outside the *de jure* sovereign territory of the United States may petition for habeas corpus to challenge the constitutionality of their detention); *Al Maqaleh v. Gates*, 605 F.3d 84, 95-96 (D.C. Cir. 2010) (location of alien outside the United States is only a factor in determining the extraterritorial reach of the Constitution); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (a foreign organization with property in the United States entitled to constitutional due process hearing before Secretary of State may classify it as a "foreign terrorist organization"); *Cardenas v. Smith*, 733 F.2d 909, 915 (D.C. Cir. 1984) (Colombian national outside the United States entitled to assert due process claim against U.S. government based on seizure of her Swiss bank account); *In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1308 n.6 (9th Cir. 1982) (nonresident aliens suing on same cause of action as citizens have the right to assert takings claim).

**[8]** In *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990), the Supreme Court wrote that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271. The Court's statement in *Verdugo* was an elaboration of its earlier language in *United States v. Eisentrager*, 339 U.S. 763 (1950), that an alien "is accorded a generous and ascending scale of rights as he increases his identity with our society." *Verdugo*, 494 U.S. at 269 (quoting *Eisentrager*, 339 U.S. at 770) (internal quotations omitted). The Court wrote in *Boumediene* that the right of an alien outside the United States to assert constitutional claims is based on "objective factors and practical concerns" rather than "formalism." 553 U.S. at 764. In determining the constitutional rights of aliens outside the United States, the Court applies a "functional approach" rather than a bright-line rule. *Id.*

A comparison of Ibrahim's case with *Verdugo, Eisentrager*, and *Boumediene* is instructive.

In *Verdugo*, plaintiff had been arrested in Mexico and brought against his will to the Mexico-United States border, where he was turned over to United States authorities and imprisoned in the United States while awaiting trial on narcotics smuggling charges. The Court held that the plaintiff had "no previous *significant voluntary connection* with the United States" and therefore had no right to assert a Fourth Amendment challenge searches and seizures of his property by United States agents in Mexico. *Verdugo*, 494 U.S. at 271 (emphasis added).

Relying on *Verdugo*, the government insists that Ibrahim left the United States "voluntarily" and that she thereby forfeited any right to assert constitutional claims she might have had if she had remained in the United States. The government mistakes the nature of the *Verdugo* inquiry. Under *Verdugo*, the inquiry is whether the alien has voluntarily established a connection with the United States, not whether the alien has voluntarily left the United States. The circumstances of an alien's departure may cast some light on whether the alien has established, and wishes to maintain, a voluntarily established connection with the United States. But the mere fact that an alien's departure is voluntary tells us very little. In Ibrahim's case, she left the United States to attend a Stanford-sponsored conference to present her academic research, performed in connection with her Ph.D. studies at Stanford, and she expected to return to Stanford after the conference to complete her studies. Ibrahim thus did not intend to sever her established connection to the United States by her voluntary departure, but rather to develop that connection further.

In *Eisentrager*, the plaintiffs were German citizens who had been arrested in China, convicted of violating the laws of war after adversary trials before a U.S. military tribunal in China, and sent to a prison in Germany to serve their sen-

tences. The Supreme Court held that they did not have a right to seek a writ of habeas corpus under our Constitution. The Court summarized:

> [To agree with plaintiffs that they are entitled to seek habeas] we must hold that a prisoner of our military authorities is constitutionally entitled to the writ, even though he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.

339 U.S. at 777.

Ibrahim's case is unlike that of the plaintiffs in *Eisentrager*. She has not been convicted of, or even charged with, any violation of law. She is a citizen of a country with which we have never been at war. She contends that the placement of her name on the government's terrorist watchlists is a mistake. Her contention is not implausible, given the frequent mistakes the government has made in placing names on these lists. She has established a substantial voluntary connection with the United States through her Ph. D. studies at a distinguished American university, and she wishes to maintain that connection.

**[9]** In *Boumediene*, the plaintiffs were aliens who had been designated as enemy combatants and who were detained at the United States Naval Station in Guantanamo. Plaintiffs had not been tried or convicted of any crime. They sought federal habeas corpus. The government argued that because plaintiffs were aliens who had committed acts outside the United States and were being detained outside the United States, they were not entitled to seek habeas relief. The Court rejected the gov-

ernment's proposed bright-line rule, calling it a "formal, sovereignty-based test." 553 U.S. at 764. The Court wrote that while the United States does not have *de jure* sovereignty over the Naval Station at Guantanamo Bay, it "maintains *de facto* sovereignty." *Id.* at 755. Applying a "functional approach," *id.* at 764, the Court held that the plaintiffs in *Boumediene*, unlike the plaintiffs in *Eisentrager*, had a right to seek a writ of habeas corpus.

Ibrahim shares an important similarity with the plaintiffs in *Boumediene*. The *Boumediene* plaintiffs and Ibrahim both sought (or seek) the right to assert constitutional claims in a civilian court in order to correct what they contend are mistakes. In *Boumediene*, plaintiffs sought the right to try to establish they were not, in fact, enemy combatants. Ibrahim seeks the right to try to establish that she does not, in fact, deserve to be placed on the government's watchlists.

**[10]** The government in *Boumediene* proposed a bright-line "formal sovereignty-based test" under which the absence of *de jure* jurisdiction over Guantanamo would have meant that plaintiffs had no right to seek habeas corpus under the Constitution. The Court disagreed, adopting instead a "functional approach" under which the absence of *de jure* jurisdiction was not determinative. *Id.* at 764. The government proposes a similar bright-line "formal sovereignty-based test" in Ibrahim's case. Under the government's proposed test in this case, any alien, no matter how great her voluntary connection with the United States, immediately loses all constitutional rights as soon as she voluntarily leaves the country, regardless of the purpose of her trip, and regardless of the length of her intended stay abroad. The government's proposed test is not the law. The law that we are bound to follow is, instead, the "functional approach" of *Boumediene* and the "significant voluntary connection" test of *Verdugo*.

**[11]** Under *Boumediene* and *Verdugo*, we hold that Ibrahim has "significant voluntary connection" with the United

States. She voluntarily established a connection to the United States during her four years at Stanford University while she pursued her Ph.D. She voluntarily departed from the United States to present the results of her research at a Stanford-sponsored conference. The purpose of her trip was to further, not to sever, her connection to the United States, and she intended her stay abroad to be brief.

**[12]** We do not hold that tourists, business visitors, and all student visa holders have the same connection to the United States as Ibrahim. Nor do we hold that Congress is without authority to exclude undesirable aliens from the United States and to prescribe terms and conditions for entry and re-entry of aliens. *See, e.g.*, *Hampton*, 426 U.S. at 101 n.21; *Galvan v. Press*, 347 U.S. 522, 530-31 (1954); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210-11 (1953). We hold only that Ibrahim has established "significant voluntary con- nection" with the United States such that she has the right to assert claims under the First and Fifth Amendments. Like the Court in *Boumediene*, we express no opinion on the validity of the underlying constitutional claims. *Boumediene*, 553 U.S. at 733.

## D. Discovery Rulings

### 1. Discovery Order

Ibrahim challenges a discovery order entered by the district court. After remand from this court but before the federal defendants were dismissed, Ibrahim sought through discov- ery: (1) FBI phone logs; (2) TSA employee logs from the San Francisco airport; (3) TSA employee logs from the Transpor- tation Security Operations Center; (4) the No-Fly List and other documents identifying Ibrahim as a candidate for special screening; (5) documents considered when placing Ibrahim's name on the No-Fly List; (6) documents considered when placing Ibrahim's name in the TSDB; (7) documents discuss- ing her detention at SFO; (8) documents instructing law

enforcement to arrest or detain Ibrahim; (9) documents discussing instructions about the incident exchanged between federal and local defendants; (10) documents discussing instructions about her between federal and local defendants; and (11) video recordings of certain conversations. The district court did not rule on these requests before dismissing the federal defendants.

After the federal defendants were dismissed, Ibrahim renewed her discovery request on the ground that these documents were relevant to her still-pending claims for damages against the city and private defendants. The district court ordered the federal defendants to produce documents numbered (1) through (3) and (7) through (11), above, because the information contained in these documents was relevant to Ibrahim's still-pending claims.

However, the district court denied Ibrahim's request for documents numbered (4) through (6), on the ground that the federal defendants had been dismissed and that the information contained in these documents was relevant, if at all, only to the claims against the now-dismissed federal defendants. The court also denied Ibrahim's request for responses to interrogatories directed to the federal defendants, on the ground that interrogatories can be directed only to parties. Fed. R. Civ. P. 33.

**[13]** We vacate the district court's denial of discovery of these three categories of documents, and its denial of the request for interrogatories, in light of our holding that Ibrahim has the right to assert claims against the federal defendants under the First and Fifth Amendments. We leave it to the district court to determine whether, in light of our holding, all or part of Ibrahim's discovery requests should be granted.

### 2.   Disclosure of Non-testifying Experts.

Ibrahim also appeals the denial of her request to share Sensitive Security Information with her non-testifying experts.

1318                    IBRAHIM v. DHS

Sensitive Security Information is "information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would . . . [b]e detrimental to the security of transportation." 49 C.F.R. § 1520.5(a)(3). Such information is shared only with "covered persons" who have a "need to know" the information "to carry out transportation security activities." *Id.* at 1520.7(j), 1520.11(a)(1). Under § 525(d) of the Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109-295, 120 Stat. 1355, 1382 (Oct. 4, 2006), Congress has authorized the disclosure of "Sensitive Security Information" during discovery to civil litigants who show "substantial need" for the information, provided that the district court

> enters an order that protects the [Sensitive Security Information] from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a . . . terrorist assessment like that done for aviation workers on the persons seeking access to [Sensitive Security Information] . . . the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation.

**[14]** Ibrahim argues that the identity of non-testifying experts is not discoverable, and that the identity of her experts will be revealed if they are required to submit to a TSA background check. Rule 26(b)(4)(D) provides, "Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Ibrahim's reliance on Rule 26 is misplaced for three reasons. First, Rule 26 shields only against disclosure through interrogatories and depositions; it does not shield against disclosure when information is required pursuant to a background check mandated by statute.

Second, Ibrahim has not shown how a background check will reveal "facts known or opinions held" by her experts. Finally, the rule does not prevent disclosure of the identity of a non-testifying expert, but only "facts known or opinions held" by such an expert. *See also* Fed. R. Civ. P. 26(b)(3)(B) (preventing disclosure of "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation"). The district court correctly held:

> It is commonplace for experts and consultants on both sides of any ordinary civil action to be vetted so that trade secrets and other sensitive information will not fall into the hands of someone with an adverse position to the owner of the sensitive information (other than, of course, adverse parties to the litigation itself). The risk is simply too great that someone in such an adverse position will be tempted to misuse sensitive information for a purpose other than the litigation. For example, a trade secret might be misappropriated by a consultant or expert and written into a pending patent application. This risk is all the greater when dealing with [Sensitive Security Information] and national security. Indeed, it is hard to imagine *any* legitimate reason for suppressing the identity of experts or consultants and exempting them from the security screening process, given that our country has a legitimate need to know that those experts and consultants can be trusted with the [Sensitive Security Information] in this case.

(emphasis in original).

## Conclusion

We hold that Ibrahim has significant voluntary connection to the United States and she may therefore assert claims against the federal defendants for prospective relief under the

First and Fifth Amendments. We vacate in part and affirm in part the district court's discovery rulings.

We REVERSE in part, AFFIRM in part, and VACATE in part. We REMAND for further proceedings consistent with this opinion. Costs to Appellant.

---

DUFFY, District Judge:

I dissent.

The facts that are pled and developed by the Petition and submission of the government show that the Petitioner, Rahinah Ibrahim, was in the United States from 2001 to 2005 on a student visa to earn her doctorate from Stanford University. Prior to the time she left her native Malaysia for Stanford, she had been an assistant professor at the University Putra Malaysia in Serdang, Malaysia. Near the end of her doctoral studies, Petitioner was invited to participate in a symposium at that same university to present her research. She voluntarily purchased her ticket to Malaysia and made the other necessary arrangements to attend the symposium. On January 2, 2005, Petitioner arrived at the airport in San Francisco as per the ticket and was advised by a representative of United Airlines that she was on a "No Fly" list. Instead of issuing her a boarding pass, the representative called the San Francisco police. Petitioner was arrested and detained for two hours until F.B.I. agents arrived and directed that she be released.[1] The Petitioner was told she was no longer on the "No Fly" list at that time. The very next day, Petitioner went to the airport where she was again told her name was on the

---

[1]Petitioner sued the San Francisco Airport, City and County of San Francisco, San Francisco Police Department and certain San Francisco Police Department officers for false arrest as part of this action. This claim was settled when she received the sum of $225,000.

"No Fly" list. Petitioner nevertheless boarded her plane, and although she claims she was subjected to enhanced scrutiny and searches at every stopover on the trip, she successfully arrived in Malaysia.

Petitioner attended the symposium and stayed in Malaysia for an additional two months until March 10, 2005, when she attempted to board a return flight to the United States. She was prevented from doing so and was told by a ticketing agent in Malaysia that she would have to wait for clearance from the U.S. embassy before being permitted to board. She was also told by another ticketing agent that a note next to her name instructed airport personnel to alert the police and have her arrested.

Petitioner has been unable to return to the United States since leaving in 2005. She has remained in contact with her friends at Stanford, using electronic devices and meeting with them in person outside of the United States. She claims, however, that such means of contact are inadequate and lists them among her injuries in bringing the present action. Petitioner also claims her alleged placement on the "No Fly" list constitutes injury because she is prevented from flying U.S. airline carriers to other foreign countries and from otherwise flying over U.S. airspace.

On March 24, 2005, Petitioner submitted a request to the Transportation Security Administration's ("TSA") "Passenger Identity Verification" program to clear her name from the "No Fly" list. Petitioner received a written response approximately one year later, advising her that any records warranting corrections had been modified. This response did not indicate whether Petitioner's name appeared on the "No Fly" list or other terrorist watchlists.

On April 14, 2005, an American consul in Malaysia sent Petitioner a letter. She learned that the State Department had

revoked her student visa on January 31, 2005.[2] The letter referenced Section 212(a)(3)(B) of the Immigration and Nationality Act ("INA") as grounds for revocation.[3] This INA provision was again referenced in the denial of her later application for a visitor visa. Petitioner claims, however, that the denials of her original student visa and her visitor visa application are solely because she is on the "No Fly" list. She instituted this Petition to remove her name from the "No Fly" list and other terrorist watchlists with the announced expectation that the State Department would then issue her a visitor visa. It is clear that one of the principal reasons Petitioner plans to visit the United States is to advance her academic career.

The only evidence in the record concerning the relationship between visa decisions and the "No Fly" list is the flat statement by the State Department that the revocation of Petitioner's student visa did not depend on Petitioner's being on the "No Fly" list: "[v]isa decisions are independent from and made without reference to any 'No Fly' list."

As the majority recognizes, courts cannot interfere with the granting (or revocation) of a visa. (*See Bustamante v. Mukasey*, 531 F.3d 1059, 1060 (9th Cir. 2008))); *see also* 8 U.S.C. §§ 1104(a); 1201(I). The majority, however, would grant Petitioner a hearing on the question of her placement on

---

[2]Although according to Petitioner's brief, her student visa was valid until January 2007, it was due to expire at the end of her studies, which occurred some three months later in June 2005.

[3]The INA provides, in pertinent part, that any alien

who: (I) has engaged in a terrorist activity; (ii) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity; (iii) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity

is "ineligible to receive visas and ineligible to be admitted to the United States . . . ." 8 U.S.C. § 1182(a)(3)(B).

the "No Fly" list, among other government watchlists. They claim that the Petitioner has a constitutional right to such a hearing because of her "substantial voluntary connections" to the United States. The government has argued that an alien located outside the jurisdiction of the United States cannot seek a mandatory injunction for alleged "as applied" unconstitutionality. I do not believe it necessary to adopt this bright line test that the government suggests. Instead, let us turn to the cases cited by the majority as precedent for their decision.

The majority relies on a number of cases to show that certain aliens located outside the United States can challenge the constitutionality of U.S. laws. One such case is *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953). In that case, the petitioner, of Chinese ancestry, entered the United States in the early 1940s during World War II. He served honorably in the United States Merchant Marine and married an American woman who had been born in this country. After the war, he continued in his career as a seaman. He received seaman's papers from the United States Coast Guard, and in 1950 he obtained a job on the S.S. Sir John Franklin, an American flagship. The voyage took several months. At all times during this voyage, Kwong Hai Chew was serving as a seaman under American articles and thus was under *de facto* jurisdiction of the United States. If he had violated U.S. law, the United States could have prosecuted him. Kwong Hai Chew was also entitled to U.S. "maintenance and cure."[4] Upon the ship's return to San Francisco, Kwong Hai Chew was denied entry, and the ship thereafter sailed to New York where Kwong Hai Chew was put on Ellis Island "for safe-keeping on behalf of

---

[4]"Maintenance and cure" is a benefit given to American seamen under an ancient doctrine that the master of a ship cannot abandon a sick seaman in a foreign port but must see to the well-being of the seaman. Thus, the master must pay for the "cure" of the seaman's injury or illness and to maintain the seaman until he can be returned to the home port. Rules for such expenditures are set in part by the flag of the vessel, in which the seaman served. 1B Matthew Bender, Benedict on Admiralty § 42 (7th ed. 2011).

the master of the S.S. 'Sir John Franklin.' " *Id.* at 595. The
Supreme Court recognized that, while Kwong Hai Chew was
on the high seas, he was at all times under the jurisdiction of
the United States, as evidenced by the American flag on the
S.S. Sir John Franklin.

Kwong Hai Chew did not attack the validity of the law that
permitted the United States Attorney General to exclude cer-
tain aliens from entry into the United States. The Court
viewed his position as if he were within the continental
United States at all times in question and permitted the issu-
ance of the writ of habeas corpus. *Kwong Hai Chew* merely
proves the majority's "uncontested proposition that if Ibrahim
had remained in the United States," she would have been able
to challenge the constitutionality of the government's action
in placing her on the terrorist watchlists. In the instant case,
Petitioner resides in Malaysia and, therefore, does not enjoy
the right of constitutional challenge.

Slightly more instructive on the issue of whether aliens
located outside of the United States can bring constitutional
claims is *Boumediene v. Bush*, 553 U.S. 723 (2008). There,
the action was brought on behalf of certain aliens held captive
at the U.S. naval base at Guantánamo Bay, Cuba. Boumed-
iene and his fellow petitioners found themselves under *de
facto* U.S. jurisdiction in Guantánamo Bay, where the United
States exercised "absolute and indefinite control." *Id.* at 727.
The Supreme Court rejected the same bright line test pro-
posed by the government here and found that Boumediene
and his fellow petitioners had the right to seek the writ of
habeas corpus. The Supreme Court's decision did not disre-
gard the extraterritoriality of the claims being asserted, but
focused instead on the fact that Boumediene and his fellow
petitioners held at Guantánamo Bay were in U.S. custody fol-
lowing capture in, and transfer from, various foreign lands.
Here, the Petitioner, knowing that she could be forever
banned from returning to this country, voluntarily left and

returned to her native land, outside of U.S. jurisdiction.[5] No one can believe that she did not know exactly the consequences of the choice she made.

In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a group of German nationals sought the writ of habeas corpus after being arrested by the United States Army in China, convicted of violating the laws of war by a Military Commission sitting in China, and imprisoned in Germany. The Supreme Court held that such "enemy aliens, resident, captured and imprisoned abroad" did not have the right to seek the writ. *Id.* at 777. The majority concludes that because the Petitioner is not such a person, she may seek redress for her constitutional claims. The majority, however, overlooks the fact that, like the petitioners in *Eisentrager*, the Petitioner does not find herself under U.S. jurisdiction, whether *de jure* or *de facto*, as did the petitioners in *Boumediene*.

I must also note a crucial distinction between *Boumediene* and *Eisentrager* on the one hand and the present case on the other. The petitioners in the habeas cases cited above sought to challenge their detention at U.S. hands, whereas the Petitioner is not in our custody and therefore can have no grounds on which to seek similar relief.

---

[5]The majority attempts to analogize *Boumediene* and the present case by stating that petitioners in both cases simply sought to correct mistakes the United States had made concerning their status. The majority spends much space on the failures of the TSA, the Terrorist Screening Center and other government agencies in managing the "No Fly" and other watchlists. To my mind, the statistics quoted show a real effort on the government's part to reduce the mistakes and to remove as many people from the "No Fly" and other government watchlists as possible. This effort was expended over the entire time that Petitioner was making complaints and pursuing this lawsuit. It seems to me that, if possible, the government would prefer to drop someone from the watchlists rather than have a possible airing (through costly and public litigation) of the mistakes made. All of which, I believe, is evidence that Petitioner's placement on the "No Fly" list was not a mistake.

1326                           Ibrahim v. DHS

The majority relies on the standard set forth by the Supreme Court in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to conclude that Petitioner may assert her constitutional claims. Verdugo was a Mexican national who was arrested in Mexico, brought to the United States against his will and imprisoned pending the outcome of narcotics smuggling charges against him. The Supreme Court held that Verdugo had no right to assert claims that the search and sei-zure of his property in Mexico constituted a Fourth Amend-ment violation when he had "no previous significant voluntary connection with the United States . . . ." *Id.* at 271.

The majority distinguishes *Verdugo* by finding that Peti-tioner "established a substantial voluntary connection with the United States through her studies at a distinguished American university." I cannot come to the same conclusion. If we were to hold today that Petitioner may assert her constitutional claims because she formed a "substantial voluntary connec-tion with the United States" while here on a student visa, then we would be hard pressed not to allow all alien students who studied in the United States and subsequently left the country to bring constitutional claims in our courts.

The majority seems to think that the holding of this case can be restricted to Petitioner and her constitutional claims alone. In doing so, however, it points to no reason why those similarly situated to the Petitioner could not avail themselves of the holding of this case. The majority believes it is enough that Petitioner (1) was in the country for a period of time, and (2) that upon departure she intended to come back to the country. If this were sufficient to vest constitutional rights in an alien located outside of the United States to bring actions in the United States against the government, there would be a significant number of aliens in the world just waiting to get into court. For example, a visitor to this country who over-stays his visa, makes a livelihood in this country for a sub-stantial amount of time, and chooses voluntary departure when caught as an illegal alien, could fit within the class of

people who would have such rights. He would have been in the country for a "substantial time" and would have friends and contacts in this country—as would most illegal aliens. As such, he would most likely have the desire and intention to return to this country.

As this example shows, the majority holding is too broad, while the government's bright line argument based on extra-territoriality is too narrow and hidebound for use in the modern world.

In the case at bar, however, there is no need to set forth a definitive test because the simple answer is that Petitioner has not shown a "substantial voluntary connection" with the United States, which is the measurement the majority believes the precedent would require. The Petitioner does not suggest that she ever worked in or paid taxes to the United States or indeed did anything (except study at a university) to indicate that she ever made a conscious decision to live in this country or to accept any of the responsibilities of a permanent resident. She merely came to acquire the education available and thereby improve her position in her own native country. Obviously, the Petitioner is quite content in having advanced from assistant professor at the University Putra Malaysia prior to obtaining her doctorate to associate professor and Deputy Dean of that university now. At all times that she was in the United States, her main objective was to personally benefit from this country. Any contribution the Petitioner made to the United States was incidental to this objective.[6] That, to my mind, is totally insufficient to constitute a substantial voluntary connection.

Compare the instant case with Kwong Hai Chew who, as discussed above, had an American-born wife, had become a

---

[6] In fact, Petitioner's own declaration shows she intended to contribute not to the United States, but to "the construction industry in Malaysia, specifically in the architecture field."

permanent resident and had already filed a petition for naturalization before he left the country.

In any event, the real complaint that Petitioner has is that she no longer has a visa to come and go as she pleases. We already have, in the record, a statement from the State Department establishing that Petitioner's removal from the "No Fly" list will not affect its visa determinations as concern her and that she will not get the visa she desires. Neither this action, nor any other court action, can redress her complaint.

Section 1104(a) of Title 8 sets forth the powers and duties of the Secretary of State, specifically excluding the authority to review consular officers' determinations "relating to the granting or refusal of visas." Section 1201(I) of Title 8 expressly precludes visa revocations from judicial review. Read together, courts have extended the application of Section 1104(a) to preclude administrative and judicial review of all factual determinations relating to visa applications. *See, e.g.*, *Bustamante v. Mukasey*, 531 F.3d 1059, 1060 (9th Cir. 2008). Courts are therefore deprived of the power to order the State Department to issue a visa.

This is as it should be. These questions are clearly political and should not be resolved by the judicial branch of our government. Thus, the claimed injury of which Petitioner suffers is non-redressable. At a constitutional minimum, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) *(citing Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)). Petitioner seeks an injunction to remove her name from any government watchlist, including the "No-Fly" list, to enable her passage to the United States to attend conferences and further her professional relationships. Removal of her name, however, does not ensure lawful entry into the United States. Petitioner must first obtain a valid visa.

The majority cites to the District Court's observation that "[w]hile obtaining a visa may stand as a potential obstacle to her entry into the United States, it does not completely foreclose redressability. Petitioner is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time." This may ring true where remaining roadblocks do not preclude a likely redress. Here, however, the State Department based its denial of Petitioner's visa application on grounds other than her "No-Fly" status. Petitioner's inability to obtain a valid visa despite her removal from the "No Fly" list or any other government watchlist constitutes more than a "potential obstacle" to her entry—it renders her entry highly speculative at best.

In sum, I would affirm the District Court and hold that the alien Petitioner has no standing to bring this action since she has no substantial voluntary connection to this country. I would further hold that Petitioner's alleged harm is ultimately non-redressable and thus, she is without standing to bring her claim in this or any other federal court.