JAMES McMANIS (40958)
CHRISTINE PEEK (234573)
McMANIS FAULKNER
A Professional Corporation
50 W. San Fernando St., 10th Floor
San Jose, CA 95113
Telephone:     (408) 279-8700
Facsimile:      (408) 279-3244
cpeek@mcmanislaw.com

Attorneys for Plaintiff,
Rahinah Ibrahim

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHINAH IBRAHIM, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>        Defendants. | CASE NO.  C 06 0545 WHA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS**<br><br>Date:    December 20, 2012<br>Time:   8:00 a.m.<br>Ctrm:   8 – 19th Floor<br>Judge:  The Hon. William Alsup |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................1

STATEMENT OF FACTS ...........................................................................................................1

     I.         THE FEDERAL DEFENDANTS ARE RESPONSIBLE FOR
MAINTAINING THE TERRORIST SCREENING DATABASE,
WHICH INCLUDES THE NO-FLY AND SELECTEE LISTS,
AND FOR IMPLEMENTING HOMELAND SECURITY
PRESIDENTIAL DIRECTIVE-6 ...............................................................1

     II.       THE FEDERAL DEFENDANTS' UNCONSTITUTIONAL
PLACEMENT OF IBRAHIM'S NAME IN THE TERRORIST
SCREENING DATABASE SUBJECTED HER TO AN ILLEGAL
ARREST AND THE REVOCATION OF HER VISA, AND
CONTINUES TO BAR HER FROM OBTAINING A VISA OR
WORKING IN THE UNITED STATES, AND TO SUBJECT HER TO
AN ONGOING RISK OF ARREST EVEN IF SHE COULD RETURN ...............2

ARGUMENT .................................................................................................................................5

     I.         THIS COURT AND THE NINTH CIRCUIT BOTH CORRECTLY
HELD THAT IBRAHIM HAS STANDING, AND THE NINTH
CIRCUIT DENIED THE GOVERNMENT'S PETITION FOR
REHEARING ON THIS ISSUE ...................................................................5

           A.      The Ninth Circuit's Holding That Ibrahim Has Standing Is Binding
On This Court, Both As Precedent And Under The Law Of The
Case Doctrine. ...............................................................................5

           B.      The Government's Secret Evidence And Legal Argument Do Not
Change The Ninth Circuit's Binding Standing Analysis. ...........................7

           C.      The Government's Tactic Of Filing Serial Motions To Dismiss Is
Sanctionable. .................................................................................8

     II.       IBRAHIM HAS PLEADED AN ACTIONABLE CLAIM. ....................................8

     III.     IBRAHIM HAS STATED A CLAIM FOR VIOLATION OF HER DUE
PROCESS RIGHTS. ....................................................................................9

           A.      Ibrahim Has Alleged Violation Of Recognized Liberty And
Property Interests. ..........................................................................9

                1.     There Is A Protected Liberty Interest In Freedom From
Incarceration. ...................................................................9

2.     There Is A Protected Liberty Interest In Free Association And Free Exercise Of Religion. ....................................................10

3.     There Is A Protected Liberty Interest In Freedom To Pursue An Occupation. ...........................................................10

4.     There Is A Protected Liberty Interest In Freedom To Travel Without Unreasonable Burdens. ....................................................11

5.     There Is A Protected Property Interest In Money Spent On International Travel. ....................................................12

B.     Ibrahim Has Alleged A Violation Of Her Right To Substantive Due Process. ...........................................................13

C.     Ibrahim Has Alleged A Violation Of Her Right To Procedural Due Process. ...........................................................14

1.     The Adequacy Of The Government's Procedural Protections Cannot Be Determined On A Motion To Dismiss. ...........................................................14

a.     *The Government Has Not Established As A Matter Of Law That No Notice Of Any Kind Is Required.*...............16

b.     *The Government Has Not Established As A Matter Of Law That Further Process Cannot Be Provided Without Jeopardizing National Security.*............................16

2.     Ibrahim Has Stated A Stigma Plus Claim. ....................................18

IV.     IBRAHIM HAS ALLEGED VIOLATIONS OF HER FIRST AMENDMENT RIGHT TO FREEDOM OF RELIGION AND FREE ASSOCIATION ....................................................21

V.     IBRAHIM HAS STATED AN EQUAL PROTECTION CLAIM. ....................22

VI.     THE DEPARTMENT OF STATE IS PROPERLY NAMED AS A DEFENDANT BECAUSE IT IS NECESSARY FOR COMPLETE RELIEF. ...........................................................24

CONCLUSION ....................................................25

ii

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Aetna Life Ins. Co. v. Alla Medical Servs., Inc.* (9th Cir. 1988)

4
    855 F.2d 1470 ............................................................................................................. 8

5

*Am. Civil Liberties Union of Nevada v. Masto* (9th Cir. 2012)
    670 F.3d 1046 ........................................................................................................... 20

6

7

*Am. Mfrs. Mut. Ins. Co. v. Sullivan* (1999)
    526 U.S. 40 ................................................................................................................. 9

8

*Aptheker v. Secretary of State* (1964)

9
    378 U.S. 500 ........................................................................................................ 11, 12

10

*Arlington Heights v. Metropolitan Housing Dev. Corp.* (1977)

11
    429 U.S. 252 ............................................................................................................. 22

12

*Ashcroft v. Iqbal* (2009)
    556 U.S. 662 ........................................................................................................ 8, 23

13

14

*Bell Atlantic Corp. v. Twombly* (2007)
    550 U.S. 544 ........................................................................................................ 8, 23

15

*Brinkerhoff-Fans Trust & Sav. Co. v. Hill* (1930)

16
    281 U.S. 673 ............................................................................................................. 15

17

*Buxton v. Plant City* (11th Cir. 1989)

18
    871 F.2d 1037 ........................................................................................................... 11

19

*Cantwell v. Connecticut* (1940)
    310 U.S. 296 ............................................................................................................. 10

20

*Chandler v. Miller* (1997)

21
    520 U.S. 305 ............................................................................................................. 20

22

*City of Chicago v. Morales* (1999)

23
    527 U.S. 41 ............................................................................................................... 16

24

*City of Houston v. FAA* (5th Cir. 1982)
    679 F.2d 1184 ........................................................................................................... 12

25

*City of Mesquite v. Aladdin's Castle, Inc.* (1982)

26
    455 U.S. 283 ............................................................................................................... 8

27

*Cleveland Bd. of Educ. v. Loudermill* (1985)

28
    470 U.S. 532 ............................................................................................................. 14

*County of Sacramento v. Lewis* (1998)
    523 U.S. 833.................................................................................................. 13, 14

*Cramer v. Skinner* (5th Cir. 1991)
    931 F.2d 1020 ...................................................................................................... 12

*Daniels v. Williams* (1986)
    474 U.S. 327........................................................................................... 9, 14, 15

*Dupuy v. Samuels* (7th Cir. 2005)
    397 F.3d 493 ................................................................................................ 20, 21

*Employment Division v. Smith* (1990)
    494 U.S. 872........................................................................................................ 21

*Farm Labor Organizing Comm. v. Ohio* (6th Cir. 2002)
    308 F.3d 523 ........................................................................................................ 23

*Gilmore v. Gonzales* (9th Cir. 2006)
    435 F.3d 1125 ...................................................................................................... 12

*Green v. TSA* (W.D. Wash. 2005)
    351 F. Supp. 2d 1119 .................................................................................... 12, 20

*Halkin v. Helms* (D.C. 1982)
    690 F.2d 977 ........................................................................................................ 16

*Holder v. Humanitarian Law Project* (2010)
    130 S. Ct. 2705.................................................................................................... 18

*Hufford v. McEnaney* (9th Cir. 2001)
    249 F.3d 1142 ...................................................................................................... 14

*Humphries v. County of Los Angeles* (9th Cir. 2009)
    554 F.3d 1170 ................................................................................................ 19, 21

*Ibrahim v. Department of Homeland Security* (9th Cir. 2008) ("*Ibrahim I*")
    538 F.3d 1250 ........................................................................................................ 6

*Ibrahim v. Department of Homeland Security* (9th Cir. 2012) ("*Ibrahim II*")
    669 F.3d 983, 2012 U.S. App. LEXIS 2457, *19-24............................ 4, 6, 7, 12, 18

*In re Burrell* (9th Cir. 2005)
    415 F.3d 994 .......................................................................................................... 8

*Korematsu v. United States* (1944)
    323 U.S. 214........................................................................................................ 25

iv

*Korematsu v. United States*  (N.D. Cal. 1984)
    584 F. Supp. 1406 ........................................................................................... 25

*Latif v. Holder* (9th Cir. 2012)
    2012 U.S. App. LEXIS 15429 at *15-19 ........................................................ 17

*Mathews v. Eldridge* (1976)
    424 U.S. 319.................................................................................................... 15

*Milgard Tempering, Inc. v. Selas Corp. of America* (9th Cir. 1990)
    902 F.2d 703 ..................................................................................................... 7

*Miller v. Reed* (9th Cir. 1999)
    176 F.3d 1202 .................................................................................................. 12

*Millman v. Inglish* (9th Cir. 2011)
    461 Fed. Appx. 627.......................................................................................... 21

*Miranda v. Southern Pacific Transp. Co.* (9th Cir. 1983)
    710 F.2d 516 ..................................................................................................... 8

*Mohamed v. Holder* (E.D. Va. 2011)
    2011 U.S. Dist. LEXIS 96751, *23-25 ........................................................... 20

*Moore v. East Cleveland* (1997)
    431 U.S. 494..................................................................................................... 9

*Moore v. Jas. H. Matthews & Co.* (9th Cir. 1982)
    682 F.2d 830 ..................................................................................................... 7

*Morgan v. City of Pleasant Hill* (N.D. Cal. 2005)
    2005 U.S. Dist. LEXIS 40382, at *18............................................................. 23

*NAACP v. Alabama ex. rel. Patterson* (1958)
    357 U.S. 449..................................................................................................... 10

*Oviatt v. Pearce* (9th Cir. 1992)
    954 F.2d 1470 ................................................................................................... 10

*Padula v. Webster* (D.C. Cir. 1987)
    822 F.2d 97 ....................................................................................................... 25

*Palko v. Connecticut* (1937)
    302 U.S. 319..................................................................................................... 9

*Parratt v. Taylor* (1981)
    451 U.S. 527..................................................................................................... 15

v

*Paul v. Davis* (1976)
424 U.S. 693..................................................................................................... 20

*Pavelich v. Natural Gas Pipeline Co. of Am.* (N.D. Ill. Dec. 12, 2002)
No. 02 C 3374, 2002 U.S. Dist. LEXIS 23946, at *12-15 ................................... 15

*Presbyterian Church (U.S.A.) v. United States* (9th Cir. 1989)
870 F.2d 518 ..................................................................................................... 21

*R.J. Reynolds Tobacco Co. v. Shewry* (9th Cir. 2005)
423 F.3d 906 ..................................................................................................... 20

*Sagana v. Tenorio* (9th Cir. 2004)
384 F.3d 731 ..................................................................................................... 11

*San Diego Minutemen v. Cal. Bus., Transp. & Hous. Agencys Dep't Of Transp.*
(S.D. Cal. 2008)
570 F. Supp. 2d 1229 ........................................................................................ 12

*Sherbert v. Verner* (1963)
374 U.S. 398..................................................................................................... 21

*Sonnleitner v. York* (7th Cir. 2002)
304 F.3d 704 ..................................................................................................... 15

*Stevens v. Rifkin* (N.D. Cal. 1984)
608 F. Supp. 710 .............................................................................................. 18

*Town of Southold v. Town of East Hampton* (2d Cir. 2007)
477 F.3d 38 ....................................................................................................... 12

*Tuggles v. City of Antioch* (N.D. Cal. 2009)
2009 U.S. Dist. LEXIS 92495, at *44-45 .......................................................... 23

*Ulrich v. City and County of San Francisco* (9th Cir. 2002)
308 F.3d 968 ..................................................................................................... 18

*United States v. James Daniel Good Real Property* (1993)
510 U.S. 43........................................................................................................ 14

*Valmonte v. Bane* (2d Cir. 1994)
18 F.3d 992 ................................................................................................. 20, 21

*Velez v. Levy* (2d Cir. 2005)
401 F.3d 75. ...................................................................................................... 18

*Washington v. Davis* (1976)
426 U.S. 229...................................................................................................... 22

vi

*Washington v. Glucksberg* (1997)
   521 U.S. 702.................................................................................................................. 9

*Wenger v. Monroe* (9th Cir. 2002)
   282 F.3d 1068 ........................................................................................................ 20, 21

*Zinermon v. Burch* (1990)
   494 U.S. 113.................................................................................................................. 9

**STATUTES**

8 U.S.C § 1182(a)(3)(b) ...................................................................................................... 4

42 U.S.C. § 2000bb ........................................................................................................... 21

42 U.S.C. § 2000bb-1 ....................................................................................................... 21

49 C.F.R. §§ 1520.7 .......................................................................................................... 19

Fed. R. Civ. P. 8(a)(2) ........................................................................................................ 8

Fed. R. Civ. P. 11(b)(1)-(2)................................................................................................. 8

**OTHER AUTHORITIES**

Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109-
   295 § 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006) ................................................. 19

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

**INTRODUCTION**

Plaintiff, Rahinah Ibrahim ("Ibrahim") hereby opposes the federal defendants' second motion to dismiss the thirteenth cause of action in her Second Amended Complaint ("SAC") under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Defendants' motion lacks merit and should be denied in its entirety.  As the Ninth Circuit has already held in a published opinion that is binding on this court, Ibrahim has Article III standing.  In addition, Ibrahim has adequately alleged constitutional claims against the government for violation of her First, Fifth, and Fourteenth Amendment rights.  To the extent this Court determines that any theory needs to be supplemented by additional allegations at this time, the facts filed with this Opposition demonstrate that Ibrahim can amend to cure any supposed pleading deficiencies.

**STATEMENT OF FACTS**

**I.     THE FEDERAL DEFENDANTS ARE RESPONSIBLE FOR MAINTAINING THE TERRORIST SCREENING DATABASE, WHICH INCLUDES THE NO-FLY AND SELECTEE LISTS, AND FOR IMPLEMENTING HOMELAND SECURITY PRESIDENTIAL DIRECTIVE-6.**

The Terrorist Screening Center ("TSC") was established pursuant to Homeland Security Presidential Directive-6 ("HSPD-6"), to maintain a list of "Terrorist Identities Information" for agencies of the United States Government.  (SAC ¶¶ 5, 8.)  The TSC is responsible for maintaining a consolidated terrorist screening database ("TSDB") which includes the "No-Fly List."  (*Id.* at ¶ 8.)  The Federal Bureau of Investigation ("FBI") formally nominates individuals for inclusion in the TSDB.  (*See* Request for Judicial Notice in Opposition to The Federal Defendants' Motion To Dismiss And In Opposition To Federal Defendants' Request That This Court Consider Secret Evidence And Legal Argument ("RJN"), Exh. K, p. 2.)  The National Counterterrorism Center ("NCTC") serves as the primary organization in the United States government for analyzing and integrating all intelligence regarding terrorism, and provides information to the TSC.  (SAC, ¶ 16.)  The NCTC also may create TSDB records based on information from the FBI.  (*See* RJN, Exh. K, p. 3.)

The Attorney General, Department of Homeland Security ("DHS"), and Department of State ("DOS") are jointly responsible for implementing HSPD-6, pursuant to a memorandum of

understanding dated September 16, 2003 ("2003 MOU"). (SAC, ¶¶ 5, 12, 13, 18 & 19.) The DOS is responsible for staffing the TSC, along with the Department of Justice and other federal departments and agencies. (*Id.* ¶ 18.) The Secretary of the DOS is responsible for, inter alia, (a) coordinating with the Attorney General, acting through the Director of the FBI, to establish the TSC; and (b) reviewing each nomination to the TSC's database and determining whether to include the person in records that may be accessed by foreign governments cooperating with the United States to fight global terrorism. (*Id.* at ¶ 19.)

## II.   THE FEDERAL DEFENDANTS' UNCONSTITUTIONAL PLACEMENT OF IBRAHIM'S NAME IN THE TERRORIST SCREENING DATABASE SUBJECTED HER TO AN ILLEGAL ARREST AND THE REVOCATION OF HER VISA, AND CONTINUES TO BAR HER FROM OBTAINING A VISA OR WORKING IN THE UNITED STATES, AND TO SUBJECT HER TO AN ONGOING RISK OF ARREST EVEN IF SHE COULD RETURN.

In January, 2005, Rahinah Ibrahim was a student at Stanford University, studying to obtain her Ph.D., and lawfully in the United States on a student visa. (*Id.* at ¶ 36.) Ibrahim was scheduled to fly on a United Airlines flight to Kuala Lumpur, Malaysia, to present her research findings at a conference sponsored by Stanford. (*Id.* at ¶ 36.) She was scheduled to return to Stanford in March, 2005, to submit her dissertation and complete her Ph.D. (*Id.* at ¶ 36.)

On January 2, 2005, Ibrahim and her daughter went to the ticket counter to obtain their boarding passes and check in their bags.[1] (*Id.* at ¶ 38.) At that time, an employee of United Airlines called the San Francisco Police Department ("SFPD") and informed them that Ibrahim was on the "No-Fly List." (*Id.* at ¶ 39.) A SFPD Sergeant, Richard Pate, checked the "No-Fly List" for Ibrahim's name and called John Bondanella, a watch officer for the Transportation Security Operations Center. (*Id.* at ¶¶ 25, 39.) Bondanella told Pate to not allow Ibrahim on the flight, to contact the FBI, and to detain her for questioning. (*Id.* at ¶ 39.) Ibrahim was

---

[1] The government implies that Ibrahim's challenge to her TSDB status is solely "based upon an incident in January 2005." (Federal Defendants' Motion to Dismiss ("MTD"), 1:24.) Although it is true that the facts relating to the January 2005 incident support Ibrahim's constitutional claims, her constitutional claims are not limited to those facts. All alleged and judicially noticeable facts and circumstances concerning Ibrahim's placement in the TSDB support her claims. This includes facts that show her placement was based on impermissible considerations such as religion and nationality, that the governments' actions interfered with the free exercise of religion or free association, and that the nomination and redress procedures violate due process.

1   handcuffed without any explanation and taken to a San Francisco Police Department holding cell

2   at the airport.  (*Id.* at ¶¶ 41 & 43.)  She was searched and kept there for approximately two hours.

3   (*Id.* at ¶¶ 42-43.)  The FBI finally authorized her release.  (*Id.* at ¶ 44.)

4       The following day, after some effort, Ibrahim was finally allowed to fly to Kuala

5   Lumpur, Malaysia.  (*Id.* at ¶ 45.)  At San Francisco Airport, however, and at every stop over,

6   Ibrahim was publicly subjected to enhanced searches before boarding any flights.  (*Id.* at ¶ 45.)

7       On March 10, 2005, plaintiff went to the Kuala Lumpur International Airport ("KLIA"),

8   in an attempt to fly back to the United States.  (Declaration of Rahinah Ibrahim in Opposition to

9   Federal Defendants' Motion to Dismiss ("Ibrahim Decl."), ¶ 21.)  At that time, she believed she

10   had a valid student visa.  (*Id.* at ¶ 21.)  At KLIA, however, she was not allowed to board the

11   flight.  (*Id.* at ¶ 21.)  When Ibrahim arrived at the ticket counter, the ticketing agent told her she

12   had to wait for him to get clearance from the United States Embassy.  (*Id.* at ¶ 21.)  While she

13   waited, another ticketing agent told her there was a note by her name, instructing airport

14   personnel to call the police and have her arrested.  (*Id.* at ¶ 21.)

15       Because she was unable to return to the United States as she had always planned, and

16   reasonably believing this was due to her status on a government watchlist, on March 24, 2005,

17   Ibrahim submitted a request for Passenger Identity Verification to the Transportation Security

18   Administration (TSA), the only procedure then available, in an attempt to clear her name.  (SAC,

19   ¶ 46.)  A response was not issued to Ibrahim's request until approximately one year later, in

20   March, 2006, after this action was filed.  (*Id.* at ¶ 46.)  The response did not clarify Ibrahim's

21   "No-Fly List" status and instead, simply stated that if "it has been determined that a correction to

22   records is warranted, these records have been modified."  (*Id.* at ¶ 46.)

23       On April 14, 2005, Ibrahim's visa was revoked by letter from the United States Embassy

24   in Malaysia.  (*Id.* at ¶ 47.)  The letter cited Section 212(a)(3)(B) of the Immigration and

25   Nationality Act as the basis for the visa revocation.  (*Id.* at ¶ 47.)  That section provides, in part,

26   that any "alien" who "a consular officer, the Attorney General, or the Secretary of Homeland

27   Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after

28

entry in any terrorist activity" is "inadmissible."  8 U.S.C § 1182(a)(3)(b).  (*Id.* at ¶ 47.)

In summary, defendants erroneously placed Ibrahim's name on a government watch list on an improper and unconstitutional basis, disseminated this fact to various government agencies, state actors, and private individuals in error, and subsequently failed to remove her name from the list despite her request for redress, which subjected her to an unlawful arrest and the unfounded revocation of her visa.  (*Id.* at ¶ 123.)  The consequences of being blacklisted in the government's TSDB are numerous and extend beyond air travel.  A variety of federal and state government agencies rely on information exported from the TSDB:

> The TSC shares the terrorist information contained in the TSDB by sending it 'downstream' to other government screening systems where frontline screening agents can use the information to identify individuals against TSDB records. [Footnote omitted.]  The following are examples of three databases that contain information from the TSC's consolidated watchlist: <u>(1) an employee of the U.S. Customs and Border Protection (CBP) agency at a U.S. port-of-entry searches the DHS's Interagency Border Inspection System (IBIS) to determine if a person should be granted access to the United States, (2) a state police officer stops a vehicle for a traffic violation and queries the driver's name in the FBI's National Crime Information Center (NCIC) system, and (3) a State Department consular affairs official searches the Consular Lookout and Support System to determine if a foreign national should be granted a visa to visit the United States.</u>  The TSC reported that approximately 270 million individuals are screened by frontline screening agents and law enforcement officers each month.

(RJN, Exh. L, p. v (TSC000098) (emphasis added, footnotes omitted); *see also* Declaration Of Christine Peek In Opposition To Federal Defendants' Motion To Dismiss And In Opposition To Federal Defendants' Request That This Court Consider Secret Evidence And Legal Argument ("Peek Decl."), ¶ 14, Exh. G; *Ibrahim II*, 2012 U.S. App. LEXIS 2457, at *10 (noting the DOS uses a subset of the TSDB to screen visa applicants through the Consular Lookout and Support System ("CLASS").)  Because placement in the TSDB has far-reaching consequences, it is reasonable to infer that Ibrahim would be denied a visa as a result of her blacklisting.  Even if she were granted a visa, she still may be turned away at a United States port-of-entry, and subjected to an unreasonably high risk of false arrest if stopped in the United States for even a minor traffic violation.

Ibrahim seeks declaratory and injunctive relief removing her name from any and all government watchlists on which it appears, and requiring defendants to communicate the

removal of her name from the No-Fly List to the United States Visa Office, the United States

Embassy in Kuala Lumpur, Malaysia, and any other government agency, foreign or domestic,

that relies on information from the NCTC, TSC, FBI, DOS, DHS, or TSA.  (SAC, Prayer, ¶¶ (e)-

(g).)  Alternately, Ibrahim seeks a declaration, order, and judgment that she is entitled to a name-

clearing hearing regarding the placement of her name on the No-Fly List, and an injunction

requiring defendants to provide a name-clearing hearing.  (*Id.*, Prayer, ¶¶ (h)-(i).)

## ARGUMENT

I.   **THIS COURT AND THE NINTH CIRCUIT BOTH CORRECTLY HELD THAT IBRAHIM HAS STANDING, AND THE NINTH CIRCUIT DENIED THE GOVERNMENT'S PETITION FOR REHEARING ON THIS ISSUE.**

As an initial matter, Ibrahim notes that defendants' entire standing argument has been

redacted.  Defendants also redacted the cases they cited, even though the law itself is a matter of

public record.  Ibrahim objects to this Court's consideration of any evidence, argument, or legal

authorities which her counsel have not had a full and fair opportunity to review.  Because

defendants have concealed not only evidence but also their legal argument, the only fair way to

proceed is for the Court to rule based on defendants' redacted brief.  Since defendants have

redacted their standing argument completely, their motion is unpersuasive and must be denied.

If the Court considers any part of the material underlying defendants' redactions, plaintiff

requests that her counsel be given equal access to the information and an adequate amount of

time to file a surreply on all issues before the Court rules on defendants' motion.

A.   **The Ninth Circuit's Holding That Ibrahim Has Standing Is Binding On This Court, Both As Precedent And Under The Law Of The Case Doctrine.**

The government has filed four previous motions to dismiss Ibrahim's various claims for

relief on standing grounds, in three different courts.  (*See* Federal Defendants' Memorandum of

Points and Authorities in Support of Their Motion to Dismiss Plaintiff's Claims For Lack of

Subject Matter Jurisdiction (Docket No. 63), pp. 14:16-16:2, filed in this action on May 22,

2006; Federal Defendants' Memorandum in Support of Motion to Dismiss (Docket No. 167-2),

pp. 5:11-9:17, filed in this action on June 1, 2009; RJN, Exhs. A-C (motions to dismiss

plaintiff's petition for review of the TSA's orders in the Ninth and District of Columbia

Circuits); *see also* Peek Decl., ¶ 23, Exh. Y, pp. 6:5-15.)  The government has argued the issue of

standing twice on appeal to the Ninth Circuit.  *See Ibrahim v. Department of Homeland Security*,

538 F.3d 1250, 1256, n.9 (9th Cir. 2008) ("*Ibrahim I*"); *See Ibrahim v. Department of Homeland*

*Security*, 669 F.3d 983, 2012 U.S. App. LEXIS 2457, *19-24 (9th Cir. 2012) ("*Ibrahim II*").  The

government's standing arguments have been rejected three times, once by this Court and twice

by the Ninth Circuit.  (*See* Order on Motions to Dismiss (Docket No. 197), pp. 7:2-10:2, filed in

this action on July 27, 2009; *Ibrahim II*, 2012 U.S. App. LEXIS 2457, at *19-24; RJN, Exhs. D-

F (denying government's petition for rehearing on standing issue).)

   In *Ibrahim II*, the Ninth Circuit held that Ibrahim suffered redressible injury because (1)

placement on the No-Fly List prevents her from boarding any United States carrier, whether or

not it departs from or lands in the United States; (2) the No-Fly List prevents Ibrahim from flying

over United States airspace; and (3) the United States government shares the No-Fly List with 22

foreign governments, supporting the inference that Ibrahim will suffer delays or worse even

when traveling abroad on foreign carriers.  *Ibrahim II*, 2012 U.S. App. LEXIS 2457, at *19-21.

   Separate and apart from that, the Ninth Circuit also held: "[e]ven if Ibrahim's injury were

limited to her inability to enter the United States, she would still have standing."  *Id.* (emphasis

added).  The reason Ibrahim was given for her visa revocation was an alleged connection to

terrorism; therefore, removal of her name from the TSDB would make it more likely that she

would be granted a visa.  *Id.* at *21-22.  "If Ibrahim's name were removed from the TSDB, and

thereby removed from the Consular Lookout and Support System, the State Department would

be more likely to grant her a visa, given that it has relied on her alleged connection to terrorism

as the basis for revoking her visa <u>and denying her application for a new one</u>."[2]  *Id.* at *22

(emphasis added).  The government petitioned for rehearing or rehearing en banc on the issue of

standing, which the Ninth Circuit denied.  (RJN, Exhs. D-F.)

---

[2] The government incorrectly states that the Ninth Circuit interpreted Ibrahim's injuries to relate
to her inability to fly and the revocation of her visa.  (MTD, 3:7-14.)  As discussed above, the
Ninth Circuit's opinion was not so limited, and in any event, the Ninth Circuit did not consider
the substance of Ibrahim's constitutional challenges.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

The federal government's standing argument is barred under *Ibrahim II* and the law of the case doctrine.  Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case."  *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833-35 (9th Cir. 1982) (applying the doctrine); *see also* Peek Decl., ¶ 23, Exh. Y, pp. 5:4-10 (this Court's statement that it would not revisit something the Ninth Circuit has already ruled on or impliedly rejected).  Ibrahim requests that this Court exercise its discretion to apply the law of the case doctrine here.  The Ninth Circuit not only addressed the standing issue specifically and at length in its opinion in *Ibrahim II*, it denied the government's petition for rehearing on the same issue.  This Court also has heard and rejected the government's standing arguments.  Under the law of the case doctrine, Ibrahim has standing and may prosecute her case.

### B.   The Government's Secret Evidence And Legal Argument Do Not Change The Ninth Circuit's Binding Standing Analysis.

The Ninth Circuit also held that it is reasonable to infer Ibrahim was placed on "one or more government watchlists," and that removal of her name from these government watchlists would make the grant of a visa more likely.  *Ibrahim II*, 2012 U.S. App. LEXIS 2457, *20-24. The Ninth Circuit did not limit its analysis to any particular watchlist.  Whatever Ibrahim's supposedly "secret" status may be, the government will not confirm that she has been removed from any and all government watchlists associated with the TSDB.  (*See* Peek Decl., ¶ 12.)  It is unlikely that this has occurred, given the government's denial of her visa application in 2009. (Ibrahim Decl., ¶ 16; RJN, Exh. G)  Therefore, regardless of which specific lists Ibrahim may be on, she likely still is in the TSDB and at least some other lists associated with it.  As long as Ibrahim's name remains in the TSDB or on any watchlist exported to or from the TSDB, she suffers tangible disadvantages.

Even if Ibrahim's name had been removed from all government watchlists, this Court could still hear Ibrahim's constitutional challenges, because this case would fall within a well-recognized exception to the mootness doctrine: cases where defendants voluntarily ceased the

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS; CASE NO. C06-0545 WHA

challenged practice.  *In re Burrell*, 415 F.3d 994, 998 (9th Cir. 2005).  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  Nothing prevents defendants from violating Ibrahim's rights in the same manner again, and the government has made no assurances that it will not do so.

### C.  The Government's Tactic Of Filing Serial Motions To Dismiss Is Sanctionable.

The government's filing of yet another motion to dismiss on the purported ground that Ibrahim lacks standing is sanctionable under Rule 11(b).  The government's motion is frivolous, harassing, and serves no purpose other than delay.  *See* Fed. R. Civ. P. 11(b)(1)-(2); *see also Aetna Life Ins. Co. v. Alla Medical Servs., Inc.*, 855 F.2d 1470, 1475-77 & n.3 (9th Cir. 1988). Even if the motion is not frivolous, as the *Aetna* court observed, "there comes a point when successive motions and papers become so harassing and vexatious that they justify [Rule 11] sanctions even if they are not totally frivolous under the standards set forth in our prior cases." *Aetna*, 855 F.2d at 1476 (emphasis added).  The government has reached that point.[3]

## II.    IBRAHIM HAS PLEADED AN ACTIONABLE CLAIM.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007), the Supreme Court construed this requirement to mean that the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Heightened fact pleading of specifics is not required. *Id.*  Where a complaint contains well-pleaded factual allegations, a court should assume the allegations to be true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Here, Ibrahim's SAC pleads facts sufficient to state a claim.

---

[3] Although Ibrahim does not seek sanctions at this time, she notes the Court has inherent power to sanction violations of the Federal Rules and assess attorneys' fees directly against attorneys who conduct litigation in bad faith.  *See Miranda v. Southern Pacific Transp. Co.*, 710 F.2d 516, 520-21 & n.9 (9th Cir. 1983).  Ibrahim reserves the right to seek sanctions and attorneys' fees in the future based on the government's tactic of filing serial motions to dismiss on the same issue it lost three times previously.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS; CASE NO. C06-0545 WHA

### III.    IBRAHIM HAS STATED A CLAIM FOR VIOLATION OF HER DUE PROCESS RIGHTS.

The due process clause of the Fourteenth Amendment contains a substantive component that bars arbitrary government actions, "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331-32 (1986).  In addition, it guarantees that persons will not be deprived of protected liberty and property interests without fair procedures. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  As set forth below, Ibrahim has alleged violations of both her substantive and procedural due process rights.[4]

### A.   Ibrahim Has Alleged Violation Of Recognized Liberty And Property Interests.

In any due process challenge, the first question is whether the plaintiff has been deprived of a protected interest in "property" or "liberty." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  The liberties protected by the Due Process Clause are not confined to those enumerated in the Bill of Rights.  "[T]he Due Process Clause specially protects those fundamental rights and liberties that are 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).  In Section III.A.2 of its brief, the government argues that Ibrahim has not adequately alleged a protected liberty or property interest because she has no right to travel by air and no right to pursue a career in academia.  As discussed below, the government's ongoing course of conduct with respect to Ibrahim deprives her of a variety of liberty and property interests, all of which support Ibrahim's substantive and procedural due process claims.

#### 1.   There Is A Protected Liberty Interest In Freedom From Incarceration.

Ibrahim was falsely arrested and imprisoned as a result of her erroneous blacklisting in the TSDB.  (SAC, ¶¶ 34-44, 64-76, 122-125.)  "[T]he paradigmatic liberty interest under the due

---

[4] Although the SAC alleges the government's course of conduct violated both Ibrahim's procedural and substantive due process rights (*see* SAC, ¶ 123), the government did not move to dismiss Ibrahim's substantive due process challenge.  Ibrahim's thirteenth cause of action also includes a claim for violation of the APA, separate and apart from Ibrahim's constitutional claims.  The government did not move to dismiss this claim, either.  Therefore, even if the government's motion were granted, it would not dispose of Ibrahim's thirteenth cause of action.

9

process clause is freedom from incarceration." *Oviatt v. Pearce*, 954 F.2d 1470, 1473 (9th Cir. 1992). In Ibrahim's case, because the information associated with her TSDB listing apparently includes an instruction to arrest her (*see* Ibrahim Decl., ¶ 21), the risk of harm from such placement and inadequate redress procedures includes the ongoing risk of unlawful arrest or detention. Even if this instruction were not present, placement in the FBI's National Crime Information Center (NCIC) system logically would tend to increase the chances that Ibrahim would be wrongfully detained or falsely arrested if she were stopped even for a minor traffic violation.

2.    <u>There Is A Protected Liberty Interest In Free Association And Free Exercise Of Religion.</u>

The "freedom to engage in association for advancement of beliefs and ideas is an inseparable aspect of the 'liberty'" assured by the Due Process Clause. *NAACP v. Alabama ex. rel. Patterson,* 357 U.S. 449, 460 (1958). So too is the right to free exercise of religion. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Ibrahim is an identifiable Muslim woman who wears hijab. (SAC, ¶ 36.) Defendants systematically target Muslims for investigation of terrorism based on nothing more than religion, and disseminate these reports as "positive intelligence" to other agencies. (Peek Decl., ¶ 22, Exhs. O-X; RJN, Exhs. P-Y.) Individuals have been watchlisted as a result of the FBI's terrorist-related intelligence reports. (*See* Peek Decl., ¶ 17, Exh. J, p. 3 (TSC000004); RJN, Exh. K, p. 3 (TSC000004).) In December of 2004, Ibrahim was targeted in a similar manner. (Ibrahim Decl., ¶ 20.) These practices substantially interfere with Ibrahim's protected liberty interest in associating with other Muslims and practicing her religion, by intimidating members of the Muslim community and impliedly threatening them if they do not wish to talk to law enforcement, based on nothing more than unsupported speculation and xenophobia.

3.    <u>There Is A Protected Liberty Interest In Freedom To Pursue An Occupation.</u>

Ibrahim's work as a Professor in the Department of Architecture and Dean of the of the Faculty of Design and Architecture at University Putra Malaysia ("UPM") requires that she

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

travel to attend conferences and to conduct study tours in various parts of the world, including to the United States of America and Stanford University.  (Ibrahim Decl., ¶¶ 2-5.)  Because of her TSDB status, Ibrahim is unable to fulfill her job duties.  (*See id.*, ¶¶ 5, 9, 11-15, 17-18.)

The Due Process Clause also protects an individual's right "to be free in the enjoyment of all his facilities; to be free to use them in all lawful ways; <u>to live and work where he will; to earn his livelihood by any lawful calling; and to pursue any livelihood or avocation</u>, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." *Buxton v. Plant City*, 871 F.2d 1037, 1045 (11th Cir. 1989) (emphasis added).  The Ninth Circuit recognizes that the right to pursue a profession is a protected liberty interest that may support a substantive due process claim. *See Sagana v. Tenorio*, 384 F.3d 731, 742-43 (9th Cir. 2004).  Although the right to work is subject to reasonable government regulation, *see Sagana*, 384 F.3d at 743, the government's actions here effectively precluded Ibrahim from working in the United States and ensured the revocation of her visa by listing her in various criminal and terrorist databases, with no opportunity for Ibrahim to show she is neither a criminal nor a terrorist.

4. <u>There Is A Protected Liberty Interest In Freedom To Travel Without Unreasonable Burdens.</u>

Courts have recognized a due process liberty interest in the right to travel to, from, and within the United States. *See Aptheker v. Secretary of State*, 378 U.S. 500, 505-07 (1964). Ibrahim alleges the government has blacklisted her in the TSDB, which supports the No-Fly and Selectee lists, without evidentiary support and based on impermissible considerations.  (SAC, ¶¶ 4, 32-46, 122-127.)  The TSDB supports a variety of other government databases, including DHS's IBIS, the FBI's NCIC System, and the DOS's CLASS system.  (*See* Peek Decl., ¶ 18, Exh. K, p. v (TSC000098); RJN, Exh. L, p. v (TSC000098); *see also* Motion for Order Authorizing Disclosures by San Francisco Defendants (Docket No. 238), filed in this action on November 9, 2009, p. 10:3-11 & n. 5 (the FBI disseminates anti-terrorism information to local law enforcement through its Violent Gang and Terrorist Organizations File (VGTOF), which is part of the NCIC); Peek Decl., ¶ 13, Exh. F, ¶ 8 & ¶ 14, Exh. G.)  Here, as in *Apetheker*, the only

1   discernible reasons for restricting Ibrahim's freedom of movement are her beliefs protected

2   under the First Amendment, or her status as a citizen of Malaysia, "a country with which we

3   have never been at war." *Ibrahim II*, 2012 U.S. App. LEXIS 2457, at *31.

4        The government argues Ibrahim's liberty interest in freedom of movement is not

5   implicated because there is no right to travel by a particular means,[5] citing *Gilmore v. Gonzales*,

6   435 F.3d 1125 (9th Cir. 2006), *Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999), *Green v. TSA*, 351

7   F. Supp. 2d 1119, 1130 (W.D. Wash. 2005), and other out of circuit authorities.[6]  These cases do

8   not apply, because wrongful placement in the TSDB broadly interferes with an individual's

9   freedom of movement.  It does not stop with the individual's ability to fly.  If Ibrahim were to

10  sail or somehow drive to the United States, she still would be stopped at a port-of-entry and

11  screened through IBIS, at which point her TSDB status would be discovered.  If Ibrahim had

12  remained within the United States, or if she were allowed to return, her TSDB status still would

13  subject her to an unreasonable risk of false arrest everywhere she went, due to her placement in

14  NCIC/VGTOF.  Contrary to defendants' argument, placement in the TSDB comprehensively

15  limits an individual's freedom of movement.

16        5.   There Is A Protected Property Interest In Money Spent On International
             Travel.

17        Possession of money is a recognized property interest under the Due Process Clause.  *See*

18  *San Diego Minutemen v. Cal. Bus., Transp. & Hous. Agencys Dep't Of Transp.*, 570 F. Supp. 2d

19  1229, 1241 (S.D. Cal. 2008).  It is common knowledge that international travel is a significant

20  expense, especially for an extended stay abroad.  Ibrahim alleges that she missed her flight and

21

_____

22  [5] The government also makes this argument with respect to Ibrahim's First Amendment claim.
    In addition, the government argues that Ibrahim acknowledges she has no ability to challenge the
23  revocation of her visa.  (MTD, 4:13-17, 12:22-14:11.)  This argument wastes the Court's time.
    The Ninth Circuit already has held: "Ibrahim does not challenge the revocation of her visa, as
24  decisions of consular officers to deny a visa are immune from judicial review.  [Citation
    omitted.]  But it is a reasonable inference that removal of her name from government watchlists
25  would make grant of a visa more likely." *Ibrahim II*, 2012 U.S. App. LEXIS 2457, *21.
    Ibrahim acknowledges only that she is not specifically challenging the decision of a consular
26  officer in this case.  Notwithstanding that, she may challenge the actions of other federal officials
    that led to her visa revocation, including, for example, blacklisting her in the TSDB.
27  [6] *Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007); *Cramer v. Skinner*,
28  931 F.2d 1020, 1031 (5th Cir. 1991); *City of Houston v. FAA*, 679 F.2d 1184 (5th Cir. 1982).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

had to leave a day late to Hawaii in 2005, due to the government's unlawful actions.  (SAC, ¶¶ 34-44.)  The government then assured her she had been removed from the No-Fly List, but this apparently was incorrect.  (SAC, ¶ 45.)  At a minimum, Ibrahim's name more likely than not remained on the Selectee list (and necessarily, also in the TSDB).  (SAC, ¶ 45.)  When Ibrahim attempted to travel back to the United States to complete her thesis, as was always her intention, she was denied boarding once again.  (Ibrahim Decl., ¶ 21.)  Ibrahim has a protected property interest in money invested in travel abroad.  The government's failure to provide notice – or worse, providing incorrect information – that such investments are futile deprives individuals in the TSDB of a recognized property interest.

## B. Ibrahim Has Alleged A Violation Of Her Right To Substantive Due Process.

Defendants' acts of (1) blacklisting Ibrahim in various government databases; (2) instructing others to arrest her; (3) refusing to grant her redress request yet also refusing to justify her continued blacklisting with evidence; and (4) consciously failing to adopt meaningful redress procedures despite their awareness of the high rate of error in TSDB records deprived Ibrahim of the protected liberty and property interests discussed above.  The government's conduct violates Ibrahim's right to substantive due process, even under the "shocks the conscience" test.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-55 (1998).[7]  Under this test, when officials with the luxury to make unhurried judgments and "extended opportunities to do better" nevertheless exhibit "protracted failure even to care, indifference is truly shocking."  *Id.* at 853.

In 2008, an audit of the U.S. Department of Justice, Office of the Inspector General found that for a variety of reasons, the FBI was not removing records from the TSDB when it was appropriate to do so.  (Peek Decl., ¶ 17, Exh. J (2008 audit), pp. 2-3, 6, 8-11, 13-14 (TSC000003-TSC000015); RJN, Exh. K (same).)  Defendants had failed to correct these quality control weaknesses, despite repeated warnings in the past.  (*See* Peek Decl., ¶ 15, Exh. H (2005 audit), ¶ 18, Exh. K, pp. i-ii, viii-xviii (2007 audit following up on 2005 audit); RJN, Exhs. I

---

[7] The "shocks-the-conscience" analysis is necessarily fact-based and inappropriate for resolution on a motion to dismiss.  *See Lewis*, 523 U.S. at 850 (". . . our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of the circumstances before any abuse of power is condemned as conscience-shocking.")

1   (2005 audit) & L (2007 audit).)  Lack of policies and training, failure to follow the procedures

2   that did exist, confusion regarding shared "intelligence," and inability to keep up with the mass

3   quantity of records continually being added were cited as reasons for the failures.  (*See* Peek

4   Decl., ¶ 17, Exh. J (2008 audit), pp. 7-12, 13-14, 21-22 & ¶ 18, Exh. K (2007 audit), pp. iii-iv

5   (observing the TSDB was increasing by an average of 20,000 records per month, and stating,

6   "[g]iven this growth and the TSC's weak quality assurance process, we believe the TSC is

7   underestimating the time required to sufficiently review all watchlist records for accuracy."); *see*

8   *also id.* at pp. xvii (TSC is identifying incomplete or inaccurate information faster than matters

9   are being resolved by source agencies); RJN, Exh. K (same) & Exh. L (same).)

10       Defendants' inability to improve their system of records despite repeated warnings that

11  the rate of error is high, and purposeful obfuscation of the facts in this case so as to frustrate the

12  right to judicial review, constitute an arbitrary abuse of power.  The government's actions also

13  shock the conscience because maintaining more poor quality blacklist records than the

14  government has the ability to correct does nothing to advance the legitimate goal of protecting

15  the nation from terrorists.  *See Lewis*, 523 U.S. at 846 (*citing Daniels*, 474 U.S. at 331)

16  (government action that fails to serve any legitimate governmental objective may be so arbitrary

17  or irrational that it runs afoul of the Due Process Clause).

18          **C.  Ibrahim Has Alleged A Violation Of Her Right To Procedural Due**
19              **Process.**

20              1.  The Adequacy Of The Government's Procedural Protections Cannot Be
                    Determined On A Motion To Dismiss.

21      "A procedural due process claim has two distinct elements: (1) a deprivation of a

22  constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

23  protections."  *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (internal quotation

24  marks omitted).  Procedural due process generally requires notice and some type of hearing

25  before the deprivation of a liberty or property interest.  *United States v. James Daniel Good Real*

26  *Property*, 510 U.S. 43, 48 (1993); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542

27  (1985).  A post-deprivation hearing may satisfy due process where the government shows "the

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, . . . <u>coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking</u>." *Parratt v. Taylor*, 451 U.S. 527, 538-43 (1981) (emphasis added), *overruled in part on other grounds in Daniels*, 474 U.S. at 329-32). The process afforded must be reasonably calculated to provide an adequate means for redress. *See, e.g., Brinkerhoff-Fans Trust & Sav. Co. v. Hill*, 281 U.S. 673, 682 (1930) (government "may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it").

What type of process is required and when it must be given depend on the factual situation before the court. *See Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976). Courts balance the interests for and against a particular procedure by considering the following factors:

> First, the <u>private interest</u> that will be affected by the official action; second, the <u>risk of an erroneous deprivation</u> of such interest through the procedures used, and the probable <u>value, if any, of additional or substitute procedural safeguards</u>; and finally, the <u>Government's interest</u>, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (emphasis added). The *Eldridge* factors require factual analysis, which is not susceptible to a 12(b)(6) motion. *See Pavelich v. Natural Gas Pipeline Co. of Am.*, No. 02 C 3374, 2002 U.S. Dist. LEXIS 23946, at *12-15 (N.D. Ill. Dec. 12, 2002); *see also Sonnleitner v. York*, 304 F.3d 704, 713 (7th Cir. 2002) ("[M]inimum procedural due process requirements ultimately turn on a highly fact-specific inquiry."). Resolution of these factors also would be inappropriate before this Court resolves the government's privilege assertions.

Nevertheless, the government asks this Court to adjudicate the *Eldridge* factors as a matter of law, based on secret evidence, and without giving plaintiff the opportunity to view the evidence, hear and understand defendants' arguments, or seek discovery. The government contends the redress provided by DHS and TSA is adequate, and Ibrahim is entitled to no further opportunity to know and refute the purported evidence against her because in some cases (not necessarily Ibrahim's), this might implicate classified evidence. (MTD, 18:11-19:4, 20:21-

15

23:10.)  The government further argues that no pre- or post-deprivation notice is required because this would reduce the (presumed) efficacy of watchlisting.  (*Id.* at 19:5-20:20.)

        a.   *The Government Has Not Established As A Matter Of Law That No Notice Of Any Kind Is Required.*

The government argues that it cannot provide <u>any</u> kind of notice without defeating the purpose of watchlists.  This argument ignores common sense.  Being arrested despite having committed no crime and being denied boarding at an airport generally tends to raise suspicion that one may be on a government watchlist.  In addition, the government already has discussed Ibrahim's TSDB status with her, although it apparently provided misinformation.  (SAC, ¶ 45.) Defendants also fail to provide pre-deprivation notice of what behavior will result in placement on the TSDB; therefore individuals have no opportunity to avoid the consequences of being watchlisted.  (*See* SAC, ¶¶ 29, 31.)  Such lack of notice violates due process.  *See City of Chicago v. Morales*, 527 U.S. 41, 56-60 (1999).

Providing post-deprivation notice does not reduce watchlist efficacy because at that point, the plaintiff has learned of the government's suspicions.  Furthermore, even if pre-deprivation notice would reduce watchlist efficacy, that does not give defendants' license to violate the Constitution.  Doubtless, many procedural protections afforded to criminal defendants reduce law enforcement efficacy, but that alone does not leave law enforcement free to transgress the supreme law of the land.  Defendants' authorities are not to the contrary.  *See Halkin v. Helms*, 690 F.2d 977, 997-98 (D.C. 1982) (acknowledging the fact that "the act of forwarding the name might lead to an unlawful search or seizure could make watchlisting constitutionally suspect."). No cases cited in Section III.B.1 actually considered a due process challenge to placement in the TSDB and the government's redress procedures, and they do not apply for that reason.

        b.   *The Government Has Not Established As A Matter Of Law That Further Process Cannot Be Provided Without Jeopardizing National Security.*

The government contends that the administrative remedies offered by the TSA's Passenger Identity Verification program (PIV) and DHS TRIP are adequate, and further process cannot be provided without jeopardizing national security.  As alleged in the SAC, these

16

1    remedies are not adequate because they fail to provide a meaningful opportunity to contest the

2    government's alleged "evidence" in support of the TSDB listing.  (*See* SAC, ¶¶ 46, 125.)  The

3    Ninth Circuit has expressed concern about the government's inability to respond meaningfully to

4    the question: what are individuals improperly placed in the TSDB supposed to do?  *See Latif v.*

5    *Holder*, 2012 U.S. App. LEXIS 15429 at *15-19 (9th Cir. 2012) (holding that district courts have

6    original jurisdiction over claims that the government failed to afford an adequate opportunity to

7    contest their apparent inclusion on the No-Fly List).  Here, even if Ibrahim successfully appealed

8    the TSA's ambiguous letter before the D.C. Circuit,[8] the D.C. Circuit could not order the relief

9    she seeks because TSA lacks authority to grant this relief.  In *Latif*, the Ninth Circuit recognized

10   that <u>TSA lacks authority to grant the relief plaintiff seeks, because TSA cannot remove an</u>

11   <u>individual from the TSDB</u>.  *See* 2012 U.S. App. LEXIS 15429, at *15-18.  For this reason, and

12   many other reasons, the PIV and DHS TRIP procedures and the opportunity for review in the

13   circuit courts are not adequate.

14        The government again points to the importance of national security as support for its

15   argument that further process must be denied categorically.  National security is certainly a valid

16   government interest, but the strength of the government's interest is just one factor in the

17   analysis.  In addition, the government must lay foundation for its claim that national security

18   would be implicated <u>in this case</u>.  But, this Court already determined that many allegedly

19   privileged documents could be turned over to plaintiff's counsel subject to an appropriate

20   protective order.  (*See* Peek Decl., Exh. C (security clearance letters); Exh. D (Order For

21   Production Of Items Despite The Assertion Of Various Privileges); Exh. E (Protective Order

22   Regarding Sensitive Security Information entered by this Court on January 13, 2010).)

23   Therefore, this Court effectively has rejected the position that national security precludes any

24   judicial review or further process.  (*See, e.g.*, *id.*, Exh. D, 23:4-14 (holding that defendants

25   waived the state secrets privilege by failing to assert it in a timely fashion).)

26   _____

[8] The government's assertion that Ibrahim failed to appeal the denial of her PIV application to

27   the District of Columbia Circuit is incorrect.  Ibrahim did raise this issue before the circuit courts

even though the government did not respond to her PIV application until after she filed her

28   petition.  (*See* Peek Decl., ¶¶ 3-5 & Exh. A.)

17

1      Here, the SAC alleges that the government blacklists individuals in terrorist databases

2   without any opportunity to confront the supposed "evidence" against them.  (SAC, ¶ 125.)  Such

3   blacklisting creates an underclass whose 400,000 members suffer real world consequences that

4   extend beyond air travel.  (*See* Peek Decl., ¶ 18, Exh. K, pp. i, v (TSC000094, TSC000098);

5   RJN, Exh. L, pp. i, v (TSC000094, TSC000098); *see also Ibrahim II*, 2012 U.S. App. LEXIS

6   2457, at * 11 & n. 7 (in 2007, TSDB contained records on approximately 400,000 individuals

7   according to GAO and DOJ OIG reports).  The government's authorities do not establish that

8   providing <u>Ibrahim</u> further process would in any way implicate national security, or that effective

9   review could not be achieved with appropriate safeguards, such as the ones this Court already

10  has ordered.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2728 (2010) (stating

11  organizations designated as foreign terrorist organizations could seek judicial review).

12                      2.   <u>Ibrahim Has Stated A Stigma Plus Claim.</u>

13      In addition to the liberty interests identified above, Ibrahim adequately has alleged a

14  liberty interest in freedom from being stigmatized as a terrorist, when that stigmatization occurs

15  in connection with the denial of a right or alteration of a status recognized by law.  (SAC ¶ 125.)

16  The elements of a stigma plus claim are as follows:

17          (1) "the <u>public disclosure</u> of a <u>stigmatizing statement</u> by the government, <u>the accuracy of</u>
18          <u>which is contested</u>, *plus*";

          (2) "the denial of 'some more tangible interest [] such as employment,' or the <u>alteration</u>
19          <u>of a right or status</u> recognized by state law."

20  *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (emphasis

21  added); *see also Stevens v. Rifkin*, 608 F. Supp. 710, 726-27 (N.D. Cal. 1984).  The stigmatizing

22  statement need not have caused the denial of tangible interest or change in status.  *See Stevens*,

23  608 F. Supp. at 726-27.  The stigmatizing statement also need not have originated from the same

24  actor that imposed the "plus."  *See Velez v. Levy*, 401 F.3d 75, 88-89 (2d Cir. 2005).

25      The government argues that Ibrahim cannot allege it has disclosed stigmatizing

26  statements about her.  (MTD, 14:20-16:13.)  In fact, the element of disclosure is met here.

27  Defendants disseminated information about Ibrahim's TSDB status to various government

28

1    agencies, state actors, and private individuals, which led to her unlawful arrest in public.  (SAC

2    at ¶¶ 34-44, 123, 125.)  To the extent No-Fly and Selectee list records constitute "sensitive

3    security information," they may be communicated to "covered persons," which include airlines,

4    state and local law enforcement authorities, others with a need to know, and civil litigants and

5    their counsel.  *See* 49 C.F.R. §§ 1520.7 (listing covered persons), 1520.11 (persons with a need

6    to know); *see also* Department of Homeland Security Appropriations Act of 2007, Pub. L. No.

7    109-295 § 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006) (providing for disclosure to parties or their

8    counsel with a "substantial need" for SSI in the preparation of a civil case).  Non-SSI TSDB

9    records, including records accessible to local law enforcement through NCIC/VGTOF, are not

10   covered by these regulations.  (*See* Motion for Order Authorizing Disclosures by San Francisco

11   Defendants (Docket No. 238), filed in this action on November 9, 2009, p. 10:14-20 (citing OIG

12   Audit Report 05-27 at p. 79 and explaining that information in NCIC system is not classified, but

13   at most only "law enforcement sensitive").)

14          It is worth noting that federal regulations have not been effective in limiting

15   dissemination of the No-Fly and Selectee Lists to "covered persons" and "persons with a need to

16   know."  It is common knowledge that versions of the No-Fly List and Selectee List have been

17   leaked to journalists and discussed on the television show *60 Minutes*.  (RJN, ¶ 2, Exhs. M-O.)

18   The government likely disseminated Ibrahim's TSDB status to individuals in Malaysia, and

19   discussed it with Ibrahim herself.  (*See* Ibrahim Decl., ¶ 21; SAC, ¶ 45.)  The circumstances of

20   Ibrahim's arrest also effectively disclosed her status to members of the public.  The mere

21   existence of federal regulations does not mean that an individual's No-Fly or Selectee status

22   always will be "secret," especially once an individual has already been denied boarding and told

23   this has to do with his or her inclusion on a government watchlist.

24          More importantly, even if disclosure truly were limited to statutorily authorized persons,

25   that does not defeat Ibrahim's stigma plus claim.  *See Humphries v. County of Los Angeles*, 554

26   F.3d 1170, 1187-89 (9th Cir. 2009) (being listed in child abuse database altered rights because

27   some licensing agencies were statutorily required to check the database, and others may have

28

19

1  been required to check it as a practical matter); *Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir.

2  2005); *Valmonte v. Bane*, 18 F.3d 992, 999-1002 (2d Cir. 1994) (inclusion in child abuse

3  database that would be disclosed to employers required to check it and to justify hiring persons

4  in the database was sufficient disclosure).  In the case of the TSDB, disclosure will occur

5  whenever local law enforcement query NCIC and a TSDB record exists.

6       One of the stated purposes of the TSDB is to assist in screening individuals stopped by

7  local law enforcement.  (*See* Peek Decl., Exh. K, pp. i, v; RJN, Exh. L (same).)  It is difficult to

8  imagine that a law enforcement officer responding to an airline ticketing agent because of a

9  terrorist watchlist match would decline to check NCIC.  *Cf. Humphries*, 554 F.3d at 1188-89

10  ("CANRA explicitly provides that a variety of agencies will have access to CACI, and we cannot

11  turn a blind eye to the actions of these other agencies merely because they are not explicitly

12  required by statute to receive CACI information.").  In such situations, consulting the TSDB is a

13  practical requirement.  Here, local law enforcement apparently did query NCIC, and it led to a

14  deprivation of liberty.  As long as Ibrahim remains in the TSDB, this could happen again.  (*See*

15  Ibrahim Decl., ¶ 21.)  This is sufficient disclosure for purposes of the stigma plus claim.

16       Finally, none of defendants' other authorities require dismissal here.  *Am. Civil Liberties

17  Union of Nevada v. Masto*, 670 F.3d 1046, 1058 (9th Cir. 2012) is inapposite.  That case dealt

18  with convicts who already had an opportunity for a full evidentiary hearing.  *Id.* at 1058-59.

19  *Chandler v. Miller*, 520 U.S. 305, 323 (1997) also does not apply.  The language defendants cite

20  is dicta, and further, plaintiff was not subjected to a "blanket suspicionless search" applied to all

21  travelers but rather to enhanced searches reserved for persons in the TSDB.  (*See* SAC, ¶ 45.)

22       The government also relies on *Paul v. Davis*, 424 U.S. 693, 711-12 (1976), *R.J. Reynolds

23  Tobacco Co. v. Shewry*, 423 F.3d 906, 924-25 (9th Cir. 2005), *Wenger v. Monroe*, 282 F.3d

24  1068, 1074-75 (9th Cir. 2002), *Green*, 351 F. Supp. 2d at 1129-30, *Mohamed v. Holder*, 2011

25  U.S. Dist. LEXIS 96751, *23-25 (E.D. Va. 2011) (unclear that plaintiff's TSDB status had or

26  would be disseminated or used for any purpose other than the implementation of the Secure

27  Flight Program administered by the TSA), and *Millman v. Inglish*, 461 Fed. Appx. 627, 628 (9th

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

Cir. 2011) (unpublished), but none of these cases control here.  In these cases, the plaintiff could not identify a recognized right or status lost in connection with a stigmatizing statement.  In addition, *Wenger* and *Millman* did not consider the rationale discussed in *Humphries*, *Dupuy*, and *Valmonte*.  Here, Ibrahim's SAC shows that while wearing hijab, Ibrahim was arrested by local police at a public airport because the government disseminated Ibrahim's TSDB status to United Airlines and local police.  (SAC, ¶¶ 34-44, 123, 125.)  Further, it is reasonable to infer that Ibrahim remains at risk of false arrest, so long as the government continues to stigmatize her with false allegations of terrorism.

### IV.   IBRAHIM HAS ALLEGED VIOLATIONS OF HER FIRST AMENDMENT RIGHT TO FREEDOM OF RELIGION AND FREE ASSOCIATION.

As discussed above, Ibrahim has alleged violation of her protected First Amendment right of association.  In addition, federal government action that substantially burden a religious practice must be justified by a compelling state interest and must be narrowly tailored to achieve that interest.  42 USCS § 2000bb-1; *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963), *overruled in Employment Division v. Smith*, 494 U.S. 872 (1990) but revived as to the federal government as stated in 42 U.S.C. § 2000bb.  The plaintiff must establish that the government has placed a substantial burden on his or her free exercise of religion.  *See Sherbert*, 374 U.S. at 403-06; *see also Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989).

The government does not address this test; therefore its motion to dismiss on this ground fails.  In any event, the allegations of the SAC, Ibrahim's declaration, and judicially noticeable facts show that the government investigated Muslims as terrorists based on nothing more than their religion,[9] and that individuals were watchlisted as a result of the FBI's terrorist-related reports, even when the FBI made no formal nominations.  (*See* Peek Decl., ¶ 17, Exh. J, p. 3 (TSC000004); RJN, Exh. K (same).)  Ibrahim herself was watchlisted and arrested close in time to similar activities by the FBI (*see* Ibrahim Decl., ¶ 20; SAC, ¶¶ 34-44), despite a lack of evidence that she had any connection to terrorism.  Such activities placed a substantial burden on

---

[9] SAC, ¶¶ 4, 36; Ibrahim Decl., ¶¶ 20-21; Peek Decl., ¶ 16, Exh. J, pp. 2-3, 6, 8-11, 13-14 (TSC000003-TSC000015) & ¶ 21, Exhs. O-X; RJN, Exhs. L, pp. 2-3, 6, 8-11, 13-14 (TSC000003-TSC000015) & Q-Z.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

1  Ibrahim's free exercise of religion. Discovery is needed to evaluate any purported interest

2  supporting the government's actions.

3  ## V.    IBRAHIM HAS STATED AN EQUAL PROTECTION CLAIM.

4          In various sections of their motion, defendants argue that Ibrahim cannot state a claim

5  based on the theory that she was denied the right to fly based on religion or nationality. (*See*

6  MTD, 12:8-21, 23:11-24:5.) This argument lacks merit and mischaracterizes the nature of

7  plaintiff's claim. Plaintiff alleges defendants violated her right to equal protection by placing her

8  in a terrorist database based on religion and nationality. (SAC, ¶ 126.) A plaintiff alleging a

9  violation of equal protection must show that the defendant acted in a discriminatory manner and

10  that the discrimination was intentional. *See Washington v. Davis*, 426 U.S. 229, 238-47 (1976).

11  Intent may be proved through direct or indirect evidence. *See Arlington Heights v. Metropolitan*

12  *Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977). A disproportionate impact on the affected

13  class may be evidence of discriminatory intent. *Washington*, 426 U.S. at 242.

14          Ibrahim's equal protection claim is based on the following facts, among other facts: (1)

15  Ibrahim is an identifiable Muslim woman who wears hijab; (2) Ibrahim has no criminal record or

16  connection to terrorism whatsoever; (3) agents of the federal government placed Ibrahim's name

17  in the TSDB, and on either the No-Fly or Selectee list or both lists, with instructions to arrest her;

18  (4) the FBI is the agency responsible for nominating individuals to the TSDB and its associated

19  watchlists; (5) from 2004-2008, the FBI systematically contacted Northern California Muslims

20  based on nothing more than their religious beliefs, interviewed them at their places of worship

21  under the guise of "community outreach," and disseminated reports summarizing these contacts

22  as "positive intelligence" to other agencies; (6) in December of 2004, two FBI agents contacted

23  Ibrahim at home, and told her that possibly she had been contacted because she was Malaysian,

24  and Malaysia was blacklisted by the United States government.[10] These facts are more than

25  enough to state a plausible claim that the FBI impermissibly profiled Ibrahim and placed or

26  caused her to be placed in the TSDB based on religion and nationality.

27  [10] SAC, ¶¶ 4, 36; Ibrahim Decl., ¶¶ 20-21; Peek Decl., ¶ 17, Exh. J, pp. 2-3, 6, 8-11, 13-14
    (TSC000003-TSC000015) & ¶ 22, Exhs. O-X; RJN, Exhs. K, pp. 2-3, 6, 8-11, 13-14

28  (TSC000003-TSC000015) & P-Y.

1    Defendants have produced no evidence showing they ever had a reasonable belief that

2   Ibrahim had any nexus to terrorism.  Even if they had, discriminatory motives can give rise to an

3   equal protection claim even where there are objective indicia of suspicion to satisfy the Fourth

4   Amendment.  *See Morgan v. City of Pleasant Hill*, 2005 U.S. Dist. LEXIS 40382, at *18 (N.D.

5   Cal. 2005) (*citing Farm Labor Organizing Comm. v. Ohio*, 308 F.3d 523, 533 (6th Cir. 2002)).

6   Given the dearth of evidence against Ibrahim, her lack of any criminal record or connection to

7   terrorism, the agents' admission that her nationality may have been the reason for the contact,

8   and the highly disproportionate effect of the FBI's investigatory techniques on innocent

9   Muslims, Ibrahim's claim of intentional discrimination not only is plausible but very likely.

10   Ibrahim's equal protection claim could survive even with less specific facts.  *See Tuggles v. City

11   of Antioch*, 2009 U.S. Dist. LEXIS 92495, at *44-45 (N.D. Cal. 2009) (denying motion for

12   summary adjudication based on defendant's statement that "you people" are always causing

13   problems in the neighborhood).

14    Defendants assert that dismissal is required under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009),

15   but *Iqbal* does not control the result in this case.  In *Iqbal*, the Supreme Court applied the

16   *Twombly* pleading standard to reject a *Bivens* claim against John Ashcroft and Robert Mueller

17   for allegedly approving a policy of "'holding post-September-11th detainees in highly restrictive

18   conditions of confinement until they were "cleared" by the FBI[.]'"  *Id.* at 669.  The *Iqbal* court

19   began its analysis of respondent's complaint by identifying allegations that were not entitled to

20   an assumption of truth because they were "conclusory."  *Id.* at 681.  The court deemed the

21   remaining allegations – that the FBI arrested thousands of Arab Muslim men after September 11

22   and that petitioners approved the policy of holding post-September-11th detainees in restrictive

23   conditions – insufficient to "plausibly" establish purposeful discrimination.  *Id.* at 681-82.

24    Unlike in *Iqbal*, the government can point to no event in 2004 that would produce a

25   disparate incidental impact on Malaysian Muslims as a result of legitimate law enforcement

26   activities.  Ibrahim's case further differs from *Iqbal* in that the facts showing she was targeted

27   because she is Malaysian, and that the government lacked any basis for suspecting her of

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA

terrorism, are not conclusory.  The FBI's tactic of targeting innocent Muslims as sources of

"positive intelligence" mirrors Ibrahim's own experience.[11]  All of these facts support the

inference that Ibrahim was contacted and placed in the TSDB "because of" and not "in spite of"

her religion and nationality.  Defendants' argument to the contrary lacks merit, and their motion

to dismiss Ibrahim's equal protection claim should be denied.

## VI.   THE DEPARTMENT OF STATE IS PROPERLY NAMED AS A DEFENDANT BECAUSE IT IS NECESSARY FOR COMPLETE RELIEF.

The Attorney General, DHS, and DOS are jointly responsible for implementing HSPD-6.

(SAC ¶¶ 5, 12, 13, 18 & 19.)  According to the 2003 MOU, the DOS is responsible for reviewing

nominations to the No-Fly List and determining whether to share them with foreign

governments.  (*Id.* at ¶¶ 13 & 19.)  Ibrahim seeks relief against the DOS in the form of an order

requiring the DOS to remove her name from the No-Fly List and any related databases

maintained or accessed by the DOS, and to communicate the fact of the removal to any other

government agencies that rely on information from the NCTC, the TSC, the FBI, the DOS, the

DHS, or the TSA, to identify visa applicants who may be inadmissible pursuant to Section

212(a)(3)(B) of the Immigration and Nationality Act.  (*Id.*, Prayer, ¶¶ (f)-(g).)

The government's repeated insistence that visa decisions do not depend on TSDB status

is disingenuous.  The government's statements on its own website, and its own documents

produced during discovery confirm that the DOS does use TSDB nominations in making

decisions on admissibility.  (Peek Decl., ¶ 16, Exh. I, pp. 2-3 & ¶ 18, Exh. K, p. v (TSC000098);

*see also* RJN, Exh. J, pp. 2-3 & Exh. L, p. v (TSC000098).)  That the DOS may consider other

evidence in addition to the TSDB information has no bearing on the propriety of the DOS's

continued consideration of baseless TSDB entries.  Ibrahim objects to the irrelevant and

conclusory statements in paragraph four of the Declaration of Sean Cooper, to the contrary.

It would not be helpful to obtain an order against the FBI, TSC, and NCTC to remove

Ibrahim's name from the TSDB and VGTOF, only to have her name remain in the CLASS

---

[11] Publicly available information produced by defendants in discovery also confirms that individuals have been watchlisted based on the FBI's terrorist-related intelligence reports disseminated to other agencies, even though the reports are not formal watchlist nominations. (*See* Peek Decl., ¶ 17, Exh. J, p. 3 (TSC000004); RJN, Exh. K, p. 3 (TSC000004).)

24

1    database maintained by the DOS, based on the stale TSDB information.  The participation of the

2    DOS is necessary to ensure effective relief.

3                                            **CONCLUSION**

4              Our justice system is not without examples of civil rights violations that went

5    unredressed because the prejudices of the moment were too powerful.  *See*, *e.g.*, *Korematsu v.*

6    *United States*, 323 U.S. 214, 219-24 (1944).  As late as the 1980's, the FBI considered

7    "practicing homosexuals" a security risk – and courts actually agreed.  *See Padula v. Webster*,

8    822 F.2d 97, 104 (D.C. Cir. 1987).  Today most people understand that irrational prejudice

9    caused these results, not reliable evidence of a threat to security.  Whatever procedural argument

10   the government has made in secret, it ultimately asks this Court to grant it unfettered discretion

11   to assign certain citizens to an underclass with limited civil rights, with no opportunity

12   whatsoever for the citizen to challenge the government's unfounded designation.

13             History has shown that the federal executive branch has abused such discretion to the

14   detriment of citizens who are unpopular at any given point in time.  *See*, *e.g.*, *Korematsu v.*

15   *United States*, 584 F. Supp. 1406, 1417-20 (N.D. Cal. 1984) (granting writ of *coram nobis* and

16   finding the government had deliberately omitted relevant information and provided misleading

17   information in papers before United States Supreme Court concerning the supposed "threat" to

18   national security posed by Japanese Americans).  The government cannot summarily eliminate

19   Ibrahim's rights without providing support for its claims.  The government has never presented

20   any evidence justifying its treatment of Ibrahim, an educated mother of four with a doctorate

21   from Stanford and the desire to foster cooperation between the United States and Malaysia in

22   spite of the senseless way the United States has treated her.  The government's effort to deny

23   Ibrahim her day in court should be rejected.

24   Dated: November 21, 2012                    McMANIS FAULKNER

25

26                                              /s/  Christine Peek
                                                CHRISTINE PEEK

27
                                                Attorneys for Plaintiff,
28                                              RAHINAH IBRAHIM

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS; CASE NO. C06-0545 WHA