IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAHINAH IBRAHIM,

    Plaintiff,

v.

DEPARTMENT OF HOMELAND SECURITY, et al.,

    Defendants.

No. C 06-00545 WHA

**ORDER DENYING MOTION TO DISMISS AND MOTION TO STAY DISCOVERY**

## INTRODUCTION

For six years in this civil action, plaintiff has been trying to straighten out her status on the no-fly list and/or related lists. After two appeals reversing the government's position, this order addresses yet another Rule 12 motion by the government.

## STATEMENT

From 2001 to 2005, Rahinah Ibrahim was studying under a student visa at Stanford University. In January of 2005, Ibrahim attempted to fly from San Francisco to Malaysia, her country of origin, but was detained and held at the airport because her name was on the government's no-fly list. After being held for two hours, she was released. Ibrahim was told by an unidentified person that her name was no longer on the no-fly list.

The next day, Ibrahim returned to the airport to catch a different flight. Despite what she had been told the previous day, an unidentified person told Ibrahim that she was still on the no-fly list. Inexplicably, however, Ibrahim was allowed to board her flight and fly to Malaysia. She has never been permitted to return to the United States.

In March of 2005, Ibrahim submitted a request through the TSA's "Passenger Identity Verification" to clear her name. A year later, after Ibrahim had filed suit, the TSA sent her a form letter that did not state whether her name had been removed from the no-fly list.

In April of 2005, an American consul in Malaysia sent Ibrahim a letter stating that the Department of State had revoked her student visa one month after her departure due to "possible ineligibility" under Section 212(a)(3)(B) of the Immigration and Nationality Act. This statute allows for aliens to be refused entry to the United States based on actual or likely terrorist activity. The letter further stated that her continued ineligibility for a visa would be determined when she next applied for a visa (which visa she applied for after filing suit and which was denied in 2009).

In January of 2006, Ibrahim filed suit against the DHS, TSA, the Terrorist Screening Center, the FAA, the City and County of San Francisco, the San Francisco Police Department, the San Francisco Airport, the County of San Mateo, United Air Lines, UAL Corporation, and the individuals associated with these entities. She asserted Section 1983 claims, state law tort claims, and several constitutional claims based on the inclusion of her name on government terrorist watch lists.

An August 2006 order dismissed Ibrahim's claims against the federal defendants based on lack of subject-matter jurisdiction under a federal statute that vested jurisdiction in the courts of appeals. In August of 2008, however, our court of appeals reversed and remanded, ruling that district courts have jurisdiction over such challenges, including challenges to placement on the no-fly list, at least as to certain federal defendants.

Following remand, Ibrahim filed a second amended complaint in April 2009 against the remaining federal defendants and certain city defendants. She again asserted Section 1983 claims, state law tort claims, and constitutional claims, including claims based on First Amendment freedom of association, Fifth Amendment due process, and equal protection. She also asserted a claim under the Administrative Procedure Act, alleging that the federal defendants' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with the law. The relief she sought included an injunction removing her from the no-fly list.

The federal defendants moved to dismiss Ibrahim's APA claim of lack of standing and failure to state a claim. They contended that she had no Article III standing and that she had no right to assert her First and Fifth Amendment claims because she is an alien who voluntarily left the United States. A July 2009 order held that Ibrahim had Article III standing, but her voluntary departure from the United States extinguished her capacity to sue for prospective APA and constitutional relief. As for past violations, the order held that she could pursue her claims, though certain claims were dismissed with leave to amend.

Ibrahim settled her claims against the non-federal defendants and then appealed the dismissal of her APA and constitutional claims along with related adverse discovery rulings. In February 2012, our court of appeals agreed that Ibrahim had Article III standing, reversed the dismissal of her APA and constitutional claims, and vacated certain adverse discovery rulings. 669 F.3d 983.

Now, once again, the federal defendants move to dismiss. They again assert that Ibrahim lacks standing, and that even if she does have standing, her claims must be dismissed as a matter of law. In parallel, defendants move for a stay of discovery pending resolution of their motion to dismiss.

Defendants have taken an unusual step regarding their motion to dismiss. Defendants seek to rely on law enforcement declarations to be submitted for *in camera, ex parte* review. To address this circumstance, an order requested that the parties submit briefing as to whether and to what extent it would be appropriate for the undersigned judge to receive and to rely on these materials.

**ANALYSIS**

**1. SECRET AND *EX PARTE* COMMUNICATIONS.**

The analysis begins by addressing the request by the government to dismiss this case based on secret evidence the government wishes to show the judge *ex parte* and extra record. It came about as follows:

After the government's second reversal by the court of appeals in this six-year old action, the government again moved to dismiss under Rule 12, again moving on lack-of-standing

3

1 grounds, even though the standing issue had gone the other way on appeal. While the briefing
2 was in progress, a telephone call came into the court staff saying that a federal agent was on his
3 way from Washington to San Francisco to show the judge confidential records about this case,
4 all to be relied upon by the government in support of its motion to dismiss (but not to be
5 disclosed to the other side). The officer would take back the records after the judge reviewed
6 them and would leave no record behind of what he had shown the judge. Upon hearing of this,
7 the judge suspended this proposed process and called for the briefing that is the subject of this
8 order, namely the extent to which the government may rely on secret *ex parte* communication
9 in connection with its motion to move to dismiss. Pending resolution of that issue, the Court
10 has not reviewed any such *ex parte* communications (and believes they are not even in the
11 courthouse). Nor has it read any of the redacted passages in the briefing (and believes
12 unredacted versions are not even in the courthouse).

13 Our court of appeals has not spoken directly to our circumstance so this order will review
14 the three most pertinent decisions. In essence, those decisions strongly favor maintenance of
15 our traditional system of fair play in which both sides have notice of the arguments and evidence
16 being used against them. Nonetheless, for good cause, the judge may receive *ex parte* secret
17 communications for deciding ancillary matters, such as discovery privileges, but only in the
18 rarest of circumstances should the judge do so to resolve or to end a case. It is a matter of
19 discretion for the district judge. Now follows an analysis of the three appellate decisions.

20 In a 1991 appellate decision that our court of appeals was "careful to limit" to the
21 "precise facts of this case," the district judge had reviewed *ex parte* and *in camera* an FBI
22 declaration stating that an FBI agent had been acting within the course and scope of his
23 employment for the United States and then, based thereon, dismissed a civil suit brought
24 by a criminal-investigation target against the agent. This decision is the government's best
25 authority. The plaintiff there challenged the *ex parte/in camera* procedure. The court of appeals
26 was clearly troubled by it, stating:

27 While in our judicial system adversary proceedings are the norm
and ex parte proceedings the exception, this court has generally
28 recognized the capacity of a district judge to "fashion an guide the
procedures to be followed in cases before him." *United States v.*

4

> *Thompson*, 827 F.2d 1254, 1257 (9th Cir. 1987) (finding, in a criminal context, that district court erred in considering government's reasons for utilization fo peremptory challenges ex parte). "[District judges are able to consider matters that may be unique to particular fact situations and tailor procedures to serve the ends of justice . . . ." *Id*. at 1258. We find that the procedure used by the court in the instant case was proper, it adequately balanced the rights of the Government and Meridian. The Government's interest in having FBI documents, which relate to an ongoing investigation, remain confidential was clearly satisfied by the court's action; and although Meridian did not have the opportunity to conduct discovery and cross-examine the Government's witnesses, its interests as a litigant are satisfied by the ex parte/in camera decision of an impartial district judge. However, because procedures such as these should be used only in unique situations, we are careful to limit our holding to the precise facts of this case.

*Meridian Intern. Logistics, Inc. v. United States*, 939 F.2d 740, 745 (9th Cir. 1991). Although there was no reversal per se on the procedural ground, the court of appeals reversed on the merits, holding that the generalized *ex parte* declarations were insufficient to establish that all agent acts had been within the scope of FBI authority.

*Meridian* is distinguishable for several reasons. *First*, the dismissal by the district judge was pursuant to a statutory (and public) certification by the Attorney General that the FBI actions involved had all been within the scope and course of FBI employment. Under 28 U.S.C. 2679(d)(2), this certification then mandated substitution of the United States in place of the individual defendant. In turn, the only possible claim against the United States would have been under the Federal Torts Claims Act, and it was manifest that no claim for slander, libel and interference with contract would lie against the United States under that Act. All of the foregoing was based on publicly filed certifications and argument. The only role of the *ex parte/in camera* declarations was to supply proof to back up the certification as to scope. So, the first point of distinction is the limited role that the declarations played in *Meridian*.

*Second*, despite its limited role, our court of appeals nonetheless reversed on the merits and held that the declarations were too inadequate and too conclusory to support the scope certification. It remanded for reconsideration and instructed the district judge to "entertain further documentary proof by the parties." *Id*. at 745. This meant that, on remand, both sides would have an opportunity to submit evidence on the scope issue, not just the government.

5

*Third*, our court of appeals described the substantive declarations in its public order, stating that they only generally asserted that the agent's investigation had been proper without addressing the specific factual allegation of Meridian's complaint. Put differently, under our system of law, the court felt obliged to explain the basis for its ruling, even if that meant revelation of some of the information in the secret submission.

*Fourth*, unlike here, the government there at least had the declarations filed in the court record, even if under seal, so that there would be a precise judicial record for appeal. Here, by contrast, the government wishes to whisk away all of its secret evidence and leave no trace behind in our district court records for appellate review. Our court of appeals would have to depend upon an agency bureaucratic process to recreate the same material shown to the district judge.

In short, *Meridian* provides guidance and a word of caution. Our court of appeals limited its holding there "to the precise facts" of that case. Our facts are much different. Here, we have no public statutory certification. We would have no district court record for appellate review. We would have no proceeding where both sides were given a chance to submit documentary proof on the issue, for here no one has a clue what the government's secret evidence purports to address.

In *Gilmore v. Gonzales*, 435 F.3d 1125 (9th Cir 2006), our court of appeals itself ordered the government to file under seal and *ex parte* materials sufficient to show that a TSA Security Directive was a "final order." This was done on appeal in a suit by someone who refused to give his identification at the airport security check-in and sued to challenge the authority of the TSA to condition the right to travel on showing proper identification. If the TSA Security Directive was a "final order," then the district court lacked subject-matter jurisdiction and only the court of appeals could hear a petition for review. After reviewing the Security Directive *in camera and ex parte*, our court of appeals described the directive sufficiently in its ruling to demonstrate that it was indeed a "final order" and then transferred the matter to itself under its own original review jurisdiction. Nothing in this *ex parte* procedure was used to make a ruling on the merits and, indeed, our court of appeals went on to reach the merits in the next passage in the opinion.

6

By contrast, here the government seeks to use *ex parte* communications to defeat plaintiff's case altogether.

Finally, let's turn to a decision of our appellate court most on point. Although Congress later enacted a provision to strip federal courts of subject-matter jurisdiction to review certain immigration proceedings, our court of appeals held — in an action commenced *before* the jurisdiction-stripping enactment — that due process was violated when the government uses secret, classified information to deny resident illegal aliens the privilege of legalization, that is, temporary or permanent resident status. *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 104, 1066–71 (9th Cir. 1995), *vacated on other grounds*, 525 U.S. 471 (1999). This part of the decision by our court of appeals remains good law. Given that in our very case, our court of appeals has now held that Ibrahim, even though voluntarily outside our country, is entitled to assert claims to the same extent as an alien within our borders, it is hard to avoid the *Reno* principle in the instant civil action.

To be sure, there are circumstances where a district judge must and should examine *ex parte* materials *in camera*. When claims of privilege are made in discovery matters to shield material from revelation, we do so to rule on the privilege. But there no one is yet trying to end or to win a case on the merits in secret — rather, the issue is whether the other side has a right to obtain the allegedly privileged evidence. In contrast, where the holder affirmatively seeks to use the evidence to win or to end the case, then, of course, any privilege must be deemed waived and both sides then have access to it, at least under an appropriate protective order. Here the government seeks to affirmatively use allegedly privileged information to dispose of the case entirely without ever revealing to the other side what its secret evidence might be.

Similarly, in the *Rovario* context in criminal cases, we are sometimes called on to hold an *in camera* hearing to examine a confidential informant under oath to determine the extent to which the informant has sufficient evidence helpful to the defense so as to overcome the *Rovario* privilege and require disclosure to the defense of the identity of the witness. *United States v. Spices*, 3 F.3d 1234, 1238 (9th Cir. 1993); *Rovario v. United States*, 353 U.S. 53, 59 (1957). Again, however, in that context, the government is *not* trying to use secret information to

7

1 convict. It does not wish to use the evidence at all. It is the *other side* that wants to have access
2 to the evidence for potential use in court. And, it might be added, when this is done, the
3 proceeding is reported and the transcript is made part of the record, albeit under seal, for the
4 review by the court of appeals. Before the *in camera* review, moreover, it is the practice of at
5 least this district judge to ask defense counsel to submit a list of questions to be covered by the
6 judge during the *in camera* proceeding.

7 Similarly, a district judge sometimes reviews potential *Brady* material *in camera*
8 and *ex parte* to rule on whether it must be turned over. Again, in those circumstances, the
9 government does not seek to affirmatively rely on the material. Rather, the question is whether
10 to disclose it for potential use by the other side. These are only examples. There are other
11 *ex parte* circumstances known to the courts but the main point is now evident.

12 In the exercise of its discretion, here is how the Court concludes such issues should be
13 determined. Where the government seeks to end or win a case entirely based on secret evidence
14 via an *ex parte* communication, it should first submit a precis available to both sides (i) laying
15 out the general purport of the argument and evidence such that the other side will have an
16 opportunity to respond to the general tenor of the proposed submission and (ii) explaining
17 why more detail should not be made available to the other side. Then both sides may address
18 the fairness and need for the *ex parte* procedure and, if it is to be done at all, the parameters for
19 it. The more case dispositive the proposed submission, the more justification should be shown.
20 In sum, only in the rarest of circumstances should a district judge, in his or her discretion,
21 receive *ex parte* argument and evidence in secret from only one side aimed at winning or ending
22 a case over the objection of the other side. Here, the government has not justified its sweeping
23 proposal. It has gone so far as even to redact from its table of authorities some of the reported
24 caselaw on which it relies! This is too hard to swallow.

25 This order holds that the government has not justified and may not affirmatively seek to
26 dismiss this civil action based upon proposed secret *ex parte* communications with the district
27 judge. If the government seeks to make affirmative use of evidence to end the case, then it must
28 disclose that information — under an appropriate protective order, of course, but nonetheless

disclose it. If it does not wish to make such affirmative use, then it may withhold it subject only to the possibility that plaintiff's counsel may eventually seek discovery of it, in which case it may or may not be kept under wraps depending on the strength of the competing discovery consideration at that time and the strength of the privilege asserted.

Therefore, the Court will ignore all of the redacted material in the government briefs on this set of motions and will rule on the same paperwork made available to both sides, which is totally redacted as to the standing issue. The government's latest motion based on lack of standing, being a complete mystery, is **DENIED**.

### 2. EXTRA-PLEADING MATERIAL.

As to issues other than standing, the government relies on fact declarations that are on the public record. The declaration of Sean Cooper in the Department of State is one example (Dkt. 373–74). This matter is largely outside the pleadings and would be proper only under Rule 56. The problem is that we are still at the Rule 12 stage. Plaintiff is entitled to try to prove her own version of how the agencies operate and is not obliged to accept as gospel the version declared by Mr. Cooper and the other declarants. Perhaps the government's version will prevail at trial but we are at the pleading stage and those declarations are now inadmissible. Perhaps the Ninth Circuit panel got it wrong, as government counsel now contends, in asserting that "removal of her name from government watch lists would make a grant of a visa more likely." 669 F.3d at 993. Still, such factual chapters of this story will need to be developed in discovery. At the Rule 12 stage, we cannot simply take the government's declarations as showstoppers. The government will have its chance at trial to prove that the panel erred in its conclusion.

### 3. RULE 12(b)(6) MOTION AND THE CONSTITUTIONAL CLAIMS FOR RELIEF.

A prior order by the district judge dismissed Ibrahim's claim on the ground she was an alien who had voluntarily left the United States and thus left her constitutional rights at the water's edge. Over a dissent, the court of appeals reversed and held that, by reason of her Stanford connection, Ibrahim had a substantial voluntary connection to our nation and thus had as much standing to assert constitutional claims as if she had remained here all along, which is to say, the same right to assert such rights effectively as would a citizen or a lawfully present alien.

9

The government acquiesced and did not seek review in the Supreme Court. Thus, this order must take it as a given that Ibrahim has the same standing as would a citizen or as would a lawfully present alien.

Ibrahim has sued under the Administrative Procedure Act, 5 U.S.C. 702, 706, which our court of appeals construed as a waiver of sovereign immunity, thereby allowing her claims under the First and Fifth Amendments and authorizing remedies for those claims. 669 F.3d at 991 (col. 2). No argument is made that the APA claim should be dismissed.

The question, rather, is whether Ibrahim has pled agency action violative of the First and/or Fifth Amendments. In this regard, the opinion of our court of appeals laid out severe inaccuracies and shortcomings of the no-fly list and selectee list (*see* pages 988–90). The right to travel here and abroad is an important constitutional right. To deny this right to a citizen or to a lawfully present alien (as we must treat Ibrahim under our court of appeals opinion) based on inaccurate information without an effective means of redress would unconstitutionally burden the right to travel. *Aptheker v. Secretary of State*, 378 U.S. 500, 505 (1964); *Zemel v. Rusk*, 381 U.S. 14 (1965). While the Constitution does not ordinarily guarantee the right to travel by any particular form of transportation, given that other forms of travel usually remain possible, the fact remains that for *international* travel, air transport in these modern times is practically the only form of transportation, travel by ship being prohibitively expensive or so it will be presumed at the pleading stage. Decisions involving *domestic* air travel, such as the *Gilmore* case, are not on point. 435 F.3d 1136–38.

Similarly, to deny a citizen or lawfully present alien (as we must treat Ibrahim) a right to travel on account of her religion would violate the First Amendment. *Reno*, 70 F.3d at 1066; *see also Kleindienst v. Manedel*, 408 U.S. 753, 769–70 (1972).

Without question, the government can bar anyone from boarding a plane who presents a risk of terror. The government may not, however, bar a citizen or lawfully present alien from boarding a plane based solely or mainly on the religion of the traveler or based solely or mainly on grossly inaccurate information without affording an opportunity to challenge the basis for the denial.

It is true that Ibrahim may not challenge the revocation of her visa in our district court. She does *not* do so. Rather, she challenges the actions of *other* federal officials who put in play the alleged misinformation that has led to the visa revocation, all as recognized by our court of appeals in this very case.

We are at the pleading stage. It is enough to rule now that Ibrahim has stated at least plausible claims for relief. That is, it cannot be said on the pleadings alone that, by the time of a hearing on the merits, she will be entitled to no relief whatsoever under the Administrative Procedure Act and the First and Fifth Amendments. Exactly what that relief might be would depend on how the facts of the case eventually are proven (or not). It is also unnecessary to rule on every item in the long list of possible violations of the Bill of Rights (the stigma-plus claim, for example). It is best to draw the constitutional line after we know the actual facts rather than to indulge in a long list of abstract opinions now.

### 4. THE DEPARTMENT OF STATE.

Contrary to the government, the Department of State should not be dismissed at this stage, for it is plausible that in due course its presence may be needed to accord relief. For example, if the government is ordered to remove plaintiff from all versions of the no-fly list (and its variants), then the presence of the agency may be necessary in order to provide all necessary relief. Even if it turns out that she is not on the list anymore, she is nonetheless entitled to maintain this action to root out the residual effects and echoes in the various agencies resulting from the original erroneous listing, assuming she was listed and assuming it was erroneous.

### 5. DISCOVERY AND PROTECTIVE ORDER.

The Court rejects the government's argument that Ibrahim's counsel cannot be trusted to handle sensitive information in this case. They are reputable lawyers in a reputable firm with no history of infractions.

No classified information is involved in this case. This deserves repetition — NO CLASSIFIED INFORMATION IS INVOLVED IN THIS CASE — even, the government acknowledges, in the secret submission it sought to make. This case does involve SSI, so-called "sensitive

security information." But years ago herein, pursuant to a 2006 statute, plaintiff's counsel were cleared by the agencies involved to receive and review SSI. The government's persistent and stubborn refusal to follow the statute and continued objection to counsel receiving SSI is **OVERRULED**. All such SSI reasonably requested in discovery must be turned over to counsel for their review — but not for access by plaintiff herself. This must be done pursuant to the protective order already in place (Dkt. No. 312).

Finally, as for government records it deems to be privileged, it may not rely on them without waiving any such privilege, as already ruled above. If plaintiff's counsel seek such material in discovery, the extent to which any privilege would shield them from discovery will have to be litigated in the future upon proper motion. To the extent any are eventually turned over, it would be pursuant to a protective order limiting access to counsel.

## CONCLUSION

After six years and two unsuccessful appeals by the government, it is time to resolve this case on the merits. The Court needs the cooperation and assistance of counsel to do so. The motion to dismiss is **DENIED**. The motion to stay discovery is **DENIED**. A separate case management order will set a timetable through trial.

**IT IS SO ORDERED.**

Dated: December 20, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12