JAMES McMANIS (40958)
ELIZABETH PIPKIN (243611)
CHRISTINE PEEK (234573)
JENNIFER MURAKAMI (273603)
McMANIS FAULKNER
A Professional Corporation
50 W. San Fernando St., 10th Floor
San Jose, CA 95113
Telephone:     (408) 279-8700
Facsimile:     (408) 279-3244
cpeek@mcmanislaw.com

Attorneys for Plaintiff,
Rahinah Ibrahim

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHINAH IBRAHIM, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>    Defendants. | CASE NO. C 06 0545 WHA<br><br>**PLAINTIFF'S TRIAL BRIEF**<br><br>**REDACTED**<br><br>Trial:     December 2, 2013<br>Time:     8:00 a.m.<br>Ctrm.:    8, 19th Floor<br>Judge:   The Honorable William Alsup<br><br>Complaint Filed: January 27, 2006 |

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .......................................................................................1

   I.    Life in the United States: 1983-1990 ............................................1

   II.   Life in the United States: 2000-2005 ............................................2

   III.   The Growth of American Terrorist Watchlists After September 11, 2001 ..............2

   IV.   The United States Government ████ REDACTED ████ ................4

   V.   ████ REDACTED ████ Interview With FBI Agent Kevin Kelley ...........6

   VI.   ████ REDACTED ████ Arrest In January, 2005. ...........7

   VII.   ████ REDACTED ████ Revocation Of Her Visa in 2005, And The Forfeiture Of An Entire Month's Salary ..........................8

   VIII.   ████ REDACTED ████ Increased Scrutiny Of Her 2009 Visa Application, And Ultimately, To Her ████ REDACTED ████ ............9

   IX.   Living Wit ████ REDACTED ████ 2005-Present ....................9

ARGUMENT .............................................................................................................10

   I.    Defendants' Failure To Provide Plaintiff Notice Or A Hearing Violates The Fifth Amendment Guarantee Of Procedural Due Process ..............10

       A.   ████ REDACTED ████ Violates Plaintiff's Recognized Liberty And Property Interests....................................11

           1.   Freedom To Travel Internationally ....................................11

           2.   Freedom From Incarceration....................................12

           3.   Free Association And Free Exercise Of Religion .............13

           4.   Freedom To Pursue An Occupation....................................14

           5.   Property Interest In Money Spent On International Travel. ..............15

           6.   Freedom From False Governmental Stigmatization In Connection With The Denial Of A Tangible Right Or Status .........15

       B.   Defendants' Procedures Pose An Unacceptable Risk of Erroneous Deprivation, Which Can Be Remedied By Additional or Substitute Procedural Safeguards........................................18

i

C.     Providing Plaintiff Notice And A Hearing Would Not Harm Any Legitimate Government Interests ................................................ 25

D.     Relief Sought ................................................................................ 28

II.     The Government's Actions Violate Substantive Due Process ................................ 29

A.     Defendants' Actions Infringed And Continue To Infringe Plaintiff's Protected Liberty Interest In International And Domestic Travel ........................................................................................... 30

B.     Defendants' Actions Burdened And Continue To Burden Plaintiff's Protected Liberty Interest in the Right to Work in Her Chosen Occupation ................................................................................... 32

C.     Defendants' Actions Deprived Ibrahim Of Her Protected Property Interest In Money Spend On International Travel ..................................... 33

D.     Relief Sought ................................................................................ 33

III.     The Government's Actions Were Arbitrary And Capricious, In Violation Of The Administrative Procedure Act .................................................................... 34

IV.     The Government's Actions Violated The First Amendment ................................ 35

A.     Religious Associations ................................................................. 36

B.     Familial Associations ................................................................... 37

C.     Government's Lack of Compelling Interest and Least Restrictive Means ............................................................................................ 37

D.     Retaliation ..................................................................................... 38

E.     Relief Sought ................................................................................ 38

V.     The Government's Actions Violate the Equal Protection Clause ........................ 39

A.     Plaintiff Is A Member Of A Suspect Class, Requiring Strict Scrutiny ........................................................................................ 39

B.     Plaintiff Was Subjected To Intentional Discriminatory Treatment, Based Upon Her Membership In A Suspect Class And Her Free Exercise Of Her Religious Faith ................................................... 40

1.     The Government Intentionally And Disproportionately Targeted Muslims For Counterterrorism Investigations, Which Automatically Results In Watchlisting In Accordance With Defendants' Publicly Stated Policy ......................................... 40

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

2. The Government's REDACTED Shows Consciousness Of Guilt ................................ 42

3. The Government's Investigation Of Dr. Ibrahim And REDACTED Is Consistent With Its Intentional Discriminatory Treatment Of Muslims ........................ 433

CONCLUSION ........................................................................................................ 44

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Albright v. Oliver*, 510 U.S. 266 (1994)..................................................................................... 30

4

*Allen v. City of Portland*, 73 F.3d 232 (9th Cir. 1996) ................................................................ 13

5

*Allen v. Illinois*, 478 U.S. 364 (1986) ......................................................................................... 23

6

*Aptheker v. Secretary of State*, 378 U.S. 500 (1964) ............................................................. 12, 32

7

*Barnes v. Healy*, 980 F.2d 572 (9th Cir. 1992)............................................................................ 23

8

9

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ............................................................................... 15

10

*Boudin v. Dulles*, 136 F. Supp. 218 (D.D.C. 1955) ..................................................................... 23

11

*Board of Dirs. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537 (1987)........................... 37

12

*Brinkerhoff-Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673 (1930) ................................................ 11

13

*Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008)............................................................... 13

14

*Christian Science Reading Room Jointly Maintained v. City and County of San Francisco*, 784 F.2d 1010 (9th Cir. 1986) ................................................................................ 40

15

16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)................. 41, 42

17

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .................................................................... 19, 20

18

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).................................................... 40

19

*City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188 (D.C. Cir. 1991) ............................................................................................................................................ 35

20

21

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .................................................. 18, 23

22

*Clow v. Bank of Am.*, 2012 U.S. Dist. LEXIS 118705 (D. Or. June 5, 2012)............................... 14

23

*Cole v. Richardson*, 405 U.S. 676 (1972) .................................................................................... 13

24

*Conn v. Gabbert*, 526 U.S. 286 (1999) ........................................................................................ 14

25

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)....................................................... 29, 30, 31

26

*Cummings v. Hampton*, 485 F.2d 1153 (9th Cir. 1973)................................................................ 13

27

*Daniels v. Williams*, 474 U.S. 327 (1986) ................................................................................... 18

28

*DeNieva v. Reyes*, 966 F.2d 480 (9th Cir. 1992)...................................................................... 11, 12

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999) ................................................................. 32

*Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005) .............................................................. 16, 24

*Elfbrandt v. Russell*, 384 U.S. 11 (1966) ................................................................................. 13

*Farm Labor Organizing Comm. v. Ohio*, 308 F.3d 523 (6th Cir. 2002) ..................................... 43

*First Girl, Inc. v. Reg'l Manpower Adm'r of U.S. Dep't of Labor*, 499 F.2d 122
    (7th Cir. 1974) ...................................................................................................................... 35

*Flores v. Pierce*, 617 F.2d 1386 (9th Cir. 1980) .............................................................. 39, 42

*Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001) ................................................................. 30

*Ford v. City of Yakima*, 706 F.3d 1188 (9th Cir. 2013) ......................................................... 38

*Gete v. INS*, 121 F.3d 1285 (9th Cir. 1997) ........................................................................... 19

*Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009) ........................................................... 13

*Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539 (1963) ..................................... 14

*Green v. TSA*, 351 F. Supp. 2d 1119 (W.D. Wash. 2005) ....................................................... 16

*Greene v. McElroy,* 360 U.S. 474 (1959) ......................................................................... 14, 32

*Hamdi v. Rumsfeld*, 542 U.S. 507 (June 28, 2004) ............................................. 13, 18, 22, 25, 27

*Hirabayashi v. United States*, 320 U.S. 81 (1943) .................................................................. 40

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ................................................. 28

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694
    (2012) ................................................................................................................................... 36

*Hufford v. McEnaney*, 249 F.3d 1142 (9th Cir. 2001) ............................................................ 10

*Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir.
    2009) .............................................................. 16, 17, 18, 19, 20, 21, 22, 24, 27, 28

*Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983 (9th Cir. 2012) ................................. 12, 25, 32

*Ibrahim v. DHS*, 538 F.3d 1250 (9th Cir. 2008) ..................................................................... 24

*In re Gault*, 387 U.S. 1 (1967) .............................................................................................. 23

*In re Stolar*, 401 U.S. 23 (1971) ........................................................................................... 13

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. June 11, 2004) ........................................................... 18

v

*Kaur v. Holder*, 561 F.3d 957 (9th Cir. 2009) ............................................................................ 27

*Kiareldeen v. Ashcroft*, 273 F.3d 542 (3d Cir. 2001) ................................................................ 27

*Korematsu v. United States*, 323 U.S. 214 (1944) .................................................................... 25

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984) ...................................... 25, 26

*Latif v. Holder* ("*Latif I*"), 686 F.3d 1122 (9th Cir. 2012) ...................................................... 24

*Latif v. Holder*, No. 3:10-CV-00750, 2013 U.S. Dist. LEXIS 122533, *21-27 (D.
    Or. Aug. 28, 2013) ............................................................................. 12, 16, 17, 26, 30

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ........................................................ 14

*Lester v. Parker*, 235 F.2d 787 (9th Cir. 1956) ........................................................................ 14

*Lingle v. Chevron*, 544 U.S. 528 (2005) ................................................................................... 31

*Mahers v. Halford*, 76 F.3d 951 (8th Cir. 1996) ...................................................................... 15

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................................................... 11, 25

*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999) ......................... 38

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007) ............................................................... 40

*Miller v. Johnson*, 515 U.S. 900 (1995) ............................................................................. 39, 40

*Morgan v. City of Pleasant Hill*, 2005 U.S. Dist. LEXIS 40382, at *18 (N.D. Cal.
    2005) .................................................................................................... 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................ 34

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................................... 14, 35

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................................................. 14, 35

*O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940 (9th Cir.
    1996) .................................................................................................... 34

*Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ..................................................................... 12

*Oyama v. California*, 332 U.S. 633 (1948) .............................................................................. 40

*Parratt v. Taylor*, 451 U.S. 527 (1981) ................................................................................... 18

*Paul v. Davis*, 424 U.S. 693 (1976) ........................................................................................ 16

*Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73 (1st Cir. 1993) ..................................................... 34

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) ................................................................ 40

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................................... 36

*Sagana v. Tenorio*, 384 F.3d 731 (9th Cir. 2004) .............................................................. 14, 15, 32

*Scales v. United States*, 367 U.S. 203 (1961) ............................................................................... 36

*Stevens v. Rifkin*, 608 F. Supp. 710 (N.D. Cal. 1984) ................................................................. 16

*Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172 (W.D. Wash. 2012) ......................................... 40

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) .......................................................................... 13

*Terry v. Ohio*, 392 U.S. 1 (1968) .................................................................................................. 19

*Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002) ................................... 16

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) .......................................... 18

*United States v. Lanier*, 520 U.S. 259 (1997) .............................................................................. 30

*United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013) ........................................................... 27

*Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994) ....................................................................... 16, 20

*Vance v. Barrett*, 345 F.3d 1083 (9th Cir. 2003) ..................................................................... 15, 33

*Vasquez v. Rackauckas*, No. 11-55795, 2013 U.S. App. LEXIS 22464, *52 (9th Cir. Nov. 5, 2013) ................................................................................................................. 20

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ......................... 39

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................................... 39

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .......................................................................... 30

*Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) ................................................................ 13

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) .................................................................. 15, 16

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .................................................................................... 39

**STATUTES**

28 U.S.C. § 2385 ............................................................................................................................. 36

42 U.S.C. § 2000bb-1(b) ................................................................................................................. 36

49 U.S.C. § 46110 ........................................................................................................................... 23

5 U.S.C. § 706 ................................................................................................................................. 34

5 U.S.C. § 706(2)(A) .................................................................................................... 35

5 U.S.C. § 706(2)(B) .................................................................................................... 35

8 U.S.C. § 1534(e)(3) .................................................................................................... 27

## **OTHER AUTHORITIES**

9/11 Commission Report ............................................................................................. 21

Nat'l Research Council, Protecting Individual Privacy In The Struggle Against
    Terrorists: A Framework For Program Assessments, Committee On Technical
    And Privacy Dimensions Of Information For Terrorism Prevention And Other
    National Goals (2008) ............................................................................................ 21

Office of the Inspector General of the DHS, DHS Challenges in Consolidating
    Terrorist Watch List Information," August 2004 ................................................... 21

U.S. Dep't of Justice Office of the Inspector General, Audit Division, Review of
    the Terrorist Screening Center, June 2005 ............................................................ 26

United States Government Accountability Office, Data Mining: Agencies Have
    Taken Key Steps to Protect Privacy in Selected Efforts, but Significant
    Compliance Issues Remain, August 2005 .............................................................. 22

**INTRODUCTION**

Defendants REDACTED

These actions violated Dr. Ibrahim's protected constitutional rights and caused her to be falsely arrested and imprisoned in an airport, denied boarding on two flights, subjected to enhanced searches before flying, REDACTED , impeded in her professional advancement, and prevented from accepting work or promoting her inventions in the United States despite having a Ph.D. from Stanford.

At every possible opportunity, defendants have argued that plaintiff lacks standing to pursue redress for any of these harms because they contend she suffered no redressable injury. Having lost these arguments several times, as well as numerous other procedural defenses, they now face trial. As the evidence will show, defendants' actions injured Dr. Ibrahim and she is entitled to the relief prayed for in her Second Amended Complaint.

**STATEMENT OF FACTS**

**I.       Life in the United States: 1983-1990.**

Dr. Ibrahim first traveled to the United States in 1983 to obtain her degree in architecture. The Malaysian government selected her for a scholarship based on her high school examination results. Dr. Ibrahim was the first student on the shortlist for scholarship consideration from her boarding school. She attended a six-month English course in Azusa, California, before accepting an offer to complete a four-year architecture program at the University of Washington in Seattle.

While studying in the United States, Dr. Ibrahim met and married her husband, Mustafa Kamal Mohammed Zaini, another undergraduate student in the same program. The couple married in 1986, in Seattle, Washington. In 1987, Dr. Ibrahim graduated from the University of Washington and had her first child, Raihan Mustafa Kamal, in Seattle. Now in her twenties, Ms. Mustafa Kamal is a United States citizen.

Dr. Ibrahim went on to obtain a Master's Degree in architecture from the Southern

California Institute of Architecture in Santa Monica, California.  After Dr. Ibrahim obtained her degree in 1990, the family returned to Malaysia.  She had three more children: Rafeah, Luqman Alhakeem, and M. A.

## II.      Life in the United States: 2000-2005.

Dr. Ibrahim worked in the architecture field in Malaysia for several years before transitioning into academia.  She was one of the founding members of the architecture department at the Universiti Putra, Malaysia ("UPM"), and the department's first female lecturer.  To be promoted, Dr. Ibrahim needed to obtain a doctoral degree.  While in Malaysia, she met Stanford University Professor Boyd Paulson, who encouraged her to apply to Stanford.  At the time Dr. Ibrahim was accepted at Stanford, no one else at UPM had ever been admitted to a Stanford Ph.D. program, and UPM management told her that she had to attend.  Because the scholarship program available to her only covered expenses for four years, Dr. Ibrahim had a relatively short time to complete a program that normally took six or seven years to finish.

Starting in 2000, Dr. Ibrahim obtained an engineering degree and a Ph.D. in Construction Engineering and Management from Stanford.  While at Stanford, Dr. Ibrahim was involved with the Islamic Society of Stanford University (ISSU) and volunteered with Spiritual Care Services at Stanford Hospital.  Although the need for hysterectomy surgery delayed and threatened to derail completion of Dr. Ibrahim's Ph.D. due to lack of funds, Professor Paulson personally arranged to finance an additional quarter so that she could finish.  Before she left the United States, Dr. Ibrahim had two job offers: one for a post-doctoral position in the Global Projects Center under Stanford Professor Raymond Levitt, and another from Mid-Peninsula Housing, a non-profit housing organization.

As of 2005, Dr. Ibrahim had spent over ten years – or about a quarter – of her life in the United States, including all of her formal education, her courtship with her husband, their marriage, and the beginning of their family.  She considers the United States her second home.

## III.      The Growth of American Terrorist Watchlists After September 11, 2001.

As of September 11, 2001, the United States Department of State maintained a terrorist watchlist known as TIPOFF, which contained approximately 60,000 individual records.

Originally a shoebox filled with three-by-five index cards, the TIPOFF database would later become the source of all records contained within the TIDE database currently operated by the National Counterterrorism Center (NCTC).  TIDE records are in turn the source of the records contained in the consolidated Terrorist Screening Database (TSDB) administered by the Terrorist Screening Center (TSC).

Although the FAA maintained a no-fly list in 2001, it contained just 12 names. Frustrated by the lack of information sharing between the various law enforcement agencies and the FAA, the 9/11 Commission criticized the agencies for hoarding information and recommended creating a center for joint operational planning and joint intelligence.

Even before these recommendations were released in July 2004, the executive branch took steps to create a consolidated terrorist watchlist by issuing Homeland Security Presidential Directive-6 and its implementing MOU.  These directives authorized creation of the TSC and charged it with administering the TSDB, "a consolidated terrorist screening database that is a continuously updated, sensitive but unclassified subset of the Terrorist Information possessed by the TTIC,"[1] and the domestic terrorism information possessed by the FBI.  The TSDB exports information on watchlisted individuals to a variety of downstream "clients," including but not limited to, the following: (1) the No-Fly and Selectee Lists used by TSA; (2) the Known and Suspected Terrorist File (KSTF),[2] used by the FBI; (3) the CLASS database used by the DOS; and (4) the TECS database used by DHS.[3]

On October 29, 2001, former President Bush promulgated HSPD-2, entitled "Combating Terrorism Through Immigration Policies."  HSPD-2 authorized creation of the Foreign Terrorist Tracking Task Force (FTTTF), to locate, detain, prosecute, and deport aliens associated with, suspected of being engaged in, or supporting terrorist activity within the United States.[4]  The

---

[1] The Terrorist Threat Integration Center (TTIC) was the precursor to the NCTC.
[2] The KSTF file previously was known as the Violent Gang and Terrorist Organizations File (VGTOF).
[3] Another database known as the Interagency Border Inspection System (IBIS) is housed within TECS; thus TECS contains the same information as IBIS.
[4] FTTTF provided space, equipment, personnel, and technological and financial support to assist in the creation of the TSC.  FTTTF is also a "customer" of the TSC.

3

1  directive called for an increase in the number of Customs and INS[5] special agents assigned to

2  Joint Terrorism Task Forces (JTTFs), and an end to what it termed the "abuse of student visas."

3  A 2003 GAO report observed that although DOS and INS officials reported having revoked visas

4  to prevent suspected terrorists from entering the country, neither of these agencies or the FBI had

5  a policy that covered investigating, locating, and taking action when a visa holder had already

6  entered.  The report specifically noted INS attorneys' complaints that instituting removal

7  proceedings after an alien had entered the United States could be challenging, because "the

8  government could be called on to disclose any classified or law enforcement sensitive

9  information that serves as the basis of the charges against the alien."

10       The government's decision to target foreign students had a strong effect on the Muslim

11  student community at Stanford.  Dr. Ibrahim testified that ISSU, the Muslim student

12  organization, emailed its members to advise them that there may be an increased likelihood that

13  law enforcement would contact them, and that if they were contacted, they should cooperate with

14  law enforcement.  After September 11, 2001, some of Dr. Ibrahim's female friends asked

15  security officers to escort them home from class to their dormitories, or took off their hijab

16  because they were afraid to be seen with it on.  Some of her male friends shaved their beards to

17  better fit in.  Whereas before 9/11, Muslim students were comfortable walking alone on campus,

18  they were now advised to walk in groups.

19  **IV.    The United States Government Watchlists Rahinah Ibrahim.**

20       Dr. Ibrahim has no affiliation with any terrorist organizations and has never supported

21  terrorist activities.  ███████████████ REDACTED ███████████████

22  ██████████████████████

23       In spite of this, ████████████████████████████ REDACTED ██

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████

26  ███████████████████████████  occurred a few weeks after Dr. Ibrahim's

27  husband came to visit her for a week while she recovered from surgery late in October, 2004.

28  [5] The INS was reorganized in 2003, and its investigative and law enforcement function was
transferred to the Bureau of Immigration and Customs Enforcement (ICE), within DHS.

1     REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

. Code "C" refers to individuals whose identities have

22 been "corroborated" "as a group member by an informant or individual of unknown reliability."

23 Code "D" indicates that the individual "[f]requents a documented group's area, associates with

24 known group members, and/or affects group dress, hand signals, tattoos, or symbols."

25     REDACTED

26

27

28

1        REDACTED

2

3

4

5    **V.**        REDACTED        **Interview With FBI Agent Kevin Kelley.**

6        Special Agent Kelley and another FBI Agent, REDACTED , interviewed Dr.

7    Ibrahim at home on December 23, 2004.  Although Kelley told Dr. Ibrahim that "INS" had asked

8    him to speak to her, he did not ask to see any of her immigration documents.  At that time, Dr.

9    Ibrahim's student visa was valid until January 11, 2007.  Dr. Ibrahim recalls that Kelley claimed

10   not to know why "INS" had asked him to speak to her, but volunteered that possibly it was

11   because she was from Malaysia, and Malaysia is blacklisted by the government.  Kelley denies

12   making this statement.

13       Agent Kelley did ask Dr. Ibrahim about Jemaah Islamiyah, a terrorist organization that

14   she only knew about from publicly available news sources.  Based on this line of questioning,

15   Dr. Ibrahim thought possibly the FBI wanted to recruit her as an informant.  Agent Kelley also

16   asked about Dr. Ibrahim's husband, her husband's travel, her religious travel, her participation in

17   religious organizations at Stanford, her upcoming travel plans to a conference in Hawaii, and her

18   future travel plans to the United States.

19       In accordance with the FBI's general practice, the interview was not recorded.  Kelley's

20   summary of the interview and Dr. Ibrahim's responses to questions varied from her account,

21   sometimes dramatically.  Kelley incorrectly stated that Dr. Ibrahim was married in San Francisco

22   (it was Seattle) and the circumstances under which she met her husband.  He also incorrectly

23   stated that she did not wish to go on a full Hajj in Saudi Arabia, when in fact, her remarks

24   concerned the treatment of women at conferences in Saudi Arabia and had nothing to do with

25   travel for religious purposes.  In addition, Kelley incorrectly stated that Dr. Ibrahim asked

26   whether the Malaysian Security Service was responsible for the FBI's interest in her and her

27   family.  Dr. Ibrahim asked no such question and has never heard of a "Malaysian Security

28   Service."

1    A redacted version of Special Agent Kelley's summary of the interview was produced in

2 response to a FOIA request by Dr. Ibrahim's counsel.  The summary, which is stamped

3 "unclassified," identifies three file numbers at the bottom of the first page: (1) 315B-SF-137113-

4 302-1; (2) 315B-SF-137006-19;[6] and (3) 315B-SF-137113-8.  The FBI's website contains a list

5 of file classifications and their general meaning, which identifies files numbered "315" as

6 "international terrorist" investigations.  As a matter of policy, all main international terrorist

7 subjects for both full and preliminary investigations in the 315 classification are nominated for

8 entry into the TSDB and its supported systems.

9    **VI.**        REDACTED        **Arrest In January, 2005.**

10    As a Muslim, Dr. Ibrahim wears hijab to reflect her modesty, which she believes is

11 required by her religion.  She was dressed in this manner the morning of January 2, 2005, when

12 she, her friend, and her then-fourteen-year-old daughter Rafeah attempted to fly from San

13 Francisco Airport to Kona, Hawaii.  Dr. Ibrahim was still weak and recovering from

14 hysterectomy surgery, and had requested wheelchair assistance to the gate.  Dr. Ibrahim's party

15 met first with a United Airlines representative, Aimee Herrera; later, with her supervisor David

16 Nevins; and ultimately, with the San Francisco police.  Initially, the police tried to claim that Dr.

17 Ibrahim had overstayed her visa, but Dr. Ibrahim's immigration documents showed this claim

18 was incorrect.  Dr. Ibrahim was shocked to hear one of the police officers tell her they had to

19 arrest her at the United Airlines counter.

20    Everyone at the United counter, including the United employees, about 50 people in line,

21 and Rafeah, saw Dr. Ibrahim get arrested and led away in handcuffs.  She was transported in

22 handcuffs to a holding cell, where she was imprisoned for approximately two hours, searched in

23 a culturally insensitive manner, denied her medication until the paramedics were called, and

24 denied the ability to use the restroom in private.  Although Dr. Ibrahim asked to speak to Agent

25 Kelley, whom she believed could clear her name, and was told the FBI was coming to talk to her,

26

27    [6] REDACTED

28

1   no one from the FBI ever came.  After missing her flight and being publicly humiliated, she was

2   released without explanation.  No one ever charged her with a crime, or provided any

3   justification whatsoever for the arrest, other than to say they had no choice but to arrest her while

4   they waited for Washington D.C. to clear her.

5        Lee Korman, an Aviation Security Inspector with the Department of Homeland Security,

6   met Dr. Ibrahim in the holding cell.  He told her that her name had been removed from the No-

7   Fly List.  Mr. Korman accompanied Dr. Ibrahim and her daughter back to the United counter to

8   get them on a flight to Kona the following day.  Although Dr. Ibrahim was allowed to fly the

9   next day, and Mr. Korman again said the new No-Fly List did not have her name on it, certain

10  red flags suggested that her name had not been totally cleared.  On January 3, 2005, Dr. Ibrahim

11  was issued a bright red colored boarding pass, and was given an "SSSS" status.  She saw the

12  ticketing agent making more phone calls before he issued her a boarding pass, and she was

13  subjected to enhanced searches.

14  **VII.**    **REDACTED**                    **Revocation Of Her Visa in 2005, And
15  The Forfeiture Of An Entire Month's Salary.**

16       Dr. Ibrahim had hoped to complete her thesis from Malaysia, but Professor Marc

17  Nissen's dissatisfaction with one of her chapters forced her to concede that she had to sit down

18  with him in person.  She also wanted to see Professor Paulson again, because she knew he was

19  struggling with cancer and his medicine was not working.  Believing her visa was still valid, she

20  spent 3,000 ringgit of her own money on a plane ticket back to the United States.  At the time,

21  this was almost her entire month's salary.  In March 2005, when she attempted to board her

22  flight at the airport in Kuala Lumpur, she was denied boarding, told her visa had been revoked,

23  and told there was a note by her name saying to arrest her.  Professor Paulson later passed away,

24  and Dr. Ibrahim lost the chance to say good-bye to him in-person.

25       Defendants' records show that                      **REDACTED**

26

27                                      Dr. Ibrahim did not learn that

28  her visa had been revoked until she physically arrived at the airport in Kuala Lumpur, and was

1    denied boarding.

2         In an attempt to clear her name, Dr. Ibrahim submitted a Passenger Identity Verification

3    Form (PIVF) to the TSA in March 2005.  She did not receive a response until April 2006, several

4    months after she filed this lawsuit.  The response did not clarify her status, and merely stated,

5    "[w]here it has been determined that a correction to records is warranted, these records have been

6    modified to address any delay or denial of boarding that you may experience as a result of the

7    watch list screening process."  Dr. Ibrahim later received a DHS TRIP Redress Control Number,

8    which also failed to clarify her status.

9    **VIII.**    ████████ REDACTED ████████ **Increased Scrutiny Of Her 2009 Visa**

10   **Application, And Ultimately, To Her** ████████ REDACTED ████████ **:**

11        In 2009, Dr. Ibrahim applied for a visa to come to the United States to give her deposition

     and to participate in her own trial.  ████████ REDACTED ████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████, the consular post in Kuala Lumpur

16   denied the visa under section 213(a)(3)(B) of the Immigration and Nationality Act.  When Dr.

17   Ibrahim asked what that section meant, a DOS representative wrote the word "terrorist" on her

18   application, in front of her.

19        Since Dr. Ibrahim could not obtain a visa to travel to the United States, she could not

20   travel here to provide deposition testimony in this case.  She also was forced to decline an

21   invitation to a conference, and had to explain to her superiors at UPM the reason she could not

22   go.  Because her ability to attain future promotions is based on subjective factors, and the ability

23   travel to the United States is important for someone in her field, Dr. Ibrahim believes that her

24   inability to travel to the United States will decrease the likelihood that she will be promoted.

25   **IX.**    **Living With** ████████ REDACTED ████████

26            ████████ **2005-Present.**

27   ████████████████ REDACTED ████████████████

28   ████████████████████████████████████████████████████████

9

REDACTED

**ARGUMENT**

I.       **Defendants' Failure To Provide Plaintiff Notice Or A Hearing Violates The
         Fifth Amendment Guarantee Of Procedural Due Process**

"A procedural due process claim has two distinct elements: (1) a deprivation of a
constitutionally protected liberty or property interest, and (2) a denial of adequate procedural
protections." *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (internal quotation
marks omitted). Once Dr. Ibrahim has established REDACTED

burdens a protected liberty or property interest, the Court must assess whether the process

afforded by defendants satisfies due process under the balancing test set forth in *Mathews v.*

*Eldridge*, 424 U.S. 319, 335 (1976):

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

*Id.* at 335.  Where established constitutional interests are at stake, a post-deprivation hearing may

suffice, "but under no circumstances has the Supreme Court permitted a state to deprive a person

of a life, liberty, or property interest under the Due Process Clause without any hearing

whatsoever." *DeNieva v. Reyes*, 966 F.2d 480, 485 (9th Cir. 1992).  Any procedure afforded

must be reasonably calculated to provide an adequate means for redress.  *See, e.g.*, *Brinkerhoff-*

*Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673, 682 (1930) (holding the state "may not deprive a

person of all existing remedies for the enforcement of a right, which the State has no power to

destroy, unless there is, or was, afforded to him some real opportunity to protect it").

A.   ████████ REDACTED ████████   **Violates Plaintiff's Recognized Liberty And Property Interests.**

The government incorrectly frames this issue in terms of whether plaintiff has an interest

in avoiding security screening.  This misses the point.  In denying defendants' third motion to

dismiss, this Court found that plaintiff was "entitled to maintain this action to root out the

residual effects and echoes in the various agencies resulting from the original erroneous listing,

assuming she was listed and assuming it was erroneous."  (*See* Docket No. 399, 11:18-21.)  The

government has no legitimate interest in screening people based on irrational prejudice or

incorrect information.  Dr. Ibrahim is entitled to fair treatment and appropriate procedural

protections before the government's screening system deprives her of protected liberty or

property interests, as discussed below.

1.   Freedom To Travel Internationally.

The right to international travel is a constitutionally protected liberty interest under the

1  Due Process Clause of the Fifth Amendment.  *Aptheker v. Secretary of State*, 378 U.S. 500, 505,

2  514 (1964); *DeNieva*, 966 F.2d at 485-86 (holding that plaintiff had a constitutional right to

3  international travel, and therefore due process required a hearing regarding deprivation of her

4  passport).  Dr. Ibrahim has a continuing right to travel internationally under the Due Process

5  Clause of the Fifth Amendment, due to her significant voluntary connection with the United

6  States.  *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994-97 (9th Cir. 2012) ("*Ibrahim II*").

7  Placement on the No-Fly List implicates the liberty interest in international travel.  *Latif v.*

8  *Holder*, No. 3:10-CV-00750, 2013 U.S. Dist. LEXIS 122533, *21-27 (D. Or. Aug. 28, 2013)

9  ("*Latif II*").  █████████████████████ REDACTED █████████████████████

10 ████████████████████████████████████████████████████████████████████

11 █████████████████.  Placement in the TSDB may also result in the inability to board an

12 international flight, because it is routinely used for the same purposes as the No-Fly List and the

13 Selectee List:

14      However, as recommended by the 9/11 Commission and as required under the
        IRTPA, TSA may use ''the larger set of watch lists maintained by the Federal
15      government'' when warranted by security considerations.  For example, TSA may
        learn that flights on a particular route may be subject to increased security risk.
16      Under this circumstance, TSA may decide to compare passenger information on
        some or all of the flights on that route against the full TSDB or other government
17      databases, such as intelligence or law enforcement databases.

18 Department of Homeland Security, Transportation Security Administration, Secure Flight

19 Program, 73 Fed. Reg. 209, p. 64019 (Oct. 28, 2008).

20 ████████████████████████ REDACTED ████████████████████████

21 ████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████

26      2.  Freedom From Incarceration.

27      "[T]he paradigmatic liberty interest under the due process clause is freedom from

28 incarceration."  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *see also Hamdi v.*

1 | *Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality), *superseded by statute on other grounds as noted*

2 | *in Gherebi v. Obama*, 609 F. Supp. 2d 43, 50 (D.D.C. 2009).  Although defendants claim ███

3 | ██████████████████████ REDACTED ██████████████████████

4 | ██████, since Ibrahim was in fact arrested and imprisoned in a holding cell for two hours

5 | due to a watchlist match.  The FBI told the police to detain her.  ███ REDACTED ███

6 | ██████████████████████████████████████

7 | ████████████████████████████

8 | ████████████████████████████████████

9 | ████████████████████████████████████████

10 | ████████████████████████████████████████

11 | ████████████████████████████████████████████████

12 | and no reasonable person detained under such circumstances would feel free to leave.  *See*

13 | *Washington v. Lambert*, 98 F.3d 1181, 1185-91 (9th Cir. 1996); *Allen v. City of Portland*, 73

14 | F.3d 232, 235-36 (9th Cir. 1996).

15 | 

16 | 　　　　　3.  Free Association And Free Exercise Of Religion.

17 | 　　　　The First Amendment protects individuals from punishment based on "guilt by

18 | association."  *See, e.g., Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966).  Statutes that deprive

19 | individuals of liberty or property interests based simply on their associations, memberships, and

20 | beliefs violate the First Amendment.  *See, e.g., Cole v. Richardson*, 405 U.S. 676, 680 (1972); *In*

21 | *re Stolar*, 401 U.S. 23, 30-31 (1971); *Cummings v. Hampton*, 485 F.2d 1153, 1154-56 (9th Cir.

22 | 1973).  The constitution also protects the freedom of communication of ideas, particularly in the

23 | academic community.  *See Sweezy v. New Hampshire*, 354 U.S. 234, 245, 249-51 (1957).

24 | 　　　　"Freedom of personal choice in matters of marriage and family life" is another one of the

25 | liberties protected by due process.  *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008).

26 | "[T]he First Amendment protects those relationships, including family relationships, that

27 | presuppose deep attachments and commitments to the necessarily few other individuals with

28 | whom one shares not only a special community of thoughts, experiences, and beliefs but also

distinctively personal aspects of one's life." *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal quotes omitted), *overruled in part on other grounds as noted in Clow v. Bank of Am.*, 2012 U.S. Dist. LEXIS 118705 (D. Or. June 5, 2012).

Here, the government has infringed Dr. Ibrahim's protected First Amendment rights.  The religious organizations with which Dr. Ibrahim associated, such as the ISSU, are not engaged in illegal or other improper activities, nor has the government demonstrated them to have any substantial connections with such activities.  Dr. Ibrahim therefore remains free to associate with these organizations.  *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 557-58 (1963).  In 2004, Kelley questioned Dr. Ibrahim extensively about her husband as well as her religious practices and associations, which are protected.  Furthermore, the government has suggested ████████████████████ REDACTED ████████████████████

████████████████████████.  The government's interrogation of individuals about their protected First Amendment activities or based on their protected First Amendment activities, under the threat of coercion and deportation, can only deter individuals from engaging in protected conduct.  The chilling effect produced by such law enforcement activities does not withstand constitutional scrutiny.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958); *see also NAACP v. Button*, 371 U.S. 415, 433-34 (1963).

    4.   <u>Freedom To Pursue An Occupation.</u>

The Ninth Circuit recognizes that the right to pursue a profession is a protected liberty interest.  *See Sagana v. Tenorio*, 384 F.3d 731, 742-43 (9th Cir. 2004).  The right to seek and obtain employment in one of the common walks of life is a right entitled to constitutional protection and to protection at the hands of a court of equity.  *Lester v. Parker*, 235 F.2d 787, 788-90 (9th Cir. 1956) (per curiam).  "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment."  *Greene v. McElroy,* 360 U.S. 474, 492 (1959). ████████████████████ REDACTED ████████████████████

████████████████████████ – far longer than the brief interruption which was held insufficient in *Conn v. Gabbert*, 526 U.S. 286 (1999), on which defendants have relied.

1   Although the right to work is subject to reasonable government regulation, *see Sagana*, 384 F.3d

2   at 743, the government's actions here precluded Dr. Ibrahim from working in the United States

3   at all, although she had offers for jobs that would not ordinarily require a security clearance

4   before the government revoked her visa.

5               5.  Property Interest In Money Spent On International Travel.

6       Possession of money is a recognized property interest under the Due Process Clause. *See*

7   *Vance v. Barrett*, 345 F.3d 1083, 1088, n.6 (9th Cir. 2003) (*citing Mahers v. Halford*, 76 F.3d

8   951, 954 (8th Cir. 1996)) (inmates have a property interest in money from outside sources); *cf.*

9   *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972) (property interests protected by procedural due

10  process go beyond the ownership of money and include "the right of the individual to contract").

11  Believing her visa was valid until January 2007, Dr. Ibrahim spent 3,000 ringgit of her own

12  money on a plane ticket back to the United States, almost her entire month's salary.  By denying

13  her boarding and revoking her visa ████████████ REDACTED ████████████

14  ████████████████████████████ the government deprived Dr. Ibrahim of this

15  money and of the right to enter into a valid contract with a commercial airline.  Although the

16  government claims she had no expectation of being allowed to travel to the United States without

17  a valid visa, the government overlooks the fact that it bore the burden of providing Dr. Ibrahim

18  notice of the revocation and it failed to carry that burden.  The government's acts of ██████

19  ██████ REDACTED ██████  and failing to provide notice of ████████ REDACTED ████████

20  arbitrarily undermined her protected property rights.  Even worse, the decision to revoke was

21  based ████████████████ REDACTED ████████████████

22  ██████████████████.

23             6.  Freedom From False Governmental Stigmatization In Connection With The
24                   Denial Of A Tangible Right Or Status.

      The Supreme Court has recognized that individuals have a constitutionally protected

25  liberty interest in their "good name, reputation, honor, or integrity" if they can meet the "stigma-

26  plus" test. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  The two prongs of the

27  "stigma plus" test are: (1) "the public disclosure of a stigmatizing statement by the government,

28

the accuracy of which is contested, *plus*"; (2) "the denial of 'some more tangible interest [] such as employment,' or the alteration of a right or status recognized by state law." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (*quoting Paul v. Davis*, 424 U.S. 693, 701, 711 (1976)); *see also Stevens v. Rifkin*, 608 F. Supp. 710, 726-27 (N.D. Cal. 1984).

Inclusion in terrorist databases is stigmatizing. *See Latif II*, 2013 U.S. Dist. LEXIS 122533, *28-29; *Green v. TSA*, 351 F. Supp. 2d 1119, 1129 (W.D. Wash. 2005) ("[T]here can be little doubt that association with a government terrorist watchlist 'might seriously damage [Plaintiffs'] standing and associations in [their] community.'"). The Supreme Court has found stigma on the basis of far less blistering statements. *See, e.g., Constantineau*, 400 U.S. at 434 n. 2, 435-37 (finding stigma attached to label of "excessive drink[er] of intoxicating liquors"); *Paul*, 424 U.S. at 697 (finding stigma attached to label of "active shoplifter"). Dr. Ibrahim disputes the implication that she has any nexus to terrorism, and the government concedes ▮

REDACTED .

Defendants have argued that no liberty interest was implicated because ▮▮▮

REDACTED outside the context of this litigation. This argument lacks merit, because case law holds that a liberty interest is implicated when dissemination of the stigmatizing information triggers the deprivation of the tangible interest. *See Dupuy v. Samuels*, 397 F.3d 493, 509-12 (7th Cir. 2005) (dissemination of stigmatizing information to prospective employers "is the conduct that triggers the career entrants' liberty interest"); *see also Humphries v. County of Los Angeles*, 554 F.3d 1170, 1175-76, 1186, 1188-91 (9th Cir. 2009), *rev'd on other grounds*, 131 S.Ct. 447 (2010) (child abuse reports accessible to a "broad array of government agencies, employers, and law enforcement entities," as well as "some public and private groups."); *Valmonte v. Bane*, 18 F.3d 992, 999-1002 (2d Cir. 1994) (inclusion in child abuse database that would be disclosed to employers required to check it and to justify hiring persons in the database was sufficient disclosure).

As of 2005, the No-Fly List was routinely disseminated to commercial airlines operating within the United States, airport security personnel, customs and immigration agents, and other federal law enforcement entities (*see Green*, 351 F. Supp. 2d at 1121-22), among other

recipients.  It is undisputed that █████REDACTED█████ was also disseminated to local law enforcement officers in January 2005.  Defendants' dissemination of ███████REDACTED███████ to commercial airlines, local law enforcement, and others directly caused her to be denied boarding and physically incarcerated on January 2, 2005 – thereby extinguishing her right to travel and to remain free from incarceration on that day.

Defendants' ████████████REDACTED████████████ continues to prevent her from traveling to or entering the United States (*see Latif II*, 2013 U.S. Dist. LEXIS 122533, at *28-29), burden her prospects for employment in the United States or job promotion in Malaysia, and subject her to an ongoing risk of false arrest should she be stopped at a United States port of entry.  The fact that the risk of false arrest is increased is sufficient for purposes of the stigma-plus test.  *Cf. Humphries*, 554 F.3d at 1188 (stigma-plus applies when a right or status is "**altered** or extinguished") (emphasis added).  Similarly, the fact that further promotion at UPM is less likely given plaintiff's █████REDACTED█████ is sufficient to allege a tangible burden on Dr. Ibrahim's right to pursue her chosen profession.  *Cf. id.*  Not only would any potential employer attempting to sponsor plaintiff for a work visa discover ███████REDACTED███████, she was forced to disclose her situation to her current employer, who would otherwise naturally tend to wonder why one of its star academics continually refused specific invitations to travel to the United States, the leading country in her field.  The same reasoning applies to the ████████REDACTED████████ ██████████████████: "[a] tangible burden exists in this context where a law effectively requires agencies to check a stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit."  *Id.*

The *Humphries* court determined that a tangible burden could be shown even if agencies were not required by law to check the stigmatizing list, but instead checked it "reflexively," "whether by internal regulation or custom[.]"  *Humphries*, 554 F.3d at 1188.  Here, the ███████ ████████████████████████REDACTED████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████  Like the agencies in *Humphries*, ████████████████REDACTED████████████████

1   ████████████████REDACTED████████████████, and "will therefore be more hesitant

2   to issue that benefit." *Id.* at 1191. ████████REDACTED████████ also ensures that

3   even in the unlikely event that a visa was granted, it would be delayed. *See also id.* at 1192.

4       Furthermore, even if plaintiff were granted a visa, ████████REDACTED████████

5   ███████████████████████████████████████████████████████████

6   ████████████. Defendants' conduct infringed and continues to infringe plaintiff's

7   protected liberty interests under the stigma-plus test.

8       **B. Defendants' Procedures Pose An Unacceptable Risk of Erroneous Deprivation,
        Which Can Be Remedied By Additional or Substitute Procedural Safeguards.**

9       Procedural due process generally requires notice and some type of hearing before the

10  deprivation of a liberty or property interest. *United States v. James Daniel Good Real Prop.*, 510

11  U.S. 43, 48 (1993); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985). Where the

12  government has a compelling interest in immediate action to prevent harm – ████REDACTED████

13  ████████ – a post-deprivation hearing will satisfy due process if "some meaningful opportunity

14  subsequent to the initial taking" is available to determine the parties' rights and duties. *See, e.g.,*

15  *Parratt v. Taylor*, 451 U.S. 527, 538-43 (1981), *overruled in part on other grounds in Daniels v.*

16  *Williams*, 474 U.S. 327, 329-32 (1986). Even in the face of national security concerns, due

17  process requires "notice of the factual basis for [the aggrieved party's] classification, and a fair

18  opportunity to rebut the Government's factual assertions before a neutral decisionmaker."

19  *Hamdi*, 542 U.S. at 509, 533.[7]

20      The government does not provide formal pre- or post-deprivation notice to watchlisted

21  individuals, through DHS TRIP or otherwise. Not only does the government fail to provide

22  notice of the fact of the watchlisting or the basis for it, it also fails to provide notice of the types

23  of conduct that will result in watchlisting. The fact that defendants strenuously resist providing

24  notice of any kind naturally tends to heighten the risk of error. *See Gete v. INS*, 121 F.3d 1285,

---

[7] *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. June 11, 2004), cited by defendants in their summary judgment motion at page 18, lines 17-18, brushed aside due process concerns with virtually no analysis. *Jifry* was decided only weeks before the Supreme Court clarified in *Hamdi v. Rumsfeld*, 542 U.S. 507 (June 28, 2004) (plurality), that national security concerns **do not** justify dispensing with fair procedures.

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

1297 (9th Cir. 1997) ("… without knowing the exact reasons for the seizure, as well as the
particular statutory provisions and regulations they are accused of having violated," individuals
whose vehicles were seized "may not be able to clear up simple misunderstandings or rebut
erroneous inferences drawn by the INS."); *City of Chicago v. Morales*, 527 U.S. 41, 56-60
(1999) (ordinance held unconstitutionally vague for failure to provide adequate notice of
prohibited conduct).  In addition, the factors discussed below further heighten the risk of an
erroneous deprivation.

**Inadequate or biased training**: █████████████████████████████████████████████.  In
addition, the FBI had to remove over 700 documents and 300 presentations from its training
materials as of 2012 because they consisted of factual inaccuracies and improper stereotyping of
Muslims.

**Automatic** ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████.

**"Standards" so low they give agencies virtually unlimited discretion to act based on**
**improper criteria such as religion or national origin**: Defendants purport to apply the
"reasonable suspicion" standard for inclusion in the TSDB.  This test is misapplied in this
context because the purpose of a watchlist is not to perform a quick check for weapons in a
situation where the presence or absence of weapons can be easily confirmed, as in *Terry v. Ohio*,
392 U.S. 1 (1968), but to make an inherently uncertain prediction about future violence.  *See also*
*Humphries*, 554 F.3d at 1194-95 (inclusion in a child abuse database based on a determination
that a report is "not unfounded" is a "very low threshold" and the "reverse of the presumption of

1   innocence"); *Valmonte*, 18 F.3d at 1004 ("The crux of the problem with the procedures is that the

2   'some credible evidence' standard results in many individuals being placed on the list who do

3   not belong there."); *Morales*, 527 U.S. at 60 ("The Constitution does not permit a legislature to

4   'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and

5   say who could be rightfully detained, and who should be set at large.'")  In addition, the

6   reasonable suspicion standard is so low that it facilitates the impermissible use of demographic

7   criteria in watchlisting.

8        **Vague, poorly understood "standards"**: Even the extremely low "reasonable

9   suspicion" standard was not ████████████ REDACTED █████████████

10  █████████████████████████████████████████████████ invites

11  error.  *Morales*, 527 U.S. at 56-64 (1999) (vague laws may be invalidated due to the likelihood

12  of arbitrary and discriminatory enforcement).

13       **"Standards" that are secret from the public**: Even if the "reasonable suspicion"

14  standard had been consistently applied and did not admit bias – which is not the case – that

15  standard is ████████████ REDACTED ██████████████

16  ███████████████████.

17       **Poor controls on the quality of evidence-gathering**: ██████ REDACTED ██████

18  ████████████████████████████████████████████

19  ████████████████████      *See Humphries*, 554 F.3d at 1192 (California DOJ had no

20  independent duty to ensure accuracy of reports of alleged child abuse and no formal mechanism

21  existed to request review of a report or appeal refusal to review a report); *see also Vasquez v.*

22  *Rackauckas*, No. 11-55795, 2013 U.S. App. LEXIS 22464, *52 (9th Cir. Nov. 5, 2013)

23  (determining whether someone is an "active gang member" presents a considerable risk of error).

24  In Dr. Ibrahim's case, Kelley's interview summary departed significantly from Dr. Ibrahim's

25  account of the interview, but there is ██████████ REDACTED ███████████

26  ████████████████████████████████████████████

27  ████████████████

28       **High probability that errors in the original "derogatory information" will be**

1  **perpetuated**: Although the DOS claims it bases its visa adjudications on its review of the

2  "classified derogatory information," that claim is meaningless if the original information was

3  incomplete or erroneous.  *See Humphries*, 554 F.3d at 1193 ("Unless the agency unilaterally

4  undertakes its own detailed investigation, it may only perpetuate any errors contained in the

5  original report, even as it draws its own 'independent conclusions.'")  In Dr. Ibrahim's case,

6  REDACTED

7

8

9

10

11

12

13      Other publicly available documents produced by defendants have acknowledged a risk of

14  error associated with data mining activities conducted without sufficient oversight, and

15  specifically, the potential for **false leads**.  *See* Office of the Inspector General of the DHS, DHS

16  Challenges in Consolidating Terrorist Watch List Information," August 2004, OIG-04-31, pp.

17  27-28; *see also* Nat'l Research Council, Protecting Individual Privacy In The Struggle Against

18  Terrorists: A Framework For Program Assessments, Committee On Technical And Privacy

19  Dimensions Of Information For Terrorism Prevention And Other National Goals, pp. 77-79

20  (2008), *available at* http://www.nap.edu/catalog.php?record_id=12452.  For example, a

21  computer scanning emails will not necessarily be able to tell that the letters "JIM" stand for

22  "Jamaah Islah Malaysia," a professional organization, not "Jemaah Islamiyah Malaysia," a

23  phrase alluding to a terrorist organization.  Likewise, a computer scanning for the word

24  "architecture" may not be able to distinguish use of the word in a discussion of Dr. Ibrahim's

25  field of study from use as a code word for the World Trade Center, disguised as a discussion of a

26  field of study (see 9/11 Commission Report, p. 248, *available at* http://govinfo.library.unt.edu

27  /911/report/911Report.pdf).  It is publicly known that defendants used data mining to gather

28  information on investigative targets.  *See*, *e.g.*, United States Government Accountability Office,

21

Data Mining: Agencies Have Taken Key Steps to Protect Privacy in Selected Efforts, but

Significant Compliance Issues Remain, August 2005, GAO-05-866, pp. 54-58. Errors arising

from false leads could be corrected with additional procedural protections.

REDACTED

**NCTC's presumption of correctness for watchlist nominations**: The NCTC generally

relies upon the originating agency's designation that there is reasonable suspicion to believe a

person is engaged in terrorist or terrorist-related activities as being presumptively valid. Even

where national security interests are at stake, courts have been unwilling to presume the

correctness of the government's account of the facts for purposes of the due process analysis.

*See Hamdi*, 542 U.S. at 527-37 (rejecting government's argument that court should assume the

accuracy of facts contained in government witness's declaration with no opportunity for

rebuttal); *see also Humphries*, 554 F.3d at 1192-99 (finding substantial risk of error in part

because California DOJ presumed the information in child abuse reports was accurate and

conducted no separate investigation to verify accuracy).

**A** REDACTED **redress unit for** REDACTED : In 2008, an audit

of the U.S. Department of Justice, Office of the Inspector General found that for a variety of

reasons, the FBI was not removing records from the TSDB when it was appropriate to do so.

Defendants had failed to correct these quality control weaknesses, despite repeated warnings in

the past. Lack of policies and training, failure to follow the procedures that did exist, confusion

regarding shared "intelligence," and inability to keep up with the mass quantity of records

continually being added were cited as reasons for the failures.  Auditors disagreed with TSC's

time estimate required to review all records for accuracy, and observed that TSC was identifying

incomplete or inaccurate information faster than matters were being resolved by source agencies.

REDACTED ,

the TSC's ability to maintain accurate records is unlikely to improve over time.

**Inadequate notice of actions taken in response to a redress request**: Neither the DHS

TRIP program nor its predecessor, the PIVF, provided notice of an individual's watchlist status

or the basis for watchlisting.  The TSA's statement that it reviewed undisclosed records and took

undisclosed action for undisclosed reasons not only does not provide notice of the reasons for the

agency's decision, it does not even provide notice of what the decision was.  This is not adequate

notice to satisfy due process, thereby increasing the risk that errors will go uncorrected.  *See*,

*e.g.*, *In re Gault*, 387 U.S. 1, 33 (1967), *abrogated in part on other grounds*, *Allen v. Illinois*, 478

U.S. 364 (1986) (notice of charges must be given sufficiently in advance of merits hearing to

allow reasonable opportunity to prepare); *Barnes v. Healy*, 980 F.2d 572, 578-79 (9th Cir. 1992)

(without notice of specific reasons for denial, claimant is reduced to guessing what evidence to

submit in response); *Boudin v. Dulles*, 136 F. Supp. 218, 221-22 (D.D.C. 1955) (plaintiff was

entitled to have all evidence on which passport office might rely appear upon the record so that

he could meet it and court could review it).  Moreover, the TSA did not respond at all until over

a year after plaintiff had submitted her PIVF and several months after she had filed both a civil

suit and a circuit court petition challenging the agencies various wrongful acts and unfair

procedures.  Due process requires that a hearing be given at a meaningful time.  *See Loudermill*,

470 U.S. at 547.

**A byzantine and legally toothless redress procedure**: The PIV/DHS TRIP

determination letter informs the complainant that the TSA's letter is a "final agency decision,"

which is judicially reviewable only in the circuit courts.  49 U.S.C. § 46110.  REDACTED

REDACTED   Even assuming Dr. Ibrahim successfully appealed

the TSA's ambiguous order, the circuit court could not order the relief she seeks because TSA

lacks authority to remove an individual from the TSDB.  *See Latif v. Holder* ("*Latif I*"), 686 F.3d

1122, 1129 (9th Cir. 2012); *see also Humphries*, 554 F.3d at 1193 ("In addition, even if the agency has the time, funding, and resources to determine that the evidence contained in the [child abuse database] is erroneous or unfounded, it does not have the power to expunge the listing.")

**Failure to provide an adequate record for judicial review of DHS TRIP/PIVF final orders**: The record submitted by the government in Dr. Ibrahim's appeal to the circuit court demonstrates that the PIVF and DHS TRIP programs are not constitutionally adequate process. The "record" consisted of four heavily redacted TSA security directives that do not discuss Dr. Ibrahim on their face, and could not have comprised the full administrative record in this case. When Dr. Ibrahim moved to compel the complete record or supplement it, the TSA opposed her motion. The government's refusal to produce the complete record frustrates the purpose of judicial review. *See Ibrahim v. DHS*, 538 F.3d 1250, 1256 (9th Cir. 2008) ("*Ibrahim I*") (reviewing court should be one that can take evidence).

**An "err on the side of caution" attitude that deliberately ensnares individuals who present little or no risk**. An agency's acknowledged error rate, discovered during internal reviews or audits, may inform the analysis of risk of an erroneous deprivation. *See Dupuy*, 397 F.3d at 505 (citing the "unacceptable" 74.6 percent reversal rate for challenged child abuse reports in finding a high risk of an erroneous deprivation). Here, the trier of fact may infer that defendants' admitted tendency towards overinclusion has led to a similarly high rate of error and downgrading of watchlist designations. *See Humphries*, 554 F.3d at 1195 (noting that task force report suggesting half of 800,000 DOJ records maintained in child abuse index should be purged "confirms our own observations about the low threshold for putting names on the CACI and the tendency to overinclude.")  For example, in one year, ████████ REDACTED ████████ ████████████████████████████████████████ ████████

It is important to note that the facts available on TSDB errors and downgrades only reflect the results of defendants' own audits.  Significantly, defendants have avoided ████████ ██████████████████ REDACTED ██████████████████

REDACTED

REDACTED, which also tends

to increase the risk of error.

In summary, the government's policies and procedures, and its actions with respect to Dr. Ibrahim, demonstrate that it cannot be trusted to protect the constitutional rights of individuals REDACTED. The risk of error is too great to allow the government to deprive people of protected liberty and property interests, based on secret evidence, with no meaningful review.

### C. Providing Plaintiff Notice And A Hearing Would Not Harm Any Legitimate Government Interests.

The third *Mathews* factor considers the government's interest, including any administrative burdens that additional or substitute procedures would entail. *Mathews*, 424 U.S. at 335. The government's argument boils down to the notion that its national security concerns are so great that they outweigh all other considerations of personal liberty and procedural fairness, as was held in *Korematsu v. United States*, 323 U.S. 214, 217-24 (1944), *petition for writ of coram nobis granted by Korematsu v. United States*, 584 F. Supp. 1406, 1417-20 (N.D. Cal. 1984) (finding the government had deliberately omitted relevant information and provided misleading information concerning the supposed "threat" to national security posed by Japanese Americans). Although the government does not cite *Korematsu*, it asks the Court to adopt similar reasoning. The United States Supreme Court has rejected such a "heavily circumscribed role" for the courts:

> Indeed, the position that the courts must forgo any examination of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of the separation of powers, as this approach serves only to *condense* power into a single branch of government.

*See Hamdi*, 542 U.S. at 535-36 (italics in original).

The government's national security interest here does not rise to the level of the wartime emergency faced in World War II. As the Ninth Circuit observed, the United States has never been at war with Malaysia. *Ibrahim II*, 669 F.3d at 996. Nor can defendants show that providing further process to Dr. Ibrahim would burden any national security interest, or that effective

1  review could not be achieved with appropriate safeguards.

2      The national security interest at issue here is far less urgent than that ultimately shown to

3  be factually unsupported in *Korematsu*. The vast majority of watchlisted individuals – 96.8

4  percent as of March 2007 – are designated as handling code 3, **REDACTED**. Prior to

5  that, in 2005, auditors found that 75 percent of the records they reviewed were designated as

6  handling code 4 – **REDACTED** – and an

7  additional 22 percent were designated handling code 3. *See* U.S. Dep't of Justice Office of the

8  Inspector General, Audit Division, Review of the Terrorist Screening Center, June 2005, pp. viii.

9  Nevertheless, the government vigorously defends its decision to target persons it characterizes as

10  "lower threat" in order to gain an investigative advantage:

11      We asked the TSC Director about the content of the TSC's consolidated watch
    list. She informed us that, **to err on the side of caution, individuals with any**
12  **degree of a terrorism nexus were included** on the consolidated watch list, as
    long as minimum criteria was met (i.e., the person's name was partially known
13  plus one other piece of identifying information, such as the date of birth). The
    Director further explained that one of the benefits of watch listing individuals who
14  pose a lower threat was that their movement could be monitored through the
    screening process **and thereby provide useful intelligence information to**
15  **counterterrorism investigators**. In addition, she stated that lower-threat level
    individuals can have associations with higher-threat level terrorists, and watch
16  listing lower-threat individuals **may lead to uncovering the location of other**
    **watch list individuals**.
17
18  *See id.*, pp. viii-ix (emphasis added). The 2005 TSC Director's statement is consistent with other

19  accounts of No Fly List encounters that show the purpose of the TSDB and the No-Fly List is not

20  necessarily to prevent terrorists from committing acts of violence on airplanes, but to aid law

21  enforcement in investigations unrelated to aviation security. *See Latif II*, 2013 U.S. Dist. LEXIS

22  122533 at *14-19 (accounts of plaintiffs Washburn, Ghaleb, Mashal, Meshal, and Persaud).

23      The specific national security purpose served by the watchlisting makes a difference in

24  the analysis. An alleged interest in watchlisting individuals who present no threat themselves, in

25  the hope that this may one day possibly yield useful information on actual terrorists, is entitled to

26  less weight than an interest in preventing an imminent threat. The government watchlists

27  everyone for whom it has ever opened a counterterrorism investigation, even if the purported

28  basis for the investigation was flimsy or influenced by prejudice. Making it easier for the

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

government to coerce people into serving as informants for counterterrorism investigations is simply not the same interest as preventing individuals known to have violent intentions from entering the country.

Even if an interest in coercing people into serving as informants were found to be legitimate, this interest does not preclude fair proceedings. *See Hamdi*, 542 U.S. at 529 ("Moreover, as critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat."). In criminal cases, courts readily acknowledge that due process may require the government to disclose classified information, or at least a summary of the classified information, in the interests of procedural fairness. *See United States v. Sedaghaty*, 728 F.3d 885, 892, 903-08 (9th Cir. 2013) (trial court erred in approving an inadequate substitution for classified material that was relevant and helpful to the defense). Here, defendants' act of REDACTED is as close as one could get to accusing her of a crime, without actually doing so. *See Humphries*, 554 F.3d at 1186, 1201 (fact of listing in child abuse index is not only stigmatizing, it is, in substance, a judgment against those listed).

In addition, the government is already required to disclose, or at least provide detailed summaries of, classified information to aliens in civil proceedings in similar contexts. *See, e.g., Kaur v. Holder*, 561 F.3d 957, 961-62 (9th Cir. 2009) (in asylum context, finding that the "conclusory and opaque" summary of classified evidence provided by Board of Immigration Appeals failed to comply with applicable regulations and due process); *Kiareldeen v. Ashcroft*, 273 F.3d 542, 551-55, 552 n. 2 (3d Cir. 2001) (in removal context, finding that government's unclassified summary including detailed information, such as date and location of subject's meeting with terrorist associates, identities of associates, and specific statements made by the subject regarding terrorist acts he wanted to carry out, was sufficient to mount a defense to the allegations); *Cf.* 8 U.S.C. § 1534(e)(3) (contemplating an Alien Terrorist Removal Court that provides a pre-removal hearing and requires the government to submit an unclassified summary

1   of the "specific evidence" against the alien); *see also Holder v. Humanitarian Law Project*, 130

2   S. Ct. 2705, 2728 (2010) (stating organizations designated as foreign terrorist organizations

3   could seek judicial review). Here, the government has not provided the "who, what, when,

4   where, and why" of any allegations against Dr. Ibrahim, even in an unclassified format. Doing

5   so would not impair any legitimate government interest, especially considering the government's

6   ███████████████████████████████████ REDACTED ███████████████████████████████████.

7       **D. Relief Sought.**

8       The court need not spell out precisely what procedures the government must use in order

9   to find defendants' actions unlawful and set them aside. *See Humphries*, 554 F.3d at 1201.

10  Based on the foregoing, plaintiff is entitled to the following relief on her procedural due process

11  claims:

12  - A declaration, order, and judgment that ███████ REDACTED ███████ to local
13    law enforcement officers, thereby causing her arrest on January 2, 2005, violated her
      protected liberty interest in avoiding stigma in connection with the deprivation of her
14    right to remain free from unreasonable searches and seizures, without adequate
15    procedural protections.

16  - A declaration, order, and judgment that ███████ REDACTED ███████ status to local
      law enforcement officers, thereby causing her arrest on January 2, 2005, violated her
17    protected liberty interest in freedom from unreasonable searches and seizures, without
18    adequate procedural protections.

19  - A declaration, order, and judgment that ███████ REDACTED ███████
      ████████████████████, thereby preventing her from
20    boarding her scheduled flight on January 2, 2005, violated her protected liberty interest in
      avoiding stigma in connection with the deprivation of her right to travel, without
21    adequate procedural protections.

22  - A declaration, order, and judgment that ███████ REDACTED ███████
23    ████████████████████, thereby preventing her from
      boarding her scheduled flight on January 2, 2005, violated her protected liberty interest in
24    the right to travel, without adequate procedural protections.

25  - A declaration, order, and judgment that ███████ REDACTED ███████
      █████ and revoking her visa without notice, ███████ REDACTED ███████
26    ████████████████████, and resulting in the loss of nearly an entire
      month's salary, violated her protected property interest in possession of money, without
27    adequate procedural protections.

28  - A declaration, order, and judgment that Dr. Ibrahim is entitled to a name-clearing hearing

1  regarding the ███████████ REDACTED ███████████, and an
   injunction requiring defendants to provide Dr. Ibrahim with a name clearing hearing
2  regarding ██████████ REDACTED ██████████.

3  • A declaration, order, and judgment that █████ REDACTED █████████████

4  ███████████████████████████████████████████
   ████████████████████████ continues to interfere with plaintiff's right to travel,
5  without adequate procedural protections, and an order requiring defendants to set aside
   ███████████ REDACTED ██████████████

6

7  • A declaration, order, and judgment that █████ REDACTED █████████████

8  ██████████████████████████████████████
   █████████████████████ violated and continues to violate plaintiff's right to
9  pursue her chosen occupation, without adequate procedural protections, and an order
   requiring defendants to set aside ██████ REDACTED ████████████

10

11 • A declaration, order, and judgment that █████ REDACTED █████████████

12 █████████████████████████████████████████
   ████████████████████ continues to subject plaintiff to an undue risk that she
13 will be falsely arrested if she attempts to enter the United States even if she could obtain
   a visa, without adequate procedural protections, and an order requiring defendants to set
14 aside █████████ REDACTED ███████████.

15 • A declaration, order, and judgment that █████ REDACTED █████████████
   violated and continues to violate plaintiff's First
16 Amendment right to associate ████ REDACTED ███████, without adequate procedural protections,
   and an order requiring defendants to set aside ████ REDACTED ████████
17 █████████████████████████████████

18 • A declaration, order, and judgment that defendants' ████ REDACTED ██████████
   ███████████████████ violated and continues to violate plaintiff's First
19 Amendment right to exercise her religion and associate with other Muslims, without
   adequate procedural protections, and an order requiring defendants to set aside
20 ███████ REDACTED █████████████

21

22 • A declaration, order, and judgment that █████ REDACTED █████████████
   violated and continues to violate plaintiff's right to
23 equal protection, without adequate procedural protections, and an order requiring
   defendants to set aside █████ REDACTED █████████████

24

25 **II.    The Government's Actions Violate Substantive Due Process.**

26 Substantive due process protects individuals against "the exercise of power without any

   reasonable justification in the service of a legitimate governmental objective." *County of*

27 *Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The first step in the analysis is to identify a

28

fundamental life, liberty, or property interest that has been infringed by government action.  *See*
*Washington v. Glucksberg*, 521 U.S. 702, 719-21 (1997).  The next step is to analyze whether the
government's action is so egregious and lacking in justification as to be "arbitrary in the
constitutional sense."  *Lewis*, 523 U.S. at 845-46.  Under the "shocks the conscience" test, when
officials with the luxury to make unhurried judgments and "extended opportunities to do better"
nevertheless exhibit "protracted failure even to care, indifference is truly shocking."  *Id.* at 847,
853.  Here, the government's conduct violates Ibrahim's right to substantive due process, even
under the "shocks the conscience" test.  *See id.* at 845-55.

In their summary judgment motion, defendants cited a number of cases for the
proposition that if the injury in question is covered by a more specific constitutional provision,
such as the Fourth or Eighth Amendment, it cannot be analyzed under substantive due process.[8]
While plaintiff does not dispute this general rule of law, it does not defeat plaintiff's substantive
due process claim because that claim is not based on injuries covered by more specific
constitutional provisions.  Dr. Ibrahim may pursue substantive due process claims based on
defendants' interference with her protected liberty interests in the unenumerated rights to travel
and to work in her chosen field without unreasonable restrictions, and her protected property
interest in money spent on international travel.  Moreover, defendants' "preemption" argument
does not apply at all to plaintiff's procedural due process claims.

### A. Defendants' Actions Infringed And Continue To Infringe Plaintiff's Protected Liberty Interest In International And Domestic Travel.

Defendants' REDACTED interferes with plaintiff's right to travel in a
comprehensive manner, effectively stopping her at every possible port of entry.  *See Latif II*,
2013 U.S. Dist. LEXIS 122533 at *26-27.  Defendants' contention that Dr. Ibrahim's right to
travel has not been infringed is unpersuasive, because Dr. Ibrahim was denied boarding twice in
2005, and because REDACTED is intended to function and does function as a
barrier to her ability to travel internationally to the United States.  This is true REDACTED .

---

[8] *See* Defendants' MPA, 20:8-19 (*citing United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997);
*Albright v. Oliver*, 510 U.S. 266, 266 (1994); *Fontana v. Haskin*, 262 F.3d 871, 882 (9th Cir.
2001).)

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

1   [REDACTED], because the TSDB is routinely used

2   for the same purposes and because [REDACTED]

3   [REDACTED].  Defendants' [REDACTED] was not

4   made in haste, under pressure, or without the luxury of a second chance, as in *Lewis*.  Defendants

5   had weeks to deliberate between the time Dr. Ibrahim's husband visited her in October 2004 and

6   the [REDACTED].  Over a month passed between the [REDACTED]

7   and Special Agent Kelley's December 2004 interview.  Although defendants admit [REDACTED]

8   [REDACTED]

9   [REDACTED]

10  [REDACTED].[9]

11  Despite "extended opportunities to do better," defendants not only demonstrated a "protracted

12  failure to care," they defend their decision to watchlist "lower threat" individuals on the ground

13  that it might hypothetically someday yield some investigative advantage.  *See Lewis*, 523 U.S. at

14  853.  Whatever the hypothetical investigative benefits of watchlisting "lower threat" individuals

15  may be, such speculative reasoning surely does not justify [REDACTED]

16  [REDACTED].

17          An action violates substantive due process if it fails to substantially advance a legitimate

18  government interest.  *See Lewis*, 523 U.S. at 845-46 (government action that fails to serve any

19  legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due

20  Process Clause); *see also Lingle v. Chevron*, 544 U.S. 528, 542 (2005) (rejecting "substantially

21  advances" test in the context of takings claims but leaving it intact for substantive due process

22  claims).  [REDACTED]

23  [REDACTED]

24  [REDACTED] does nothing to advance the abstract goal of protecting the nation from

25  _____

26  [9] Defendants' argument that litigating the basis for [REDACTED] would
    require classified evidence lacks merit.  (*See* Docket No. 534, pp. 23-24.)  Defendants

27  voluntarily took this evidence out of the case by claiming it was subject to the state secrets
    privilege.  The available direct and circumstantial evidence does not disclose that defendants'

28  national security interest would be impaired if they were unable to watchlist individuals [REDACTED]
    [REDACTED]

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

terrorists.  Even if gaining an investigative advantage were found to be a legitimate government

interest, persons who do not meet the reasonable suspicion standard are highly unlikely to have

useful information to provide to law enforcement.  This relationship between the government's

purported interest and its challenged actions in this case is even more attenuated than that struck

down in *Aptheker*, because the government ████████████████REDACTED████████████████

████████.  *See Aptheker*, 378 U.S. at 514 (noting tenuous relationship between bare fact of

organizational membership and the activity Congress sought to proscribe).

Even if plaintiff lacks a protected liberty interest in a visa, that fact does not somehow

eliminate her protected Fifth Amendment liberty interest in the freedom to travel internationally

without unreasonable restrictions.  The Ninth Circuit recognized that that the Fifth Amendment

protects plaintiff.  *See Ibrahim II*, 669 F.3d at 997.  Defendants' ████████REDACTED████████

████████████████████████████ despite having many years ████████REDACTED████████

shocks the conscience.

### B. Defendants' Actions Burdened And Continue To Burden Plaintiff's Protected Liberty Interest in the Right to Work in Her Chosen Occupation.

The right to work and to practice a specific profession is recognized as a protected liberty

interest.  *See Greene*, 360 U.S. at 492; *Sagana*, 384 F.3d at 742-43.  The due process cases also

recognize that the government may reasonably regulate the right to pursue employment, which

may be reviewed under a lower standard than heightened scrutiny.  *See Sagana*, 384 F.3d at 743;

*Dittman v. California*, 191 F.3d 1020, 1029-31 & n.5 (9th Cir. 1999).  In this case, however, the

federal government has not attempted to regulate entry into any one profession because of risks

specific to that profession.  Rather, the government has erected a blanket barrier to employment

in the United States and impaired Dr. Ibrahim's job advancement prospects in Malaysia by

████████████████████REDACTED████████████████████.  These actions

prevent Dr. Ibrahim from accepting any employment in her field in the United States at all, and

work to her disadvantage in the subjective evaluation process she must go through in order to

advance in her field in Malaysia.  Even under a lower standard of review, the government's

interest in protecting the nation from terrorists is not rationally related to ████REDACTED████

1  [REDACTED] The

2  government continues to injure Dr. Ibrahim by precluding her from working in the United States

3  and impairing her opportunities for promotion s[REDACTED]

4  [REDACTED]

5  **C.  Defendants' Actions Deprived Ibrahim Of Her Protected Property Interest In Money Spend On International Travel.**

6  

7  Plaintiff has a protected property interest in the money she spent on international travel,

8  for which she did not ultimately receive a refund. *See Vance*, 345 F.3d at 1088, n.6. [REDACTED]

9  [REDACTED]

10 [REDACTED]

11 

12 As above, defendants' actions were arbitrary in a constitutional sense because [REDACTED]

13 [REDACTED] does not advance the goal of national security, even if the

14 Court credited defendants' speculation that watchlisting "lower threat" individuals could serve

15 an investigative purpose, for example, by applying greater pressure on those individuals to

16 become informants.

17 **D.  Relief Sought.**

18 Based on the foregoing, plaintiff is entitled to the following relief on her substantive due

19 process claims:

20 •  A declaration, order, and judgment that [REDACTED]

21 [REDACTED], thereby preventing her from

22 boarding her scheduled flight on January 2, 2005, violated her protected liberty interest in the right to travel, and was arbitrary and capricious.

23 •  A declaration, order, and judgment that [REDACTED], and to revoke her visa without notice,

24 [REDACTED], and resulting in the loss of nearly an entire month's salary, violated her protected property interest in possession of money, and was arbitrary and capricious.

25 

26 •  A declaration, order, and judgment that [REDACTED]

27 [REDACTED] continues to interfere with plaintiff's right to travel, and is arbitrary and capricious, and an order requiring defendants to set

28 aside [REDACTED]

**REDACTED**

- A declaration, order, and judgment that **REDACTED**

  **REDACTED**

  continues to interfere with plaintiff's right to pursue her chosen occupation, and is arbitrary and capricious, and an order requiring defendants to set aside **REDACTED**

### III.   The Government's Actions Were Arbitrary And Capricious, In Violation Of The Administrative Procedure Act.

The APA authorizes district courts to issue injunctive relief to correct agency action that is: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; . . . or (F) unwarranted by the facts[.]"  5 U.S.C. § 706.  Here, the government's repeated **REDACTED**

**REDACTED** was arbitrary and capricious, and must be set aside.

In determining whether an action is "arbitrary and capricious," the reviewing court must determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted).  "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (*quoting Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *see also Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993) (agency's decision must be rational).

In Dr. Ibrahim's case, the government has produced no evidence to support her **REDACTED**.  Defendants admit that Dr. Ibrahim's **REDACTED**,

34

1    [REDACTED]

2    [REDACTED]

3    [REDACTED]

4    [REDACTED] .  A finding based upon no reliable evidence

5    whatsoever is a clear error of judgment and an abuse of discretion.  *First Girl, Inc. v. Reg'l*

6    *Manpower Adm'r of U.S. Dep't of Labor*, 499 F.2d 122, 124 (7th Cir. 1974) (per curiam); *see*

7    *also City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 189 (D.C. Cir. 1991)

8    (even "assuming[] arguendo" that the agency had ample statutory authority, its action was devoid

9    of "reasoned decision-making," and was therefore arbitrary and capricious).

10        In addition, as discussed throughout this brief, the government's actions also were

11   contrary to constitutional right, power, privilege, or immunity, in violation of the APA.  The

12   Court therefore has the power to issue an injunction setting aside defendants' decision to

13   [REDACTED]

14   [REDACTED]

15        Based on the foregoing, plaintiff is entitled to the following relief on her APA claims:

16   • A declaration, order, and judgment that [REDACTED]
17     [REDACTED] was arbitrary, capricious, an abuse of discretion, or
       otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and
18     an order requiring defendants to set aside [REDACTED]

19   • A declaration, order, and judgment that [REDACTED]
20     [REDACTED] was contrary to constitutional right, power, privilege,
       or immunity, in violation of the APA, 5 U.S.C. § 706(2)(B), and an order requiring
21     defendants to set aside [REDACTED]

22   **IV.    The Government's Actions Violated The First Amendment**

23   Defendants' terrorist watchlisting scheme [REDACTED]

24   [REDACTED] to engage in lawful association in support of her religious beliefs and

25   associations, familial relationships, and first amendment protected speech.  Government "action

26   which may have the effect of curtailing the freedom to associate is subject to the closest

27   scrutiny," even if the governmental action challenged may appear to be totally unrelated to

28   protected liberties.  *Patterson*, 357 U.S. at 460-61; *see also Button*, 371 U.S. at 433.

**A. Religious Associations.**

The federal government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1(b).  "The right to freedom of association is a right enjoyed by religious and secular groups alike."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012).   "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Unlike in *Scales v. United States*, 367 U.S. 203, 221, 229-30 (1961), where the Supreme Court required an element of scienter in order to convict an individual for violating the Smith Act,[10] the government's reasonable suspicion standard for the TSDB and associated databases is so broad as to permit watchlisting based on religious associations and other protected associations, regardless of whether the person knew that the government suspected the group of furthering a terrorist agenda, or had any intent to further such goals.  Furthermore, REDACTED

The FBI questioned Dr. Ibrahim regarding a terrorist organization known to operate in Malaysia of which she has never been a member, Dr. Ibrahim's husband's "ideology," her own involvement in the local Muslim community, and her religious travel to Saudi Arabia.  None of these is an appropriate basis on which to place an individual on a terrorist watchlist that has the effect of limiting constitutional rights.  In addition, the government's watchlisting practices substantially burdened religious expression of the Muslim faith as a general matter, including Muslims at Stanford who were told to expect law enforcement to contact them, and many who changed their religious observance to fit in.  The government selected thousands of individuals

[10] 28 U.S.C. § 2385 (setting criminal penalties for advocating overthrow of the United States government).

1    for interviews because of their national origin.  The FBI reportedly linked the number of

2    terrorism investigations its field offices would have to conduct with the number of mosques

3    within a given field office's area.  One former FBI informant stated that he was told by FBI

4    agents that Islam is a threat to U.S. national security.  Given these facts, a reasonable person

5    would understand that continuing to associate with others of that faith could have legal

6    consequences.

7        **B.  Familial Associations.**

8        The freedom to enter into and carry on certain intimate or private relationships is a

9    fundamental element of liberty protected by the Bill of Rights:

10       Such relationships may take various forms, including the most intimate.  We have
         not attempted to mark the precise boundaries of this type of constitutional
11       protection. The intimate relationships to which we have accorded constitutional
         protection include marriage; the begetting and bearing of children; child rearing
12       and education; and cohabitation with relatives.

13   *Board of Dirs. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) (citations

14   omitted).  The government has targeted Dr. Ibrahim based on her family associations.  In 2004,

15   Kelley questioned Dr. Ibrahim extensively about her husband.  Furthermore, REDACTED

16

17

18                                      violates Dr. Ibrahim's rights of association with her family

19   members.

20       **C.  Government's Lack of Compelling Interest and Least Restrictive Means.**

21       The government concedes REDACTED

22   ; therefore its "national security" interest is nonexistent.  The government articulates no

23   other interest in support of its interference with Dr. Ibrahim's religious and family associations.

24   While the government has an interest in preventing terrorist attacks, its vague and overbroad

25   criteria do not serve that purpose because they inevitably lead to wasted resources for the

26   surveillance of individuals who are not a threat, REDACTED .  The government could

27   reduce the risk of an erroneous watchlisting based impermissibly on protected First Amendment

28   associations by adopting a higher standard, such as probable cause, and by requiring review by a

1  neutral magistrate of the facts allegedly supporting the watchlisting prior to finalizing the

2  nomination.  Even assuming the government had articulated a valid national security interest

3  with respect to plaintiff – which it has not – the government has presented no evidence showing

4  that these less restrictive measures would not address national security concerns.

5  **D.  Retaliation.**

6  Since defendants lack any legitimate national security reason for interfering with Dr.

7  Ibrahim's protected liberty and property interests, one also may infer that the government's ████

8  ████████ REDACTED ████████ is retaliatory, based on a desire to block her from exercising her First

9  Amendment right to access the courts and petition for redress of grievances.  To establish a First

10  Amendment retaliation claim, the plaintiff must show (1) the defendant acted to deter or chill the

11  plaintiff's speech, *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir.

12  1999); and (2) the defendant's desire to chill speech was the "but for" cause of the unlawful

13  conduct.  *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013).  The plaintiff need not

14  show his or her speech was actually chilled, but merely that defendant intended to interfere with

15  the plaintiff's free speech rights.  *Mendocino Envtl. Ctr..*, 192 F.3d at 1300.  Intent to inhibit

16  speech may be shown by direct or circumstantial evidence.  *Id.* at 1300-01.

17  In 2009, Dr. Ibrahim sought a visa for the express purpose of providing deposition and

18  trial testimony in this case.  Not only did the government deny her visa application, it did not stop

19  there.  It also ████████████ REDACTED ████████████

20  ████.  These facts are sufficient to permit the inference that defendants intended to interfere

21  with plaintiff's clearly established right to petition the court for redress of grievances, and that

22  ████████ REDACTED ████████ but for this desire.

23  **E.  Relief Sought.**

24  Based on the foregoing, plaintiff is entitled to the following relief on her First Amendment

25  claims:

26  • A declaration, order, and judgment that ████████ REDACTED ████████
      interfered with plaintiff's right to associate with her
27  family members, and an order requiring defendants to set aside ████ REDACTED ████

28

1   • A declaration, order, and judgment that REDACTED interfered with plaintiff's right to associate with others of the Muslim faith, and an order requiring defendants to set aside REDACTED

2

3   • A declaration, order, and judgment that REDACTED interfered with plaintiff's right to exercise her First Amendment right to free speech and to petition for redress of grievances, and an order requiring defendants to set aside REDACTED

4

5

6   **V.      The Government's Actions Violate the Equal Protection Clause.**

7   A plaintiff alleging a violation of equal protection must show that the defendant acted in

8   a discriminatory manner and that the discrimination was intentional. *See Washington v. Davis*,

9   426 U.S. 229, 238-47 (1976). Intent may be proved through direct or indirect evidence. *See*

10  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

11  Conspicuous patterns of discrimination are rare, and not necessary to find a violation of

12  the Equal Protection Clause. *Miller v. Johnson*, 515 U.S. 900, 913-15 (1995). Here, however,

13  the evidence reveals a stark pattern by federal law enforcement of targeting the Muslim

14  community for investigation and watchlisting, pursuant to the policy of automatically

15  watchlisting persons targeted for full or preliminary counterterrorism investigations. The Ninth

16  Circuit has recognized that, "the effect of a law may be so harsh or adverse in its weight against a

17  particular race that an intent to discriminate is not only a permissible inference but also a

18  necessary one." *Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (*citing Yick Wo v.*

19  *Hopkins*, 118 U.S. 356 (1886)).

20  In the absence of such patterns, a disproportionate impact on the affected class may be

21  aggregated with additional evidence of discriminatory intent. *Washington*, 426 U.S. at 242.

22  Even if the Court does not find that the disproportionate targeting of Muslims in the

23  government's counterterrorism investigations (and therefore also the watchlists) shows

24  discriminatory intent for all practical purposes, *see Washington*, 426 U.S. at 242, this evidence

25  may be considered together with the evidence of Special Agent Kelley's conduct during the

26  December 2004 interview, and other evidence of discriminatory intent.

27  **A.      Plaintiff Is A Member Of A Suspect Class, Requiring Strict Scrutiny.**

28  Strict scrutiny is applied when government action disadvantages a suspect class or

infringes on a fundamental right.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440

(1985).  "'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the

most exacting judicial examination[.]'"  *Miller*, 515 U.S. at 904 (*quoting Regents of Univ. of Cal.

v. Bakke*, 438 U.S. 265, 291 (1978)).  Court apply strict scrutiny to racial and ethnic

classifications, requiring the government to articulate a compelling interest that the challenged

action is narrowly tailored to serve.  *Id.* at 904.  National origin also has been held to be a suspect

class.  *Oyama v. California*, 332 U.S. 633, 644-46 (1948); *Hirabayashi v. United States*, 320

U.S. 81, 100 (1943).  Strict scrutiny is also applied when government action burdens religious

expression, because religion is a suspect class, *Christian Science Reading Room Jointly

Maintained v. City and County of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986) (collecting

cases), and because the right to free exercise of religion is fundamental.  *See, e.g.*, *Stormans Inc.

v. Selecky*, 844 F. Supp. 2d 1172, 1200 (W.D. Wash. 2012).

   Dr. Ibrahim is a Muslim, ethnically Malay, and a citizen of Malaysia.  All of these

classifications receive strict scrutiny.  In addition, as discussed below, defendants' watchlisting

scheme burdens the fundamental right to freely exercise the Muslim faith, and therefore must be

analyzed under strict scrutiny.

**B.    Plaintiff Was Subjected To Intentional Discriminatory Treatment, Based Upon Her Membership In A Suspect Class And Her Free Exercise Of Her Religious Faith.**

   1.   The Government Intentionally And Disproportionately Targeted Muslims For Counterterrorism Investigations, Which Automatically Results In Watchlisting In Accordance With Defendants' Publicly Stated Policy.

   Discriminatory acts towards third parties may be relevant to show discriminatory intent

towards the plaintiff.  *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007).  Here, the

evidence will show that the government systematically and disproportionately targeted Muslims

for counterterrorism investigations.  Because defendants' publicly stated policy is to

automatically watchlist all persons subjected to a full or preliminary investigation, the practice of

disproportionately targeting Muslims for investigation can only result in a watchlist where

Muslims are disproportionately represented.

   Muslims at Stanford and elsewhere were disproportionately targeted by law enforcement

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

after September 11.  The government selected thousands of individuals for interviews in part

because they came from majority-Muslim countries.  By some estimates, the FBI has

interviewed as much as one quarter of the entire United States Muslim community.  Starting in

October 2004 and continuing through February 2005, Immigration and Customs Enforcement

(ICE) targeted large numbers of immigrants, most of whom came from majority-Muslim

countries, for terrorism investigations in an operation known alternatively as "Operation

Frontline" or the "October Plan."  Public documents summarizing interviews conducted during

Operation Frontline/the October Plan contain numerous "315" file numbers; therefore, it is

highly likely that the subjects of these files are or were at one time watchlisted pursuant to

defendants' publicly stated policy of watchlisting all international terrorism suspects in the 315

classification.  The odds of Muslim students being contacted by law enforcement were so readily

apparent, the Muslim student organization at Stanford warned its members about it.

     Moreover, FBI trainings have been discovered to stereotype Muslims, and teach agents

things such as the more devout a Muslim, the more likely he is to be violent.  Over 700

documents and 300 presentations have been removed from the FBI's training materials as of

2012 because they consisted of factual inaccuracies and improper stereotyping of Muslims.

     In addition, the standards for including individuals in the TSC watch list are extremely

low – allowing watchlisting based on an interpretation of facts that "would lead one to *believe*

that an individual *may* be an appropriately *suspected* terrorist."  Such low thresholds for

inclusion on a watchlist permit factors such as religion and national origin to infiltrate the

decision-making process.  Indeed, one former FBI informant revealed that he was told by FBI

agents that Islam is a threat to U.S. national security.  It should come as no surprise that using

such a vague, easily met standard facilitates unfair targeting.  Such loose language permits the

government to invent a facially neutral rationale for watchlisting practically anyone; yet the

government has chosen to focus on Muslims in particular.

     All of the above facts show the government's watchlisting scheme has a disproportionate

effect on Muslims, and are strong circumstantial evidence of discriminatory intent.  *Cf. Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("Apart from the

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

1  text, the effect of a law in its real operation is strong evidence of its object."). Here, the

2  government has consciously chosen to focus its law enforcement efforts on Muslims because of,

3  not in spite of, their religious beliefs.

2.  The Government's ███████ REDACTED ███████ Shows Consciousness
   Of Guilt.

████████ REDACTED ████████

████████████████████████

█████████████████████████████

█████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████████████████

████████████████████████

███████████████████████

██████████████

████████████████████

████████████████████████████

█████████████████████████████

██████████████████████

21  ███████████████████████  This fact also shows the government's

22  watchlisting scheme has a disproportionate effect on Muslims and is circumstantial evidence of

23  discriminatory intent. *Cf. Church of the Lukumi Babalu Aye*, 508 U.S. at 535. The effect of the

24  government's watchlisting scheme on Muslims is so harsh, intent to discriminate is not only a

25  permissible inference, it is also a necessary one. *See Flores*, 617 F.2d at 1389.

26  ///

27  ///

28

3.    The Government's Investigation Of Dr. Ibrahim And ███████ REDACTED ███████ Is Consistent With Its Intentional Discriminatory Treatment Of Muslims.

Dr. Ibrahim was the subject of a ███ international terrorism investigation, which ███████████████████████ ██████ REDACTED ██████. Kelley's interview of Dr. Ibrahim was consistent with FBI practices reported by numerous other Muslims. There is direct evidence that Special Agent Kelley told Dr. Ibrahim she may have been contacted because she was from Malaysia, and that Malaysia was blacklisted by the government. ██████ REDACTED ██████ ████████████████████████████████████████████, the evidence shows that the interview followed an ICE dragnet targeting persons from majority-Muslim countries, during Ramadan, when Dr. Ibrahim's husband had come to visit her after surgery. The FBI interrogated Dr. Ibrahim regarding a terrorist organization known to operate in Malaysia, her husband's "ideology," her own involvement in the local Muslim community, and her religious travel to Saudi Arabia. When defendants ██████ REDACTED ██████ ████████████████████████████████████████████████ ███████

Discriminatory motives can give rise to an equal protection claim even where there are objective indicia of suspicion to satisfy the Fourth Amendment. *See Morgan v. City of Pleasant Hill*, 2005 U.S. Dist. LEXIS 40382, at *18 (N.D. Cal. 2005) (*citing Farm Labor Organizing Comm. v. Ohio*, 308 F.3d 523, 533 (6th Cir. 2002)). Given defendants' admission that ███ ████████████ REDACTED ████████████, and publicly known information about the FBI's treatment of the Muslim community during the relevant timeframe, intentional discrimination is very likely the reason she was targeted for a ███ international terrorism investigation, and therefore ████████ REDACTED ████████ as a matter of routine procedure. Dr. Ibrahim is entitled to a declaration, judgment, and order that ████████████ REDACTED ████████████ violated her right to equal protection, and an injunction requiring defendants to set aside ██████ REDACTED ██████ ████████████████████████████████████████████ ███████

PLAINTIFF'S TRIAL BRIEF; CASE NO. C 06-0545 WHA

1

**CONCLUSION**

2      Defendants' watchlisting scheme ████████REDACTED████████ violates long-standing

3 constitutional principles that define the United States as a nation.  Such conduct is not only

4 illegal, it is an attack on our collective identity as Americans.  The eyes of the world are upon us

5 as we struggle to preserve these values.  Dr. Ibrahim respectfully requests that the Court uphold

6 them by granting the relief requested in this brief and in the parties' Joint Proposed Final Pretrial

7 Order.

8

9 Dated: November 12, 2013                         McMANIS FAULKNER

10

11                                                                /s/  Christine Peek_____
                                                                 CHRISTINE PEEK

12
                                                                 Attorneys for Plaintiff,
13                                                               RAHINAH IBRAHIM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28