JAMES McMANIS (40958)
ELIZABETH PIPKIN (243611)
CHRISTINE PEEK (234573)
JENNIFER MURAKAMI (273603)
McMANIS FAULKNER
A Professional Corporation
50 W. San Fernando, 10th Floor
San Jose, CA  95113
Telephone:     (408) 279-8700
Facsimile:      (408) 279-3244
cpeek@mcmanislaw.com

Attorneys for Plaintiff,
Rahinah Ibrahim

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHINAH IBRAHIM, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>        Defendants. | CASE NO. C 06-0545 WHA<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE AT TRIAL – REDACTED**<br><br>Complaint Filed: January 27, 2006<br>Trial Date: December 2, 2013 |

# TABLE OF CONTENTS

I.    **DEFENDANTS' POLICIES AND PROCEDURES ON TERRORIST WATCHLISTING, WATCHLIST NOMINATIONS, AND INVESTIGATIONS**..................................................................................1

    A.    **Trial Exhibit No. 13:** U.S. Department of State List of Designated Foreign Terrorist Organizations.....................................1

    B.    **Trial Exhibit No. 58:** NCIC Code Manual ......................................1

    C.    **Trial Exhibit No. 59:** NCIC Technical and Operational Update 04-3 ...............................................................................................2

    D.    **Trial Exhibit No. 251:** General Accounting Office, May 2012, Routinely Assessing Impacts of Agency Actions Since the December 25, 2009, Attempted Attack Could Help Inform Future Efforts ..............................................................................................3

    E.    **Trial Exhibit No. 502:** Homeland Security Presidential Directive 2, October 29, 2001...........................................................................4

    F.    **Trial Exhibit No. 506:** FOIA response from U.S. Department of Justice, Federal Bureau of Investigation to Andrew Christy, dated September 13, 2011 ........................................................................5

    G.    **Trial Exhibit No. 512:** Department of Homeland Security, Office of the Inspector General, The DHS Process for Nominating Individuals to the Consolidated Terrorist Watchlist, February 2008 ......................................................................................7

    H.    **Trial Exhibit No. 516:** Page from the FBI's website entitled Current FBI File Classification List (1st Quarter Fiscal Year 2008) ..................................................................................................7

    I.    **Trial Exhibit No. 517:** Respondents' Notice of Filing of the Record and Statement Regarding the Record (*Ibrahim v. DHS*, D.C. Circuit Case No. 06-1218), July 13, 2009..............................8

    J.    **Trial Exhibit No. 519:** Response to Petitioner's Motion to Compel the Complete Administrative Record, or in the Alternative, to Supplement the Record (*Ibrahim v. DHS*, D.C. Circuit Case No. 06-1218), September 3, 2009...................................................9

    K.    **Trial Exhibit No. 522:** Department of Homeland Security, Transportation Security Administration, Secure Flight Program, 73 Fed. Reg. 209, 64018 (Oct 28, 2008)...........................................9

L.   **Trial Exhibit No. 666:** Archive - National Commission on Terrorist Attacks Upon the United States, Statement of Russell E. Travers .................................................................................. 10

II.   **CONSOLIDATED WATCHLIST ERRORS AND UNRELIABILITY.** ............... 11

A.   **Trial Exhibit No. 101:** U.S. Department of Justice, Office of the Inspector General Audit Division, Review of the Terrorist Screening Center, Audit Report 05-27 ........................... 11

B.   **Trial Exhibit No. 102:** U.S. Department of Justice, Office of the Inspector General, Audit Division, Follow-up Audit of the Terrorist Screening Center, Audit Report 07-41 ............................ 13

C.   **Trial Exhibit No. 508:** U.S. Department of Justice, Office of the Inspector General, Audit Division, Audit of the U.S. Department of Justice Watchlist Nomination Process, Audit Report 08-16 .................... 15

D.   **Trial Exhibit No. 638:** United States Senate Subcommittee on Investigations, Homeland Security and Foreign Affairs Committee, Federal Support for and Involvement in State and Local Fusion Centers, Majority and Minority Report Staff .......................... 16

III.   **CONGRESSIONAL TESTIMONY AND RELATED MATERIALS.** .................. 18

A.   **Trial Exhibit No. 238:** United States Government Accountability Office, Report to Congressional Requesters, Terrorist Watchlist Screening, Opportunities Exist to Enhance Management Oversight, Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List ........................ 18

B.   **Trial Exhibit No. 250:** House Judiciary Testimony, March 24, 2010 ................................................................................. 19

C.   **Trial Exhibit No. 729:** Federal Bureau of Investigation Director Robert S. Mueller, III, April 23, 2008, Testimony before the House Judiciary Committee ................................................... 20

IV.   **PROFILING, BIASED TRAINING, AND BIASED INVESTIGATIVE TECHNIQUES** ........................................................ 21

A.   **Trial Exhibit Nos. 84-90 and 657-665:** (FBI Mosque Outreach Program) ............................................................................. 21

B.   **Trial Exhibit No. 93:** FBI FOIA response to request by ACLU for documents reflecting training materials ................................... 25

C.   **Trial Exhibit No. 95:** FBI Press Release, Response to Media Reporting Regarding Counterterrorism Training ......................... 27

1

2

D.    **Trial Exhibit No. 536:** Letter and FOIA response from FBI to Dr. Ivan Greenberg re FOIPA No. 1114232-002 (October Plan).................28

3

4

5

E.    **Trial Exhibit No. 680:** Declarations of Craig Monteilh Submitted by Plaintiffs in Support of Their Oppositions to Motions to Dismiss (*Fazaga v. Federal Bureau of Investigation, et al.*, U.S.D.C. Case No. SA CV 11-00301 CJC)...................................................30

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

# TABLE OF AUTHORITIES

**Cases**

*321 Studios v. MGM Studios, Inc.,*
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) .................................................................. 11

*Anschutz Corp. v. Merrill Lynch & Co.,*
   785 F. Supp. 2d 799 (N.D. Cal. 2011) ............................................................... 10, 20

*B.T. Produce Co. v Robert A. Johnson Sales, Inc.,*
   354 F. Supp. 2d 284 (S.D.N.Y. 2004).......................... 4, 6, 7, 10, 13, 15, 16, 17, 19, 24, 26, 29

*Barron v. Reich,*
   13 F.3d 1370 (9th Cir. 1994) ............................... 2, 3, 4, 6, 7, 10, 13, 15, 16, 17, 19, 24, 26, 29

*Bennett v. Medtronic, Inc.,*
   285 F.3d 801 (9th Cir. 2002) ..................................................................... 8, 9, 30

*Blair v City of Pomona,*
   223 F.3d 1074 (9th Cir. 2000) ............................................................................ 4

*Brown v. Valoff,*
   422 F.3d 926 (9th Cir. 2005) ........................................................................... 2, 3

*Casas-Castrillon v. DHS,*
   535 F.3d 942 (9th Cir. 2008) .............................................................................. 8

*Chhetry v. U.S. Dep't of Justice,*
   490 F.3d 196 (2d Cir. 2007)........................................................... 25, 26, 28, 29

*Christiansen v. Wells Fargo Bank,*
   2012 U.S. Dist. LEXIS 142070, *2, n.2 (N.D. Cal. 2012) ...................... 1, 5, 8, 24, 26, 29

*Del Puerto Water Dist. v United States Bureau of Reclamation,*
   271 F.Supp.2d 1224 (E.D. Cal. 2003).......................... 4, 6, 7, 10, 13, 15, 16, 17, 19, 24, 26, 29

*Fazaga v. Federal Bureau of Investigation, et al.,*
   U.S.D.C. Case No. SA CV 11-00301 CJC ................................................................ 30

*Heliotrope Gen., Inc. v. Ford Motor Co.,*
   189 F.3d 971 (9th Cir. 1999) ........................................................... 25, 28, 30

*Holder v. Holder,*
   305 F.3d 854 (9th Cir. 2002) .............................................................................. 9

*Ibrahim v. DHS,* D.C. Circuit Case No. 06-1218 ................................................. 8, 9

*Ieradi v. Mylan Laboratories, Inc.,*
   230 F.3d 594 (3rd Cir. 2000).......................................................... 25, 26, 28, 29

iv

*Lyons Milling Co. v. Goffe & Carkener, Inc.*,
  46 F.2d 241 (10th Cir. 1931) ................................................................. 1, 5, 8

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................. 8, 13, 15, 16

*Matthews v. National Football League*,
  688 F.3d 1107 (9th Cir. 2012) ............................................ 25, 26, 28, 29

*Metoyer v. Chassman*,
  504 F.3d 919 (9th Cir. 2007) ............................................ 25, 26, 28, 30

*O'Toole v. Northrop Grumman Corp.*,
  499 F.3d 1218 (10th Cir. 2007) .......... 1,2, 3, 4, 5, 6, 7, 8, 10, 13, 15, 16, 17, 19, 24, 26, 28, 29

*Peters v. Delaware River Port Auth.*,
  16 F.3d 1346 (3d Cir. 1994) ................................................. 25, 26, 28, 29

*Torrens v. Lockheed Martin Servs. Group, Inc.*,
  396 F.3d 468 (1st Cir. 2005) ................................ 4, 6, 7, 10, 13, 15, 16, 17, 19, 24, 26, 29

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo*,
  971 F.2d 244 (9th Cir. 1992) ................................................................. 8

*United States v. Ferguson*,
  681 F.3d 826 (6th Cir. 2012) ................................................................. 9

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) .............................................. 25, 28, 30

*Wietschner v. Monterey Pasta Co.*,
  294 F. Supp. 2d 11028 (N.D. Cal. 2003) ............................................ 28

**Statutes**

44 U.S.C. § 1507 ................................................................. 12

Rule 401 of the Federal Rules of Evidence ................................... *passim*

**Other Authorities**

21B Charles Alan Wright, et al., Federal Practice and Procedure § 5106.4 (2d ed. 2005) ........... 9

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

Plaintiff, Rahinah Ibrahim ("plaintiff"), submits this Request for Judicial Notice of certain trial exhibits and facts contained therein.  Pursuant to Rule 201 of the Federal Rules of Evidence, plaintiff requests that this Court take judicial notice of the following facts and trial exhibits attached hereto as Exhibit A:

## I.   DEFENDANTS' POLICIES AND PROCEDURES ON TERRORIST WATCHLISTING, WATCHLIST NOMINATIONS, AND INVESTIGATIONS.

**A. Trial Exhibit No. 13:** U.S. Department of State List of Designated Foreign Terrorist Organizations

Plaintiff requests that the Court take notice of the following fact in Trial Exhibit No. 13, *available at* http://www.state.gov/j/ct/rls/other/des/123085.htm:

1. Jemaah Islamiya is on the Department of State's List of Designated Foreign Terrorist Organizations.  (*See* Trial Exhibit No. 13, p. 1.)

Legal Authority: Courts may take judicial notice of rules and orders of the executive departments of the federal government, as well as documents reflecting official agency acts. *Lyons Milling Co. v. Goffe & Carkener, Inc.*, 46 F.2d 241, 246 (10th Cir. 1931) (rules and orders made by the executive departments); *Christiansen v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 142070, *2, n.2 (N.D. Cal. 2012) (documents reflecting official acts); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007) (court may take judicial notice of a party's own publications on the Internet).

Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 13 and the facts contained therein are relevant because the evidence will show that Special Agent Kevin Kelley questioned Dr. Ibrahim about Jemaah Islamiya in December 2004.

**B. Trial Exhibit No. 58:** NCIC Code Manual

Plaintiff requests that the Court take judicial notice of the following facts concerning Trial Exhibit No. 58, *available at* http://www.scribd.com/doc/24035658/NCIC-2000-Code-Manual-December-2000:

1. The National Crime Information Center (NCIC) is a computerized index of criminal justice information available to federal, state, and local law enforcement and other criminal justice agencies.  *See* Exhibit B, National Crime Information Center, *available at* http://www.fbi.gov/about-us/cjis/ncic.  *O'Toole*, 499 F.3d at 1224-25.

2. The NCIC database includes 21 files: seven property files and 14 person files, including the Known or Appropriately Suspected Terrorist File (KSTF) (*see* Exhibit C, National Crime Information Center, NCIC files, *available at* http://www.fbi.gov/about-us/cjis/ncic/ncic_files), formerly known as the Violent Gang and Terrorist Organizations File (VGTOF). (*See* Exhibit D, National Crime Information Center, History and Milestones, *available at* http://www.fbi.gov/about-us/cjis/ncic/ncic_history.) *O'Toole*, 499 F.3d at 1224-25.

3. As of the year 2000, Entry Criteria Code C for the VGTOF Group Member Capability Criteria For Entry (ECR) Field Codes meant, "Corroborated identification as a group member by an informant or individual of unknown reliability." (*See* Trial Exhibit No. 58, p. P004123.)

4. As of the year 2000, Entry Criteria Code D for the VGTOF Group Member Capability Criteria For Entry (ECR) Field Codes meant, "Frequents a documented group's area, associates with known group members, and/or affects group dress, hand signals, tattoos, or symbols." (*See* Trial Exhibit No. 58, p. P004123.)

5. As of the year 2000, the ECR Field is mandatory and must have one of the following designations: A, BC, BD, BE, BF, CD, CE, CF, DE, DF, or EF. (*See* Trial Exhibit No. 58, p. P004123.)

Legal Authority: Courts may take judicial notice of the records and reports of administrative agencies, including internal manuals and handbooks. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (taking judicial notice of a Department of Labor Field Operations Handbook); *Brown v. Valoff*, 422 F.3d 926, 931 & n.7 (9th Cir. 2005) (taking judicial notice of a state Department of Corrections Operations Manual); *see id.* at 933, n.9 (taking notice of state administrative bulletin); *see also O'Toole*, 499 F.3d at 1224-25 (party failed to dispute its own information posted online).

Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 58 and the facts contained therein are relevant because codes ███████ REDACTED ███████

███████████████████████████████████████████

██████

**C. Trial Exhibit No. 59:** NCIC Technical and Operational Update 04-3

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 59, *available at* http://troopers.ny.gov/ejusticeny/communications/Artifacts/extranet/supportservices2/ncicpub/tou/nov2004.pdf:

1. On or about November 1, 2004, the NCIC 2000 Code Manual was updated. (*See* Trial Exhibit No. 59, p. P004375, P004389-90.)

2

2. As of November 1, 2004, Entry Criteria Code H for the VGTOF Group Member Capability Criteria For Entry (ECR) Field Codes meant, "Subject is suspected or believed to be associated with terrorism or a terrorist organization." (*See* Trial Exhibit No. 59, p. P004390.)

3. As of November 1, 2004, criteria H on its own may support entry. (*See* Trial Exhibit No. 59, p. P004389.)

Legal Authority: *Barron*, 13 F.3d at 1377; *Brown*, 422 F.3d at 931 & n.7; *O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 59 and the facts contained therein are relevant because ████████ REDACTED ████████

█████████████████████████████████████████████████████████████

████

**D. Trial Exhibit No. 251:** General Accounting Office, May 2012, Routinely Assessing Impacts of Agency Actions Since the December 25, 2009, Attempted Attack Could Help Inform Future Efforts

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 251, *available at* http://www.gao.gov/assets/600/591312.pdf:

1. Following the failed December 2009 attack by Umar Farouk Abdulmutallab, new watchlisting guidance was approved in 2010. The GAO found that: "[s]ince the guidance was approved, nominating agencies have expressed **concerns about the increasing volumes of information** and related challenges in processing this information and noted that the long-term impacts of the revisions may not be known for some time." (*See* Trial Exhibit No. 251, pp. TSC000893-894 (emphasis added).) For example, NCTC officials noted that in May 2010, "the **volume of incoming nominations exceeded NCTC's ability to process it**, resulting in a backlog" that was not resolved until October 2011. (*See id.*, p. TSC000894 (emphasis added).)

2. The CBP issues **"no-board" recommendations based on the Immigration and Nationality Act**, which the air carriers typically follow and which increased in number after the failed December 2009 attack:

Before the attempted attack, CBP assessed individuals who were departing from airports that had CBP Immigration Advisory Program officers on site. At airports without such a program, passengers in the TSDB but not on the No Fly List generally were allowed to board flights and travel to U.S. airports. Upon arrival at a U.S. port of entry, CBP would inspect the passengers and determine their admissibility. CBP continues to assess passengers through the Immigration Advisory Program for flights departing from airports that have a program presence.

For both the Pre-Departure Targeting Program and the Immigration Advisory Program, if CBP determines that a passenger would likely be deemed inadmissible upon arrival at a U.S. airport, it recommends that the air carrier not board that passenger (that is, it makes a **no board recommendation**). CBP generally makes these no board

3

recommendations **based on provisions for admissibility found in the Immigration and Nationality Act**.

(*Id.*, p. TSC000902-906 (emphasis added).)

Legal Authority: Courts may take judicial notice of official government records and reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens v. Lockheed Martin Servs. Group, Inc.*, 396 F.3d 468, 472-73 (1st Cir. 2005) (taking notice of letter by then-Acting Navy Secretary as "a legally significant event, like a treaty or a will"); *Del Puerto Water Dist. v United States Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) (taking judicial notice of a public report by the United States Bureau of Reclamation and a copy of the Bureau's "Integrated Key Milestones," which had been distributed to the public by the Department of Interior); *B.T. Produce Co. v Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285-86 & n.2 (S.D.N.Y. 2004) (taking judicial notice of U.S. Department of Agriculture report and analysis of a bribery incident involving USDA inspectors); *see also O'Toole*, 499 F.3d at 1224-25.  Courts also may take judicial notice of the findings of independent commissions. *Blair v City of Pomona*, 223 F.3d 1074, 1081 (9th Cir. 2000) (taking judicial notice of an independent commission's report on the code of silence among police officers).

Pursuant to Rule 401 of the Federal Rules of Evidence, officials' reported concerns about the size of the TSDB and its associated databases over time are relevant to the risk of an erroneous deprivation and the likelihood that defendants will be able to manage data effectively. Facts concerning uses of the TSDB and the Immigration and Nationality Act to deny boarding are relevant to the effect of ███ REDACTED ███ on plaintiff's protected liberty interest in the right to travel.

**E.  Trial Exhibit No. 502:** Homeland Security Presidential Directive 2, October 29, 2001

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 502, *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2001/10/20011030-2.html:

1. The President established the Foreign Terrorist Tracking Task Force (FTTTF) through Homeland Security Presidential Directive-2 as a multi-agency effort led by the Attorney General with assistance from the Secretary of State, the FBI, and other government agencies and officials.  (*See* Trial Exhibit No. 502, p. P001510.)

4

2.   The mission of the FTTTF is to ensure that federal agencies coordinate programs to: 1) deny entry into the United States of aliens associated with, suspected of being engaged in, or supporting terrorist activity; and 2) locate, detain, prosecute, or deport any such aliens already present in the United States.  (*Id.*, p. P001510.)

<u>Legal Authority</u>: Courts may take judicial notice of rules and orders of the executive departments of the federal government, as well as documents reflecting official agency acts. *Lyons Milling Co.*, 46 F.2d at 246; *Christiansen v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 142070, *2, n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the above facts are relevant because the FTTTF played an important role in standing up the Terrorist Screening Center (TSC) in 2003, as noted in Trial Exhibit No. 101, p. TSC000433, and in working with the Federal Bureau of Investigation (FBI) and Immigration and Customs Enforcement (ICE) to fulfill its mission, as noted in Trial Exhibit No. 729, p. TSC001179.  **REDACTED**

**F.   Trial Exhibit No. 506:** FOIA response from U.S. Department of Justice, Federal Bureau of Investigation to Andrew Christy, dated September 13, 2011

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 506, *available at* https://epic.org/privacy/airtravel/EPIC_DOJ_FOIA_NoFlyList_09_13_11.pdf:

1.   In response to a Freedom of Information Act (FOIA) request by Mr. Andrew Christy of the Electronic Privacy Information Center (EPIC), the FBI publicly released a version of a December 21, 2010 memorandum entitled Counterterrorism Program Guidance Watchlisting Administrative And Operational Guidance (*see* Trial Exhibit No. 506, pp. P001834-1862), which contains a description of the TSDB handling codes, as follows:

**Handling Code 1**
(U//FOUO) Handling Code 1 is for individuals for whom there is an **active arrest warrant** in the NCIC Wanted Persons File. The warrant number must be included on the FD-930 (refer to paragraph 1.4). If a subject is watchlisted with Handling Code 1 and the arrest warrant becomes invalid, the case agent must submit a new FD-930 to TREX to update the record.

. . .

**Handling Code 2**
(U//FOUO) Handling Code 2 is for individuals for whom the Department of Homeland Security (**DHS) has or will issue a detainer should the individual be encountered** by law enforcement.  A review of intelligence

5

records must precede nominations of individuals into the KST file with this handling code.  To use Handling Code 2, a review and approval for legal sufficiency by both the Chief Division Counsel and the Office of General Counsel (OGC) is required.  The TSC OGC representative, in coordination with the National Security Law Branch (NSLB), will provide such review and approval for OGC.

. . .

**Handling Code 3**
(U//FOUO) Handling Code 3 is for individuals who have been **watchlisted but do not meet the additional criteria required for Handling Code 1 or 2**.  These records must contain a first and last name and ANY Date of Birth (Circa Date of Birth, Year of Birth, or FULL Date of Birth).

(*Id.*, pp. P001838-1840 (emphasis added).)

2.  The FBI also released a version of Section 19-06 of its National Foreign Intelligence Program Manual ("NFIP"), which states in pertinent part as follows:

B. (U) Watchlisting Policy for Known or Appropriately Suspected Terrorists

1. The Counterterrorism Division's (CTD) policy requires that **all main IT subjects for both Full and Preliminary Investigations in the 315 classification** and all subjects of domestic terrorism (DT) Full Investigations in the 266 classification shall be nominated for entry Into the TSC's Terrorist Screening Database (TSDB) end all eligible supported systems if the subject meets the criteria for inclusion.

(*Id.*, p. P001863 (emphasis added).)

Legal Authority: Courts may take judicial notice of public records, including the records and reports of administrative agencies.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the FBI's policy of watchlisting all main IT subjects in the 315 classification is relevant because the publicly available FD-302 interview form concerning plaintiff bears "315" file numbers, and because ██ REDACTED ██ ████████████████████████████████████████████ ███████████████████████████████████████████ This is relevant to the analysis of the risk of an erroneous deprivation of protected liberty and property interests.  The facts concerning the handling codes are relevant to the government's alleged interest in its current procedures, because the publicly available evidence shows that the vast majority of watchlisted individuals fall within the lowest handling code.

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

**G. Trial Exhibit No. 512:** Department of Homeland Security, Office of the Inspector General, The DHS Process for Nominating Individuals to the Consolidated Terrorist Watchlist, February 2008

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 512, *available at* http://www.oig.dhs.gov/assets/Mgmt/OIG_08-29_Feb08.pdf:

1.  The policy of the U.S. Customs and Border Protection (CBP) regarding watchlisting of individuals suspected of having terrorist connections, who are identified at ports of entry, is as follows: "When individuals with suspected terrorist connections are identified by CBP at POEs, the information must go to the FBI.  The normal procedure is for CBP to **notify the Joint Terrorism Task Force (JTTF)**.  In these instances CBP will not make a nomination because the **FBI will process the nomination through the NCTC**."  (Trial Exhibit No. 512, p. P001649 (emphasis added).)

2.  The policy of Immigration and Customs Enforcement (ICE) regarding watchlisting of individuals suspected of having terrorist connections is as follows: "ICE agents in the United States did not make any nominations to the watchlist.  The Department of Justice has the jurisdiction for investigating and prosecuting domestic terrorism cases while ICE is responsible for enforcing immigration and customs laws.  Not having domestic jurisdiction over terrorist-related cases reduces the occasions ICE would have to make watchlist nominations.  ICE agents overseas can, and do, make nominations directly to the NCTC.  However, **ICE is represented on the JTTF and any derogatory information ICE develops about individuals who could be nominated, is submitted through the JTTF**."  (*Id.*, p. P001651 (emphasis added).)

Legal Authority: Courts may take judicial notice of official government records and reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, DHS's policies and procedures, and specifically the fact that watchlist nominations are submitted through the JTTF, are relevant because ████████████████ REDACTED ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████

**H. Trial Exhibit No. 516:** Page from the FBI's website entitled Current FBI File Classification List (1st Quarter Fiscal Year 2008)

Plaintiff requests that the Court take judicial notice of the existence of Trial Exhibit No. 516 on the FBI's public website, and the fact that it states that file classification 315 refers to

7

1   "International Terrorism Investigations."  (*See* Trial Exhibit No. 516, p. 3.)  Trial Exhibit No.

2   516 is available at http://www.fbi.gov/foia/current-fbi-file-classification-list-1st-quarter-fy2008.

3       Legal Authority: Courts may take judicial notice of rules and orders of the executive

4   departments of the federal government, as well as documents reflecting official agency acts.

5   *Lyons Milling Co.*, 46 F.2d at 246; *Christiansen v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS

6   142070, *2, n.2; *see also O'Toole*, 499 F.3d at 1224-25 (court may take judicial notice of a

7   party's own publications on the Internet).

8       Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 516 is relevant

9   because it demonstrates that plaintiff was the subject of an international terrorism investigation,

10  in combination with other public records that show "315" file numbers associated with Special

11  Agent Kelley's interview of plaintiff.  ██████████████ REDACTED ██████████████

12  █████████████████████████████████████████████████████████████████

13  ████████████████████████     This conclusion is significant because defendants'

14  publicly available policies and procedures state that all main international terrorism suspects in

15  the 315 classification will be included in the consolidated Terrorist Screening Database.  This is

16  relevant to plaintiff's due process claim because ████████ REDACTED ████████ based on

17  nothing more than the opening of an investigation tends to increase the risk of an erroneous

18  deprivation.  *See Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976).

19  **I.   Trial Exhibit No. 517:** Respondents' Notice of Filing of the Record and Statement
        Regarding the Record (*Ibrahim v. DHS*, D.C. Circuit Case No. 06-1218), July 13, 2009

20      Plaintiff requests that the Court take judicial notice of the fact that the administrative

21  record produced by the TSA in plaintiff's D.C. Circuit challenge to the TSA's policies and

22  procedures regarding the No Fly and Selectee lists consisted only of four redacted security

23  directives that did not reference plaintiff on their face.

24      Legal Authority:  Courts may take judicial notice of matters of record in other

25  proceedings.  *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803, n.2 (9th Cir. 2002) (*quoting United*

26  *States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir.

27  1992)); *see also Casas-Castrillon v. DHS*, 535 F.3d 942, 952 (9th Cir. 2008) (taking judicial

28  notice of portion of the administrative record).

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

1      Pursuant to Rule 401 of the Federal Rules of Evidence, the notice of filing the record is

2  relevant because defendants contend, and plaintiff denies, that defendants' current DHS TRIP

3  procedures are adequate to satisfy the constitutional requirement of due process.  Trial Exhibit

4  517 demonstrates that the "record" produced in plaintiff's D.C. Circuit challenge to the TSA's

5  policies and procedures, including its "final order" regarding plaintiff's Passenger Identity

6  Verification Form, consisted merely of four redacted security directives and is not adequate to

7  provide meaningful notice or opportunity to be heard.

8      **J.   Trial Exhibit No. 519:** Response to Petitioner's Motion to Compel the Complete
       Administrative Record, or in the Alternative, to Supplement the Record (*Ibrahim v. DHS*,
9      D.C. Circuit Case No. 06-1218), September 3, 2009

10      Plaintiff requests that the Court take judicial notice of the fact that when plaintiff moved

11  to compel the complete administrative record in the D.C. Circuit action, or in the alternative, to

12  supplement the record, that the TSA opposed her motion.

13      Legal Authority: *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (*quoting*

14  21B Charles Alan Wright, et al., Federal Practice and Procedure § 5106.4 (2d ed. 2005)); *see*

15  *also Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002) (notice of briefs filed in state court);

16  *Bennett*, 285 F.3d at 803, n.2.

17      Pursuant to Rule 401 of the Federal Rules of Evidence, the TSA's opposition to

18  plaintiff's motion is relevant because it demonstrates that the current redress procedures of the

19  DHS and TSA do not provide meaningful notice or opportunity to be heard, because these

20  agencies have frustrated any effort to discover facts that would assist Dr. Ibrahim in obtaining

21  relief.

22      **K.  Trial Exhibit No. 522:** Department of Homeland Security, Transportation Security
       Administration, Secure Flight Program, 73 Fed. Reg. 209, 64018 (Oct 28, 2008)
23
        Plaintiff requests that the Court take judicial notice of the TSA's final rule implementing
24
    the Secure Flight program, which states in pertinent part:
25
            However, as recommended by the 9/11 Commission and as required under the
26          IRTPA, TSA may use 'the larger set of watch lists maintained by the Federal
            government' when warranted by security considerations.  For example, TSA may
27          learn that flights on a particular route may be subject to increased security risk.
            Under this circumstance, TSA may decide to compare passenger information on
28          some or all of the flights on that route against the full TSDB or other government

9

1    databases, such as intelligence or law enforcement databases.

2  (*See* Trial Exhibit No. 522, 73 Fed. Reg. 209, p. 64019.)

3        Legal Authority: The contents of the Federal Register are judicially noticeable.  44

4  U.S.C. § 1507.

5        Pursuant to Rule 401 of the Federal Rules of Evidence, the TSA's final rule is relevant

6  because it tends to show how placement in the TSDB affects individuals' protected liberty

7  interest in the right to international travel.

8      **L.  Trial Exhibit No. 666:** Archive - National Commission on Terrorist Attacks Upon the
        United States, Statement of Russell E. Travers

9        Plaintiff requests that the Court take judicial notice of the following statements appearing

10  in Trial Exhibit No. 666, *available at* http://govinfo.library.unt.edu/911/hearings/hearing7

11  /witness_travers.htm:

12      1.  "The merger of the TIPOFF and TTIC programs will provide federal officials with
            the capability to access a unified and comprehensive list – currently consisting of
13          more than 120,000 records."  (Trial Exhibit No. 666, pp. P003645-3646.)

14      2.  As of 9/11/01 there were **61,489** records in TIPOFF.  (*Id.*, P. P003648.)

15      3.  As of 1/8/04 there were **120,012** records in TIPOFF, an increase of **95%**.  (*Id.*, p.
16          P003648.)

17      4.  As of 9/11/01 there were **48,161** records in CLASS.  (*Id.*, p. P003648.)

18      5.  As of 1/8/04 there were **100,510** records in CLASS, an increase of **109%**.  (*Id.*, p.
            P003648.)
19
        6.  As of 9/11/01 there were **23,375** records in IBIS.  (*Id.*, p. P003649.)
20
        7.  As of 1/8/04 there were **57,710** records in IBIS, an increase of **147%**.  (*Id.*, p.
21          P003649.)

22        Legal Authority: Courts may take judicial notice of official government records and

23  reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-

24  73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86

25  & n.2; *see also O'Toole*, 499 F.3d at 1224-25.  Courts may take judicial notice of the fact that

26  statements were made in testimony before Congress.  *See Anschutz Corp. v. Merrill Lynch &*

27  *Co.*, 785 F. Supp. 2d 799, 834 (N.D. Cal. 2011) (*citing 321 Studios v. MGM Studios, Inc.*, 307 F.

28  Supp. 2d 1085, 1107 (N.D. Cal. 2004)).

---

10

Pursuant to Rule 401 of the Federal Rules of Evidence, the statement that the newly created unified terrorist watchlist contained more than 120,000 records as of January 26, 2004, and the statements concerning the increase in size of the TIPOFF, CLASS, and IBIS databases are relevant because they are public representations by a government official of the size of the lists at that time.  The changes in size of the TSDB and its associated databases over time are relevant to the risk of an erroneous deprivation and the likelihood that the TSC will ever be able to correct the errors in the TSDB or manage its data effectively.

## II.    CONSOLIDATED WATCHLIST ERRORS AND UNRELIABILITY.

**A. Trial Exhibit No. 101:** U.S. Department of Justice, Office of the Inspector General Audit Division, Review of the Terrorist Screening Center, Audit Report 05-27

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 101, *available at* http://www.justice.gov/oig/reports/FBI/a0527/final.pdf:

1. In order for the TSC to begin operating by December 1, 2003, it was co-located with the Foreign Terrorist Tracking Task Force (FTTTF).  The FTTTF provided space, equipment, personnel, and technological and financial support to assist in the creation of the TSC.  (Trial Exhibit No. 101, p. TSC000433.)

2. As of December 1, 2003, the consolidated watchlist was not ready to be used for screening purposes.  (*Id.*, p. TSC000401.)

3. As of December 1, 2003, the TSC's protocol was to separately query a variety of existing agency watchlist systems, including (a) Transportation Security Administration's No Fly and Selectee Lists; (b) TIPOFF; (c) the FBI's NCIC, namely the Violent Gang and Terrorist Organizations File; and (d) the Treasury Enforcement Communications System (TECS), which included the Interagency Border Inspection System (IBIS) and the National Automated Immigration Lookout System (NAILS).  (*Id.*, p. TSC000401-402.)

4. The TSC divided the creation of the consolidated database (TSDB) into three phases: (a) TSDB 1A; (b) TSDB 1B; and (c) Advent TSDB.  (*Id.*, p. TSC000402.)

5. TSDB 1A became operational on March 12, 2004, and was discontinued on April 1, 2005.  (*Id.*, p. TSC000402.)  TSDB 1A was populated with data received directly from the individual supporting agencies' watchlist systems.  (*Id.*, pp. TSC000402, TSC000441.)  Neither the TSC nor the participating agencies reviewed the data prior to its transfer to the TSC because of time constraints and the volume of work involved.  (*Id.*, p. TSC000442.)  TSC officials acknowledged that this method of transfer caused some names that appeared on multiple watchlists to be present in the TSDB many times.  (*Id.*, pp. TSC000402.)

6. TSDB 1B came online in June 2004.  (*Id.*, p. TSC000403.)  TSC officials had concerns about the completeness of records in the TSDB 1B and decided to run TSDB 1A and 1B in parallel until these concerns could be fully addressed.  (*Id.*, p. TSC000403, n.8, TSC000443.)

7.  TSC did not establish a formal technical advisory group until June 2004 and hired its first Chief Information Officer (CIO) in August 2004.  (*Id.*, p. TSC000404.)  The CIO stated that the IT Branch was understaffed and had not been sufficiently focused on establishing controls to ensure data integrity.  (*Id.*, p. TSC000404, TSC000447.)

8.  The vast majority of the 109,849 records sampled by the auditors were included in the two lowest handling code categories.  (*Id.*, p. TSC000404-405.)  Approximately **75%** of the records were categorized as **handling code 4** (the lowest code), and another **22%** were categorized at **handling code 3** (the second lowest).  (*Id.*, p. TSC000405, TSC000449-450.)  Only 318 records were identified at handling codes 1 and 2, the highest levels.  (*Id.*, p. TSC000450.)

9.  Individuals at handling code 4 often do not have enough identifying information to categorize the individual at a higher handling code.  (*Id.*, p. TSC000405, n.10.)  They also could be associates of a suspected terrorist and therefore may not pose a direct terrorist threat.  (*Id.*, p. TSC000405, n.10.)

10.  The TSC Director informed the auditors that, "to err on the side of caution, individuals with any degree of a terrorism nexus were included on the consolidated watch list, as long as minimum criteria was met (i.e., the person's name was partially known plus one other piece of identifying information, such as the date of birth). The Director further explained that one of the **benefits** of watch listing individuals who pose a lower threat was that their **movement could be monitored through the screening process and thereby provide useful intelligence information** to counterterrorism investigators. In addition, she stated that lower-threat level individuals can have associations with higher-threat level terrorists, and **watch listing lower-threat individuals may lead to uncovering the location of other watch list individuals**."  (*Id.*, p. TSC000405-406 (emphasis added).)

11.  On October 22, 2004, NCTC officials estimated there were approximately 170,000 unique individuals who were known to the U.S. government as known or suspected terrorists or has having ties to terrorism.  (*Id.*, p. TSC000469.)

12.  As of January 2005, the TSDB 1A and 1B included a total of **455,002 and 237,615 records**, respectively.  (*Id.*, p. TSC000409, TSC000469.)  The difference in the number of records resulted from "the TSC's decision, in its early days of operation, to accept **less than optimal data** in order to quickly develop a comprehensive database."  (*Id.*, p. TSC000409, TSC000469 (emphasis added).)  As of March 2005, the TSC reported it had reduced the difference to 40,200 records existing in TSDB 1A but not TSDB 1B.  (*Id.*, p. TSC000409.)

13.  In reviewing the TSDB 1B records, auditors discovered 31 duplicate records, 336 records with no handling code assigned, and 31,954 records that were categorized as "armed and dangerous" but had handling code instructions for the lowest level handling code.  (*Id.*, p. TSC000409-10, TSC000470-475.)

14.  "The Interagency Border Inspection System (IBIS) resides on the DHS's Treasury Enforcement Communications System, or TECS, a large computerized information system containing more than a billion records in 700 tables, designed to identify individuals, businesses, and vehicles suspected of or involved in violation of federal law."  (*Id.*, p. TSC000427.)

15.  "The Consular Lookout and Support System (CLASS) is the State Department's tool for vetting foreign individuals applying for visas to the United States. Maintained by the Bureau of Consular Affairs, the CLASS visa database provides information on aliens that is used in the determination of whether visa issuance is appropriate. This

12

database receives information from TIPOFF on individuals associated with or suspected of terrorism and acts as a watch list during the visa issuance process and other processes involving name-checks at State Department Consular Affairs posts throughout the world."  (*Id.*, p. TSC000427-28, TSC000458-459.)

16. As of October 2004, 3,673 records had been removed from the TSDB 1B since its creation in June 2004.  (*Id.*, p. TSC000463.)

17. The auditors noted problems with duplicate records in the TSDB and stated, "The TSDB should not contain multiple records with completely identical identifying information."  (*Id.*, p. TSC000470-472.)

<u>Legal Authority</u>: Courts may take judicial notice of official government records and reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the above facts are relevant because they tend to show that from its inception, the TSDB was plagued by inconsistent data and inadequate IT support and infrastructure, which increases the risk of an erroneous deprivation of protected liberty and property interests.  *See Mathews*, 424 U.S. at 333-35.  They also show that from its inception, the TSDB has included a significant number of individuals who do not pose a direct terrorist threat, which relates to the risk of error and the government's alleged interest in its current watchlisting procedures.  Finally, they provide relevant background information about the nature and purpose of defendants' various terrorist watchlists and associated databases.

**B. Trial Exhibit No. 102:** U.S. Department of Justice, Office of the Inspector General, Audit Division, Follow-up Audit of the Terrorist Screening Center, Audit Report 07-41

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 102, *available at* http://www.justice.gov/oig/reports/FBI/a0741/final.pdf:

1. As of February 2006, the TSC reported that the TSDB contained approximately 400,000 records.  (*Id.*, p. TSC000124.)

2. "Since April 2004, the TSDB has more than quadrupled in size, growing from 150,000 to **724,442 records** in April 2007."  (*Id.*, p. TSC000110.)

3. The auditors expressed concern that the TSC's ongoing review of the watchlist was taking longer than projected.  As of April 2007, "the TSC was continuing its efforts to conduct a record-by-record review of the consolidated watchlist and anticipated that all watchlist records would be reviewed by the end of 2007.  **However, the watchlist database continues to increase by an average of over 20,000 records per month**

13

**and contained over 700,000 records as of April 2007**." Given this growth and the TSC's weak quality assurance process, the auditors believed the TSC was "underestimating the time required to sufficiently review all watchlist records for accuracy." (Trial Exhibit No. 102, pp. TSC000096-97 (emphasis added), TSC000109-111.) The auditors concluded that "the TSC is identifying incomplete or inaccurate information in TSDB records faster than the matters are being resolved by source agencies." (*Id.*, pp. TSC000110, TSC000157-158.)

4.   As of July 2006, the No Fly List contained 71,872 records. (*Id.*, p. TSC000106.) As of January 31, 2007, the date the TSC completed its special review of the No Fly List, the No Fly List contained 34,230 records. (*Id.*, p. TSC000106.) The **TSC recommended 22,412 records for removal from the No Fly List** and placement on the Selectee List. (*Id.*, p. TSC000106.) The TSC determined that another **5,086 records did not require inclusion on either the No Fly List or the Selectee List**. (*Id.*, p. TSC000106.)

5.   As of the date of the audit, the TSC was still running two versions of the TSDB in tandem, because the web-based version known as "TSDB NTP" was "unable to export watchlist data to most screening agencies or process expedited and domestic terrorist nominations into the TSDB." (*Id.*, pp. TSC000129-130.) The auditors found that the two versions of the TSDB were not synchronized, "which caused inconsistent record counts between the two systems." As a result, the auditors noted that "records had been inappropriately maintained in the TSDB without any watchlist designation." (Id., pp. TSC000130-131, TSC000133.)

6.   TSC officials informed the auditors that "in September 2006 they had identified 2,682 records in the TSDB that were not being exported to any screening database. Working with NCTC, the TSC determined that **2,118 of these records should not have been watchlisted in any system** and needed to be removed from the TSDB." (*Id.*, p. TSC000100 (emphasis added).) On April 27, 2007, "the TSC implemented an information technology solution to delete these records." (*Id.*, p. TSC000100, n. 9.)

7.   As of March 2007, the auditors had identified **6,262 duplicate TSDB records** (meaning the records contained the same identifying information for five primary identifying fields), and at least 20% of those "had some discrepancy in handling instruction, identifying information, or watchlist export designation." (*Id.*, pp. TSC000103-104.)

8.   The auditors found that the TSC's redress reviews were not always completed in a timely manner. (*Id.*, p. TSC0000097, TSC000107, TSC000112-113.)

9.   The auditors found that TSC had no procedure for reviewing records to ensure that only appropriate records were included in the TSDB, despite being responsible for removing outdated or obsolete data. (*Id.*, p. TSC000100.)

10.   The auditors reviewed 156 TSDB records that had been subjected to TSC's quality assurance procedures, 105 of which had been reviewed (a) as incoming watchlist data ("single review queue") or (b) after a watchlist encounter. (*Id.*, p. TSC000105.) Of these 105, **38% "continued to contain errors or inconsistencies that were not identified through TSC's quality assurance efforts**." (*Id.*, p. TSC000105-107.)

11.   The auditors found that TSC's own redress activities identified a high rate of error in watchlist records, with **45% of the watchlist records relating to redress complaints requiring modification or deletion** from the watchlist. (*Id.*, p. TSC000112.) This number did not include "records that were modified or removed as part of a redress inquiry by a misidentified individual," which TSC did not track. (*Id.*, p. TSC000170,

14

n.64.)  **Twenty percent of the complaints reviewed necessitated removing the complainant's identity from the watchlist**.  (*Id.*, p. TSC000170-171.)  The Privacy Officer acknowledged that "the high percentage of records requiring modification or removal may point to **deficiencies in the terrorist watchlist nomination process** and with nominating agencies not providing the TSC important information for updating terrorist records."  (*Id.*, p. TSC000112 (emphasis added).)

12. The auditors' file review found that the Department of State and DHS's Customs and Border Protection "did not revise encounter records in a screening database in a timely fashion to reflect modified or removed terrorist records."  (*Id.*, p. TSC000113.)

13. As of March 6, 2007, **96.8%** of the records in the TSDB were designated **handling code 3**.  (*Id.*, p. TSC000126.)

<u>Legal Authority</u>: Courts may take judicial notice of official government records and reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the above facts are relevant because they tend to show that the TSDB has a high rate of error, and specifically, a high rate of TSDB records that should not be in the TSDB, which increases the risk of an erroneous deprivation of protected liberty and property interests.  *See Mathews*, 424 U.S. at 333-35.  They also show that the TSDB has included a significant number of individuals who do not pose a direct terrorist threat, which relates to the risk of error and the government's alleged interest in its current watchlisting procedures.

**C. Trial Exhibit No. 508:** U.S. Department of Justice, Office of the Inspector General, Audit Division, Audit of the U.S. Department of Justice Watchlist Nomination Process, Audit Report 08-16

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 103, *available at* http://www.justice.gov/oig/reports/plus/a0816/final.pdf:

1.  "In general, individuals who are subjects of ongoing FBI counterterrorism investigations are nominated to TSC for inclusion on the watchlist, including persons who are being preliminarily investigated to determine if they have links to terrorism." (Trial Exhibit No. 508, p. TSC000007.)

2.  The auditors found that the FBI was not always removing records from the watchlist when it was appropriate to do so.  (*Id.*, p. TSC000003.)  "Additionally, TREX and TSC personnel stated that FBI field offices are not always requesting the removal of watchlisted individuals when closing an investigation. While there are circumstances allowing the FBI to maintain a watchlist record on individuals for whom it has closed an investigation, TREX and TSC officials believed that **often individuals inappropriately remained watchlisted** because the case agents did not file the

15

paperwork necessary to effect their removal." (*Id.*, p. TSC000010.)

3. The auditors recommended that: "watchlist records on individuals determined to have no nexus to terrorism should be removed from the database to improve the accuracy of the list and to reduce the risk that innocent individuals will be stopped or detained as a result of outdated watchlist records." (*Id.*, p. TSC000012.)

4. Although the FBI provided training on watchlisting to various FBI personnel, "some field personnel did not follow FBI watchlist nomination procedures.  For example, some FBI personnel failed to modify or remove watchlist records when appropriate, while others bypassed FBI headquarters and submitted nominations directly to NCTC." (*Id.*, pp. TSC000012-13.)

Legal Authority: Courts may take judicial notice of official government records and reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the above facts are relevant because they tend to show that FBI personnel failed to remove watchlisted individuals when appropriate, despite having received training, which increases the risk of an erroneous deprivation of protected liberty and property interests.  *See Mathews*, 424 U.S. at 333-35.

**D. Trial Exhibit No. 638:** United States Senate Subcommittee on Investigations, Homeland Security and Foreign Affairs Committee, Federal Support for and Involvement in State and Local Fusion Centers, Majority and Minority Report Staff

Plaintiff requests that the Court take judicial notice of the following facts concerning, and statements in Trial Exhibit No. 638, which is available at the link at http://www.hsgac.senate.gov/subcommittees/investigations/reports?c=112:

1. In 2012, the Permanent Subcommittee on Investigations issued a report summarizing its investigation of federal support for state and local fusion centers, which are defined as: "a collaborative effort of 2 or more Federal, State, local, or tribal government agencies that combines resources, expertise, or information with the goal of maximizing the ability of such agencies to detect, prevent, investigate, apprehend, and respond to criminal or terrorist activity." (*See* Trial Exhibit No. 638, pp. P001084, P001088-1092.)

2. As part of its investigation, the Subcommittee reviewed draft intelligence reports known as "Homeland Intelligence Reports" (HIRs) or alternately, "Intelligence Information Reports" (IIRs), submitted to DHS by the fusion centers, including drafts marked by DHS reviewers as cancelled. (*Id.*, pp. P001101-1102, P001114-1115.)

3. Concerning requests to cancel draft HIRs about individuals with records in the Terrorist Identities Datamart Environment (TIDE), the Subcommittee wrote: "While reporting information on an individual who is listed in the TIDE database sounds

16

1    significant, the Subcommittee found that DHS officials tended to be skeptical about
the value of such reporting, **because of concerns about the quality of data**
2    **contained in TIDE**." (*Id.*, pp. P001117-1118 (emphasis added).)

3    4.   The Subcommittee elaborated on the DHS officials' concerns about the quality of the
information in TIDE:

4
Although NCTC describes its TIDE database as holding information on
5    the identities of known and suspected terrorists, DHS officials – who
interacted with TIDE data on a daily basis, as they reviewed reporting not
6    only from state and local law enforcement encounters but from encounters
by DHS components – said they found otherwise.  "Not everything in
7    TIDE is KST," DHS privacy official Ken Hunt told the Subcommittee,
using a shorthand term for "known or suspected terrorist."

8
**"Would you buy a Ford?" one DHS Senior Reports Officer asked the**
9    **Subcommittee staff during an interview, when he was asked how**
**serious it was for someone to be a match to a TIDE record.  "Ford**
10   **Motor Company has a TIDE record."**

11   Ole Broughton headed Intelligence Oversight at I&A from September
2007 to January 2012.  In an interview with the Subcommittee, Mr.
12   Broughton expressed the concern DHS intelligence officials felt working
with TIDE data.  In one instance, Mr. Broughton recalled he "saw an
13   individual's two-year-old son [identified] in an HIR.  He had a TIDE
record."  **Mr. Broughton believed part of the problem was that**
14   **intelligence officials had routinely put information on "associates" of**
**known or suspected terrorists into TIDE, without determining that**
15   **that person would qualify as a known or suspected terrorist.  "We had**
**a lot of discussion regarding 'associates' in TIDE," Mr. Broughton**
16   **said.**

17   Mark Collier, who served as a Senior Reports Officer and briefly as chief
of the Reporting Branch, recalled another case.  An HIR was drafted
18   concerning an incident with a TIDE match, but the TIDE record was based
on an FBI inquiry.  **Later on the FBI ended its inquiry and cleared the**
19   **individual of any connection to terrorism – but because DHS had filed**
**an HIR on the person, the individual's record was kept active in**
20   **TIDE.**  Subcommittee interviews of Ken Hunt (2/27/2012), former Senior
Reports Officer (3/1/2012), Mark Collier (3/8/2012), and Ole Broughton
21   (4/18/2012).

22   (*Id.*, p. P001118, n.156 (emphasis added).)

23        Legal Authority: Courts may take judicial notice of official government records and

24   reports, as well as matters of public record.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-

25   73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86

26   & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

27        Pursuant to Rule 401 of the Federal Rules of Evidence, government reports reflecting

28   DHS officials' concerns about the quality of TIDE records are relevant because the information

17

in the TSDB on international terrorists is ingested from the TIDE database, which is maintained by the NCTC.

### III.     CONGRESSIONAL TESTIMONY AND RELATED MATERIALS.

**A.  Trial Exhibit No. 238:** United States Government Accountability Office, Report to Congressional Requesters, Terrorist Watchlist Screening, Opportunities Exist to Enhance Management Oversight, Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List

Plaintiff requests that the Court take judicial notice of the following facts in Trial Exhibit No. 238, *available at* http://www.gao.gov/new.items/d08110.pdf:

1. "The National Counterterrorism Center and the FBI rely upon standards of reasonableness in determining which individuals are appropriate for inclusion on the Terrorist Screening Center's consolidated watch list.  In general, individuals who are reasonably suspected of having **possible links** to terrorism—in addition to individuals with known links—are to be nominated."  (Trial Exhibit No. 238, p. P006541 (emphasis added).)

2. "According to the National Counterterrorism Center, determining whether to nominate an individual can involve some level of subjectivity.  Nonetheless, any individual reasonably suspected of having links to terrorist activities is to be nominated to the list and remain on it **until the FBI or the agency that supplied the information** supporting the nomination, such as one of the intelligence agencies, **determines the person is not a threat** and should be removed from the list."  (*Id.*, p. P006541 (emphasis added).)

3. "TSC data also show that **more than 100,000 records have been removed** from the watch list since TSC's inception."  (*Id.*, p. P006558 (emphasis added).)

4. "According to federal officials, encounters with individuals who were positively matched to the watch list assisted government efforts in tracking the respective person's movements or activities and provided the **opportunity to collect additional information** about the individual that was shared with agents conducting counterterrorism investigations and with the intelligence community for use in analyzing threats.  Such coordinated collection of information for use in investigations and threat analyses is one of the **stated policy objectives** for the watch list.  **Most of the individuals encountered were questioned and released because the intelligence and investigative information on these persons that supported the watch list records and the information obtained during the encounter did not support taking further actions**, such as denying an individual entry into the United States."  (*Id.*, p. P006562 (emphasis added).)

5. "The Department of State described several scenarios under which an individual on the terrorist watch list might still be granted a visa.  According to the department, visas can be issued following extensive interagency consultations regarding the individuals who were matched to watch list records.  The department explained that the **information that supports a terrorist watch list record is often sparse or inconclusive**.  It noted, however, that having these records exported to the Consular Lookout and Support System provides an **opportunity for a consular officer to question the alien to obtain additional information** regarding potential inadmissibility."  (*Id.*, p. P006606.)

18

6. "If the individual is a U.S. citizen or an admitted non-citizen, CBP officers at the port are to apprise the local Joint Terrorism Task Force of any suspicions about the person after questioning, in order **to permit post-entry investigation or surveillance**." (*Id.*, p. P006608.)

<u>Legal Authority</u>: Courts may take judicial notice of official government records and reports, as well as matters of public record. *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25.

Pursuant to Rule 401 of the Federal Rules of Evidence, the above facts are relevant because they tend to show an increased risk of an erroneous deprivation of protected liberty and property interests, due to the government's stated policy of watchlisting individuals whom it speculates may have possible links to terrorism, and refusing to remove them from the list until their innocence has been demonstrated to the FBI's or some other agency's satisfaction.  Facts concerning the policy objectives of the watchlist, namely, the desire to bring individuals in for questioning, is also relevant to the government's alleged interests.

**B. Trial Exhibit No. 250:** House Judiciary Testimony, March 24, 2010

Plaintiff requests that this Court take judicial notice of the following statement by Timothy Healy in Trial Exhibit No. 250, *available at* http://judiciary.house.gov/hearings/printers/111th/111-116_55598.PDF:

> The TSC aids the Department of State in identifying known or suspected terrorists through two different processes.  The first is the Security Advisory Opinion (SAO) process, whereby individuals that are watch listed could be identified at the time of their visa application to visit the United States.  When consular officers process visa applications, checks are run in CLASS to determine whether any derogatory information exists to warrant a visa denial.  **If it is determined that the visa applicant is a possible match to an individual on the Terrorist Watchlist, the consular officer requests an SAO.  The SAO request is forwarded to the TSC, where the Department of State's subject matter experts at the TSC review the associated TSDB and TIDE records to determine whether the visa applicant is in fact the same watchlisted individual**.  The TSC's only role in this process is to determine if the individual applying for the visa is the same individual on the Terrorist Watch list.  **In the case of a positive match, the TSC forwards the information to the Department of State's Visa Office, in the Bureau of Consular Affairs, to prepare an SAO in response to the request**.  The SAO is then forwarded to the consular officer adjudicating the visa, who has the authority to issue or deny visa applications.  Individuals that are watchlisted at the time of their visa application could be identified through this process.

(Trial Exhibit No. 250, pp. TSC001048-1049.)

19

1      <u>Legal Authority</u>: Courts may take judicial notice of the fact that statements were made in

2  testimony before Congress.  *See Anschutz Corp.*, 785 F. Supp. 2d at 834.

3      Pursuant to Rule 401 of the Federal Rules of Evidence, the statement above is relevant

4  because it tends to show that defendants concede the CLASS database plays an integral role in

5  the SAO review process, "whereby individuals that are watch listed could be identified at the

6  time of their visa application to visit the United States."  Plaintiff was denied a visa **REDACTED**

7  ████████████████████████████████████████████████████████████████████

8  **C. Trial Exhibit No. 729:** Federal Bureau of Investigation Director Robert S. Mueller, III,
    April 23, 2008, Testimony before the House Judiciary Committee

9

10      Plaintiff requests that the Court take judicial notice of the following statements appearing

11  in Trial Exhibit No. 729, *available at* http://www.fbi.gov/news/testimony/fbi-priorities-changes-

12  and-challenges-3:

13      1.  "The Foreign Terrorist Tracking Task Force (FTTTF) uses innovative analytical
        processes and unique proprietary technologies to find, track, and remove known or

14          suspected terrorists by tracking their electronic footprints.  The FTTTF collects and
        analyzes a wide range of FBI, U.S. government, and public source data, from

15          biometric data to travel records, to keep foreign terrorists and their supporters out of
        the United States, and, if necessary, to locate, detain, remove, or prosecute such

16          persons.  Participants in the FTTTF include the **FBI**, the Department of Defense, **U.S.
        Immigration and Customs Enforcement**, Customs and Border Protection, and other

17          representatives from the U.S. intelligence community."  (Trial Exhibit No. 729, p.
        TSC001179 (emphasis added).)

18      2.  "The FTTTF also works with foreign partners, including **Canada, Australia, and the
        United Kingdom**, in this effort.  To meet its mission, the FTTTF has put in place

19          **information sharing agreements** among participating agencies and other public and
        proprietary companies to aid in locating terrorists and their supporters who are or who

20          have been in the United States."  (*Id.*, p. TSC001179-80.)

21      3.  "The FTTTF also has access to more than 70 sources of data containing lists of
        known and suspected foreign terrorists and their supporters.  The FTTTF shares data

22          with the U.S. intelligence community and other government agencies to create a
        centralized data mart for use by trained FTTTF analysts."  (*Id.*, p. TSC001180.)

23

24      <u>Legal Authority</u>: *Anschutz Corp.*, 785 F. Supp. 2d at 834.

25      Pursuant to Rule 401 of the Federal Rules of Evidence, the above statements are relevant

26  because they tend to establish the role of the various law enforcement agencies in the

27  government's terrorist watchlisting system, as well as the breadth of the government's

28  information sharing initiatives.

**IV.    PROFILING, BIASED TRAINING, AND BIASED INVESTIGATIVE TECHNIQUES.**

**A.  Trial Exhibit Nos. 84-90 and 657-665:** (FBI Mosque Outreach Program)

Plaintiff requests that the Court take judicial notice that from 2004 to 2008, FBI agents engaged in a "mosque outreach program" that gathered information about Muslims' religious practices and the physical layout of their places of worship, which the FBI frequently characterized in its reports as "positive intelligence."  That the FBI made such contacts and reported them as "positive intelligence" is capable of ready determination by reference to records produced by the FBI in response to public records requests from the American Civil Liberties Union, which the ACLU subsequently published online and which are available through the links at http://www.aclu.org/files/assets/aclu_eye_on_the_fbi_-_mosque_outreach_03272012_0_0.pdf.  The existence of the mosque outreach program and the information gathered as a result of it is generally known within the trial court's jurisdiction, and can be accurately and readily determined from the following government reports:

1.     **Trial Exhibit No. 84:** This FD-542 form reported contact between the FBI and the South Bay Islamic Association on November 24, 2006.  Although the report contains no substantive discussion at all, it is marked as "positive intelligence" and states that it was disseminated outside the FBI.

2.     **Trial Exhibit No. 85:** This FD-542 form reported contact between the FBI and the South Bay Islamic Association on April 5, 2007.  Although the report contains no substantive discussion at all, it is marked as "positive intelligence" and states that it was disseminated outside the FBI.

3.     **Trial Exhibit No. 86:** This FD-542 form reported contact between the FBI and the South Bay Afghan Community Center and failed attempts to set up an outreach meeting with the Afghan Cultural Center.  It is marked as "positive intelligence" and states that it was disseminated outside the FBI.

4.     **Trial Exhibit No. 87:** This FD-542 form reported FBI contacts with 20 northern California mosques.  It is marked as "positive intelligence" and states that it was disseminated

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

outside the FBI.

5.     **Trial Exhibit No. 88:** This FD-542 form reported contact between the FBI and the Anjuman-e-Najmi mosque in Fremont, including the fact that the FBI received a tour of the facility.  The report included the contents of an email describing the community's religious beliefs and history.  This report is marked as "positive intelligence" and states that it was disseminated outside the FBI.

6.     **Trial Exhibit No. 89:** This FD-542 form reported contact between the FBI and representatives of the Bay Area Cultural Connections (BAYCC).  The report included details of the building layout and the number of individuals observed on the premises.  The report notes the "ITU" (investigative technique used) as "Intel Program."

7.     **Trial Exhibit No. 90:** This FD-542 form reported contact between the FBI and representatives of the Bay Area Cultural Connections (BAYCC).  It reflects that the FBI searched LexisNexis and Department of Motor Vehicle records to obtain detailed information about an individual, including date of birth, social security number, address and home telephone number.  The report notes that other law enforcement databases, including the National Crime Information Center (NCIC), the FBI's Automated Case Support System (ACS), and one redacted source were also used to research one or more individuals whose identity has been redacted.  The report notes the "ITU" (investigative technique used) as "Intel Program."

8.     **Trial Exhibit No. 657:** This FD-542 form reported contact between the FBI and a mosque in Seaside, and specifically recorded the fact that a member had expressed frustration about delay in air travel.  This report is marked as "positive intelligence" and states that it was disseminated outside the FBI.

9.     **Trial Exhibit No. 658:** This FD-542 form reported contact between the FBI and a mosque in Seaside and noted the specific topic of a sermon, namely, "the evils associated with the practice of earning interest on money."  The FBI discussed terrorism with at least one member.  The report also appears to contain the number "266" in handwriting next to a redacted case ID number.  Files in the 266 classification concern "Acts of Terrorism - Domestic Terrorists."  (*See* Trial Exhibit No. 516, p. 3.)  This report is marked as "positive intelligence"

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

1 and states that it was disseminated outside the FBI.

2       10.   **Trial Exhibit No. 659:** This FD-542 form reported contact between the FBI and

3 the Islamic Center of Santa Cruz.  The report contained notes on the layout of the mosque: "The

4 Mosque consists of a small single first floor room with partitions dividing the space and a small

5 second floor."  This report is marked as "positive intelligence" and states that it was

6 disseminated outside the FBI.  It also bears a stamp indicating that it was uploaded to the FBI's

7 Automated Case Support System (ACS).

8       11.   **Trial Exhibit No. 660:** This FD-542 form reported contact between the FBI and a

9 mosque in Seaside.  The report noted the fact that a new building had been purchased for use as a

10 mosque.  This report is marked as "positive intelligence" and states that it was disseminated

11 outside the FBI.  It also bears a stamp indicating that it was uploaded to the FBI's Automated

12 Case Support System (ACS).

13       12.   **Trial Exhibit No. 661:** This FD-542 form reported contact between the FBI and

14 members of a mosque in Seaside, in addition to another person or persons whose identities have

15 been redacted.  The report noted that the benefits of the new building included the ability for men

16 and women to meet at the same time, on different floors.  It noted that the FBI was given a copy

17 of the Koran.  It also reported contact between the FBI and an unknown member of the Islam

18 Center of Castroville.  The contents of this discussion are partly redacted, but the report indicates

19 that the FBI was interested in returning to "continue the relationship."  This report is marked as

20 "positive intelligence" and states that it was disseminated outside the FBI.

21       13.   **Trial Exhibit No. 662:** This FD-542 form reported contact between the FBI and

22 the South Bay Islamic Association, including a discussion of the Hajj, Islam in general, and

23 certain topics which have been redacted .  The report specifically noted members' concerns with

24 the FBI's investigation of imams in Lodi, California.  This report is marked as "positive

25 intelligence" and states that it was disseminated outside the FBI.

26       14.   **Trial Exhibit No. 663:** This FD-542 form reported contact between the FBI and

27 members of a Seaside mosque, as well as a member of the Islam Center of Castroville.  The

28 report discussed the mosque's recent move to a new building, the fact that the FBI was given a

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

1  tour of the building, and the fact that "date fruits" were sold after the service.  This report is

2  marked as "positive intelligence" and states that it was disseminated outside the FBI.

3       15.    **Trial Exhibit No. 664:** This FD-542 form reports that the FBI took a tour of the

4  facilities at the Muslim Community Association (MCA) in Santa Clara, California on

5  10/03/2005, which included a school, prayer room, meeting hall, administrative offices and book

6  store.  It also discussed contact between the FBI and Granada Islamic School.  This report is

7  marked as "positive intelligence" and states that it was disseminated outside the FBI.

8       16.    **Trial Exhibit No. 665:** This FD-542 form reported contact between the FBI and

9  Islamic Networks Group, a nonprofit that provides training on Islam to various organizations.

10 The report stated that the purpose of the contact was to discuss a recently written article, the full

11 description of which has been redacted.  It is marked as "positive intelligence" and states that it

12 was disseminated outside the FBI.

13      <u>Legal Authority</u>: Courts may take judicial notice of public records, including the records

14 and reports of administrative agencies.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73;

15 *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 &

16 n.2; *see also O'Toole*, 499 F.3d at 1224-25; *see also Christiansen*, 2012 U.S. Dist. LEXIS

17 142070, *2, n.2 (official agency acts).  Here, plaintiff does not request notice the truth of

18 statements contained within the reports, but the fact that certain information was collected and

19 memorialized in FD-542 forms as part of the FBI's mosque outreach program.

20      The existence of the program and the fact that it was used to gather intelligence may also

21 be judicially noticed on the ground that it is generally known within the trial court's jurisdiction,

22 as confirmed by the following newspaper articles:

23    1.  **Trial Exhibit No. 686:** Maria L. La Ganga, Federal Bureau of Investigation
          documents reveal profiling of N. California Muslims, Los Angeles Times, March 28,
24        2012, *available at* http://articles.latimes.com/2012/mar/28/local/la-me-fbi-california-
          mosques-20120328.
25
      2.  Michael Bastasch, Report: FBI used 'mosque outreach' program to spy on Muslims,
26        The Daily Caller, April 2, 2012, *available at* http://dailycaller.com/2012/04/02/report-
          fbi-used-mosque-outreachprogram-to-spy-on-muslims/.  (*See* Exhibit E.)
27
      If a fact is frequently reported in the news and undisputed, it may be judicially noticed

28 even if the source is a newspaper article or online source.  *See Matthews v. National Football*

24

1  *League*, 688 F.3d 1107, 1113 & n.5 (9th Cir. 2012) (taking notice of undisputed statistics

2  available on the NFL's website); *Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594, 597-98 (3rd

3  Cir. 2000) (taking judicial notice of information in a newspaper article); *Peters v. Delaware*

4  *River Port Auth.*, 16 F.3d 1346, 1356 & n.12 (3d Cir. 1994) (taking notice of newspaper accounts

5  showing that the New Jersey and Pennsylvania delegations of the Delaware River Port Authority

6  were sometimes in competition with each other); *Chhetry v. U.S. Dep't of Justice*, 490 F.3d 196,

7  199-200 (2d Cir. 2007) (per curiam) (BIA did not err in taking administrative notice of changed

8  country conditions based on news articles found on yahoo.com).  In addition, courts may take

9  notice of what is in the public record, irrespective of the truth of the contents.  *Von Saher v.*

10  *Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *Heliotrope Gen.,*

11  *Inc. v. Ford Motor Co.*, 189 F.3d 971, 981, n. 18 (9th Cir. 1999) (taking judicial notice of

12  information contained in news articles that showed the market was aware of costs associated

13  with defendants' tax strategy).  Here, defendants cannot reasonable dispute the existence of the

14  program or the fact that it was used to gather intelligence because their own documents confirm

15  these facts, and because these facts have been widely reported by reputable news sources.

16        Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibits 84-90, 657-665,

17  and 686 and the information contained therein are relevant because (a) at trial, the evidence will

18  show plaintiff attended the MCA while in the United States, and the MCA was included in

19  defendants' mosque outreach program as noted in Trial Exhibit No. 664; and (b) discriminatory

20  acts towards third parties may be relevant to show discriminatory intent towards the plaintiff.

21  *See Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007).

22      **B.  Trial Exhibit No. 93:** FBI FOIA response to request by ACLU for documents reflecting

23        training materials

23      Plaintiff requests that the Court take judicial notice of the following facts concerning

24  Trial Exhibit No. 93:

25

26      1.  Trial Exhibit No. 93 is a Power Point presentation that was used by the FBI to train its
        agents.  (*See, e.g.*, Trial Exhibit No. 675, p. P005452, *available at*
        http://www.wired.com/dangerroom/2011/07/fbi-islam-101-guide/#more-53126;

27          ACLU, FBI 'Islam 101' Guide Depicted Muslims as 7th-Century Simpletons
        (wired.com), *available at* https://www.aclu.org/spy-files/fbi-islam-101-guide-

28          depicted-muslims-7th-century-simpletons-wiredcom (Exhibit F).

2.  It contains a slide titled, "Islam 101," which includes bullet points such as "Hard for Westerners to understand," and "Transforms country's culture into 7th century Arabian ways."  (*See* Trial Exhibit No. 93, p. P003570.)

3.  It contains a slide titled, "Recommended Reading," which includes an image of the front cover of a book entitled, The Truth About Mohammed: Founder of the World's Most Intolerant Religion, by Robert Spencer, among other titles.  (*See* Trial Exhibit No. 93, p. P003579.)

Trial Exhibit No. 93 is available online at http://www.wired.com/images_blogs/dangerroom/2011/07/Cultural-Interviewing-Interrogation-PowerPoint1.pdf, and also at https://www.aclu.org/files/fbimappingfoia/20111019/ACLURM000463.pdf.  The circumstances under which it was released to the public have been documented on publicly available websites and in newspaper articles, as noted above.

Legal Authority: Courts may take judicial notice of public records, including the records and reports of administrative agencies.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73; *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 & n.2; *see also O'Toole*, 499 F.3d at 1224-25; *see also Christiansen*, 2012 U.S. Dist. LEXIS 142070, *2, n.2 (official agency acts).  Here, plaintiff does not ask the Court to notice the truth of the statements contained in the Power Point, but instead, the fact of its existence and use in training FBI agents.  In addition, if a fact is frequently reported in the news and undisputed, it may be judicially noticed even if the source is a newspaper article or online source.  *See Matthews*, 688 F.3d at 1113 & n.5; *Ieradi*, 230 F.3d at 597-98; *Peters*, 16 F.3d at 1356 & n.12; *Chhetry*, 490 F.3d at 199-200.  It is proper for the court to notice the content of the news articles relating to Trial Exhibit No. 93 to the extent that they provide information about the context in which the public records were produced that is not reasonably subject to dispute.

Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 93 and related news articles are relevant because they tend to show an overall pattern and practice by the FBI of discriminating against Muslims and holding stereotyped views about them, and because discriminatory acts towards third parties may be relevant to show discriminatory intent towards the plaintiff.  *See Metoyer*, 504 F.3d at 937.

/ / /

/ / /

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

**C. Trial Exhibit No. 95:** FBI Press Release, Response to Media Reporting Regarding Counterterrorism Training

Plaintiff requests that the Court take notice of the fact that the FBI issued a September 15, 2011 public response to criticism of its training materials in the form of a press release, which is available at http://www.fbi.gov/news/pressrel/press-releases/response-to-media-reporting-regarding-counterterrorism-training.  Defendants' press release stated, in part:

> The training segment that is the subject of recent media reports does not reflect the views of the FBI and is not consistent with the overall instruction provided to FBI personnel.  It was conducted six months ago, one time only, and was quickly discontinued because it was inconsistent with FBI standards on this topic.  It was delivered to an audience of 37 agents as part of FBI career path training.

(*See* Trial Exhibit No. 95.)

Plaintiff further requests that the Court take judicial notice of the existence and content of the "recent media reports" to which the FBI was responding, because they are necessary to put the FBI's press release in context:

1. **Trial Exhibit No. 676**: Ackerman, Spencer, *Federal Bureau of Investigation Teaches Agents: 'Mainstream Muslims Are Violent, Radical,'* Wired, September 14, 2011, *available at* http://www.wired.com/dangerroom/2011/09/fbi-muslims-radical/.

2. **Trial Exhibit No. 96**: Slides from training presentation by W. Gawthrop: Doctrinal Basis for Jihad, *available at* http://www.wired.com/images_blogs/dangerroom/2011/09/fbi_doctrinal_basis_for_jihad.pdf (link from Trial Exhibit No. 676).

3. **Trial Exhibit No. 97**: Slides from training presentation by W. Gawthrop: Strategic Themes and Drivers in Islamic Law, *available at* http://www.wired.com/images_blogs/dangerroom/2011/09/fbi_islamic_law.pdf (link from Trial Exhibit No. 676).

4. **Trial Exhibit No. 98**: Slides from training presentation by W. Gawthrop: Militancy Considerations (2 full page slides), *available at* http://www.wired.com/images_blogs/dangerroom/2011/09/fbi_militancy_charts.pdf (link from Trial Exhibit No. 676).

5. **Trial Exhibit No. 99**: Slides from training presentation by W. Gawthrop: Militancy Considerations, *available at* http://www.wired.com/images_blogs/dangerroom/2011/09/fbi_militancy_considerations.pdf (link from Trial Exhibit No. 676).

Finally, plaintiff requests that the Court take judicial notice of the fact that the ACLU and others responded to the FBI's September 15, 2011 press release and other statements by the FBI. (*See* Trial Exhibit No. 667, Letter from ACLU, Muslim Public Affairs Council to Robert S. Mueller, III, Director, Federal Bureau of Investigation, *available at* https://www.aclu.org/files/assets/sign_on_letter_to_dir_mueller_re_radicalization_report_10.4.11.pdf; Spencer Ackerman & Noah Shachtman, *Video: FBI Trainer Says Forget 'Irrelevant' al-Qaida, Target Islam*, Wired,

27

1   Sept. 20, 2011, *available at* http://www.wired.com/dangerroom/2011/09/fbi-islam-qaida-

2   irrelevant/all/, (attached as Exhibit G); Trial Exhibit No. 94, *available at* http://www.wired.com

3   /dangerroom/2011/09/fbi-islam-domination/.)

4          Legal Authority: Courts may take judicial notice of press releases.  *Wietschner v.*

5   *Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1108 (N.D. Cal. 2003); *see also O'Toole*, 499 F.3d at

6   1224-25.  If a fact is frequently reported in the news and undisputed, it may be judicially noticed

7   even if the source is a newspaper article or online source.  *See Matthews*, 688 F.3d at 1113 &

8   n.5; *Ieradi*, 230 F.3d at 597-98; *Peters*, 16 F.3d at 1356 & n.12; *Chhetry*, 490 F.3d at 199-200.

9   In addition, courts may take notice of what is in the public record, irrespective of the truth of the

10  contents.  *Von Saher*, 592 F.3d at 960; *Heliotrope Gen., Inc.*, 189 F.3d at 981, n. 18.  Here, the

11  FBI's press release (Trial Exhibit No. 95) acknowledges that the materials identified in Trial

12  Exhibit Nos. 676 and 96-99 were at one time used to train FBI agents, but were later removed.

13  Although the FBI made certain representations as to the reasons for the removal, those

14  representations were challenged publicly by the ACLU and numerous other civil rights

15  organizations.  (*See* Trial Exhibit No. 667, p. P003664-3665.)

16         Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 95 and related

17  news articles are relevant because they tend to show an overall pattern and practice by the FBI of

18  discriminating against Muslims and holding stereotyped views about them, and because

19  discriminatory acts towards third parties may be relevant to show discriminatory intent towards

20  the plaintiff.  *See Metoyer*, 504 F.3d at 937.

21     **D.  Trial Exhibit No. 536:** Letter and FOIA response from FBI to Dr. Ivan Greenberg re
          FOIPA No. 1114232-002 (October Plan)
22
23         Plaintiff requests that the Court take judicial notice of the fact that, starting in October

24  2004 and continuing through February 2005, Immigration and Customs Enforcement (ICE)

25  targeted large numbers of immigrants, most of whom came from majority-Muslim countries, for

26  terrorism investigations in an operation known alternatively as "Operation Frontline" or the

27  "October Plan."  (*See* Trial Exhibit Nos. 521, 525, 526, and 536.)  The existence of Operation

28  Frontline/the October Plan and the information gathered as a result of it is generally known

    within the trial court's jurisdiction, and can be accurately and readily determined from the

                                                    28
    PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

1   government reports found in Exhibit 536.  Plaintiff requests that the Court take judicial notice

2   that all or nearly all of these records bear "315" file classification numbers, including some with

3   "315B," the same as Dr. Ibrahim.  (*See*, *e.g.*, Trial Exhibit No. 536, pp. p P006872, P006885,

4   P006900, P006924.)  The public records found in Trial Exhibit No. 536 are available online at

5   http://www.governmentattic.org/4docs/FBI-OctoberPlan_2004Updt.pdf, along with other similar

6   public records relating to the government's October Plan.

7        <u>Legal Authority</u>: Courts may take judicial notice of public records, including the records

8   and reports of administrative agencies.  *Barron*, 13 F.3d at 1377; *Torrens*, 396 F.3d at 472-73;

9   *Del Puerto Water Dist.*, 271 F.Supp.2d at 1234; *B.T. Produce Co.*, 354 F. Supp. 2d at 285-86 &

10  n.2; *see also O'Toole*, 499 F.3d at 1224-25; *see also Christiansen*, 2012 U.S. Dist. LEXIS

11  142070, *2, n.2 (official agency acts).  Here, plaintiff does not request notice the truth of

12  statements contained within the reports, but the fact that certain information was collected and

13  memorialized in government records as part of the FBI's October Plan, as demonstrated by its

14  response to Dr. Greenberg.

15       The following documents also show that the circumstances under which "Operation

16  Frontline" was carried out are generally known within the trial court's territorial jurisdiction:

17       1.  **Trial Exhibit No. 521**: FBI's New Surveillance Plan Chills Religious and Political
18           Activity, Bay Area Civil Rights Groups Warn, American Civil Liberties Union,
             October 5, 2004, *available at* https://www.aclu.org/national-security/fbis-new-
19           surveillance-plan-chills-religious-and-political-activity-bay-area-civil-.

20       2.  **Trial Exhibit No. 525**: Eric Lichtblau, Inquiry Targeted 2,000 Foreign Muslims in
             2004, N.Y. Times, Oct. 31, 2008, *available at*
21           http://www.nytimes.com/2008/10/31/us/31inquire.html?_r=0.

22       3.  **Trial Exhibit No. 526**: Joint Press Release by Yale Law School and the American-
             Arab Anti-Discrimination Committee, ICE Targets Immigrants from Muslim
23           Majority Countries during 2004 Presidential Election, Nov. 4, 2008, *available at*
             http://nnirr.blogspot.com/2008/11/fw-from-adc-ice-targets-immigrants-from.html.

24       If a fact is frequently reported in the news and undisputed, it may be judicially noticed

25  even if the source is a newspaper article or online source.  *See Matthews*, 688 F.3d at 1113 &

26  n.5; *Ieradi*, 230 F.3d at 597-98; *Peters*, 16 F.3d at 1356 & n.12; *Chhetry*, 490 F.3d at 199-200.

27  In addition, courts may take notice of what is in the public record, irrespective of the truth of the

28  contents.  *Von Saher*, 592 F.3d at 960; *Heliotrope Gen., Inc.*, 189 F.3d at 981, n. 18.  Here,

1    defendants cannot reasonable dispute the existence of the October Plan or the type of information

2    recorded as a result of it, because their own documents confirm these facts, and because these

3    facts have been widely reported by reputable news sources.

4         Pursuant to Rule 401 of the Federal Rules of Evidence, Trial Exhibit No. 536 and related

5    news articles are relevant because they tend to show an overall pattern and practice by the FBI of

6    targeting Muslims for counterterrorism investigations, and including them in the 315 file

7    classification, which results automatically in watchlisting pursuant to defendants' publicly stated

8    policy of watchlisting all main international terrorism subjects in that file classification.

9    Discriminatory acts towards third parties may be relevant to show discriminatory intent towards

10   the plaintiff.  *See Metoyer*, 504 F.3d at 937.

11   **E.   Trial Exhibit No. 680:** Declarations of Craig Monteilh Submitted by Plaintiffs in
          Support of Their Oppositions to Motions to Dismiss (*Fazaga v. Federal Bureau of

12        Investigation, et al.*, U.S.D.C. Case No. SA CV 11-00301 CJC)

13        Plaintiff requests that the Court take judicial notice of the fact that Craig Monteilh, a

14   former FBI informant, filed publicly available declarations in which he detailed the tactics the

15   FBI's Joint Terrorism Task Forces (JTTFs) used to conduct dragnet surveillance of the Muslim

16   community.

17        Legal Authority: Courts may take judicial notice of matters of record in other

18   proceedings.  *Bennett*, 285 F.3d at 803, n.2.  In addition, courts may take judicial notice of what

19   is in the public record, irrespective of the truth of the contents.  *Von Saher*, 592 F.3d at 960.

20        Pursuant to Rule 401 of the Federal Rules of Evidence, the publicly filed declarations of

21   Craig Monteilh are relevant regardless of their truth, because they show that information about

22   JTTF sources and methods against the Muslim community are publicly available and not a state

23   secret or law enforcement privileged, as defendants claim.  Other publicly available sources

24   reported the same or similar tactics, including specifically the FBI's efforts to record information

25   about the interior of the mosques (*compare* Trial Exhibit No. 680, pp. P006152-6153, P006156-

26   6157, P006172, and P006181 *with* Trial Exhibit Nos. 88, 89, 659, 661, 663, and 664).  This

27   information is further relevant because Special Agent Kevin Kelley was assigned to a Northern

28   California JTTF when he ███████████ REDACTED ███████████

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA

1   ████████ REDACTED ████████

2

3   Dated:  November 30, 2013                    McMANIS FAULKNER

4

5                                                   _____//s//_____
                                                CHRISTINE PEEK
6
                                                Attorneys for Plaintiff, RAHINAH
7                                               IBRAHIM

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE; CASE NO. C 06-0545 WHA