1  JAMES McMANIS (40958)
   ELIZABETH PIPKIN (243611)
2  CHRISTINE PEEK (234573)
   RUBY H. KAZI (243872)
3  JENNIFER MURAKAMI (273603)
   McMANIS FAULKNER
4  A Professional Corporation
   50 W. San Fernando, 10th Floor
5  San Jose, CA  95113
   Telephone:     (408) 279-8700
6  Facsimile:      (408) 279-3244
   cpeek@mcmanislaw.com
7
   Attorneys for Plaintiff,
8  Rahinah Ibrahim

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  RAHINAH IBRAHIM, an individual,          Case No. C 06-0545 WHA

14          Plaintiff,                       **PLAINTIFF'S PROPOSED FINDINGS OF
                                             FACT AND CONCLUSIONS OF LAW
15     vs.                                   AFTER BENCH TRIAL**

16  DEPARTMENT OF HOMELAND
    SECURITY, et al.,                        **FILED UNDER SEAL**
17                                             (REDACTED)
            Defendants.                      Trial Dates:     December 2-6, 2013
18                                           Complaint Filed:  January 27, 2006

19

20

21

22

23

24

25

26

27

28

## **FINDINGS OF FACT**

1.       Dr. Ibrahim first traveled to the United States in 1983.  **[Dep. of R. Ibrahim at 11:25-13:18.]**  While studying in the United States, Dr. Ibrahim met her husband, Mustafa Kamal Mohammed Zaini, and married him in 1986, in Seattle, Washington.  **[Dep. of R. Ibrahim at 10:6-9, 13:12-14:2, 66:19-67:2.]**

2.       In 1987, Dr. Ibrahim graduated from the University of Washington and had her first child, Raihan Mustafa Kamal, in Seattle.  **[Dep. of R. Ibrahim at 14:3-5, 15:3-11.]**

3.       In 1990, Dr. Ibrahim obtained a Master's Degree in architecture, and then returned to Malaysia with her family.  **[Dep. of R. Ibrahim at 14:21-15:2, 15:12-17.]**

4.       Dr. Ibrahim became one of the founding members of the architecture department at the Universiti Putra, Malaysia ("UPM"), and the department's first female lecturer.  **[Dep. of R. Ibrahim at 16:2-15.]**

5.       She is currently Dean of the Faculty of Design and Architecture, and also a Professor of Architecture, at UPM.  **[Dep. of R. Ibrahim at 11:16-18.]**

6.       Starting in 2000, Dr. Ibrahim obtained an engineering degree and a Ph.D. in Construction Engineering and Management from Stanford.  **[Dep. of R. Ibrahim at 27:2-14; Exh. 28, pp. 1-2.]**

7.       While at Stanford, Dr. Ibrahim was involved with the Islamic Society of Stanford University (ISSU), and volunteered with Spiritual Care Services at Stanford Hospital.  **[Dep. of R. Ibrahim at 22:1-5, 22:13-24:18, 25:12-14.]**

8.       Dr. Ibrahim also went with her family to pray at the MCA in Santa Clara, a Muslim place of worship.  **[Dep. of R. Ibrahim at 72:1-3, 72:5-21.]**

Government Watchlisting Grows in the Wake of September 11, 2001

9.       In 2003, the executive branch issued Homeland Security Presidential Directive-6 and its implementing MOU.  **[Kahn at RT 389:17-390:2; Exhs. 538, 541.]**

10.       The Terrorist Screening Center (TSC) was charged with administering the TSDB, a sensitive, but unclassified consolidated terrorist screening database.  **[Lubman at RT 559:17-560:9; Exh. 101, p. TSC000400-401.]**

11.     A Department of State (DOS) terrorist watchlist known as TIPOFF grew to become the source of the records contained within the TIDE database currently operated by the National Counterterrorism Center (NCTC).  **[Exh. 666, pp. P003648, P003644-3650; Exh. 101, p. TSC000426.]**

12.     TIDE records are the source of the records contained in the consolidated Terrorist Screening Database (TSDB).  **[Exh. 508, p. TSC000010; Kahn at RT 390:11-391:7.]**

13.     Department of Homeland Security (DHS) officials have expressed concern about the quality of the data found in TIDE.  **[Exh. 638, pp. P001117-1118 & n.156.]**

14.     The TSDB exports information on watchlisted individuals to a variety of downstream "customers" or "clients," including but not limited to, the following:

a.     the No-Fly and Selectee Lists used by Transportation Security Administration (TSA); **[Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 62, 64 & 209-215.]**

b.     the Known and Suspected Terrorist File (KSTF) (previously known as the Violent Gang and Terrorist Organizations File (VGTOF) **[Dep. of D. Lubman (FBI) at 82:2-4, 82:6-8]**, used by the Federal Bureau of Investigation (FBI); **[Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 64 & 209-215.]**

c.     the Consular Lookout and Support System (CLASS) database used by the DOS; **[Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 64, 77, 78 & 209-215.]**

d.     the TECS database used by the DHS; **[Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 64, 77, 78 & 209-215, Dep. of D. Lubman (FBI) at 177:18-20.]**

e.     The TUSCAN database used by Canada; and **[Dep. of D. Lubman (FBI) at 172:15-17; Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 64 & 209-215.]**

f.     The TACTICS database used by Australia. **[Dep. of D. Lubman (FBI) at 172:15-17; Exh. 6, p. TSC001665; Exhs. 9, 57, 61, 64 & 209-215.]**

15.     In 2004, and in the present day, it is standard that individuals in TSDB are exported to CLASS visa or CLASS passport databases.  **[Dep. of D. Lubman (FBI) at 176:24-25, 177:15-20, 179:7-10, 220:25-221:1, 221:4-5.]**

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

16.     Defendants do not maintain information regarding the religion of individuals placed in the TSDB.  **[Lubman at RT 320:1-321:6.]**

17.     After September 11, 2001, some female Muslim students at Stanford asked security officers to escort them home from class to their dormitories, or took off their hijab because they were afraid to be seen with it on.  **[Dep. of R. Ibrahim at 209:2-15.]**

18.     Some male Muslim students at Stanford shaved their beards to better fit in.  **[Dep. of R. Ibrahim at 209:2-15.]**

The Effect of the Government's Policies on Dr. Ibrahim – Watchlist Status

19.     Dr. Ibrahim has no affiliation with any terrorist organizations, has never supported terrorist activities, and is not a known or reasonably suspected terrorist.  **[Dep. of R. Ibrahim at 52:20-25, 201:23-202:3; Lubman at RT 304:1-22, 312:6-313:18.]**

20.     The FBI admits that Dr. Ibrahim does not currently pose, nor has she ever posed, REDACTED




21.     Kelley's JTTF squad conducted a mosque outreach program that included the MCA in Santa Clara, California.  **[Kelley at RT 363:9-364:11; Exhs. 84-90 & 657-665.]**

22.     One purpose of the mosque outreach program was to provide a point of contact for the mosques as a potential source of intelligence.  **[Kelley at RT 364:16-24.]**

23.     In the 2004 timeframe, the only other religious group members for which the FBI conducted outreach were Sikhs in the South Bay.  **[Kelley at RT 381:15-20.]**

24.     In the 2001-2004 timeframe, there are numerous examples of surveillance and investigations targeted at Muslim individuals and communities.  **[Sinnar at RT 525:18-527:1, 529:25-530:24; Exhs. 84-90, 657-665; Exh. 536.]**

25.     In late October, 2004, Dr. Ibrahim's husband came to visit her while she recovered from surgery.  **[Dep. of R. Ibrahim at 71:6-11.]**

26.     On or about November 17, 2004, REDACTED

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

REDACTED

28.    Kelley claims REDACTED

29.    Kelley REDACTED

30.    Kelley REDACTED

31.    The reasonable suspicion standard for the TSDB is low – one level above a hunch.  **[Kahn at RT 392:12-393:16.]**  The low standard can facilitate the use of criteria such as race, religion or national origin in watchlisting decisions.  **[Sinnar at RT 523:8-525:17.]**

32.    REDACTED

33.    Kelley's REDACTED

34.    Prior to his deposition on September 12, 2013, Kelley REDACTED

35.    REDACTED

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

36.    REDACTED

37.    REDACTED

38.    Certain FBI training materials contained stereotypical reflections and statements about Islam and Muslims, and some materials were removed.  **[Sinnar at RT 527:2-22; Exh. 93, pp. P003570, P003579; Exh. 95; Exhs. 96-99 & 676 (limited purpose).]**

39.    REDACTED

40.    The majority of individuals in the TSDB are assigned the lowest handling codes – codes 3 and 4 – and the government admits that it targets individuals that may not pose a direct threat.  **[Exh. 101, pp. TSC000404-406 & n.10, TSC000449-450; Exh. 102, p. TSC000126;** *see also* **Exh. 506, pp. P001838-1840.]**

41.    REDACTED

42.    REDACTED

43.    The letter "C" signifies: "Corroborated identification as a group member by an informant or individual of unknown reliability."  **[Exh. 58, p. P004123.]**

44.    The letter "D" signifies: "Frequents a documented group's area, associates with known group members, and/or affects group dress, hand signals, tattoos, or symbols."  **[Exh. 58, p. P004123.]**

45.    REDACTED

46.    Even records that have gone through review by the TSC have been found to

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

contain errors, and auditors have identified numerous errors and inconsistencies in TSDB records since the TSC was created in 2003.  **[Exh. 101, pp. TSC000409-410, TSC000469-475; Exh. 102, pp. TSC000096-97, TSC000100, TSC000105-107, TSC000109-112, TSC000157-158, TSC000170-171 & n.64; Exh. 508, pp. TSC000003, TSC0000010, TSC0000012-13.]**

The Effect of the Government's Policies on Dr. Ibrahim – Interviewed by FBI

47.     Kelley and Special Agent Amy Richardson interviewed Dr. Ibrahim at her home on December 23, 2004.  **[Kelley at RT 369:7-11; Exhs. 4, 71 & 116.]**  REDACTED


48.     At that time, Dr. Ibrahim's student visa was valid until January 11, 2007.  **[Dep. of R. Ibrahim at 213:1-214:3, 214:19-215:4.]**

49.     Kelley claimed not to know why "INS" had asked him to speak to Dr. Ibrahim, but volunteered that possibly it was because she was from Malaysia, and Malaysia is blacklisted by the government.  **[Dep. of R. Ibrahim at 45:2-3, 45:6, 45:10, 45:12-13, 45:22-24, 46:1, 51:16-17, 51:19, 51:21-23, 51:25, 80:1-2, 80:4, 80:6-7, 80:9.]**

50.     Agent Kelley asked Dr. Ibrahim about Jemaah Islamiyah, a terrorist organization that she only knew about from publicly available news sources.  **[Dep. of R. Ibrahim at 52:10-11, 52:13, 52:15-16, 52:18; RT at 549:1-550:7 & Exh. 13, p. 1.]**

51.     Agent Kelley also asked about Dr. Ibrahim's upcoming travel plans to a conference in Hawaii, her upcoming travel plans to Malaysia, her thesis work, her plans after graduation, her future travel plans, her husband, her husband's travel, and her involvement with the Muslim community in the Bay Area.  **[Dep. of R. Ibrahim at 49:8-10, 49:12, 49:20-22, 50:1-11, 50:16-23, 50:25, 51:2-3, 51:5, 54:14-15, 54:17, 55:1-4, 55:6, 56:8-9, 56:11, 56:13-14, 58:11-12, 58:14, 58:23-59:1, 59:3, 59:16-17, 59:19, 60:22-25, 61:2, 61:18-21, 61:23, 62:17-18, 62:20, 69:11-12, 69:14-16, 69:18-20, 69:22-23, 70:18-21, 70:23, 71:21-22, 71:24, 72:1-3, 72:5, 74:22-23, 74:25, 77:5-7, 77:9; Kelley at RT 372:6-375:7, Exhs. 4, 71, & 116.]**

52.     Kelley reported the interview inaccurately in many respects.  **[Dep. of R. Ibrahim at 81:15-86:12.]**

53.     A FOIA version of Kelley's summary of the interview, stamped "unclassified," identifies three file numbers: (1) 315B-SF-137113-302-1; (2) 315B-SF-137006-19; and (3) 315B-SF-137113-8.  **[Kelley at RT 370:8-371:11; Exh. 4, p. P000774.]**

54.     File number "315" refers to international terrorism investigations.  **[Exh. 516, p. 4; Kelley at RT 371:19-372:4; Lubman at RT 339:8-10.]**

55.     Defendants' publicly stated policy is that all main international terrorist subjects for both full and preliminary investigations in the 315 classification are nominated for entry into the TSDB and its supported systems.  **[Exh. 506, p. P001863; Exh. 508, p. TSC000007; Lubman at RT 338:1-13; Kahn at RT 395:9-397:22.]**

56.     REDACTED

57.     The TSDB and its associated databases have been used as an investigative tool by the FBI and other government agencies.  **[Kahn at RT 411:8-25; Exh. 8, p. NCTC000071; Exh. 4; Exh. 71; Exh. 101, p. TSC000405-406; Exh. 238, pp. P006562, P006606, P006608.]**

The Effect of the Government's Policies on Dr. Ibrahim – January 2-3, 2005

58.     On January 2, 2005, Dr. Ibrahim arrived at San Francisco Airport with her then-fourteen-year-old daughter, Rafeah.  **[Dep. of R. Ibrahim at 86:20-23, 91:3-7, 93:2-9.]**

59.     She was still recovering from surgery and had requested wheelchair assistance. **[Dep. of R. Ibrahim at 90:21-24, 93:10-15, 94:14-16, 102:8-10, 102:12, 102:19-103:9.]**

60.     When Dr. Ibrahim attempted to check in at the United Airlines counter for her flight to Kona, Hawaii, Dr. Ibrahim was told she was going to be arrested.  **[Dep. of R. Ibrahim at 105:4-5, 105:7, 106:22-23, 106:25-107:2, 107:4-6, 107:8-10.]**

61.     Everyone at the United counter, including the United employees, about 50 people in line, and Rafeah, saw Dr. Ibrahim get arrested and led away in handcuffs.  **[Dep. of R. Ibrahim at 107:17-24, 109:18-110:6.]**

62.     As a Muslim, Dr. Ibrahim wears hijab to reflect her modesty, which she believes is required by her religion.  **[Dep. of R. Ibrahim at 27:15-21.]**

63.     She was transported in handcuffs to a holding cell, where she was imprisoned for approximately two hours, searched in a culturally insensitive manner, denied her medication until the paramedics were called, and denied the ability to use the restroom in private.  **[Dep. of R. Ibrahim at 109:3-5, 109:7, 111:5-15, 113:20-21, 113:23, 113:25-114:12, 114:14, 114:16-17, 114:19, 114:21-115:9, 115:14-15, 115:17, 115:19-21, 115:23, 116:13-14, 116:16-19, 116:21-117:14, 118:16-25, 122:8-9, 122:11-13, 122:15, 122:25-123:1, 123:3-7, 123:9-12, 123:14-21, 123:23, 123:25-124:2, 124:22-24, 127:20-128:1.]**

64.     Although Dr. Ibrahim asked to speak to Agent Kelley, whom she believed could clear her name, and was told the FBI was coming to talk to her, no one from the FBI ever came.  **[Dep. of R. Ibrahim at 119:19-20, 119:22, 119:24-25, 120:2, 120:8-9, 120:11-15, 120:17-20, 120:22, 216:24-217:8, 217:15-21.]**

65.     After missing her flight, she was released without explanation.  **[Dep. of R. Ibrahim at 110:7-9, 127:5-7, 128:25-129:6, 129:11-13, 129:15-16, 135:6-8; Exh. 31.]**

66.     No one ever charged her with a crime, or provided any justification for the arrest, other than to say they had no choice but to arrest her while they waited for Washington D.C. to clear her.  **[Dep. of R. Ibrahim at 105:19-20, 105:22-106:4, 106:22-23, 106:25-107:2, 107:4-6, 107:8-10, 128:25-129:6, 129:11-13, 129:15-21, 129:23, 130:7-8, 130:10-14, 135:9-14, 137:14-16; Kelley at RT 375:17-19; Exh. 31;** *see also* **Exhs. 62 & 229.]**

67.     Lee Korman, an Aviation Security Inspector with the DHS, met Dr. Ibrahim in the holding cell.  **[Dep. of R. Ibrahim at 128:5-16.]**  He told her that her name had been removed from the No-Fly List.  **[Dep. of R. Ibrahim at 130:15-17, 130:19, 217:22-218:3, 218:15-20.]**

68.     Although Dr. Ibrahim was allowed to fly the next day, and Mr. Korman again said the new No-Fly List did not have her name on it, certain red flags suggested that her name had not been totally cleared.  **[Dep. of R. Ibrahim at 141:1-13, 141:15, 142:5-12, 142:14, 212:6-10, 219:9-16;** *see also* **Exh. 74.]**

69.     When she traveled the next day – on January 3, 2005 – Dr. Ibrahim was issued a bright red colored boarding pass.  **[Dep. of R. Ibrahim at 141:13, 141:15, 149:1-17.]**  Dr. Ibrahim saw David Nevins of United making more phone calls before he issued her a boarding pass.  **[Dep. of R. Ibrahim at 140:19-23, 141:1-13, 141:15, 212:13-18.]**

The Effect of the Government's Policies on Dr. Ibrahim – Visa Revoked in 2005

70.     Believing her visa was still valid, Dr. Ibrahim spent 3,000 ringgit of her own money on a plane ticket back to the United States.  **[Dep. of R. Ibrahim at 176:15-23.]**  At the time, this was almost her entire month's salary.  **[Dep. of R. Ibrahim at 176:24-177:3.]**

71.     In March 2005, when she attempted to board her flight at the airport in Kuala Lumpur, she was denied boarding, told her visa had been revoked, and told there was a note by her name saying to arrest her.  **[Dep. of R. Ibrahim at 159:7-9, 160:25-161:4, 162:3-5, 162:7-14, 162:16-17, 162:19-22, 164:8-9, 164:11-16 (limited purpose as to note saying to arrest her), 165:14-15, 165:17-19, 165:21-23, 167:5-6, 167:10-13.]**

72.     Defendants' records show that Dr. Ibrahim's visa had been revoked as of January 31, 2005.  **[Exh. 15.]**  Dr. Ibrahim did not learn that her visa had been revoked until she physically arrived at the airport in Kuala Lumpur, and was denied boarding.  **[Dep. of R. Ibrahim at 167:10-13.]**

73.     It was not until after this incident that the government drafted a letter regarding her visa revocation.  **[Exh. 38, Exh. A; Exh. 224.]**

74.     Dr. Ibrahim's visa was revoked based on REDACTED

75.     In an attempt to clear her name, Dr. Ibrahim submitted a Passenger Identity Verification Form (PIVF) to the TSA in March 2005.  **[Dep. of R. Ibrahim at 170:2-172:6; Exhs. 39 & 76.]**  She did not receive a response until April 2006, several months after she filed this lawsuit.  **[Dep. of R. Ibrahim at 172:11-173:2; Exh. 40.]**

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

76.     The response stated, "[w]here it has been determined that a correction to records is warranted, these records have been modified to address any delay or denial of boarding that you may experience as a result of the watch list screening process."  **[Dep. of R. Ibrahim at 173:9-21; Exh. 40.]**

77.     The response did not clarify Dr. Ibrahim's status.  **[Exh. 40.]**

78.     Dr. Ibrahim later received a DHS TRIP Redress Control Number, which also failed to clarify her status.  **[Dep. of R. Ibrahim at 205:2-7, 206:5-6, 206:9-15, 206:18, 206:20-207:2; Exh. 48.]**

79.     Neither DHS TRIP nor its predecessor, the PIVF, permit discovery of information necessary to rebut allegations of association with terrorism.  **[Exhs. 517 & 519.]**

80.     Individuals do not receive formal notice from the government that they are in the TSDB, and lack the ability to complain directly to the FBI or TSC.  REDACTED

; **Kahn at RT 402:21-405:4, 415:7-25;**REDACTED

81.     REDACTED

82.     REDACTED

The Effect of the Government's Policies on Dr. Ibrahim – Increased Scrutiny in 2009

83.     In 2009, Dr. Ibrahim applied for a visa to come to the United States to give her deposition and to participate in her own trial.  **[Dep. of R. Ibrahim at 177:6-16; Exh. 27; Exh. 46; Exh. 47 at P001036-1075.]**

84.     The DOS consular post in Kuala Lumpur initially rejected the application and requested a Security Advisory Opinion ("SAO"), based on a hit in the CLASS database. **[Cooper at RT 423:15-424:2, 424:6-427:17; Exh. 68.]**

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

85.     The systems automatically run a search of the CLASS database as part of the visa application process.  **[Cooper at RT 428:18-21.]**  The hit in CLASS is shared with DHS because TECS and CLASS share certain information automatically.  **[Cooper at RT 431:20-432:23.]**

86.     REDACTED

87.     REDACTED

88.     REDACTED

89.     Dr. Ibrahim was not provided any specific information about the information supporting the revocation, and did not have the opportunity to specifically address allegations of which she had no notice.  **[Cooper at RT 449:4-16.]**

90.     REDACTED

91.     When Dr. Ibrahim asked what that section meant, a DOS representative wrote the word "terrorist" on the denial letter, in front of her.  **[Dep. of R. Ibrahim at 195:10-196:9, 199:19-201:3, 201:5-10; Exh. 47, p. P001033.]**

92.     The box stating "You are eligible to apply for a waiver of the ground(s) of ineligibility" has not been checked on the first page of Exhibit 47.  **[Cooper at RT 698:15-**

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

**701:14; Exh. 47, p. P001033.]**

93.     The government denied Dr. Ibrahim's visa to travel to the United States to provide deposition testimony in this case.  **[Exh. 47.]**

94.     Because Dr. Ibrahim could not travel to the United States, she was forced to decline an invitation to a conference, and had to explain to her superiors at UPM the reason she could not go.  **[Ibrahim at RT 208:7-210:3.]**

95.     Dr. Ibrahim was embarrassed by having to disclose to her colleagues that she could not travel to the United State – a fact not known to her staff until that point – and had to send a junior officer to attend the conference in her place.  **[Ibrahim at RT 210:4-211:25.]**

96.     Dr. Ibrahim has a continuing need to travel to the United States to work on her projects.  **[Dep. of R. Ibrahim at 221:10-222:18, 222:23-223:6, 223:17-224:11, 224:14-226:21.]**

97.     Dr. Ibrahim requires travel to the United States in order to commercialize her inventions and interact with venture capitalists.  **[Dep. of R. Ibrahim at 227:15-228:1.]**

98.     Dr. Ibrahim considers the United States her second home.  **[Dep. of R. Ibrahim at 207:16-23, 208:2-5.]Ib**

Dr. Ibrahim's Watchlist Status

99.     As of January 2, 2005, Dr. Ibrahim REDACTED

100.     REDACTED

101.     REDACTED

102.     REDACTED

103.    Defendants assert REDACTED

104.    In 2006, REDACTED

105.    Defendants claim REDACTED

106.    REDACTED

107.    REDACTED

108.    REDACTED

109.    REDACTED

110.    REDACTED

111.    REDACTED                                             .

13

REDACTED

112.   Individuals do not receive notice from DOS that they have been placed in CLASS.  **[Cooper at RT 464:4-6.]**  Outside of the visa application process, individuals have no opportunity to contest their placement in CLASS.  **[Cooper at RT 464:7-20.]**

113.   An individual who was denied a visa because of watchlisting would not be told that he or she was denied because of watchlisting.  **[Lubman at RT 607:22-608:15.]**

114.   REDACTED

115.   Even if plaintiff had a visa, she would still be screened through the TECS system by Customs and Border Patrol (CBP) before entry.  **[Lubman at RT 620:3-14.]**

116.   REDACTED

117.   REDACTED

118.   Being watchlisted in the TSDB affects travel because the final rule for the government's Secure Flight program allows the government to check against the full TSDB, not just the No Fly or Selectee List.  **[Kahn at RT 398:15-399:6; Exh. 522.]**

119.   REDACTED

120.   Airlines carrying passengers to the United States are required to screen them before they board, REDACTED

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL; Case No. C 06-0545 WHA

1   REDACTED

2       121.   REDACTED

3           the NTC sent an email to Philippine Airlines with the subject line "Possible

4   No-Board Request, PNR, WND, YJS."  **[Dugan at RT 807:7-809:6.]**

5       122.   REDACTED

6

7

8       123.   The no-board recommendation caused Ms. Mustafa Kamal not to board her flight

9   in Kuala Lumpur, because she was told she would be denied boarding in Manila.  **[Declaration**

10  **of Raihan Mustafa Kamal (Docket No. 651, ¶¶ 11-19.]**

11      124.   Defendants provided her a "travel letter," which is addressed to the carrier, not the

12  entity who would admit a U.S. citizen to the United States.  **[Dugan at RT 830:20-831:20.]**

13      125.   DHS knew REDACTED

14                          **[RT at 840:20-841:15.]**

15      126.   REDACTED

16  **[Lubman at RT 301:10-302:2.]**

17      127.   Dr. Ibrahim applied for a visa to testify in this case at trial.  **[Cooper at RT**

18  **689:13-15.]**

19      128.   REDACTED

20                          :

21

22

23                  <u>**CONCLUSIONS OF LAW**</u>

24  <u>Fifth Amendment Right to Procedural Due Process</u>

25      1.     "A procedural due process claim has two distinct elements: (1) a deprivation of a

26  constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

27  protections."  *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (internal quotation

28
PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

1    marks omitted).  Even in the face of national security concerns, due process requires "notice of

2    the factual basis for [the aggrieved party's] classification, and a fair opportunity to rebut the

3    Government's factual assertions before a neutral decisionmaker."  *Hamdi v. Rumsfeld*, 542 U.S.

4    507, 533 (2004) (plurality), *superseded by statute on other grounds as noted in Gherebi v.*

5    *Obama*, 609 F. Supp. 2d 43, 50 (D.D.C. 2009).

6         2.    The due process balancing test under *Mathews v. Eldridge*, 424 U.S. 319, 335

7    (1976) weighs: (1) the private interest that will be affected by the official act, (2) the risk of an

8    erroneous deprivation of such interest through the procedures used and the probable value of

9    additional procedural safeguards; and (3) the Government's interest, including the function

10   involved and the fiscal and administrative burdens that the additional procedural requirement

11   would entail.

12        3.    The placement of Dr. Ibrahim's identity on terrorist watchlists without an

13   adequate means for redress violates her recognized liberty and property interests.  (Facts 1-128.)

14             a.    The right to international travel is a constitutionally protected liberty interest

15   under the Due Process Clause of the Fifth Amendment.  *Aptheker v. Secretary of State*, 378

16   U.S. 500, 505, 514 (1964).  Dr. Ibrahim has a continuing right to travel internationally under

17   the Due Process Clause of the Fifth Amendment, due to her significant voluntary connection

18   with the United States.  *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994-97 (9th Cir.

19   2012) ("*Ibrahim II*").          [REDACTED

20                                                        , violated Dr. Ibrahim's

21   liberty interest in the right to international travel.  (Facts 19-128.)

22             b.    "[T]he paradigmatic liberty interest under the due process clause is freedom from

23   incarceration."  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *see also Hamdi*, 542

24   U.S. at 529.  REDACTED                                         violated Dr. Ibrahim's

25   liberty interest in freedom from incarceration.  (Facts 58-68.)

26             c.    Laws that deprive individuals of liberty or property interests based simply on their

27   associations, memberships, and beliefs violate the First Amendment.  *See, e.g., Cole v.*

28

                                            16
     PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
     Case No. C 06-0545 WHA

*Richardson*, 405 U.S. 676, 680 (1972); *In re Stolar*, 401 U.S. 23, 30-31 (1971); *Cummings v. Hampton*, 485 F.2d 1153, 1154-56 (9th Cir. 1973).                REDACTED

violated Dr. Ibrahim's liberty interest in free association with other Muslims and with her family members. (Facts 21-25, 38, 43-44, 51, 62.)

d.   The right to pursue a profession is a protected liberty interest.  *See Sagana v. Tenorio*, 384 F.3d 731, 742-43 (9th Cir. 2004); *Lester v. Parker*, 235 F.2d 787, 788-90 (9th Cir. 1956) (per curiam); *Greene v. McElroy,* 360 U.S. 474, 492 (1959).                REDACTED

violated Dr. Ibrahim's liberty interest in freedom to pursue the occupation of her choice. (Facts 94-98.)

e.   Possession of money is a recognized property interest.  *See Vance v. Barrett*, 345 F.3d 1083, 1088, n.6 (9th Cir. 2003) (*citing Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996); *cf. Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972).                REDACTED

violated Dr. Ibrahim's property interest in the possession of money in March 2005, when she was denied boarding on a flight to the United States that she had paid for. (Facts 70-73.)

f.   Under the "stigma-plus" test, a liberty interest is violated by: (1) "the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, *plus*"; (2) "the denial of 'some more tangible interest [] such as employment,' or the alteration of a right or status recognized by state law."  *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (*quoting Paul v. Davis*, 424 U.S. 693, 701, 711 (1976)).                REDACTED                is stigmatizing, and defendants' dissemination of the false, stigmatizing assertion that Dr. Ibrahim is a known or reasonably suspected terrorist directly caused the denial or alteration of her protected liberty interests in international travel and freedom from incarceration. (Facts 19-128.)

g.   The right to equal protection is fundamental.  Defendants' conduct in targeting Dr. Ibrahim for investigation and watchlisting violated this fundamental right. (Facts 17-18, 21-25, 38, 43-44, 51, 62.)

4.     Defendants' current procedures pose an unacceptably high risk of an erroneous deprivation of a protected liberty or property interest for the following reasons:

a.   Defendants' failure to provide Dr. Ibrahim pre- or post-deprivation notice of the factual basis for its decision REDACTED                                                                     increases the risk of an erroneous deprivation of her protected liberty and property rights to an unacceptable degree. (Facts 13, 19-20, 31, 46, 50, 52, 53-57, 64-66, 74-85, 89, 106-128.)

b.   Defendants did not provide adequate training to Special Agent Kelley REDACTED
. (Facts 28-30, 33-37.)

c.   Defendants' training materials contained factual inaccuracies and improper stereotyping of Muslims. (Fact 38.)

d.   Defendants' policy is to watchlist everyone subjected to a full or preliminary international terrorism investigation. (Facts 54-55.)

e.   The "reasonable suspicion" standard is extremely low and susceptible to abuse. *Humphries*, 554 F.3d at 1194-95 (inclusion in a child abuse database based on a determination that a report is "not unfounded" is a "very low threshold" and the "reverse of the presumption of innocence"). (Facts 19-20, 30-32, 106, 109.)

f.   Defendants failed REDACTED                                                                     .
(Facts 106-107.)

g.   Defendants apply REDACTED

(Fact 109.)

h.   Defendants have failed to adopt adequate procedures for testing the accuracy of facts gathered during investigations, whether those facts are gathered during interviews, from informants, or though data mining. (Facts 13, 19-20, 32, 46, 55, 82 85, 88, 89, 99-128.)

i.   Defendants' current procedures create an undue risk that incorrect information will be perpetuated throughout the screening process. (Facts 13, 19-20, 32, 46, 55, 82 85, 88, 89, 99-128.)

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

j.   REDACTED                                                              is so confusing that

it risks error. (Fact 28.)

k.   Defendants' DHS TRIP program is the only means available for members of the

public to request that defendants review an erroneous TSDB listing, short of filing a civil

lawsuit.  (Facts 78-82.)

l.   The DHS TRIP program does not provide watchlisted individuals with notice of

the factual basis for their watchlisting, or a fair opportunity to rebut the government's factual

assertions before a neutral decisionmaker.  (Facts 78-82.)

m.  A redress process that does not provide for any discovery, such as defendants'

PIVF and DHS TRIP procedures, risks error because a redacted one-sided record that does

not include the factual basis for the watchlisting does not afford a meaningful opportunity for

the complainant to challenge his or her placement on the TSDB.  (Facts 78-82.)

n.   Defendants' redress procedures allow the public to submit redress requests to the

TSA and not to TSC, but the TSA has no power to provide the relief requested.  *See Latif v.*

*Holder*, 686 F.3d 1122, 1129 (9th Cir. 2012).  (Facts 78-82.)

o.   Defendants routinely watchlist individuals whose nexus to terrorism is speculative

or nonexistent, and these individuals make up the vast majority of TSDB entries. (Facts 31,

32, 40, 45, 46.)

p.   Defendants have avoided collecting certain demographic information about

watchlisted individuals – namely religion – that could either establish or refute their liability

for equal protection violations.  The failure to collect such statistics facilitates a lack of

accountability for discrimination based on religion, which also tends to increase the risk of

error.  (Facts 16, 31.)

5.      The government's interest in watchlisting persons whose nexus to terrorism is

speculative or nonexistent is not sufficient to justify the infringement of protected liberty and

property interests caused by placement in the TSDB and its associated databases.  (Facts 1-128.)

6.      The government has not met its burden of showing that a compelling or even a

19

1   legitimate government interest justifies refusal to provide Dr. Ibrahim additional procedural

2   protections.  (Facts 1-128.)

3        7.     The government could provide additional procedural protections to Dr. Ibrahim

4   without compromising national security. *See*, *e.g.*, *Hamdi*, 542 U.S. at 536-538; *Kindhearts for*

5   *Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 904-08 (N.D. Ohio 2009).

6        8.     Defendants' conduct in                REDACTED

7   and publication of REDACTED                    to local law enforcement officers, thereby causing

8   her arrest on January 2, 2005, violated her protected liberty interest in freedom from

9   unreasonable searches and seizures, without adequate procedural protections, as well as her

10  protected liberty interest in avoiding stigma in connection with such a deprivation. (Facts 60-61,

11  63, 65-66, 67.)

12       9.     Defendants' conduct in                REDACTED

13  and publication of REDACTED                    to commercial airlines and various law enforcement

14  agencies, thereby preventing her from boarding her scheduled flight on January 2, 2005 and her

15  flight in Kuala Lumpur in March 2005, violated her protected liberty interest in the right to

16  travel, without adequate procedural protections, as well as her protected liberty interest in

17  avoiding stigma in connection with such deprivation. (Facts 60-61, 63, 65-66, 67-73.)

18       10.    Defendants' conduct in                REDACTED

19  and revoking her visa without notice, based on nothing more than the opening of an

20  investigation, and resulting in the loss of nearly an entire month's salary, violated her protected

21  property interest in possession of money, without adequate procedural protections.  (Facts 70-

22  74.)

23       11.    Dr. Ibrahim is entitled to a name-clearing hearing regarding REDACTED

24                                    *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d

25  1250, 1256 (9th Cir. 2008).

26       12.    Defendants' conduct in                REDACTED

27  and publication of REDACTED                    to federal law enforcement agencies, customs and

20

1   border patrol authorities, consular officials, State Department employees, and others continues to

2   interfere with plaintiff's right to travel, plaintiff's right to pursue her chosen occupation, and

3   subjects plaintiff to an undue risk that she will be falsely arrested if she attempts to enter the

4   United States even if she could obtain a visa, without adequate procedural protections. (Facts 83-

5   127.)

6        13.     Defendants' conduct in                 REDACTED

7   violated and continues to violate plaintiff's First Amendment right to associate with her spouse,

8   without adequate procedural protections. (Facts 25, 51.)

9        14.     Defendants' conduct in                 REDACTED

10  violated and continues to violate plaintiff's First Amendment right to exercise her religion and

11  associate with other Muslims, without adequate procedural protections.  (Facts 21-25, 38, 43-44,

12  51, 62.)

13       15.     Defendants' conduct in                 REDACTED

14  violated and continues to violate plaintiff's right to equal protection, without adequate procedural

15  protections.  (Facts 21-25, 38, 43-44, 51, 62.)

16       16.     Defendants' decision to deny plaintiff a visa without adequate explanation, when

17  she admittedly is not a threat, and without opportunity for waiver violates plaintiff's right of due

18  process.  *Din v. Kerry*, 718 F.3d 856 (2013).

19  Fifth Amendment Right to Substantive Due Process

20       17.     Substantive due process protects individuals against "the exercise of power

21  without any reasonable justification in the service of a legitimate governmental objective."

22  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  The first step in the analysis is to

23  identify a fundamental life, liberty, or property interest that has been infringed by government

24  action.  *See Washington v. Glucksberg*, 521 U.S. 702, 719-21 (1997).  The next step is to analyze

25  whether the government's action is so egregious and lacking in justification as to be "arbitrary in

26  the constitutional sense."  *Lewis*, 523 U.S. at 845-46.  Under the "shocks the conscience" test,

27  when officials with the luxury to make unhurried judgments and "extended opportunities to do

28

21

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

better" nevertheless exhibit "protracted failure even to care, indifference is truly shocking." *Id.* at 847, 853.

18.    Defendants' conduct in REDACTED

violated her Ibrahim's protected liberty interests in the unenumerated rights to travel and to work in her chosen field without unreasonable restrictions, and her protected property interest in money spent on international travel. (Facts 19-128.)

19.    Defendants' conduct in REDACTED                                          ,
and publication of REDACTED                  to commercial airlines and various law enforcement agencies, thereby preventing her from boarding her scheduled flight on January 2, 2005, violated her protected liberty interest in the right to travel, and was arbitrary and capricious. (Facts 70-73.)

20.    Defendants' conduct in REDACTED                                          ,
and revoking her visa without notice, based on nothing more than the opening of an investigation, and resulting in the loss of nearly an entire month's salary, violated her protected property interest in possession of money, and was arbitrary and capricious. (Facts 70-74.)

21.    Defendants' conduct in REDACTED                                          ,
and publication of REDACTED                  to federal law enforcement agencies, customs and border patrol authorities, consular officials, State Department employees, and others continues to interfere with plaintiff's right to travel as well as her right to pursue her chosen occupation, and is arbitrary and capricious. (Facts 79-127.)

The Administrative Procedure Act

22.    The Administrative Procedure Act authorizes district courts to issue injunctive relief to correct agency action that is: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; . . . or (F) unwarranted by the facts[.]" 5 U.S.C. § 706.

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

1    23.    Defendants' conduct in REDACTED

2  was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in

3  violation of the APA, 5 U.S.C. § 706(2)(A).  (Facts 1-128.)

4    24.    Defendants' conduct in REDACTED

5  was contrary to constitutional right, power, privilege, or immunity, in violation of the APA, 5

6  U.S.C. § 706(2)(B).  (Facts 1-128.)

7  First Amendment

8    25.    "The right to freedom of association is a right enjoyed by religious and secular

9  groups alike." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694,

10  706 (2012).  "Infringements on that right may be justified by regulations adopted to serve

11  compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

12  means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S.

13  609, 623 (1984).

14    26.    Defendants' conduct in REDACTED

15    infringed on her right to associate with other Muslims and with her family members.

16  (Facts 21-25, 38, 43-44, 51, 62.)

17    27.    The government lacks a reasonable belief that Dr. Ibrahim is associated with

18  terrorism and therefore cannot meet its burden to show that its actions were supported by a

19  compelling or even a legitimate government interest.  (Facts 19-20, 109.)

20    28.    The government has not met its burden to show that less restrictive measures

21  would not address its alleged interests.  (Facts 1-128.)

22    29.    To establish a First Amendment retaliation claim, the plaintiff must show (1) the

23  defendant acted to deter or chill the plaintiff's speech, *Mendocino Envtl. Ctr. v. Mendocino*

24  *County*, 192 F.3d 1283, 1300 (9th Cir. 1999); and (2) the defendant's desire to chill speech was

25  the "but for" cause of the unlawful conduct.  *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th

26  Cir. 2013).

27    30.    In denying Dr. Ibrahim's 2009 visa application and not granting her most recent

28

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

1  visa application, defendants intended to interfere with plaintiff's clearly established right to

2  petition the court for redress of grievances, and they would not have watchlisted her but for this

3  desire. (Facts 83, 88, 89-92, 110, 127.)

4         31.    Defendants' conduct in REDACTED

5  interfered with plaintiff's right to associate with her family members. (Facts 25, 51.)

6         32.    Defendants' conduct in REDACTED

7  interfered with plaintiff's right to associate with others of the Muslim faith. (Facts 21-25, 38, 43-

8  44, 51, 62.)

9         33.    Defendants' 2009 conduct in REDACTED

10  s interfered with plaintiff's right to exercise her First Amendment right to free speech

11  and to petition for redress of grievances. (Facts 83, 88, 89-92, 110, 127.)

12  <u>Equal Protection</u>

13         34.    A plaintiff alleging a violation of equal protection must show that the defendant

14  acted in a discriminatory manner and that the discrimination was intentional.  *See Washington v.*

15  *Davis*, 426 U.S. 229, 238-47 (1976).  Intent may be proved through direct or indirect evidence.

16  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

17         35.    Dr. Ibrahim is a Muslim, ethnically Malay, and a citizen of Malaysia.  All of these

18  classifications receive strict scrutiny.

19         36.    Discriminatory acts towards third parties may be relevant to show discriminatory

20  intent towards the plaintiff.  *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007).

21  Defendants' disproportionate targeting of Muslims for counterterrorism investigations, combined

22  with their policy of automatically watchlisting all persons subjected to a full or preliminary

23  investigation, is circumstantial evidence of intent to discriminate against plaintiff.  *Cf. Church of*

24  *the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("Apart from the text,

25  the effect of a law in its real operation is strong evidence of its object.").  Here, the government

26  has consciously chosen to focus its law enforcement efforts on Muslims because of, not in spite

27  of, their religious beliefs.  The effect of the government's watchlisting scheme on Muslims is so

28

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA

1    harsh, intent to discriminate is not only a permissible inference, it is also a necessary one.  *See*

2    *Flores*, 617 F.2d at 1389.  The other available direct and circumstantial evidence also shows that

3    defendants intentionally discriminated against Dr. Ibrahim REDACTED

4                         .  (Facts 21-25, 31, 38, 43-44, 49-51, 62.)

5          37.   Defendants' conduct REDACTED

6    violated her right to equal protection.

7          38.   Defendants must set aside their decisions REDACTED

8

9

10

11         39.   Defendants shall communicate the removal of Dr. Ibrahim's name from the TSDB

12   and all its supported databases, including but not limited to, TECS/IBIS, CLASS,

13   VGTOF/KSTF, TUSCAN, TACTICS, the No Fly List, and the Selectee List, to the United States

14   Visa Office, the United States Embassy in Kuala Lumpur, Malaysia, and any other government

15   agency, foreign or domestic, that relies on information from the TSDB or any of its supported

16   databases.

17         40.   It would not harm national security for Dr. Ibrahim to be informed of her current

18   and historic watchlist status.  Plaintiff's counsel may inform Dr. Ibrahim of her current and

19   historic watchlist status.

20         41.   Dr. Ibrahim is entitled to a public trial in this matter.

21   DATED:  December 13, 2013               McMANIS FAULKNER

22

23                                   /s/  Christine Peek
                                    CHRISTINE PEEK

24
                                    Attorneys for Plaintiff,
25                                   Rahinah Ibrahim

26

27

28

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL;
Case No. C 06-0545 WHA