JAMES McMANIS (40958)
ELIZABETH PIPKIN (243611)
CHRISTINE PEEK (234573)
McMANIS FAULKNER
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:     (408) 279-8700
Facsimile:     (408) 279-3244
Email:          cpeek@mcmanislaw.com
                epipkin@mcmanislaw.com

Attorneys for Plaintiff,
Rahinah Ibrahim

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RAHINAH IBRAHIM, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>        Defendants. | Case No. C 06-0545 WHA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS (REDACTED)**<br>Date:   March 13, 2014<br>Time:   8:00 a.m.<br>Ctrm:   8 – 19th Floor<br>Judge:  The Hon. William Alsup |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................. 1

I.  DEFENDANTS DID NOT TELL THE TRUTH
    REGARDING DR. IBRAHIM FOR NINE YEARS AND
    FAILED TO TAKE REASONABLE MEASURES TO
    CORRECT THEIR MISTAKES ................................................................. 1

II. DEFENDANTS DELAYED, AND THUS DENIED,
    JUSTICE TO DR. IBRAHIM BY MAKING THE SAME
    UNMERITORIOUS PROCEDURAL ARGUMENTS
    AGAIN AND AGAIN ................................................................................. 2

III. THE FEDERAL DEFENDANTS MISREPRESENTED
     THEIR RELIANCE ON THE ALLEGED STATE
     SECRETS EVIDENCE .............................................................................. 4

IV. DEFENDANTS REFUSED TO FOLLOW THE COURT'S
    SCHEDULING ORDERS AND UNNECESSARILY
    DELAYED DISCOVERY FOR YEARS .................................................... 5

V.  DEFENDANTS IMPROPERLY ASSERTED PRIVILEGES
    THROUGHOUT DISCOVERY TO KEEP PLAINTIFF
    FROM LEARNING WHAT REALLY HAPPENED ................................... 7

VI. DEFENDANTS OBSTRUCTED THE TRAVEL OF
    PLAINTIFF TO TESTIFY .......................................................................... 8

VII. THE FEDERAL DEFENDANTS MISREPRESENTED THE
     REASON PLAINTIFF'S DAUGHTER WAS UNABLE TO
     BOARD HER FLIGHT TO THE UNITED STATES .............................. 8

VIII. DEFENDANTS MADE IMPROPER PRIVILEGE
      ASSERTIONS DURING THE TRIAL, WHICH
      INTERRUPTED PLAINTIFF'S QUESTIONING AND
      CAUSED INFORMATION TO BE WITHHELD FROM
      THE PUBLIC NEEDLESSLY ................................................................... 9

IX. DEFENDANTS' MAIN WITNESS HAD TO CORRECT
    HER SWORN DEPOSITION TESTIMONY AT TRIAL .................... 11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD
OF ATTORNEYS' FEES AND COSTS (REDACTED); Case No. C 06-0545 WHA

LEGAL ARGUMENT ..................................................................................................... 11

I.       PLAINTIFF IS ENTITLED TO ATTORNEYS FEES
       UNDER THE EQUAL ACCESS TO JUSTICE ACT, 28
       U.S.C. 2412, *ET SEQ.*, BECAUSE SHE IS THE
       PREVAILING PARTY AND FEDERAL DEFENDANTS
       ACTED IN BAD FAITH ................................................................ 11

       A.     Plaintiff Is Entitled To Attorneys' Fees At Market
             Rates Under 28 U.S.C. § 2412(b) Due To Federal
             Defendants' Bad Faith .................................................... 12

       B.     In The Alternative, Plaintiff Is Entitled To Attorneys'
             Fees At The Statutorily Determined Rate Under 28
             U.S.C. § 2412(d)(1)(A), With A Rate Enhancement For
             Certain Counsel With Specialized Skill And
             Knowledge ..................................................................... 13

           (1)    The Federal Defendants' Position Was Not
                  Substantially Justified. ..................................... 14

           (2)    A Rate Enhancement Is Appropriate For
                  McManis Faulkner Because No Other Firm
                  Would Take Dr. Ibrahim's Case Due To The
                  Difficulty Of The Issues, Even Though Her
                  Case Had Merit ................................................. 15

           (3)    In Addition, A Rate Enhancement Is
                  Appropriate For Plaintiff's Counsel, James
                  McManis, Christine Peek, and Marwa
                  Elzankaly For Their Specialized Knowledge
                  And Skill In Constitutional Cases ..................... 16

II.      PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES AS
       SANCTIONS AGAINST FEDERAL DEFENDANTS FOR
       THEIR NUMEROUS DISCOVERY ABUSES ....................................... 16

III.     PLAINTIFF'S COUNSEL'S RATES ARE REASONABLE,
       AS ARE THE EXPENSES CLAIMED .............................................. 17

CONCLUSION ...................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aetna Life Ins. Co. v. Alla Medical Servs., Inc.*,
  855 F.2d 1470 (9th Cir. 1988) ................................................................. 3

*Andrew v. Bowen*,
  837 F.2d 875 (9th Cir. 1988) ................................................................. 14

*Bay Area Peace Navy v. United States*,
  914 F.2d 1224 (9th Cir. 1990) ............................................................... 14

*Brown v. Sullivan*,
  916 F.2d 492 (9th Cir. 1990) ........................................................... 12, 13

*Cazares v. Barber*,
  959 F.2d 753 (9th Cir. 1992) ........................................................... 12, 13

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ................................................................................ 12

*Commissioner, INS v. Jean*,
  496 U.S. 154 (1990) .............................................................................. 17

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) .............................................................................. 17

*Ibrahim v. Department of Homeland Security*,
  538 F.3d 1250 (9th Cir. 2008) ("*Ibrahim I*") ......................................... 3

*Ibrahim v. Department of Homeland Security*,
  669 F.3d 983 (9th Cir. 2012) ("*Ibrahim II*") ........................................ 3

*In re September 11 Litig.*,
  236 F.R.D. 164 (S.D.N.Y. 2006) ........................................................... 7

*Miranda v. Southern Pacific Transp. Co.*,
  710 F.2d 516 (9th Cir. 1983) ................................................................. 3

*Mohamed v. Jeppesen Dataplan, Inc.*,
  614 F.3d 1070 (9th Cir. 2010) (en banc) ............................................... 4

*Pierce v. Underwood*,
  487 U.S. 552 (1988) .............................................................................. 15

*Rawlings v. Heckler*,
  725 F.2d 1192 (9th Cir. 1984) ............................................................... 12

*Rodriguez v. United States*,
  542 F.3d 704 (9th Cir. 2008) .......................................................... 11, 12

*Thomas v. Peterson*,
  841 F.2d 332 (9th Cir. 1988) ............................................................... 14

iii

*United States v. First Nat'l Bank of Circle*,
    732 F.2d 1444 (9th Cir. 1984) ............................................................................................ 14

**Statutes**

28 U.S.C. § 2412, *et seq.* ...................................................................................................... 11

28 U.S.C. § 2412(b) ........................................................................................................ 11, 12

28 U.S.C. § 2412(d)(1)(A) ................................................................................................ 13, 14

28 U.S.C. § 2412(d)(2)(A)(ii) ........................................................................................... 14, 15

49 U.S.C. § 114 ........................................................................................................................ 7

Fed. R. Civ. P. 11(b)(1)-(2) ...................................................................................................... 3

Fed. R. Civ. P. 16(f)(1)(C) ...................................................................................................... 16

Fed. R. Civ. P. 16(f)(2) ........................................................................................................... 16

Fed. R. Civ. P. 37(a)(5) ........................................................................................................... 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD
OF ATTORNEYS' FEES AND COSTS (REDACTED); Case No. C 06-0545 WHA

**INTRODUCTION**

This case is the first successful challenge to a government watchlist and the subject of multiple groundbreaking rulings by the Court as well as two landmark Ninth Circuit opinions. Throughout the case, the government has repeatedly denied Dr. Ibrahim any measure of justice and done everything within its power to hide the truth about her situation. The Court ruled in Dr. Ibrahim's favor, granting her injunctive and declaratory relief. The government's campaign to conceal its erroneous watch listing of an innocent woman was manifestly unjustified. By law, Dr. Ibrahim is the prevailing party and is therefore entitled to attorneys' fees for prosecuting this case that has benefited all Americans.

**STATEMENT OF FACTS**

I.      **DEFENDANTS DID NOT TELL THE TRUTH REGARDING DR. IBRAHIM FOR NINE YEARS AND FAILED TO TAKE REASONABLE MEASURES TO CORRECT THEIR MISTAKES.**

When Dr. Ibrahim was arrested in 2005, the Department of Homeland Security told her that her name had been removed from the no-fly list. The DHS representative also told her that she should not have gone through the ordeal of her denial of boarding and arrest. (Ibrahim Depo. Desig., 133:12-15.) Dr. Ibrahim told Lee Korman, the DHS inspector, that "[y]ou should have all your information up to date as quickly as you can." (Ibrahim Depo. Desig., 131:4-8.)

Although defendants said they would fix the problem, they turned around and did the opposite. Defendants continued to prohibit plaintiff's travel to the United States. Dr. Ibrahim had to pursue this case to clear her name, resulting in this Court's order requiring defendants to make the proper corrections. Incredibly, defendants kept REDACTED in the dark for many years, neglecting to discuss REDACTED with REDACT until right before REDACT REDACTED in 2013.

Even worse, defendants continued to humiliate Dr. Ibrahim by falsely branding her a "terrorist." In this vein, the government employed a cloak-and-dagger approach to this litigation, refusing to acknowledge to Dr. Ibrahim and the world that she is not a threat. The Court's recent public summary was the first time that Dr. Ibrahim and the public received any acknowledgement of her factual innocence from the United States government. Defendants

1

relied on lawyers' tactics to delay the matter and hide the truth while the taint of false allegations haunted Dr. Ibrahim.

Defendants' overreaching behavior regarding secrecy in this matter continues to this day. The Court ordered the parties to meet and confer on release of a redacted version of the Court's sealed opinion dated January 14, 2014. The sealed opinion would allow plaintiff and the public to understand more about what happened in the case and contains many facts for which the government asserts no privilege. Plaintiff has twice inquired of defendants regarding their proposed redactions, once on January 15, 2013, and again on January 24, 2013. Defendants have not provided their proposed redactions to plaintiff.

## II. DEFENDANTS DELAYED, AND THUS DENIED, JUSTICE TO DR. IBRAHIM BY MAKING THE SAME UNMERITORIOUS PROCEDURAL ARGUMENTS AGAIN AND AGAIN.

This case is a testament to the Department of Justice's ability to make the same procedural arguments over and over. Defendants never contested this case on its merits. Instead, they engaged in extensive motion practice to shield their wrongful actions from scrutiny. In the process, the government succeeded in halting the case for two appeals. The first appeal addressed jurisdictional issues, holding that this Court had jurisdiction over the TSC and other agencies but not the TSA.

On remand after the first appeal in 2008, the government primarily argued that the federal defendants cause Dr. Ibrahim no harm sufficient to confer standing. The Court and the Ninth Circuit repeatedly rejected the government's mistaken assertion that Dr. Ibrahim suffered no redressable injury, yet the government advanced the same argument at every stage of the case. When the case was remanded to this Court in 2012, the government filed yet another motion to dismiss based on standing. At that time, plaintiff alerted the Court and defendants that the government's repeated use of the same standing arguments was abusive:

> The government has filed four previous motions to dismiss Ibrahim's various claims for relief on standing grounds, in three different courts. (*See* Federal Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss Plaintiff's Claims For Lack of Subject Matter Jurisdiction (Docket No. 63), pp. 14:16-16:2, filed in this action on May 22, 2006; Federal Defendants' Memorandum in Support of Motion to Dismiss (Docket No. 167-2), pp. 5:11-9:17, filed in this action on June 1, 2009; RJN, Exhs. A-C (motions to dismiss

2

plaintiff's petition for review of the TSA's orders in the Ninth and District of Columbia Circuits); *see also* Peek Decl., ¶ 23, Exh. Y, pp. 6:5-15.)  The government has argued the issue of standing twice on appeal to the Ninth Circuit.  *See Ibrahim v. Department of Homeland Security*, 538 F.3d 1250, 1256, n.9 (9th Cir. 2008) ("*Ibrahim I*"); *see Ibrahim v. Department of Homeland Security*, 669 F.3d 983, 2012 U.S. App. LEXIS 2457, *19-24 (9th Cir. 2012) ("*Ibrahim II*").  The government's standing arguments have been rejected three times, once by this Court and twice by the Ninth Circuit.  (*See* Order on Motions to Dismiss (Docket No. 197), pp. 7:2-10:2, filed in this action on July 27, 2009; *Ibrahim II*, 2012 U.S. App. LEXIS 2457, at *19-24; RJN, Exhs. D-F (denying government's petition for rehearing on standing issue).)

. . .

The government's filing of yet another motion to dismiss on the purported ground that Ibrahim lacks standing is sanctionable under Rule 11(b).  The government's motion is frivolous, harassing, and serves no purpose other than delay.  *See* Fed. R. Civ. P. 11(b)(1)-(2); *see also Aetna Life Ins. Co. v. Alla Medical Servs., Inc.*, 855 F.2d 1470, 1475-77 & n.3 (9th Cir. 1988).  Even if the motion is not frivolous, as the *Aetna* court observed, "there comes a point when successive motions and papers become so harassing and vexatious that they justify [Rule 11] sanctions even if they are not totally frivolous under the standards set forth in our prior cases."  *Aetna*, 855 F.2d at 1476 (emphasis added).  The government has reached that point.[3]

FN 3: Although Ibrahim does not seek sanctions at this time, she notes the Court has inherent power to sanction violations of the Federal Rules and assess attorneys' fees directly against attorneys who conduct litigation in bad faith.  *See Miranda v. Southern Pacific Transp. Co.*, 710 F.2d 516, 520-21 & n.9 (9th Cir. 1983).  Ibrahim reserves the right to seek sanctions and attorneys' fees in the future based on the government's tactic of filing serial motions to dismiss on the same issue it lost three times previously.

(Plaintiff's Memorandum of Points and Authorities in Opposition to Federal Defendants' Motion to Dismiss (Docket No. 382), 5:20-6:9, 8:6-15 & n.3.)

After plaintiff filed the above statement, the Court indeed denied the government's 2012 motion to dismiss based on standing.  Undeterred, the government moved for summary judgment on the same grounds, again denied.  The government then stood up in both opening and closing arguments in 2013 and made the same standing arguments it had already lost many times.  The government also relied on the same argument in its proposed findings of fact and conclusions of law.  The government's repeated use of the same faulty positions unnecessarily prolonged this action and wasted the resources of all involved.

Defendants went so far as to imply that plaintiff was ▮▮▮REDACTED▮▮▮ when they knew otherwise.  In a petition for rehearing before the Ninth Circuit filed on April 25, 2012,

defendants stated that '[e]ven if it were assumed that plaintiff was on a watchlist in 2005, it could not be inferred that she continues to be on one in 2012." (Peek Decl., Exh. D, p. 2.)  Defendants made this statement knowing full well that REDACTED

REDACTED   Therefore, it was false to imply that she could not allege or prove that REDACTED

### III.   THE FEDERAL DEFENDANTS MISREPRESENTED THEIR RELIANCE ON THE ALLEGED STATE SECRETS EVIDENCE.

At the April 18, 2013 hearing on plaintiff's motion to compel, defense counsel represented to the Court that if the state secrets privilege were invoked, then that evidence was simply excluded from the case and could not be relied upon by either side.  Defendants further solidified that position in their response to the Court's request for a submission stating whether they agreed that the government "may not rely in any way upon any information it has refused to turn over to plaintiff in response to a reasonable request":

> In response, Defendants affirm that they will not rely on any information they have withheld on grounds of privilege from Plaintiff in response to a discovery request in this case.  Defendants are mindful of the Court's December 20, 2012 ruling (Dkt. 399) that the Government may not affirmatively seek to prevail in this action based upon information that has been withheld on grounds of privilege, and have acted in a manner consistent with that ruling in both the assertion of privilege and summary judgment briefing.

(Docket No. 541, p. 2.)  Nevertheless, the government argued for the first time on summary judgment that in the alternative to its standing arguments, it was entitled to judgment in its favor as a matter of law, based on the state secrets privilege.  (Docket No. 534, pp. 23-25.)  Although the Court denied defendants' summary judgment motion on that issue, defendants continued to argue at the pretrial conference and at trial that the entire action had to be dismissed because the "core of the case" was subject to the state secrets privilege, citing *Mohamed v. Jeppesen Dataplan, Inc.,* 614 F.3d 1070, 1080 (9th Cir. 2010) (en banc).  The government's reversal of position was another procedural tactic that created additional work for the Court and plaintiff and had nothing to do with the merits of the case.

4

## IV.   DEFENDANTS REFUSED TO FOLLOW THE COURT'S SCHEDULING ORDERS AND UNNECESSARILY DELAYED DISCOVERY FOR YEARS.

Dr. Ibrahim first propounded written discovery on the federal defendants on July 31, 2006.  After remand in 2009, Dr. Ibrahim issued amended requests.  Defendants produced only publicly available reports, and did not produce any documents that related to Dr. Ibrahim's watchlist status specifically.

Although defendants were dismissed from the case in July of 2009, they continued to insert themselves into the proceedings in a manner that obstructed discovery between the remaining parties.  The federal defendants attempted to use executive privileges – primarily the protection applied to "sensitive security information" (SSI) – to prevent the San Francisco defendants, USIS, and Bondanella from disclosing facts about Dr. Ibrahim's 2005 arrest at the airport.  In an attempt to overcome the barrier posed by the federal defendants' SSI objections, two of Dr. Ibrahim's counsel underwent fingerprinting and an extensive background check, and spent a significant amount of time negotiating a special SSI protective order, which was entered on January 13, 2010 (Docket No. 312).  The case against the San Francisco defendants, USIS, and Bondanella settled before any information was produced pursuant to the 2010 SSI order.

After the 2012 remand, Ibrahim propounded amended document requests and interrogatories, which sought the same information as her 2009 requests.  Ibrahim also propounded four 30(b)(6) deposition notices and some additional written discovery, most notably a request that the government admit Dr. Ibrahim did not meet even the very low, publicly available, "generally applicable" standard for inclusion in the consolidated TSDB.  As in the past, the federal defendants responded to Dr. Ibrahim's 2012 discovery requests with numerous privilege objections, including SSI and the law enforcement privilege.  In December, 2012, the court denied the federal defendants' request to stay discovery and overruled their objections to producing any SSI, holding as follows:

> This case does involve SSI, so-called 'sensitive security information.'  But years ago herein, pursuant to a 2006 statute, plaintiff's counsel were cleared by the agencies involved to receive and review SSI.  The government's persistent and stubborn refusal to follow the statute and continued objection to counsel receiving SSI is OVERRULED.  All such SSI reasonably requested in discovery must be

5

turned over to counsel for their review — but not for access by plaintiff herself. This must be done pursuant to the protective order already in place (Dkt. No. 312).

(*See* Docket No. 399, 11:28-12:6 (capitalization in original).)

In January 2013, to facilitate discovery, Dr. Ibrahim's counsel sent two proposed protective orders to government counsel for their review – one regarding sensitive security information and another regarding non-SSI.  Dr. Ibrahim's proposed SSI order was virtually identical to the 2010 SSI order, except that references to previously vacated discovery orders were removed.

On February 7, 2013, the Court ordered defendants to provide a privilege log to plaintiff's counsel by February 19, 2013 at noon, and specifically allowed them to do so on an attorneys' eyes only basis.  (*See* Docket No. 407, p. 2.)  The Court further ordered the parties to negotiate an interim protective order so that plaintiff's counsel could learn her current status. (*See* Docket No. 407, p. 2.)

Defendants did not comply with the Court's February 19, 2013 deadline (*see* Docket No. 416), thereby violating the Court's February 7, 2013 Order and creating more work and delay. In addition, as late as March 2013, defendants repeatedly sought to limit discovery and impose an expedited summary judgment procedure, even though their requests were rejected each time. (*See* Docket Nos. 406, p. 2; 408, pp. 1-2; 417, p. 2; 433, pp. 3-4 (defendants' requests for alternative procedures with limited discovery); Docket Nos. 407; 409, p. 1; 437, p. 2 (rejecting defendants' requests for alternative procedures with limited discovery).)  Defendants' refusal to accept the procedures ordered by this Court necessitated additional work by all concerned before plaintiff could conduct meaningful discovery.

Furthermore, because of defendants' refusal to provide discovery related to plaintiff's situation, plaintiff had to incur the expense of extensive motions to compel that dealt with defendants' numerous unmeritorious privilege objections.  (*See, e.g.,* Docket Nos. 461, 462, and 464.)

## V.   DEFENDANTS IMPROPERLY ASSERTED PRIVILEGES THROUGHOUT DISCOVERY TO KEEP PLAINTIFF FROM LEARNING WHAT REALLY HAPPENED.

After the Court granted in part and denied in part plaintiff's first round of motions to compel in April, 2013, plaintiff proceeded with depositions.  The defendants' conduct during the depositions was even more secretive and obstructive than the Court and the public observed at the trial.  At least four or five government counsel attended each deposition.  These counsel conducted lengthy conferences among themselves both on and off the record while questions were pending and everyone was waiting.  The government lodged more than two-hundred objections and instructions not to answer to questions about Dr. Ibrahim's situation in the depositions of their witnesses (Docket Nos. 491, 492, and 517.)  On top of the constant privilege assertions and long conferences amongst the multiple government lawyers attending every deposition in this case, plaintiff eventually learned that defendants were improperly using the qualified "sensitive security information" privilege to withhold information from plaintiff and her counsel and delay the proceedings.

In July of 2013, plaintiff attempted to use a document at a deposition that the City and County of San Francisco had produced to plaintiff long ago.  Local law enforcement created the document, not the federal government.  For the first time at the deposition, defendants attempted to assert that the document was SSI.  (Peek Decl., Exh. F.)  In the course of meeting and conferring with attorneys for the Transportation Security Administration (TSA) regarding defendants' SSI designations, plaintiff learned for the first time that the Department of Justice had prophylactically marked many documents as SSI, without any determinations or review by the TSA.  (Peek Decl., ¶ 11.)  A federal statute, 49 U.S.C. § 114, and its implementing regulations authorize TSA to designate materials as SSI, not the DOJ.  The documents were not in fact "sensitive security information," and had been misleadingly marked that way. It is improper in litigation for the DOJ, not the TSA, to designate materials as SSI.  *In re September 11 Litig.*, 236 F.R.D. 164, 173 (S.D.N.Y. 2006).

Defendants proceeded in this manner not just with documents, but also with depositions.  No TSA official was present at the depositions to make SSI assertions.  Contrary to statute, the

7

DOJ took matters into its own hands and designated the entirety of each deposition transcript as SSI, requiring a long wait while the TSA reviewed each deposition for SSI designations after the fact.

## VI.   DEFENDANTS OBSTRUCTED THE TRAVEL OF PLAINTIFF TO TESTIFY.

Defendants also deprived plaintiff of the opportunity to travel here to prosecute her case. The Court held that defendants did not provide plaintiff the opportunity for a visa waiver as they should have.  Furthermore, as defendants have always said, they have discretion to let plaintiff or anyone else into the country.  Even if defendants' ultimate decision on plaintiff's visa is not reviewable, defendants chose to exercise their discretion to deprive an innocent person who is not a threat the right to appear in court for her own case, and they went so far as to do the same to plaintiff's daughter.

## VII.   THE FEDERAL DEFENDANTS MISREPRESENTED THE REASON PLAINTIFF'S DAUGHTER WAS UNABLE TO BOARD HER FLIGHT TO THE UNITED STATES.

On the first day of trial, plaintiff's counsel reported that plaintiff's daughter, Raihan Mustafa Kamal, who had been disclosed on plaintiff's witness list, was not permitted to board her flight from Kuala Lumpur to attend trial.  (RT at 3:13-4:23.)  The Court asked defense counsel – who pleaded ignorance – to investigate the reason.  (RT at 5:1-25.)  At the end of the day, defense counsel represented that, "defendants did nothing to deny plaintiff's daughter boarding.  It's our understanding that she just simply missed her flight.  She has been rebooked on a flight for tomorrow.  She should arrive tomorrow."  (RT at 166:10-14.)  In fact, Ms. Mustafa Kamal was denied boarding because someone from the Customs and Border Patrol's National Targeting Center (part of DHS) sent an email to Philippine Airlines with the subject line "Possible No-Board Request, PNR, WND, YJS," which caused Malaysian Airlines to deny boarding to Ms. Mustafa Kamal.  (RT 807:7-809:24; *see also* Declaration of Raihan Mustafa Kamal (Docket No. 651), ¶¶ 11-19.)  Ms. Mustafa Kamal had not made any rebooking (*see* Docket No. 651, ¶¶ 19-20), and defendants' witness could not confirm who had made the alleged rebooking.  (RT at 827:10-828:5.)

8

The truth was disclosed only because Ms. Mustafa Kamal was persistent in her efforts to discover the real reason she was denied boarding and plaintiff's counsel reported the results of her efforts to the Court, causing the Court to request that the government produce a witness.  (RT at 172:8-178:15.)  Had Ms. Mustafa Kamal, plaintiff's counsel, and the Court not persisted in uncovering the facts, defendants were content to leave the Court with the false impression that Ms. Mustafa Kamal simply overslept and failed to arrive on time to the airport, just as they were content to leave the world with the false impression for nine years that Rahinah Ibrahim was a threat to America, and to leave REDACTED  with the false impression that ▒▒ had done nothing wrong.  (RT at 172:8-20.)  True to form, on the date of this filing, the government filed the "redacted" version of the Declaration of Maureen Dugan that withholds relevant, non-privileged information from the public on the issue.

## VIII.   DEFENDANTS MADE IMPROPER PRIVILEGE ASSERTIONS DURING THE TRIAL, WHICH INTERRUPTED PLAINTIFF'S QUESTIONING AND CAUSED INFORMATION TO BE WITHHELD FROM THE PUBLIC NEEDLESSLY.

Plaintiff's counsel used a series of power point slides during her opening statement at trial.  The government lodged myriad objections before openings to protect old information and information that was already in the public domain.  The Court had to caution government counsel a few times that something that was in the public domain could not qualify as SSI.  (RT 50:12-51:19, 67:5-13, 90:11-18.)

Then, after the Court made privilege rulings regarding plaintiff's opening, the government persisted in claiming privilege for information where the privilege was already overruled.  For example, on Slide 19, a timeline of events, there was an entry for October 20, 2009, which stated: "Oct. 20, 2009: Dr. Ibrahim is added to the TSDB for the 3rd time."  On December 2, 2013, counsel for the federal defendants made the following representations to the Court as to Slide 19, and the Court made the following rulings:

THE COURT: All right. Look, I don't need – you don't need -- that was just idle curiosity. You didn't assert it for -- you didn't assert SSI for March 2nd?

MS. FAREL: Correct, your Honor. That statement --is –

THE COURT: But you are asserting LES?

9

MS. FAREL: Yes, your Honor.

THE COURT: **Overruled on LES**.

MS. FAREL: The May 30, 2007, that statement is SSI, as I said, and I believe your Honor ordered that it could not be disclosed publicly. That statement is also –

THE COURT: That is correct under SSI, but I will not -- again, I say that it is so old and stale that it can't possibly -- it may have some residual law enforcement value, but the public interest and public disclosure is too great at this point, **so the privilege has got to give way**.

MS. FAREL: Yes, your Honor. **And then on October 20, 2009, this statement is not SSI for the same reasons that the March 2, 2007, statement is not SSI, but it is LES**. And this is an October 2009 statement.

THE COURT: **Same ruling**. It is a little more recent, but it's still four years ago.

(RT at 68:10-69:6 (emphasis added).)  In this exchange, the Court overruled defendants' assertion of the law enforcement privilege as to the entry for October 20, 2009 on Slide 19. Defendants' counsel specifically stated that the October 20, 2009 information <u>was not SSI</u>.  (RT at 69:2-4.)

Three days later, defense counsel represented that the fact that Dr. Ibrahim was added to the TSDB in October of 2009 "<u>may be SSI</u>."  (RT at 695:21-698:7.)  On this basis, defendants' counsel objected to a question that merely asked the witness to confirm that Dr. Ibrahim was added to the TSDB in October 2009.  (RT at 695:21-696:3; RT at 697:21-23.)  Based on defendants' objection, the Court stated, "So we're not certain what -- whether there's even a privilege there, but for the time being, that part of the transcript will be under seal."  (RT at 697:24-698:1.)  The Court further indicated that the courtroom would have to be closed for any further questioning on this topic.  (RT at 698:2-3.)  Defense counsel's representation to the Court that plaintiff's 2009 TSDB status "<u>may be SSI</u>" contradicted their earlier representation on December 2, 2013 that this status <u>was not SSI</u>.  In fact, the Court had already ruled that the October 2009 information was not privileged and could be publicly discussed.

## IX.   DEFENDANTS' MAIN WITNESS HAD TO CORRECT HER SWORN DEPOSITION TESTIMONY AT TRIAL.

In addition to the misrepresentations and omissions discussed above, defendants' main witness, Debra Lubman, had to concede that her sworn deposition testimony was inaccurate on two points: (1) the response to plaintiff's 2005 Passenger Identify Verification Form; and (2) the current criteria for the No-Fly List.  (RT 342:10-344:13; 345:17-23; 350:6-352:19; 597:21-598:18 & 613:14-617:2.)  Moreover, defense counsel objected to any questioning on the current No-Fly List criteria on the purported ground that, REDACTED

REDACTED (RT at 597:4-598:18.)  This statement was incorrect.  In fact, Ms. Lubman <u>had</u> answered questions about the current No-Fly List criteria during her May 29, 2013 deposition.  (RT at 613:10-617:2.)  Plaintiff's counsel did not learn until the trial that her answer was inaccurate, such that Ms. Lubman felt the need to clarify her testimony on the stand.  (RT at 613:10-617:2.)  Oddly, Ms. Lubman had supposedly already made corrections to her deposition and did not REDACTED

REDACTED

REDACTED.  (Peek Decl., Exh. E.)  Defendants produced a witness at trial who had reviewed her deposition and painstakingly REDACTED  but overlooked a REDACTED

REDACTED.

## LEGAL ARGUMENT

### I.   PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES UNDER THE EQUAL ACCESS TO JUSTICE ACT, 28 U.S.C. § 2412, *ET SEQ.*, BECAUSE SHE IS THE PREVAILING PARTY AND FEDERAL DEFENDANTS ACTED IN BAD FAITH.

The Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, et seq., authorizes a prevailing party in any civil action brought against the United States to obtain attorneys' fees from the government.  Under Section 2412(b) of the EAJA, the "United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law."  28 U.S.C. § 2412(b).  "The common law allows a court to assess attorney's fees against a losing party that has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008) (quoting *Chambers v. NASCO*,

11

*Inc.*, 501 U.S. 32, 45-46 (1991) (citations and internal quotations omitted)).  Attorneys' fees awarded under Section 2412(b) are based upon reasonable market rates.  *Brown v. Sullivan*, 916 F.2d 492, 495 (9th Cir. 1990).

Dr. Ibrahim is entitled to an attorneys' fees award at reasonable market rates under Section 2412(b) of the EAJA because of the federal defendants' bad faith in "the governmental action that precipitated the litigation as well as the government's litigation posture."  *See Rawlings v. Heckler*, 725 F.2d 1192, 1195 (9th Cir. 1984); *Cazares v. Barber*, 959 F.2d 753, 755 (9th Cir. 1992).

### A.   Plaintiff Is Entitled To Attorneys' Fees At Market Rates Under 28 U.S.C. § 2412(b) Due To Federal Defendants' Bad Faith.

"A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent."  *Rodriguez*, 542 F.3d at 709 (internal quotations omitted).  "Mere recklessness does not alone constitute bad faith; rather, an award of attorney's fees is justified when reckless conduct is 'combined with an additional factor such as frivolousness, harassment, or an improper purpose.'"  *Id.* (citation omitted).

In evaluating bad faith and substantial justification, the Ninth Circuit has adopted the "underlying action" theory, which focuses on the governmental action that precipitated the litigation as well as the government's litigation posture.  *Rawlings*, 725 F.2d at 1195; *Cazares*, 959 F.2d at 755.  "For practical purposes, the distinction between defining 'position' as the litigation position or the underlying agency conduct makes little difference.  Courtroom attempts to defend unreasonable agency actions usually will be unreasonable also."  *Rawlings*, 725 F.2d at 1195 (citation omitted).  "It is our opinion that the remedial purpose of the EAJA is best served by considering the totality of the circumstances prelitigation and during trial."  *Id.* at 1196.

It is unnecessary to find that every aspect of a case is litigated by a party in bad faith in order to find bad faith by that party.  *Rodriguez*, 542 F.3d at 712.  The court may award fees for the entire course of litigation "if it finds that the fees incurred during the various phases of litigation are in some way traceable…to the bad faith."  *Id.* at 713 (citation omitted).  Examples

12

of bad faith include failure to perform a statutory duty, inexcusable delay and multiplication of proceedings, and an arrogant and calloused attitude on the part of government defendants. *See Brown*, 916 F.2d 492 at 496 (failure to examine evidence adduced at hearing as required by statute and bad faith delays); *Cazares*, 959 F.2d at 755 (district court found bad faith because of government officials arrogant and calloused attitude).

Here, the evidence shows that the governmental action that precipitated the litigation was unreasonable. The government made an error with devastating consequences that necessitated this lawsuit. Instead of taking reasonable actions to correct that error, the government tried to hide its mistakes for years by delaying this action to the extreme. Throughout the case, the government threw up procedural roadblocks at every turn, making multiple misrepresentations to plaintiff and the Court along the way. The government did everything it could to make it almost impossible for plaintiff to prosecute this case, from strategically and systematically attempting to exhaust plaintiff's resources to barring plaintiff from testifying at her own trial.

Defendants failed to fulfill many statutory duties in the course of the case as well: (1) failure to provide plaintiff with explanation for her visa denial; (2) failure to allow plaintiff opportunity to apply for a visa waiver; and (3) failure to follow the SSI statute and instead willy-nilly stamp documents as SSI when the TSA had not made that determination. Furthermore, the error that precipitated this entire case was based on REDACTED ███████████████████████████████████████████, refusal to correct the REDACTED completely and fully, and hypervigilant efforts to conceal the errors, even from REDACTED ██████████, evidence bad faith, just as a statutory violation would.

**B.    In The Alternative, Plaintiff Is Entitled To Attorneys' Fees At The Statutorily Determined Rate Under 28 U.S.C. § 2412(d)(1)(A), With A Rate Enhancement For Certain Counsel With Specialized Skill And Knowledge.**

Alternatively, should the Court find that the federal defendants have not acted in bad faith, plaintiff would still be entitled to attorneys' fees under Section 2412(d)(1)(A) because the federal defendants' position was not substantially justified. Section 2412(d)(1)(A) of the EAJA allows for the award of attorneys' fees to a prevailing party with a net worth of less than $2

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS (REDACTED); Case No. C 06-0545 WHA

million "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).  The EAJA sets a limit on the rate of attorneys' fees claimed under Section 2412(d)(1)(A) to no more than $125 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A)(ii).

"In making a determination of substantial justification, the court must consider the reasonableness of both 'the underlying government action at issue' and the position asserted by the government 'in defending the validity of the action in court.'"  *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1230 (9th Cir. 1990).  Thus, the government must prove the reasonableness of *both* its pre-litigation conduct and its litigation position.  *Andrew v. Bowen*, 837 F.2d 875, 880 (9th Cir. 1988).

Moreover, the government bears the burden of showing that its conduct and litigation position were substantially justified both legally and factually.  *See Thomas v. Peterson*, 841 F.2d 332, 335 (9th Cir. 1988) ("the government has the burden of showing that its case had a reasonable basis in law and in fact.")  The statutory language of EAJA, that a prevailing party "shall" be awarded fees unless the government's position was substantially justified, "creates the presumption of a fee award."  *United States v. First Nat'l Bank of Circle*, 732 F.2d 1444, 1447 (9th Cir. 1984).

### (1)     The Federal Defendants' Position Was Not Substantially Justified.

As detailed above, the federal defendants' position that Dr. Ibrahim's case should be kicked out of court was not substantially justified.  Factually, defendants have conceded Dr. Ibrahim is not a threat and the Court has found that the root of the whole problem was an error by the government.  Therefore, the government has no factual justification for its position and any contentions that this prolonged action somehow protected national security should fall on deaf ears.

Legally, the government's positions requesting dismissal were reversed on two separate appeals and rejected multiple times by the Court.  The repeated reliance on standing was not

1   substantially justified.  In addition, the government's late argument that state secrets precluded

2   the entire case not only contradicted its previous representations to the Court but was also based

3   on vague assertions that the state secrets evidence was implicated, a factor nowhere to be found

4   in the case law.  Furthermore, the government's positions on privilege in this litigation were not

5   credible, such as its attempts to close the courtroom or otherwise claim privilege for facts already

6   in the public domain and its improper SSI assertions.

7              **(2)     A Rate Enhancement Is Appropriate For McManis Faulkner Because
                          No Other Firm Would Take Dr. Ibrahim's Case Due To The
8                         Difficulty Of The Issues, Even Though Her Case Had Merit.**

9          Although the EAJA generally authorizes fees not to exceed $125 per hour adjusted for

10  inflation, a Court may award fees at a higher rate where "a special factor, such as the limited

11  availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C.

12  § 2412(d)(2)(A)(ii).  Applying this provision, the Supreme Court has held that the statutory rate

13  may properly be increased in a case where there is limited availability of "attorneys having some

14  distinctive knowledge or specialized skill needful for the litigation in question."  *Pierce v.*

15  *Underwood*, 487 U.S. 552, 572 (1988).

16         Here, a rate enhancement is appropriate because of the limited availability of attorneys

17  qualified for the proceedings involved at the statutory rates.  Dr. Ibrahim could not find any other

18  counsel to take her case, even though it had merit.  (Declaration of Rahinah Ibrahim, ¶ 3.)  This

19  case was an unusual and complex case that resulted in two Ninth Circuit rulings and multiple

20  orders by this Court.  The various court orders resulting in case have been cited hundreds of

21  times by other courts and secondary sources.  (Peek Decl., ¶ 8, Exh. C.)  There were an

22  extremely limited number of attorneys who were available with the skill and expertise to

23  prosecute a case of this nature.

24  ///

25  ///

26  ///

27  ///

28  ///

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD
OF ATTORNEYS' FEES AND COSTS (REDACTED); Case No. C 06-0545 WHA

**(3)** **In Addition, A Rate Enhancement Is Appropriate For Plaintiff's Counsel, James McManis, Christine Peek, and Marwa Elzankaly For Their Specialized Knowledge And Skill In Constitutional Cases.**

Here, plaintiff is also entitled to fees in excess of the EAJA statutory rate for the work of three lawyers with specialization in constitutional law who worked on this case—James McManis, Christine Peek, and Marwa Elzankaly.  (*See* McManis Decl., ¶ 23.)  All three of these attorneys possess specialized expertise in constitutional law and civil rights litigation, and this case required that specialized expertise.  Moreover, as Dr. Ibrahim's inability to find other counsel and the novelty of the issues in this case demonstrate, such expertise was not available at the statutory rate.  Paying clients have routinely hired all three lawyers to litigate constitutional issues at rates far higher than the statutory rates.

## II.   PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES AS SANCTIONS AGAINST FEDERAL DEFENDANTS FOR THEIR NUMEROUS DISCOVERY ABUSES.

The discovery rules also require an award of fees in this case.  Under Rule 37, if a motion to compel discovery is granted or if the requested discovery is provided **after** the motion was filed, the court **must** require the offending party, attorney, or both, to pay the moving party's reasonable expenses incurred in making the motion, including attorneys' fees.  Fed. R. Civ. P. 37(a)(5).  Rule 16 also provides for the same sanctions as Rule 37, but for failure to comply with a scheduling or other pretrial order.  Fed. R. Civ. P. 16(f)(1)(C).  In the event such a violation is found, the court **must** order the offending party, its attorney, or both to pay reasonable expenses – including attorney's fees – incurred because of noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust.  Fed. R. Civ. P. 16(f)(2).

Here, plaintiff had to bring multiple motions to compel resulting in orders that defendants comply with the most basic discovery requirements.  Furthermore, because of defendants' excessive delay in discovery matters, defendants were still producing documents and producing a key witness, Kevin Kelley, for deposition after the discovery cutoff.  Defendants did not respect the Court's scheduling order and pushed everything in this case as far out as they possibly could, exhausting the resources of plaintiff and requiring extensive supervision from the Court.

Sanctions in the form of appropriate fees should be awarded for defendants' obstreperous discovery conduct.

## III.   PLAINTIFF'S COUNSEL'S RATES ARE REASONABLE, AS ARE THE EXPENSES CLAIMED.

Once entitlement to fees is determined, the court's task of determining what fee is reasonable is essentially the same as that described in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Commissioner, INS v. Jean,* 496 U.S. 154, 161 (1990).  Under *Hensley*, the starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  461 U.S. at 433.  The result of this calculation is known as the lodestar.

Plaintiff's lodestar calculations are included in the chart attached as Exhibit A to the Declaration of Christine Peek.  Plaintiff seeks fees of $ 3,630,057.50 for nine years of legal work opposing the government's tactics.

The number of hours for which plaintiff seeks compensation is reasonable.  The attorneys and other staff carefully documented the work they did by maintaining contemporaneous time records, detailing the time spent broken down by date and activity.  In reviewing the time records for all attorneys and staff, McManis Faulkner exercised billing judgment by eliminating unnecessary or duplicative hours.  For example, time spent litigating against the San Francisco defendants, USIS, and Bondanella was eliminated, unless the work related to the case against the federal defendants.  Plaintiff's counsel imposed a general reduction of approximately five percent on all hours calculated.

As the Declarations of Allen Ruby and James McManis make clear, the fees sought for plaintiff's counsel are well within the prevailing market rate that attorneys with their level of experience charge at law firms in the Bay Area.

Furthermore, plaintiff has incurred expenses in this case in the amount of $293,860.18. (Peek Decl., Exh. B.)

## CONCLUSION

In 1928, Justice Brandeis wrote the following:

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers.  The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

*Olmstead v. United States,* 277 U.S. 438, 479 (1928) (dissenting).  McManis Faulkner took on this case when no one else would to protect an innocent person and all Americans from encroachment on our Constitutional freedoms by zealous and well-meaning officials.  McManis Faulkner's work resulted in many important decisions by this Court and the Ninth Circuit that serve as a check on the government's abuses of its watchlist system.  Such checks are critical to uphold the Constitutional principles upon which this nation was founded.  The fees and expenses incurred by McManis Faulkner to see this case to completion were necessary and reasonable because of the complexity of the issues and the behavior of the government.  For the foregoing reasons, plaintiff requests an award of attorneys' fees of $3,630,057.50 and expenses of $293,860.18.

DATED:  January 28, 2014

McMANIS FAULKNER


 /s/  Elizabeth Pipkin
ELIZABETH PIPKIN

Attorneys for Plaintiff,
Rahinah Ibrahim

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS (REDACTED); Case No. C 06-0545 WHA